THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:
March 7, 2013

Mailed:
June 18, 2014

## UNITED STATES PATENT AND TRADEMARK OFFICE

—

Trademark Trial and Appeal Board

—

*Amanda Blackhorse, Marcus Briggs-Cloud, Philip Gover,*
*Jillian Pappan, and Courtney Tsotigh*

*v.*

*Pro-Football, Inc.*

—

Cancellation No. 92046185

—

Jesse A. Witten, Jeffrey J. Lopez, John D. V. Ferman, Lee Roach and Stephen Wallace of Drinker, Biddle & Reath LLP for Amanda Blackhorse, Marcus Briggs, Philip Gover, Jillian Pappan, and Courtney Tsotigh.

Robert L. Raskopf, Claudia T. Bogdanos and Todd Anten of Quinn Emanuel Urquhart & Sullivan, LLP for Pro-Football, Inc.

—

Before Kuhlke, Cataldo and Bergsman, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

## OVERVIEW

Petitioners, five Native Americans, have brought this cancellation proceeding pursuant to Section 14 of the Trademark Act of 1946, 15 U.S.C. § 1064(c). They seek to cancel respondent's registrations issued between 1967 and 1990 for

trademarks consisting in whole or in part of the term REDSKINS for professional football-related services on the ground that the registrations were obtained contrary to Section 2(a), 15 U.S.C. § 1052(a), which prohibits registration of marks that may disparage persons or bring them into contempt or disrepute. In its answer, defendant, Pro-Football, Inc., asserted various affirmative defenses including laches.[1]

As explained below, we decide, based on the evidence properly before us, that these registrations must be cancelled because they were disparaging to Native Americans at the respective times they were registered, in violation of Section 2(a) of the Trademark Act of 1946, 15 U.S.C. § 1052(a). This decision concerns only the statutory right to *registration* under Section 2(a). We lack statutory authority to issue rulings concerning the right to *use* trademarks. *See, e.g.*, *In re Franklin Press, Inc.*, 597 F.2d 270, 201 USPQ 662, 664 (CCPA 1979).

<u>The Registrations at Issue</u>

The following six registrations (hereinafter referred to collectively as the REDSKINS marks) are the subject of this cancellation proceeding:

1. Registration No. 0836122 for the mark THE REDSKINS (stylized), shown below, for "entertainment services – namely, football exhibitions rendered in stadia and through the media of radio and television broadcasts," in Class 41;[2]

---

[1] The Board struck the other affirmative defenses, which primarily concern Constitutional challenges and they are preserved for appeal.

[2] Registered September 26, 1967; second renewal.



2.  Registration No. 0978824 for the mark WASHINGTON REDSKINS, in typed drawing form, for "entertainment services – namely, presentations of professional football contests," in Class 41;[3]

3.  Registration No. 0986668 for the mark WASHINGTON REDSKINS and design, shown below, for "entertainment services – namely, presentations of professional football contests," in Class 41;[4]



4.  Registration No. 0987127 for the mark THE REDSKINS and design, shown below, for "entertainment services – namely, presentations of professional football contests,"[5] in Class 41;



---

[3] Registered February 12, 1974; third renewal.

[4] Registered June 18, 1974; second renewal.

[5] Registered June 25, 1974; second renewal.

5. Registration No. 1085092 for the mark REDSKINS, in typed drawing form, for "entertainment services – namely, presentations of professional football contests," in Class 41;[6] and

6. Registration No. 1606810 for the mark REDSKINETTES, in typed drawing form, for "entertainment services, namely, cheerleaders who perform dance routines at professional football games and exhibitions and other personal appearances," in Class 41.[7]

<u>Prior Litigation</u>

This is the second time the Board has faced a petition to cancel these registrations. On September 10, 1992, Suzan Harjo and six other Native Americans filed a petition to cancel the above-noted registrations on the ground the marks consist of or comprise matter which disparages Native American persons, and

---

[6] Registered February 7, 1978; second renewal.

[7] Registered July 17, 1990; renewed in 2000. Section 8 affidavits of continuing use and applications for renewal under Section 9 must be filed at the end of each successive 10-year period following the date of registration. 15 U.S.C. § 1059. *See also* Trademark Manual of Examining Procedure (TMEP) § 1606.03 ("The Director has no authority to waive the deadline for filing a proper § 9 renewal application."). We note the last Section 8 affidavit and Section 9 application for renewal was filed in 2000 and accepted by the USPTO on March 9, 2004. The filing deadline for the next renewal would have been July 17, 2010 but USPTO records do not show any such filing. Thus, it appears regardless of the outcome of this proceeding, this registration has expired. Nonetheless, when a registration which is the subject of a cancellation proceeding is abandoned or left to expire during the proceeding, such action is treated as an abandonment of the registration without the consent of the petitioner. 37 C.F.R. § 2.134(b). *See also* Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 602.02(b) (3d ed. rev. June 2013). Typically, the Board would issue a show cause order to the respondent to indicate whether the expiration of the registration was purposeful or inadvertent. If such action was purposeful, judgment is entered against the respondent as to that registration. If the expiration was inadvertent, the petitioner would be allowed time to pursue its claim to final judgment. Neither party alerted the Board to this issue. Because the proceeding was tried and briefed on all the registrations including this one, we proceed to final judgment on this registration.

brings them into contempt, ridicule, and disrepute; and the marks consist of or comprise scandalous matter under Section 2(a) of the Trademark Act. Respondent denied the salient allegations in the petition for cancellation and asserted eleven affirmative defenses, including laches. The Board struck all of respondent's affirmative defenses. *Harjo v. Pro Football, Inc.*, 30 USPQ2d 1828, 1833 (TTAB 1994); and 50 USPQ2d 1705, 1710 (TTAB 1999). After seven years of litigation, involving multiple discovery and pretrial motions, the Board issued its decision on the merits, held that respondent's REDSKINS marks were disparaging to Native Americans when registered and ordered the registrations canceled. *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1743.

Respondent appealed the decision to the United States District Court for the District of Columbia. On motion for summary judgment, the District Court reversed the Board for two reasons:

> The TTAB's finding of disparagement is not supported by substantial evidence and must be reversed. The decision should also be reversed because the doctrine of laches precludes consideration of the case.

*Pro-Football, Inc. v. Harjo,* 284 F. Supp. 2d 96, 68 USPQ2d 1225, 1263 (D.D.C. 2003).

The petitioners appealed the rulings that the claim of disparagement was not supported by substantial evidence and that the defense of laches may be asserted against a disparagement claim. The United States Court of Appeals for the District of Columbia Circuit held that the District Court applied the wrong standard in evaluating laches as to at least one of the petitioners because "laches runs only from

the time a party has reached his majority" and, while retaining jurisdiction over the case, remanded the record to the District Court to evaluate whether laches barred petitioner Mateo Romero's claim. *Pro-Football, Inc. v. Harjo,* 415 F.3d 44, 75 USPQ2d 1525, 1528 (D.C. Cir. 2005). The D.C. Circuit did not address the issue of whether substantial evidence supported the Board's finding of disparagement. On remand, the District Court found that laches did bar the claim:

> [D]efendant Romero unreasonably delayed his bringing of a cancellation proceeding and … his eight-year delay demonstrates a lack of diligence on his part. The court further finds that Defendant Romero's delay has resulted in both trial prejudice and economic prejudice to Pro-Football, such that it would be inequitable to allow Defendant Romero to proceed with his cancellation petition.

*Pro-Football, Inc. v. Harjo*, 567 F. Supp.2d 46, 87 USPQ2d 1891, 1903 (D.D.C. 2008).

Petitioners appealed. The D.C. Circuit affirmed the decision of the lower court on the issue of laches and stated that the petitioners "argue only that the District Court improperly assessed evidence of prejudice in applying laches to the facts at issue" and limited its decision "to that question." *Pro-Football, Inc. v. Harjo*, 565 F.3d 880, 90 USPQ2d 1593 (D.C. Cir. 2009). Thus, the D.C. Circuit resolved the case solely on the issue of laches, never addressing the Board's finding of disparagement on the merits.

<u>The Current Litigation</u>

While *Harjo* was pending, six new individual petitioners filed a petition to cancel the same registrations for the REDSKINS marks.[8] Proceedings were suspended pending the disposition of the *Harjo* civil action and resumed in March 2010.[9]

In March 2011, the parties stipulated, with certain exceptions, that the entire *Harjo* record may be submitted into evidence through a Notice of Reliance.[10] The stipulation provides in pertinent part that:

1.  Except as provided below, all evidence submitted with a Notice of Reliance, as well as all deposition transcripts and exhibits thereto submitted by any party, in Harjo … shall be admissible in this proceeding unless the Trademark Trial and Appeal Board ruled in Harjo that the evidence was not admissible, in which case all arguments as to admissibility are preserved.

2.  The Parties do not stipulate that any particular piece of evidence described in paragraph 1 is relevant to any issue in this proceeding, and therefore may object to evidence described in paragraph 1 on grounds that it is not relevant.[11]

---

[8] During this proceeding, petitioner Shquanebin Lone-Bentley withdrew her petition for cancellation. TTABVue 24. The citations to "TTABVue" throughout the decision are to the Board's public online database that contains the proceeding file, available on the USPTO website, www.USPTO.gov. The number represents the prosecution history number listed in the electronic case file.

[9] Board's notice of suspension (TTABVue 6); notice of proceedings resumed (TTABVue 23).

[10] Joint Stipulation Regarding Admissibility of Certain Evidence & Regarding Certain Discovery Issues, dated March 11, 2011, and filed March 14, 2011 (TTABVue No. 31). In Board proceedings there is no live testimony. Testimony is taken by deposition and the resulting transcripts are filed with the Board. Other appropriate evidence is submitted under a Notice of Reliance. Information regarding Board procedure may be found in the Trademark Rules 37 C.F.R. §§ 2.101-2.136 and the TBMP both available on the USPTO website www.uspto.gov.

[11] *Id.*

As stipulated, the parties only reserved the right to make objections based on relevance to evidence earlier admitted into the *Harjo* record and admitted into this case under paragraph 1. All other possible objections, including those based on hearsay, were waived. This was confirmed from both parties at the oral hearing.

In view of the intense pretrial litigation engaged in by the parties in *Harjo* and because the record created in that case was voluminous, the Board ordered the parties to appear at a pretrial conference.[12]

> In order to litigate this proceeding as efficiently as possible, a pretrial conference will help the Board and the parties focus the evidence and arguments at trial.[13]

After briefing by the parties, the Board issued another order setting forth the applicable law relating to the issues of disparagement and laches involved herein.[14]

In regard to the former issue, the Board noted that the test for disparagement comprises a two-step inquiry:

> a. What is the meaning of the matter in question, as it appears in the marks and as those marks are used in connection with the goods and services identified in the registrations?
>
> b. Is the meaning of the marks one that may disparage Native Americans?

*Pro-Football, Inc. v. Harjo,* 68 USPQ2d at 1248; *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1740-41. *See also, In re Geller*, __ F.3d ___, 110 USPQ2d 1867, 1869 (Fed. Cir. 2014). Both questions are to be answered as of the various dates of

---

[12] Board's March 15, 2011 Order (TTABVue 32).

[13] *Id*. at 2 (TTABVue 32, p. 2).

[14] Board's May 31, 2011 Order (TTABVue 40).

registration of the involved marks. *Pro-Football, Inc. v. Harjo,* 68 USPQ2d at 1248; *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1735, 1741. In deciding the second question, whether the term "redskins" may disparage Native Americans, we look not to the American public as a whole, but to the views of the referenced group (*i.e.,* Native Americans). *Pro-Football, Inc. v. Harjo,* 68 USPQ2d at 1247; *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1739.[15]

The views of the referenced group are "reasonably determined by the views of a substantial composite thereof." *Pro-Football, Inc. v. Harjo,* 68 USPQ2d at 1247 (quoting *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1739). A "substantial composite" of the referenced group is not necessarily a majority of the referenced group. *In re Heeb Media LLC,* 89 USPQ2d 1071, 1074 (TTAB 2008); *In re Squaw Valley Dev. Co.*, 80 USPQ2d 1264, 1279 n.12; *cf. Ritchie v. Simpson*, 179 F.3d 1091, 50 USPQ2d 1023, 1024 (Fed. Cir. 1999) ("Whether a mark comprises immoral and scandalous matter is to be ascertained in the context of contemporary attitudes, and the relevant viewpoint is not necessarily that of a majority of the general public, but of a 'substantial composite.'") (quoting *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 31 USPQ2d 1923, 1925-26 (Fed. Cir. 1994)). What comprises a "substantial composite" of the referenced group is a fact to be determined at trial. In making this determination, "we are charged with taking into account the views of the entire

---

[15] *See id*. at 8-11 (TTABVue 40, pp. 8-11). In our earlier order outlining the applicable law, the statement that the perceptions of the general public are irrelevant refers to the ultimate legal determination. It does not foreclose evidence of general perception. If, for example, numerous dictionary definitions unanimously included a usage characterization indicating a term is offensive, contemptuous, etc. that could be evidence of the general perception of a term and could serve to support a finding that the referenced group finds the term to be disparaging.

referenced group who may encounter [respondent's services] in any ordinary course of trade for the identified goods and services." *Heeb Media,* 89 USPQ2d at 1075.[16] Finally, any cancellation of a registration should be granted only with "due caution" and "after a most careful study of all the facts." *Rockwood Chocolate Co. v. Hoffman Candy Co.,* 372 F.2d 552, 152 USPQ 599, 601 (CCPA 1967) (internal citations omitted).

## THE RECORD

The record includes the pleadings, the files of respondent's registrations by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), deposition testimony of each of the petitioners and the associated deposition exhibits, and nearly the entire *Harjo* record (except for the deposition testimony of the *Harjo* petitioners), by stipulation. The submissions from the *Harjo* record are listed in full in Appendix A (for petitioners) and Appendix B (for respondents).[17]

As noted above, the parties only preserved the right to make objections in this case based on relevance to any evidence earlier admitted into the *Harjo* record. Respondent asserted 26 pages of relevancy objections. We have considered those objections in weighing the evidence and specifically address them where we have relied on evidence for our findings of fact. We do not rely on the Ross Survey and

---

[16] *See id.* at 8-9 (TTABVue 40, pp. 8-9).

[17] The record includes copies of newspaper articles, publications, resolutions, letters, and other printed materials originally submitted and considered in the *Harjo* proceeding which are dated, published or otherwise were disseminated prior to 1993. In *Harjo,* all of these materials were submitted under Notices of Reliance by both parties. Despite the fact that some of these materials (e.g., letters) are not properly introduced under Notice of Reliance, because no party to that proceeding objected to the means of submission, the Board considered the material as admitted into the record. *Harjo v. Pro-Football, Inc.,* 50 USPQ2d at 1723.

therefore we do not address respondent's various arguments with regard to that piece of evidence.[18]

Petitioners' objections to respondent's evidence are overruled. As noted above, on March 14, 2011, the parties filed a stipulation regarding the admissibility of evidence in this case. In *Harjo,* the Board admitted the particular evidence to which petitioners now object because neither party then objected to it coming in under a Notice of Reliance. *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1721-23. The Board specifically stated as to these documents and other documents upon which respondent relies that it "has considered all such material of both parties as part of the record in this case." *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1723. While the Board in *Harjo* discussed the hearsay nature of the evidence or lack of foundation, it was admitted into the record; and the parties' stipulation in this case waives all objections, other than relevancy, as to this evidence. Thus, petitioners are estopped from objecting to the evidence on any basis except relevance because the evidence had been admitted in *Harjo* and, therefore, falls within paragraph No. 1 of the stipulation noted above.

In their reply brief, petitioners assert that "[i]n addition to the waiver of the hearsay objections, the news articles would fit within hearsay exceptions, including the ancient records exception, so their content may be considered for the truth of

---

[18] We do note generally that the survey would have very limited probative value. As the Board noted in *Harjo*, 50 USPQ2d at 1734, the Ross survey is "a survey of current attitudes towards the word 'redskin(s)' as a reference to Native Americans." Therefore, the survey does not directly measure the perceptions of Native Americans during the relevant time frame.

11

the matters asserted."[19]   While the ancient documents exception could provide further support for reliance on various documents from both parties (newspaper articles, letters, etc.), the contents of which would otherwise constitute hearsay, in view of the waiver of hearsay objections it is not necessary to apply this exception.[20]

Finally, regarding the parties' waiver of hearsay objections, courts have routinely accepted and enforced such waivers, and relied on the evidence for the truth of the matter asserted.  "The presumption of waivability has found specific application in the context of evidentiary rules.  Absent some 'overriding procedural consideration that prevents enforcement of the contract,' courts have held that agreements to waive evidentiary rules are generally enforceable even over a party's subsequent objections."  *U.S. v. Mezzanatto*, 513 U.S. 196, 202 (1995), *citing* 21 C.

---

[19] Pet'rs' Reply Br. 9-10 (citing Fed. R. Evid. 803(16)) (TTABVue No. 184).

[20] Under Rule of Evidence 803(16), "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are not considered hearsay, and therefore, are not excluded by the hearsay rule.  *Id*.  Further, "[t]he ancient document exception contained in Rule 803(16) . . . clearly applies to any document including letters, records, contracts, maps, newspapers and certificates."  4 Michael H. Graham, *Handbook of Federal Evidence* § 803:16, at 405-06 (6th ed. 2006); *see, e.g.*, *Martha Graham Sch. & Dance Found. Inc. v. Martha Graham Ctr. of Contemporary Dance Inc.*, 380 F.3d 624, 72 USPQ2d 1143, 1156 (2d Cir. 2004) (affirming lower court reliance on two letters for the truth of the statements therein as admissible under Rule 803(16), the ancient-documents exception to the hearsay rule, to determine copyright ownership of dances). *See also Bell v. Combined Registry Co.*, 397 F. Supp. 1241, 188 USPQ 707 (N.D. Ill. 1975), *aff'd*, 536 F.2d 164 (7th Cir. 1976) (allowing letters and newspaper articles from the 1930s and 1940s to determine a copyright suit); *Murray v. Sevier*, 50 F.Supp.2d 1257, 1264 n.6 (M.D.Ala. 1999) (interviewee's statements reported in a newspaper article admissible under Rule 803(16)), *vacated on other grounds*, *Murray v. Scott*, 253 F.3d 1308 (11th Cir. 2001).  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Rule of Evidence 901(b)(8) states that an ancient document may be authenticated by evidence that the document "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."  Fed. R. Evid. 901(b)(8).  Rule of Evidence 902 provides that newspapers and periodicals are self-authenticating.  Fed. R. Evid. 902(6).

Wright & K. Graham, FEDERAL PRACTICE AND PROCEDURE (FPP) § 5039, pp. 207-08 (1977). "Courts have 'liberally enforced' agreements to waive various exclusionary rules of evidence. *Id.* (*quoting* Note, *Contracts to Alter the Rules of Evidence*, 46 HARV. L. REV. 138, 139-140 (1933)). "[A]lthough hearsay is inadmissible except under certain specific exceptions, we have held that agreements to waive hearsay objections are enforceable." *Id. citing U.S. v. Bonnett*, 877 F.2d 1450 (10th Cir. 1989) (hearsay objection waived by stipulation); *see* FPP § 5039.4 Estoppel and Waiver – Withdrawal of Objections and § 5039.5 Estoppel and Waiver – Stipulations and Contractual Waiver. *See also U.S. v. Alazzam,* slip op. No. 1:08cr101 (JCC) (E.D.Va. September 29, 2009), 2009 WL 3245392 (use of waiver extended to a prosecution's case in chief).[21]

## STANDING

A plaintiff must show that it has a "real interest" in the outcome of a proceeding in order to have standing. *Ritchie v. Simpson,* 50 USPQ2d at 1025. A "real interest" in the proceeding is a legitimate personal interest in the opposition or cancellation. *Id.*, *citing Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

---

[21] While the content of newspaper articles is hearsay and in some cases, for example, where an individual is quoted, presents a double hearsay problem, the waiver is applicable to all levels of hearsay objections. In view thereof, we have considered the statements in the newspaper articles. *See Hope for Families & Community Service, Inc. v. Warren,* 721 F.Supp.2d 1079, 1178 n. 114 (M.D.Ala. 2010) (consideration of content of newspaper article). Finally, respondent itself relies on the statements made in various documents, including letters and newspapers. *See Cooper Hospital/University Medical Center v. Sullivan,* 183 F.R.D. 119 (D.N.J. 1998) (consideration of the content of newspaper articles proper; where party itself relied upon the content of newspaper articles it waives the objection).

Amanda Blackhorse is a member of the Navajo Nation.[22] She testified that she considers the term REDSKINS in respondent's marks to be derogatory and is offended by it.[23]

Phillip Martin Gover is a member of the Paiute Indian Tribe of Utah.[24] He testified that he perceives the terms REDSKIN and REDSKINS to be disparaging, even in connection with respondent's services.[25]

Courtney Tsotigh is a member of the Kiowa Tribe of Oklahoma.[26] She testified that she finds the term REDSKIN to be disparaging in any context including for an "NFL team."[27]

Marcus Briggs-Cloud is a member of the Muscogee Nation of Florida.[28] He testified that he finds the term REDSKINS in the registrations to be disparaging and offensive.[29]

Jillian Pappan testified that she is a Native American.[30] She testified, *inter alia*, that the use of the term REDSKIN is analogous to the term "nigger," and that people should not profit by dehumanizing Native Americans.[31]

---

[22] Amanda Leeh Blackhorse Dep. 127:8-9, 196:13-197:3, June 22, 2011 (TTABVue 122, pp. 135, 204-05).

[23] Blackhorse Dep. 58:15, 120:11-121:4 (TTABVue 122, pp. 66, 128-29).

[24] Phillip Martin Gover Dep. 10:9-13, June 16, 2011 (TTABVue 120, p. 16).

[25] Gover Dep. 91:6-92:10, 94:15, 187:1-13 (TTABVue 120, pp. 97-98, 100, 193).

[26] Courtney Tsotigh Dep. 8:2-17, 146:12-21, Oct. 25, 2011 (TTABVue 115, pp. 14, 152).

[27] Tsotigh Dep. 113:12-15, 115:5-117:24, 146:22-147:7 (TTABVue 115, pp. 119, 121-23, 152-53).

[28] Marcus Anthony Briggs-Cloud Dep. 135:11-20 (TTABVue 110, p. 141). *See also* 69:16-70:22, 136:8-139:7, June 23, 2011 (TTABVue 110, pp. 75-76, 109-11, 115, 120, 142-43).

[29] Briggs-Cloud Dep. 63:16-29, 75:1-13, 103:3-105:11 (TTABVue 110, pp. 69, 81, 109-10).

In view of the foregoing, we find that each of the petitioners has established a real interest, a personal stake, in the outcome of this proceeding and, therefore, has standing. Respondent does not dispute the petitioners' standing.

## DISPARAGEMENT CLAIM

While this is the second petition asserting a claim of disparagement against the same six registrations and the parties stipulated to the same record, this proceeding presents significant differences from the first. The *Harjo* case asserted other claims not present here, e.g., that the Native American imagery as well as the word REDSKINS was scandalous to the general public and that the Board should, in making its decision, apply the Indian Trust Doctrine.[32]

The determination of the disparagement claim at issue herein requires the following two-step analysis:

> a. What is the meaning of the matter in question, as it appears in the marks and as those marks are used in connection with the goods and services identified in the registrations?
>
> b. Is the meaning of the marks one that may disparage Native Americans?[33]

---

[30] Jillian Pappan Dep., pp. 49:4-5, 174:16-19, Aug. 11, 2011 (TTABVue 112, pp. 53, 61, 178).

[31] Pappan Dep., pp. 48:24-50:6, 57:15-24, 173:9-174:4 (TTABVue 112, pp. 52-54, 61, 178).

[32] As a result, the litigation generated an expansive record encompassing broader issues. Like the dissent we acknowledge the criticisms of the District Court; however, in our review of the record we believe that the weight and relevance of certain evidence became obfuscated by the several issues raised in the *Harjo* case. Moreover, the hearsay objection has been waived in this proceeding, which has resulted in a qualitatively different evidentiary record for us to consider.

[33] Section 2(a) prohibits registration of a mark "which may disparage … persons … or bring them into contempt, or disrepute." As held in the prior order of May 31, 2011, "for purposes of this proceeding the guidelines for determining whether the mark is disparaging are

As confirmed by the parties at the oral hearing, it is already established that (1) this disparagement claim only pertains to the term REDSKINS[34] and (2) as to "the meaning of the matter in question" "as used in connection with respondent's services, REDSKINS clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word."[35]  *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1742, *rev'd on other grounds*, *Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1249.

Moreover, as to the second point, the evidence overwhelmingly supports a determination that the term REDSKINS as it appears in the marks retains the meaning Native American.  Two of the registrations include Native American imagery.  Registration No. 0986668 (top) and Registration No. 0987127 (bottom) are shown below.



---

equally applicable to determining whether such matter brings persons or institutions into contempt or disrepute."  TTABVue 40, p. 4.  We, therefore, use the word disparage in this case as an umbrella term for "may disparage … or bring them into contempt or disrepute."

[34] As to the Native American imagery in two of the registrations, in the *Harjo* case the Board found that "petitioners have not established, under Section 2(a), that this matter may disparage Native Americans." *Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1743.

[35] Respondent's position that the term REDSKINS has a separate meaning as the name of a football team does not affect the first prong of the test because even as the name of the football team it retains the meaning Native American.  *See infra* discussion of *Squaw Valley*, 80 USPQ2d 1264.



The image of a Native American has appeared prominently as a logo on the helmets of respondent's Washington Redskins' team uniforms, as demonstrated by the images below of its former players John Riggins in Super Bowl XVII in 1983 (left) and Doug Williams in Super Bowl XXII in 1988 (right).



The Washington Redskins marching band had worn Native American headdresses as part of its uniforms between the 1960s and the 1990s, as shown in the image below from the 1980s.

---

[36] SUPER BOWL XVII: HOG DAY AFTERNOON (NFL Films 1983), Petitioners' Notice of Reliance, Ex. 103 (TTABVue 95, p. 70).

[37] AMBUSH AT SUPER BOWL XXII (NFL Films 1988), Petitioners' Notice of Reliance, Ex. 104 (TTABVue 95, p. 72).



[38]

The Redskinettes also had appeared wearing costumes suggestive of Native Americans, as shown in the 1962 photograph of them reproduced below, which contained the title "Dancing Indians" and the caption "Here are the Redskinettes all decked out in their Indian garb and carrying Burgundy and Gold pom-poms."



[39]

Between 1967 and 1979, the annual Washington Redskin press guides, shown below, displayed American Indian imagery on the cover page.

---

[38] HAIL TO THE REDSKINS 1937-1988 (NFL Films 1988), Petitioners' Notice of Reliance, Ex. 95 (TTABVue 95, p. 54).

[39] "Dancing Indians," *Redskins* (magazine), Oct. 7, 1962, at 15, Petitioners' Notice of Reliance, Ex. 29 (TTABVue 52, p. 17).




Respondent has made continuous efforts to associate its football services with

Native American imagery.

As confirmed by the District Court:

Meaning of the Matter In Question … "This is not a case where, through usage, the word 'redskin(s)' has lost its meaning, in the field of professional football, as a reference to Native Americans in favor of an entirely independent meaning as the name of a professional football team. Rather, when considered in relation to the other matter comprising at least two of the subject marks and as used in connection with respondent's services, 'Redskins' clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word." Id. Based on the record before the TTAB, the Court finds that this conclusion is supported by substantial evidence. *Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1248-1249 *quoting Harjo v. Pro-Football, Inc.*, 50 USPQ2d at 1742.

---

[40] 1967 Redskins Press Guide, Petitioners' Notice of Reliance, Ex. 29 (TTABVue 54, p. 28).

[41] 1979 Redskins Press Guide, Petitioners' Notice of Reliance, Ex. 29 (TTABVue 74, p. 21).

The term REDSKINS in the registered marks when used in connection with professional football retains the meaning Native Americans. Thus, the first prong of the test, "what is the meaning of the matter" is established.

The only issue left for decision is the second question in the disparagement test (was the meaning of the marks, at the times of the registrations, one that may have disparaged Native Americans?) as it pertains to the term REDSKINS.[42]

Having narrowed the issue to be determined, it is now necessary to understand what type of disparagement case the facts of this limited case present. We must make our determination in the context of a respondent's goods or services. Such context can:

(1) turn an innocuous term into a disparaging one, *see In re Lebanese Arak Corp.,* 94 USPQ2d 1215, 1223 (TTAB 2010) (likely meaning of KHORAN is the Islamic holy text and use for wine disparages religion and beliefs of Muslim Americans); *see also Doughboy Industries, Inc. v. The Reese Chemical Co.,* 88 USPQ 227 (Exm'r in Chief 1951) (Doughboy refers to World War I

---

[42] In the *Harjo* case, on appeal, the District Court noted its concern about the breadth of the issues presented noting: "Under the broad sweep of the TTAB's logic, no professional sports team that uses Native American imagery would be permitted to keep their trademarks if the team's fans or the media took any action or made any remark that could be construed as insulting to Native Americans. The Court cannot accept such an expansive doctrine; particularly when premised on a finding that is not supported by any substantial evidence. ... This is undoubtedly a 'test case' that seeks to use federal trademark litigation to obtain social goals." *Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1254, 1262. In contrast, this case presents a much narrower issue and pertains only to the word REDSKINS. With regard to the District Court's observation about "social goals," the underlying purpose of this portion of the Trademark Act is, in effect, a social goal as legislated by Congress, to keep matter that would disparage others off of the register. The statutory requirement to remove disparaging matter from the register is not obfuscated in the present case by peripheral issues.

American soldier as reinforced by picture of soldier on packaging and use on "a prophylactic preparation for the prevention of venereal diseases" disparages the soldiers); or

(2) strip the disparaging meaning from an otherwise disparaging term, *see Squaw Valley*, 80 USPQ2d 1264, 1267 (SQUAW when used with ski-related goods means only the geographic location Squaw Valley ski resort and does not retain the meaning Native American woman under the first part of the test, and, as such is not disparaging; but as to non-ski-related goods and services the meaning remains Native American woman, i.e., the goods and services did not change the meaning, and the evidence was sufficient to support the second prong of the test that the term is considered disparaging as the term is used in connection with the identified goods or services); or

(3) have no effect on a term's disparaging meaning, *see Heeb Media*, 89 USPQ2d 1071, 1077 (applicant's good intent and inoffensive goods and services do not obviate finding that HEEB is disparaging in context of the goods and services; and disagreement within the referenced group does not erase the perception of those who find it disparaging).[43]

---

[43] There is no case in our review where a term found to be a racial slur in general was found not to be disparaging when used in the context of specific services. The District Court in *Harjo* noted that "[t]he ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and during the relevant time frame . . . [t]he ultimate legal inquiry is not whether the term 'redskins' is a pejorative term for Native Americans." *Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1252. This does not mean that if the record shows that the term is pejorative, or a racial slur, that such a showing could not add to the evidence supporting a finding that a substantial composite of the referenced group find it disparaging, even when used solely with the recited services. Moreover, if a term is found to be a racial slur, then it may be

possible to find the term disparaging in the context of the specific services without evidence as to the specific services. In *Squaw Valley*, in making a determination regarding the second prong of the disparagement test, the Board relied on evidence that showed the "opinions of Native Americans regarding the term are not limited to particular contexts." *Squaw Valley*, 80 USPQ2d at 1276.

Thus, if it is shown that a term is generally disparaging, e.g., a racial slur, in any context, that includes the specific context of the subject goods or services, and to that extent the comment by the District Court as to the ultimate legal determination does not limit the avenues by which a deciding court or tribunal arrives there. *See Heeb*, 89 USPQ2d at 1077 ("[A] term is considered to be disparaging by a substantial composite of the referenced group, regardless of context, including in connection with applicant's identified goods and services.")

As noted by the Board in *Squaw Valley,* in the context of an *ex parte* proceeding we are by necessity limited to inferential evidence. In the context of an *inter partes* proceeding, the parties are not so limited and may present direct evidence, but that does not render indirect evidence non probative. In particular, with a claim of disparagement of a referenced group brought by individuals, the individual plaintiffs may testify as to their perceptions regarding a term and the context of the specific services, but to prove it is disparaging to a substantial composite of the group, more general evidence can be probative. The hypothetical evidentiary dilemma posed by the Board in *Squaw Valley*, the difficulty of finding statements about use in connection with paperclips, is also applicable to the *inter partes* context. *Squaw Valley*, 80 USPQ2d at 1277 n. 9. Thus, just as in an *ex parte* context where a term may be found to be generally disparaging in any context and prohibited from registration for a specific context, even absent evidence of the referenced group making a statement as to that specific context, such an evidentiary record may also be sufficient in an *inter partes* case.

Respondent's expert, Dr. Ronald Butters (discussed *infra*), sheds some light on this issue. On the one hand he testifies that disparagement is tied to intent when considering the term redskins, which includes the context of use, but that the word nigger is inherently disparaging regardless of context and presumably intent. Butters Dep. pp. 279:19-25 – 280:2-22 (TTABVue 163, p. 92) (Q. Sir, let's talk for a moment about your views as to the meaning of the word disparaging. Is it your testimony that disparaging means – excuse me, includes an intent to belittle or to demean? A. That is correct. Q. So there's some intentionality involved in the word disparaging: A. Yes. Q. And that refers to the intention of the speaker? A. Yes. Q. You also testify, sir, that the word nigger is a disparaging word; is that correct? A. Yes. Q. The word nigger itself has no intentions, correct? A. Correct. Q. The word itself has no ability to form any intentions; is that correct? A. Of course. Q. Yet you say that the word itself is disparaging; is that correct? A. The word nigger is a disparaging word in the English language, yes."). Thus, if the evidence regarding the inherent nature of the term is strong (or as Mr. Barnhart, respondent's other expert discussed *infra*, explains that while no word is intrinsically offensive, overwhelming offensive usage would merit a usage label, Barnhart Dep. p. 44, (TTABVue 159, p. 47)), that would be probative of disparagement in any context to the perception of the referenced group within the context of the specific services without direct evidence.

Here, petitioners assert that REDSKINS is a racial slur, thus the facts do not present the *Doughboy* case because it is not allegedly an innocent term where the nature of the goods or services renders the mark disparaging. The facts also do not fall within the part of the *Squaw Valley* case where the Board reversed the refusal as to the ski-related gear because it did not pass the first prong of the test inasmuch as the word lost its allusion to Native American women when used in the ski context due to the geographic location called "Squaw Valley" and the well-known ski resort located there. Here, it is conceded by the parties and established by the record that the term REDSKINS retains its meaning "Native American" even when used with respondent's services.

Turning back, then, to the issue in this case, namely, whether the term REDSKINS was disparaging at the time of registration, the services do not have an effect on the meaning of the term, i.e., the first prong. The question is only as to the second prong, whether the term is disparaging. The facts of this case demonstrate the type of disparagement presented in *Heeb* and the non-ski-related goods and services portion of *Squaw Valley*. In other words, respondent's alleged honorable intent and manner of use of the term do not contribute to the determination of whether a substantial composite of the referenced group found REDSKINS to be a disparaging term in the context of respondent's services during the time period 1967-1990, because the services have not removed the Native American meaning from the term and intent does not affect the second prong. If it is found to be

23

disparaging during the relevant time period, then the Trademark Act mandates removal from the register.[44]

In presenting their case, petitioners laid out two categories of evidence to prove that the term REDSKINS, even when considered solely as used with football and cheerleading services, was disparaging during the relevant time periods: (1) a general analysis of the word; and (2) the specific views of the referenced group. In some instances these two types of evidence intersect.

As noted above, the prior *Harjo* case encompassed more issues as reflected by the pleadings and illustrated by the voluminous and wide-ranging record. We only focus on the evidence that most directly reflects the sentiments of Native Americans. In particular, concerning the general analysis of the word, we focus on the testimony and reports provided by the parties' respective experts, dictionary definitions and reference books. For the specific views of Native Americans, we focus on the National Congress of American Indians' ("NCAI") 1993 Resolution 93-11, the deposition of NCAI Executive Director, Ms. JoAnn Chase, the deposition of Harold Martin Gross, and various newspaper articles, reports, official records and letters.

<div align="center">Expert Reports</div>

Dr. Geoffrey Nunberg served as petitioners' expert witness in linguistics, specializing in lexical semantics ("the study of the use of words and lexicography").[45]

---

[44] As noted above, the Board's jurisdiction is limited to the question of registrability. The Board does not have the power to enjoin use.

Dr. Ronald R. Butters served as respondent's linguistic expert witness,[46] specifically tasked by respondent to research "the evolving history of the meaning of the term redskin in American English."[47] David K. Barnhart was respondent's expert witness in lexicography, whom respondent asked to evaluate "the term redskins in the current American usage, particularly in the context of sports."[48] The record establishes that each of these witnesses is qualified to testify regarding the term "redskin" within the context of their specialties.[49]

---

[45] Geoffrey Nunberg earned a Ph.D. in linguistics from City University of New York, served as a Consulting Professor of Linguistics at Stanford University and a principal scientist at Xerox Palo Alto Research Center, and served as an editor and chair of the usage panel for the *American Heritage Dictionary*. Geoffrey D. Nunberg Dep. 229:15-25, 230:8-12, Feb. 18, 1997 ("Nunberg 2/18/97 Dep.") (TTABVue 81, pp. 122-23); Nunberg Dep. Ex. 32 (TTABVue 108, pp. 95, 99). Dr. Butters, respondent's expert witness, opined that Dr. Nunberg has a good reputation and is an expert in the field of linguistics. Butters Dep. 73:-74:, Dec. 20, 1996 (TTABVue 163, p. 23).

[46] Ronald R. Butters earned a Ph.D. in English with a concentration in linguistics, served as Professor of English at Duke University and co-chaired its linguistics program, and served as chief editor of American Dialect Society publications. Ronald R. Butters Dep. 8:22-25, 9:22-23, 10:13-25, Dec. 20, 1996 ("Butters 1996 Dep.") (TTABVue 163, pp. 6, 7); Butters Dep. Ex. 1 (TTABVue 164, p. 4).

[47] Butters 1996 Dep. 23:10-14 (TTABVue 163, p. 10).

[48] David K. Barnhart Dep. 5:11-12, 24:5-9 (TTABVue 159, pp. 8, 27); Barnhart Dep. Ex. 2 (TTABVue 162, p. 14). Mr. Barnhart was a general editor at Clarence L. Barnhart, Inc., a "small dictionary house" between 1966 and 1980, and at the time of his deposition, was the founder and owner of Lexik House Publishing, a publisher of the Barnhart Dictionary Companion, "a quarterly journal that updates dictionaries." Barnhart Dep. 13:1-14:14, 20:25-21:20) (TTABVue 159, pp. 16, 23-24); Barnhart Dep. Ex. 2 (TTABVue 162, p. 14). Mr. Barnhart did not survey or evaluate Native Americans' reaction to the use of the term "redskins." His research "involved more general English usage than targeting a particular ethnic group." Barnhart Dep. 62:10-25 (TTABVue 159, p. 65).

[49] None of the experts specifically researched Native American viewpoint of the word "redskin(s)" in connection with football-related services during any time period.

We focus on those parts of the expert reports and testimony concerning the derivation of the word redskin(s), dictionary usage labels and usage of the term "redskin(s)" over the years in various media.[50]

### 1. Derivation of the Word "Redskin(s)" as Reference to Native Americans

Mr. Barnhart explains that "[t]he original (or core) meaning of the word redskin identifies the race of people found by colonizing Europeans in the 16th and 17th Centuries."[51]  In his report Mr. Barnhart confirms that "redskin(s)" as an ethnic term refers to skin color:

> It is reasonable to expect people upon encountering something new to use a term which bears on its use, size, appearance or other characteristic feature.  The word red appears in a large number of terms in English.  It should be noted that there is another meaning for redskin descriptive of a variety of potato.  In the case of the potato it is because of its color.  In the case of the people living in North America

---

[50] Mr. Barnhart and Dr. Butters offered conclusions that the term "redskin(s)" has taken on a secondary meaning as the name of respondent's team. *See* Barnhart Dep. Exh. 3 (TTABVue 162 pp. 18-19) ("There is ample evidence to support the position that Redskins has acquired secondary meaning in the context of sports. . . . The collected evidence indicates that the use of the term redskin in the context of sports is overwhelmingly more significant that [sic] the use of the term in its core meaning. . . . It is my conclusion based on the examination of evidence of usage consistent with the practice of lexicography and linguistics that the term Redskins as used by the Washington Redskins has acquired secondary meaning separate from the usage associated with the North American Indians.") *See also* Butters 1996 Dep., pp. 23-24 (TTABVue 163, 10) ("I think the major change began with the inception of the Washington Redskins football team in the 1930s.  As that team evolved and as professional football grew more and more popular and influential in American popular culture, the term Washington Redskins, in general the larger term Washington Redskins, and then more particularly the shortening of Washington Redskins to Redskins began to take on a meaning of its own identified with the football team.  So that this secondary meaning became a very important meaning for the term itself.")  However, this evidence goes to the first prong of the test where it is found and conceded that the asserted "secondary meaning" retains the "core meaning" Native American.  Because REDSKINS used in connection with respondent's services while meaning a football team, retains its "core meaning" identifying a "race of people," the meanings are not legally separate for the purposes of determining disparagement under Section 2(a).

[51] Barnhart Expert Report (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, p. 18).

upon the arrival of Europeans it was likewise based upon appearance. . . . In recent years the sensitivities of these people have caused some speakers of English to adjust their usage of some of these terms accordingly. . . . The naturalness of the construction of the word redskin is underscored by the presence in the language of other terms with reference to color in describing the appearance of a person's skin. Blue skin is a 19th Century term used to describe blacks. See for instance Grose 1796 edition where he defines blue skin as "a person begotten of a black woman by a white man. One of the blue squadron; any one having a cross of the black breed, or, as it is termed, a lick of the tar brush." . . . Another example of this genre is darkskin for a black. Still other examples include yellow-skin for an Asian, black-skinned and brown-skinned for blacks.[52]

In extrapolating on the concept of the use of skin color in language Mr. Barnhart testifies as follows:

Q. Do you know the word darky?

A. Yes.

Q Is that word natural in its construction insofar as it applies to complexion?

A. Yes.

Q. Is it offensive to African-Americans?

A. It can be.

Q. Is it derogatory?

A. Depending on the context, yes. But I haven't evaluated the context of darky particularly, so I would want to see some more examples and evaluate what evidence I could accumulate, yes.[53]

The record includes two works by Irving Lewis Allen who Dr. Butters testifies is a sociologist "who has given some thought to language" and is "certainly a

---

[52] Barnhart Expert Report (TTABVue 162, p. 21).

[53] Barnhart Dep. pp. 71-72 (TTABVue 159, pp. 74-75).

respectable scholar."[54]  We particularly point to the following excerpt from his book

*Unkind Words:  Ethnic Labeling from Redskin to WASP* (Bergin & Garvey 1990) p.

18:

> Nearly half of all interracial slurs ...refer to real or imagined physical differences. ... Most references to physical differences are to skin color, which affirms what we have always known about the significance of color in human relations.  Asian groups were called yellow this and that and Native Americans were called redskins, red men, and red devils.[55]

### 2.    Dictionary Usage Labels for "Redskin" Entries

The record includes several dictionary definitions (submitted separately or

within the contexts of the expert reports) published during the relevant time frame

of 1967 through 1990.  A representative sample is set forth below:

a.    RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1204 (1967):[56]
redskin  *n.  Often Offensive.*  a North American Indian.

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1204 (1973):[57]
redskin  *n.  Often Offensive.*  a North American Indian.

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1618 (2d ed. 1987):[58]
redskin   *n.   Slang* (*often disparaging and offensive*). a
North American Indian.

---

[54] Butters 1996 Dep. 72:15-23, Dec. 20, 1996 (TTABVue 163, p. 22).

[55] Irving Lewis Allen, *Unkind Words:  Ethnic Labeling From Redskin To Wasp* (Bergin & Garvey 1990), Petitioners' Notice of Reliance, Ex. 57 (TTABVue 87 p. 20).  See also Allen, Irving Lewis, *The Language of Ethnic Conflict Social Organization and Lexical Culture* (Columbia University Press 1983) p. 51 (Redskin listed as an ethnic epithet for Native American) Petitioners' Notice of Reliance Ex. 1 (TTABVue 63, p. 41).

[56] Petitioners' Notice of Reliance, Ex. 1 (TTABVue 62, p. 171).

[57] Petitioners' Notice of Reliance, Ex. 1 (TTABVue 63, p. 11).

[58] Petitioners' Notice of Reliance, Ex. 1 (TTABVue 63, p. 48).

b. HBJ SCHOOL DICTIONARY (1977):[59]
redskin *n.* A North American Indian.

c. WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1513 (2d ed. 1977):[60]
**red'skin, *n.*** a North American Indian; so called from the reddish or coppery color of the skin.

c. WORLD BOOK DICTIONARY, VOL. 2 1752 (1979):[61]
**redskin** (red'skin'), *n., adj.* North American Indian: *We have had more difficulty with white desperadoes than with redskins* (Theodore Roosevelt).

d. OXFORD AMERICAN DICTIONARY 564 (1980):[62]
redskin *n. (contemptuous)* a North American Indian.

e. OXFORD ENGLISH DICTIONARY 429 (2d ed. 1989):[63]
**redskin**. Also red-skin [See RED *a.* 5c.] 1. A North American Indian. (Not the preferred term.).

We further note the earliest restrictive usage label in dictionary definitions in Mr. Barnhart's report dates back to 1966 from the *Random House Unabridged First Edition* indicating REDSKIN is "Often Offensive." From 1986 on, all of the entries presented by Mr. Barnhart include restrictive usage labels ranging from "not the preferred term" to "often disparaging and offensive."[64]

All of the experts referenced, either by testimony or in their expert reports, the seminal work in lexicography, *Dictionaries: The Art and Craft of Lexicography*,

---

[59] Nunberg Dep. Ex. 9 (TTABVue 83, p. 103).

[60] Nunberg Dep. Ex. 14 (emphasis in original) (TTABVue 83, p. 118).

[61] Nunberg Dep. Ex. 13 (emphasis in original) (TTABVue 83, p. 116).

[62] Petitioners' Notice of Reliance, Ex. 1 (TTABVue 63, p. 18).

[63] Petitioners' Notice of Reliance, Ex. 1 (emphasis in original) (TTABVue 63, p. 57).

[64] Barnhart Expert Report (June 8, 1996), Barnhart Dep. Exh. 3 (TTABVue 162, p. 27).

written by Sydney I. Landau and first published in 1984.[65] Mr. Barnhart, the lexicographer, explained that usage labels are a "[r]eflection of the opinion of the editor in chief … But some people that are in lexicography have been known to be less stalwart and have caved into suggestions from non-editorial sources."[66] He explains that "unlabeled terms are standard and labeled terms are labeled for some particular character."[67] Mr. Barnhart explained that the "basic and longstanding practice in lexicography which deals with noteworthy ranges of usage of any given entry term is to label those instances of terms when the usage deviates from 'Standard English.' "[68] According to Mr. Barnhart, a term is generally "assumed to be 'Standard' if it is unlabeled."[69] However, there are times when a word "is worthy of special attention, a label (usually in italic type) is included in the entry."[70]

Mr. Barnhart explains that there is no standardized method in the field of lexicography regarding restrictive usage labeling.

---

[65] *See* Barnhart Expert Report pp. 9, 18-19 (unnumbered) (quoting Sydney Landau, *Dictionaries: The Art & Craft of Lexicography* (1984)), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 26, 35-36); Butters Expert Report 5-6, 16 (June 7, 1996) (citing Sydney Landau, *Dictionaries: The Art & Craft of Lexicography* (1984)), Respondent's Notice of Reliance, Ex. 9 (TTABVue 129, pp. 41-42, 52); Nunberg 2/18/97 Dep. 331:13-332:25 (TTABVue 81, pp. 224-25).

[66] Barnhart Dep. p. 22, (TTABVue 159 p. 25).

[67] Barnhart Dep. p. 45 (TTABVue 159 p. 48.

[68] Barnhart Expert Report 8 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, p. 25). Barnhart stated that "Standard English" is basically English that "is acceptable in business, normal communications  between people, that is, everyday conversation, letter writing, telephone conversation where no particular special connotation is associated . . . in the context under consideration."  Barnhart Dep. 36:17-23 (TTABVue 159, p. 39).

[69] Barnhart Expert Report 8 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, p. 25).

[70] *Id.*

> There are no agreed upon criteria for finding some usages vulgarly offensive or contemptuous or abusive. There are few studies that shed any light on the degree of offensiveness of specified terms under specified conditions.[71]

Each expert points to the influence of outside forces, or "pressure groups" on the adoption of usage labels by dictionary editors. For example, Dr. Butters testifies that sociologists, historians, and anthropologists applied "sociopolitical pressure" regarding the use of the term "redskin" on dictionary editors and "that any dictionary that labels redskin as a derogatory term is doing so, at least indirectly, as a result of, at least in large part, sociopolitical pressure."[72] This phenomenon is also recognized in the reference works relied on by the experts.[73]

As part of his research, Mr. Barnhart reviewed dictionary entries for the term "redskin" between 1859 and 1992. He found no restrictive usage labels for the term "redskin" in any dictionaries prior to 1965.[74] Beginning in 1966 Mr. Barnhart's reviewed dictionary entries start to include usage labels indicating the term is offensive. *See Random House Unabridged* (1st ed. 1966). From that time on, more publishers include such labels at an increasing rate. By 1983, all of Mr. Barnhart's

---

[71] Barnhart Expert Report 9 (unnumbered) (*quoting* Sydney I. Landau, *Dictionaries: The Art and Craft of Lexicography* (1984)), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 26).

[72] Butters 1996 Dep. 61:7-11, 63:22-64:2 (TTABVue 163, p. 20); Butters Expert Report p. 5 *citing* Sydney I. Landau, *Dictionaries: The Art and Craft of Lexicography* (1984) (TTABVue 162 p. 69) ("In addition, what constitutes a significant-enough semantic change to warrant the revision of a dictionary entry is often a judgment call, one which is furthermore highly subject to overt and covert sociopolitical pressures, especially where possible changes in connotation and usage are concerned.")

[73] Butters Dep. pp. 61-64 (TTABVue 163, p. 20).

[74] Barnhart Expert Report 9-11 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 26-28). Mr. Barnhart reviewed twenty dictionaries published between 1946 and 1964. *Id.*

examples include a usage label indicating it is offensive.[75]    Mr. Barnhart's

conclusion only references labels that use the word disparaging:

> Since 1966, the labeling of the term has been erratic at worst and inconsistent at best.  Of the twenty-eight dictionaries consulted which appeared between 1966 and 1992, ten editors reported the term as "standard English".  Only two dictionaries have identified the term redskin as "disparaging".[76]

However, we consider the usage labels that employ the term "offensive" also

to support the legal conclusion under Section 2(a) that a term is "disparaging."

Therefore, Mr. Barnhart's conclusion is based on too narrow a construction because

he views the label "disparaging" as requiring intent.[77]    As noted above, for the

purposes of our legal review intent does not figure into the equation.    More

significantly, we disagree that the labeling is erratic and inconsistent.    Rather it

---

[75] The report includes a listing for Thorndike-Barnhart Dictionaries that indicates that their *World Book Dictionary* "1969-1992" had no label but their *Intermediate Dictionary* included a label starting in 1974.  It is unclear which specific years the *World Book Dictionary* was actually published or if the range of years simply indicates the time period before a next edition issued and we do not include that reference in our calculation.  The 1989 *Oxford English Dictionary* has the usage label "not the preferred term"; however, the 1980 *Oxford American Dictionary* includes the more direct usage label "contemptuous."  We include "not the preferred term" in the category of restricted usage, but also find this dictionary less probative than the one directed specifically to American usage.

[76] *Id*. at 30.

[77] "When labeling a word as disparaging, lexicographers are trying to determine the speaker's intent, and when labeling a word as offensive, they are assessing a hearer's response to it."    Barnhart Expert Report (*quoting* John McCluskey, *Dictionaries and Labeling of Words Offensive to Groups With Particular Attention to the Second Edition of the OED*, 11 Dictionaries: J. of the Dictionary Soc'y of N. Am. 119 (1989), Barnhart Dep Ex. 3 (TTABVue 162, p. 26).  *See also* Barnhart Dep. pp. 51-52 (TTABVue 159, pp. 54-55) ("Offense is something – disparaging and derogatory tend to refer to the speaker and to the mental baggage that person is carrying along with him.  Offensive tends to refer to the hearer and the mental baggage that person is carrying along with him.  By 'mental baggage', I mean their experience with the language and how they use it and how they feel about it.")

shows a clear trend beginning in 1966 to label this term as offensive and by 1986 the dictionaries are unanimous.

Mr. Barnhart also found that among dictionary editors' labels "there has been a sensitivity to how people react to that term [redskin] now."[78] In his expert report, Mr. Barnhart made the following conclusion based on his evaluation of the term "redskin" as it appears in various dictionary entries during the relevant time frame:

> [T]he use of the term redskin, in its core meaning and as recorded in dictionaries, is usually recognized among lexicographers as 'Standard English' which means that it is acceptable in both formal and informal speech or writing of educated people.[79]

This conclusion stands in contrast to the trend in usage labels during the relevant time period discussed above and the severe drop-off in usage discussed below. It is also contradicted by his statement in the same report that:

> The record of dictionary editors' opinions as reflected in the labeling of usage for the term redskin suggests that during the latter third of this century there has developed some change in the perceived usage of the term.[80]

We further note Mr. Barnhart is addressing usage by the general population and not from the viewpoint of Native Americans.

In his expert report, Dr. Butters opined that "sporadic labeling of *redskin* as 'offensive' is of dubious value in assessing the tone and full meaning of *redskin(s)* in

---

[78] Barnhart Dep. 63:5-5 (TTABVue 159, p. 66).

[79] Barnhart Expert Report 14 (unnumbered), Barnhart Dep., Ex. 3 (TTABVue 162, p. 31).

[80] Barnhart Expert Report 8 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, p. 25) (emphasis in the original).

past and present American culture."[81] Dr. Butter's ultimate conclusion is of limited probative value in that it pertains to general "American culture" rather than to the Native American viewpoint. In 1996, Dr. Butters testified as to the following:

> In the last 10 or 15 years, one begins to see in dictionaries the—in some dictionaries the labeling of the term redskin as sometimes offensive. One also begins to see in very recent years references to the use of the term redskin as a possibly offensive term. So that there is this, what I would say—my conclusion is a very recent incipient change.[82]

This statement recognizes the trend in usage labels during a portion of the relevant time period.

*3.     Use of the term Redskins in Various Media*

The record shows wide usage of the term in various media prior to the late sixties and very sporadic usage thereafter. A few examples are set forth below:

> Merrit Meets the Enemy. Victory over our Frontier Foes. Thirty-Seven Redskins Sent to the Happy Hunting Grounds. The Indian Problem Reaching a Conclusion. *Rocky Mountain News* (October 8, 1879);[83]

> And excited by firewater they dug up their rusty hatchets and prepared for blood and thunder. 'Ugh,' said every greasy redskin … *Rocky Mountain News* (November 19, 1890);[84]

> "Fort Wicked" Too Tough for Redskins . . . Headline from *Rocky Mountain News* (October 21, 1931);[85]

---

[81] Butters Expert Report 4, Respondent's Notice of Reliance, Ex. 9 (TTABVue 129, p.40).

[82] Butters 1996 Dep. 24:11-18 (TTABVue 163, p. 10).

[83] Nunberg Expert Disclosure p. 8 (TTABVue 83, p. 67).

[84] *Id.*

[85] Nunberg Expert Disclosure p. 9 (TTABVue 83, p. 68).

"Good luck, get a redskin for me." Excerpt from the 1940 movie Northwest Passage;[86]

"There is reason in her words!" at length broke from his compressed and trembling lips; "ay, and they bear the spirit of Christianity; what might be right and proper in a redskin, may be sinful in a man who has not even a cross in blood to plead for his ignorance."[87]

*Indian Fights on the Texas Frontier: A True Account of the Last Exciting Encounters with Redskins in Hamilton, Comanche, Brown, Erath and Adjoining Counties* (Fort Worth: Pioneer Pub. Co. 1927); *Fighting Rebels and Redskins: Experiences in Army Life of Colonel George B. Sanford*, 1861-1892 (Univ. of Oklahoma Press 1969); *Bluecoats and Redskins: The United States Army and the Indian 1866-1891* (London: Cassall, 1975); *Flashman and the Redskins* (New York: Knopf/Random House 1982).[88]

Dr. Nunberg conducted several searches of an electronic database featuring articles from major newspapers and magazines published between approximately 1975 through 1989 to glean information about use of the word "redskins" in the context of Native Americans.[89] According to Dr. Nunberg, "newspapers and television use have a particular influence on the way words are used and [help] shape the general impressions of the meanings of those [words]."[90]

---

[86] *Id.*

[87] Barnhart Expert Report (TTABVue 162, p. 24) (quoting a 1979 edition of James Fenimore Cooper's *The Last of the Mohicans*. This book was first published in 1846). *See* Butters Expert Report p. 7 (TTABVue 129, p. 43).

[88] Butters Expert Report (TTABVue 129, p. 45). These are titles of various books referenced by Dr. Butters. We note the publisher of the last title in 1982, Random House, since 1966 has included the usage label "often offensive" in its dictionaries. *See* Barnhart Report (TTABVue 162, p. 27).

[89] Nunberg 1996 Dep. 6:2-21, 149:11-12, 151:18-20 (TTABVue 98, p. 133, TTABVue 99, pp. 101, 103); Nunberg 2/18/97 Dep. 305:10-306:8 (TTABVue 81, pp. 198-99).

[90] Nunberg 2/18/97 Dep. 275:1-4 (alteration added) (TTABVue 81, p. 168).

Dr. Nunberg reported that the database search results showed 136,473 instances of "redskin," "redskins," and other words beginning with "redskin," such as "redskinnettes," with the "vast majority" involving references to the Washington Redskins.[91] Dr. Nunberg then conducted a focused search, filtering out terms such as "team," "sport," "Redskin Park," "football," "game," "fan," and "ticket," to yield results of those instances when the word "redskin" was used to refer to a Native American person.[92] This search resulted in approximately 300 references, although some of these still referred to the Washington Redskins, potatoes and peaches.[93]

Dr. Nunberg reviewed the focused search results by hand and found "71 distinct stories in which the word was used to refer to Indians."[94] According to Dr. Nunberg, none of these 71 occurrences demonstrated use of "redskin" as a standard term to refer to a Native American,[95] indicating that "the word is not a 'neutral synonym' for Indian"[96] Of those occurrences, many examples use the term in the context of racial slurs or discrimination, for example:

---

[91] Nunberg 2/18/97 Dep. 305:17-24 (TTABVue 81, p. 198); *see* Nunberg 1996 Dep. 150:21-151:1 (TTABVue 99, pp. 102-03).

[92] Nunberg 1996 Dep. 151:17-152:8 (TTABVue 99, pp. 103-04); Nunberg 2/18/97 Dep. 305:25-306:25 (TTABVue 81, pp. 198-99).

[93] Nunberg 1996 Dep. 152:9-14 (TTABVue 99, 104); Nunberg 2/18/97 Dep. 305:25-306:8, 307:1-2 (TTABVue 81, 198-200).

[94] Nunberg 2/18/97 Dep. 307:3-8 (TTABVue 81, p. 200); *see* Nunberg 1996 Dep. 153:23-154:16 (TTABVue 99, pp. 105-06).

[95] Nunberg 1996 Dep. 156:3 (TTABVue 99, p. 108).

[96] Nunberg Report p. 2 (TTABVue 83, p. 84).  See also Nunberg Dep. p. 305-310, 314:16-21 (TTABVue 81, p. 198-203, 207).

If Mr. Liles went back in history to when the 13 colonies were being organized, he would have seen that "redskin" was not used to convey respect, adulation or honor.[97]

A man who resigned from the Pulaski County sheriff's office because of alleged harassment as an American Indian has won $24,727 in a race discrimination lawsuit. . . . He said he was called "chief," "Indian Joe" and "redskin."[98]

More significant than the relatively small number of uses as a reference to Native Americans, and many of those in the context of racial slurs, is the relative absence of use of the term to describe a person. Dr. Nunberg found it significant that this search yielded so few results showing the term "redskin" as a reference to a Native American:

> There were in this database over 74,000 instances of the phrase 'American Indian' or 'American Indians.' And over 73,000 instances to the phrase 'Native Americans,' a disproportion of about 2,000 to 1 which suggests that the use of 'redskin' to refer to Indian is extremely rare in this database which suggests some reason for avoiding the term since it is, in fact, a commonly used term, for example, in the cinema and historical sources.[99]

Respondent objects to Dr. Nunberg's opinion as irrelevant because it is lacking in scientific basis. However, we do not rely on Dr. Nunberg's ultimate opinions and conclusions regarding the word "redskins," rather we look to the underlying data that is not in dispute which undeniably shows a drop-off in usage. This is corroborated by respondent's expert, Mr. Barnhart who conducted a similar electronic database search, discussed *infra*. As to the data, respondent's objection

---

[97] *Id*. at 3 (TTABVue 83, p. 85).

[98] *Id*. at 5 (TTABVue 83, p. 86).

[99] Nunberg 2/18/97 Dep. 307:18-308:2 (TTABVue 81, pp. 200-01).

that the "uses that date from outside the pertinent time periods [are irrelevant] and are not reflective of Native Americans' viewpoints," is overruled.[100] As noted above, the search encompasses the relevant time period, and is relevant in correlation to objection to use of this term by Native Americans.

Mr. Barnhart conducted a similar search using a Nexis electronic database group file featuring major newspapers, magazines and journals published between 1969 and 1996.[101] He found that the term "redskin" or "redskins" appeared in 143,920 articles at least once.[102] Similar to Dr. Nunberg's initial search results, Mr. Barnhart reported that the results of his "redskin" database search were "overwhelming to be in the context of sports," with less than two percent of the results referring to Native Americans.[103]

Mr. Barnhart would not draw any inferences about the infrequency in which the term "redskin" or "redskins" was used to refer to Native Americans. He testified that it was not what he was asked to do and it would be a significantly greater project to determine whether there is any significance to the lack of occurrences.[104] However, in his report he did, in fact, draw conclusions, when he concluded that the term REDSKIN "is acceptable in both formal and informal speech or writing of

---

[100] Pet'rs' Br. p. 18.

[101] Barnhart Expert Report 3, 18 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 20, 35).

[102] Barnhart Dep. 64:13 (TTABVue 159, p. 67); Barnhart Expert Report 3, 12 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 20, 29).

[103] Barnhart Expert Report 12 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 161, p. 29); *see* Barnhart Dep. 69:5-8; 117 (TTABVue 159, p. 72, 120).

[104] Barnhart Dep. 67:15-70:6 (TTABVue 159, pp. 70-73).

educated people."[105] The conclusion he drew was that its absence from the database references somehow supports, or at least does not refute, his finding that the term is part of standard English and acceptable for formal and informal speech or writing. Such a conclusion stands in contradiction to the stark drop off in usage as shown by Dr. Nunberg's research and supported by Mr. Barnhart's own research which shows, *inter alia*, use of the term in many literary sources until 1969 where his search of the Nexis database spanning the years 1969-1996 reveals only 2 percent of the appearances of "redskin(s)" related to "Amerindians" (96 percent referenced respondent's team and 2 percent referenced Miami University's former team name), and the addition of the usage labels in the dictionaries during the same time period. Mr. Barnhart confirms that for the last thirty years (from 1967 to 1997 the date of the deposition) "the overwhelming context in which the term redskins is used in general literature" is in a sports context.[106] To the extent respondent relies on this data to show that because it is printed in newspapers reporting on the professional football team by that name it is not disparaging in that context, Mr. Barnhart testified that his report is not based on Native American response to the term in this context, therefore, we cannot rely on this data to make such a finding or to even raise doubt about other findings, regarding the viewpoint of Native Americans.

Mr. Barnhart testifies that while the term "redskin(s)" was not disparaging "as applied to American Indian persons" in 1967-1985 it might have been

---

[105] Barnhart Expert Report (TTABVue 162, p. 31).

[106] Barnhart 1997 Dep. p. 162 (TTABVue 161, p. 10).

offensive.[107] As noted above, Mr. Barnhart attaches intent of the speaker to the word disparaging and his view of offensive is more in line with the meaning of disparaging in the context of Section 2(a).

### NCAI Resolution

The Executive Council of the National Congress of American Indians ("NCAI"), "the oldest and largest intertribal organization nationwide representative of and advocate for national, regional, and local tribal concerns," passed a resolution in 1993, entitled the "Resolution in Support of the Petition for Cancellation of the Registered Services Marks of the Washington Redskins AKA Pro-Football Inc."[108] The resolution includes in pertinent part the following:

> NCAI is the oldest and largest intertribal organization nationwide representative of and advocate for national, regional, and local tribal concerns; . . . .
>
> [T]he term REDSKINS is not and has never been one of honor or respect, but instead, it *has always been* and continues to be a pejorative, derogatory, denigrating, offensive, scandalous, contemptuous, disreputable, disparaging and racist designation for Native American's [sic]; and
>
> [T]he use of the registered service marks identified in Exhibit B to this resolution by the Washington Redskins football organization, has always been and continues to be offensive, disparaging, scandalous, and damaging to Native Americans.[109]

---

[107] Barnhart 1997 Dep. p. 181:2-25; 182:2-12, (TTABVue 161 p. 15).

[108] National Congress of American Indians Est. 1944, Resolution No. EX DC-93-11, Resolution in Support of the Petition for Cancellation of the Registered Services Marks of the Washington Redskins AKA Pro-Football Inc. (Jan. 18-19, 1993) ("NCAI Resolution"), Petitioners' Notice of Reliance, Ex. 3 (TTABVue 63, pp. 71-77).

[109] *Id*. (emphasis added).

Respondent objects to the NCAI resolution "as irrelevant, to the extent that it dates from a time period not relevant to issues in this proceeding."[110] Respondent further asserts that the District Court found it "irrelevant to the calculus."[111] The full quote from the District Court is set forth below:

> All of these resolutions were made after the relevant time frame, with no explanation by the TTAB as to how they 'shed light' on the relevant time period, and thus, are irrelevant to the calculus . . . [and] the TTAB made no findings of fact about the strength of this evidence.

*Pro-Football, Inc. v Harjo*, 68 USPQ2d at 1255.

We begin by stating that there is no question as to the authenticity or identity of this document. The stipulation by the parties is clear and unequivocal "all evidence admissible in [Harjo] shall be admissible in this proceeding" and only objections as to relevance were preserved for the evidence covered under paragraph one of the stipulation.[112] The testimony by Ms. Chase, discussed *infra*, regarding the procedures by which the NCAI Executive Council passes its resolutions and as stated in the NCAI by-laws, and the other evidence of record showing NCAI membership (referenced *infra* in the findings of fact), is sufficient to support the credibility, reliability and trustworthiness of the resolution.[113] In addition, Ms. Chase's testimony along with other evidence sets out the circumstances under

---

[110] Resp. Br. Appendix A p. 1 (TTABVue 181, p. 58).

[111] Resp. Br. p. 20 (TTABVue 181, p. 26) *quoting Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1255.

[112] Parties' Stipulation (TTABVue 31).

[113] There is nothing in the record to even suggest that NCAI's procedures were not followed. While Ms. Chase was not present when the resolution was voted on, she did attend the January 18-19 gathering, during which the resolution was adopted. Chase Dep. p. 52 (TTABVue 98, p. 58).

which the resolution was passed, i.e., that approximately 150 tribes were represented by NCAI at that time and at least one third of the tribal members were present to pass the resolution.[114]

With regard to respondent's relevancy objection, any statement made after each registration issued is not a statement from the time of registration; thus, based on respondent's logic even testimony taken from individuals in 1993-1996 (i.e., during the *Harjo* litigation) would be statements about the witnesses' opinions during the years 1967-1990, and as such, would be irrelevant. However, the mere fact that an opinion is voiced in 1993 does not mean the opinion was not held by that group or individual in the 1967-1990 time period. In *Harjo*, we note, the opinions about views from 1967-1990 given by the individual plaintiffs through testimony were accepted, by both the Board and the District Court.[115] Here, we have a claim that the registered marks disparaged Native Americans when registered. We find that a resolution passed by an organization such as NCAI, which throughout the relevant time period represented approximately thirty percent of Native Americans, setting forth the past and ongoing viewpoint of the

---

[114] To put these numbers in better context, according to the Census Bureau, there were 523,591 Native Americans in the United States in 1960, 792,730 in 1970, 1,364,033 in 1980, and 1,878,285 in 1990. Campbell Gibson & Kay Jung, Historical Census Statistics on Population Totals By Race, 1790 to 1990, and By Hispanic Origin, 1970 to 1990, For The United States, Regions, Divisions, and States App. B, tbls. B-1 to B-3 (U.S. Census Bureau, Working Paper Ser. No. 56, 2002). The U.S. census is a standard reference; therefore, we may take judicial notice of its data. Fed. R. Evid. 201; *In re Broyhill Furniture Indus. Inc.*, 60 USPQ2d 1511, 1514 n.4 (TTAB 2001).

[115] We further note respondent elicited and relied upon testimony provided in 1997 regarding views held in 1967. Barnhart 1997 Dep. pp. 170-171 (TTABVue 161, pp. 12-13) (Mr. Barnhart stating his opinion that the word "redskins" is not disparaging with regard to "the Redskins team" in 1967 through 1997). As discussed *infra*, Mr. Barnhart's definition of disparaging requires intent from the speaker.

Native Americans it represents is clearly probative of the views of Native Americans held at the referenced time period.[116] We accept individual testimony about views held in the past, therefore we accept a group statement about views held in the past, in particular here where the claim pertains to the views of a group and not individuals.[117] Respondent's objection on the basis of relevancy is overruled.

---

[116] We note in the *Harjo* decision that while Resolution 93-11 was part of the record, the Board quoted from a different NCAI resolution that could be appropriately characterized as "indicating a present objection" to the word Redskins in respondent's marks. *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d at 1725, 1747. See "Resolution to Justice Department Investigation of Human Rights Violations … NCAI Resolution 93-143, calling for the abolition of Indian nicknames, Mascots and Images and commercial use of these by sporting industries, colleges, universities and automobile manufacturers … NCAI does hereby request Senator Ben Campbell-Democrat, Colorado, and Senator Don Nickles-Republican, Oklahoma, to direct the Justice Department to investigate any human and civil rights violations by colleges, universities, and public institutions and exploit Indian imagry [sic] and lifestyles." Petitioner's Notice of Reliance Ex. 3 (TTABVue 83, pp. 47-48). By contrast, Resolution 93-11 clearly speaks to the viewpoint during the relevant time period. With regard to Resolution 93-11 the Board noted that "[e]vidence concerning the significance of the word 'redskin(s)' before and after the relevant time periods may shed light on its significance during those time periods." *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d at 1715. To clarify, while the evidence is from a time directly after the relevant time period, it addresses the viewpoint during the relevant time period and, therefore, goes beyond "indicating a present objection." Rather, it is evidence of the viewpoint during the relevant time period.

[117] We further note an editorial from the *Albuquerque Journal* dated September 12, 1992 includes the following statement: "One could argue that when the team was originally named, most people – make that most White people – didn't consider the word 'redskins' derogatory. But Indians have *long objected* to the term." Emphasis added. Petitioner's Notice of Reliance Ex. 20 (TTABVue 71, p. 87). New Mexico was home to 133,816 Native Americans in 1990 according to the Census data and a good portion of the Navajo Nation – Ms. Blackhorse, one of the petitioners, is a registered member of the Navajo Nation. Census Bureau, U.S. Dep't of Commerce, Pub. No. 1900 CP-3-7, 1990 Census of Population Characteristics of Am. Indians by Tribe & Language tbl. 1 (1994).

While we do not know if the newspaper editorial was written by a Native American, as a newspaper in a state with an appreciable number of Native Americans it is reasonable to infer that the editorial board has some knowledge regarding the sentiments of the Native American community. This is simply another example of a statement describing views held in the past. Such statements serve to cover the relevant time periods. Respondent's

Deposition of JoAnn Chase

JoAnn Chase, a Native American,[118] became Executive Director of the National Congress of American Indians on April 1, 1994, and provided testimony in 1996 about Resolution 93-11.[119] Respondent's objection to Ms. Chase's testimony as being irrelevant because the NCAI resolution dates from a time period not relevant to this proceeding is overruled. Her testimony relates to the NCAI resolution that specifically addresses the time period with which we are concerned. Her testimony also provides contemporary and historical background on the organization.

Deposition of Harold Gross

In 1972, Harold Martin Gross was the Director of Indian Legal Information Development Service, a legislative oversight program.[120] The mission of the Indian Legal Information Development Service was two-fold: (1) to provide career training to Native Americans in the fields of journalism, law and public affairs in the legislative process; and to provide legislative information to Native American tribes through a monthly magazine.[121] The staff was comprised of Native Americans. Mr. Gross testified that they asked him to help them change the name of the Washington Redskins football team because "it was disparaging, insulting and

---

relevancy objection to this editorial as being from a different time period and as not written by a Native American is overruled.

[118] Chase Dep. 7:11-13, Apr. 26, 1996 (TTABVue 98, p. 13).

[119] Id. 5:19-22 (TTABVue 98, p. 11).

[120] Gross Dep. 7:23-8:1, June 11, 1997 (TTABVue 79, pp. 169-70).

[121] Gross Dep. 8:4-8:11 (TTABVue 79, p. 170).

degrading to American Indians."[122]   In January 1972, Mr. Gross drafted a letter on behalf of his staff and sent it to Edward Bennett Williams, who was then part-owner and president of the Washington Redskins football team.[123]  That letter led to a March meeting with Mr. Williams.[124]

The following people attended that meeting along with Mr. Gross:[125]

1. Richard LaCourse, a representative of the Washington Bureau of the American Indian Press Association;

2. Leon Cook, President of the National Congress of American Indians (NCAI);

3. Ron Aguilar, District Representative of the National Indian Youth Council;

4. Dennis Banks, District Representative of the American Indian Movement;

5. Hany Geigomah, Assistant to the Commissioner of Indian Affairs and the Youth Representative from the Bureau of Indian Affairs;

6. Laura Wittstock, Legislative Review Editor of the Indian Legal Information Development Service; and

7. LaDonna Harris, President of the Americans for Indian Opportunity.

---

[122] Gross Dep. 16:11-16:19 (TTABVue 79, p. 178).  Respondent's objection to this testimony as "irrelevant in lacking foundation and scientific basis" is overruled.  The testimony simply pertains to an event he participated in and the motivation for that event.

[123] Gross Dep. Ex. 32.007: Letter from Harold Gross, Dir., Indian Legal Information Dev. Servs., to Edward Bennett Williams (Jan. 18, 1972) (TTABVue 77, pp. 11-13; TTABVue 105, p. 71-73 (duplicate)).

[124] Gross Dep. 9:2-9:5, 18:7-18:11 (TTABVue 79, pp. 171, 180).

[125] Gross Dep. 18:19-18:23 (TTABVue 79, p. 180), Gross Dep. Ex. 32.006 (TTABVue 77, p. 10; TTABVue 105, p. 69 (duplicate)).

At the meeting, the Native American attendees expressed their "reasons for objecting to the name of the team, and some of the trappings that went with it. And to present the reasons why [they] thought it should be changed."[126]

Respondent objects to Mr. Gross' testimony and exhibits (e.g., the letter to Mr. Williams) as irrelevant because "the organization he formerly represented comprised at most seven Native American members and itself did not represent any Native American tribe or organization."[127] The objection is overruled. The opinions of seven Native Americans expressed during the relevant time period are obviously relevant to the merits of the petition. Moreover, we do not rely on the testimony for the viewpoint of the Indian Legal Information Development Service, the organization Mr. Gross represented. Rather, we rely on this testimony and evidence to show that NCAI's opposition to use of the word "redskins" with respondent's services existed as early as 1972, well in advance of the 93-11 resolution and during the relevant time period. NCAI's president, Mr. Leon Cook, participated in that meeting and supported the position that respondent should cease use of the name "Redskins." The "Recommendations to the Washington, D.C. Professional Football Team" from "Leon F. Cook, President, National Congress of American Indians," et al., include the following:

---

[126] Gross Dep. 19:23-20:1 (TTABVue 79, pp. 181-82).

[127] Resp's Br. Appendix A p. 12. We further note, Mr. Gross' deposition is another example of contemporary testimony regarding past events and opinions that are not objected to as irrelevant on that basis. We further note respondent did not object to the NCAI resolution as not representing Native American tribes.

1.  That the derogatory racial epithet "Redskins" be withdrawn as a team nickname for the professional football team of Washington, D.C.[128]

In 1972, NCAI represented approximately 30 percent of Native Americans. An article published in the *Washington Daily News* on March 30, 1972, discussing the meeting with Edward Bennett Williams includes the following excerpt:

> After Petite's fist shaking speech, Williams closed this first meeting with the American Indians who claim his team nickname, 'Redskins' is a racial slur. The eleven Indian *representatives* included ... Leon Cook, president of the National Congress of American Indians which claims a membership of *300,000*; Dennis J. Banks, national chairman of the American Indian Movement.[129]

In addition, an article published in *The Washington Post* on Thursday March 30, 1972 includes the following:

> A DELEGATION OF 11 people representing a variety of Indian organizations ... Among the group ... requesting that 'the derogatory racial epithet 'Redskins" be banished from the Washington sports scene were ...Leon Cook, president of the National Congress of American Indians which claims a membership of *350,000* Indians, according to the protesting group's informal leader, Harold Gross, an attorney for another Indian organization.[130]

Harold Gross testified that he worked for NCAI in 1969 and would have first-hand knowledge as to the membership in that time period.[131] This evidence regarding NCAI's membership in the relevant time period, as well as its participation in the

---

[128] Gross Dep. Ex. 32.005 (TTABVue 77, p. 9).

[129] Petitioners' Notice of Reliance Ex. 18 (TTABVue 48, p. 33) (emphasis added)

[130] Petitioners' Notice of Reliance Ex. 18 (TTABVue 48, pp. 85-86) (emphasis added). We do not find the discrepancy between the reports in the *Daily News* and *Post* as to the membership of the NCAI as significant. The two reports agree that NCAI claimed to represent at least 300,000 American Indians.

[131] Gross Dep. p. 37 (TTABVue 79, p. 199).

1972 meeting serves to corroborate the statement in the 93-11 resolution that the term REDSKINS as used by the Washington Redskins "*has always been …offensive, disparaging, scandalous, and damaging to Native Americans.*"[132]

NCAI's decades-long challenge to the term "Redskins" is referenced in an article in the *Lakota Times* published September 16, 1992:

> The National Congress of American Indians has been battling against the racist use of Indians as mascots for decades. The battle has been uphill all the way because mainstream America does not see the term [Redskins] as offensive – because they are not American Indians. … Mr. Deloria who directed NCAI in the 1960's and spoke out on the mascot issue then ... The grounds for cancellation of the federal registration include: The term 'Redskin' … is ... disparaging.[133]

Other evidence provides information regarding NCAI's opposition to the name "Redskins" for the football team and the number of Native Americans represented by NCAI during the relevant time period. The state of Michigan issued a report addressing the use of Indian names and mascots in October 1988.[134] The purpose of this report was to examine the presence of Native American stereotyping in Michigan education institutions. The Commission surveyed colleges,

---

[132] National Congress of American Indians Est. 1944 Resolution No. Ex DC-93-11, (TTABVue 63, p. 71) (emphasis added).

[133] *Lakota Times* (September 16, 1992), Pet'rs' Notice of Reliance Ex. 20 (TTABVue 71 pp. 88-89). Respondent's objection that this article was published after the relevant time period is overruled. We only rely on the article for the information provided regarding NCAI's activities during the relevant time period. *See also NCAI Sentinel* (Winter-Spring 1969) (TTABVue 48 pp. 80-82) "NCAI Wages War on Indian Image" (campaign to combat negative images and references to Native Americans); and letter from William B. Welles and Charles B. Kusen to Mr. Pete Rozelle (April 25, 1972) (commenting on "movement to change the familiar titles of many teams in the sports world," including the "Redskins") Petitioners' Notice of Reliance Ex. 32 (TTABVue 77 p. 20).

[134] *See* Michigan Civil Rights Commission Report on Use of Nicknames, Logos and Mascots Depicting Native American People in Michigan Education Institutions (October 1988) ("Michigan Comm'n Report"), Petitioners' Notice of Reliance, Ex. 77 (TTABVue 91, p. 94).

universities, high schools and junior high/middle schools.[135] In addition, the Commission contacted Native American organizations in Michigan to solicit feedback on stereotyping of Native Americans.[136] Respondent apparently lodged several objections to this report (it is included by bates numbers in the objections to documents referred to as "correspondence"); however, we only rely on the following reference in 1988 to NCAI in this report and there is no objection to that information.

> The National Congress of American Indians, the oldest and largest national Indian group in the U.S. also supports this organization's efforts to have the Washington team's name changed.[137]

In April 1993, the Miami University Senate held meetings to determine whether or not to abandon their team name REDSKINS, which they ultimately did. Dr. Britton Harwood made the following statement:

> The National Congress of American Indians, representing approximately 150 tribal governments, calls it [redskin] a racial slur.[138]

---

[135] Michigan Comm'n Report, at 13 (TTABVue 91, p. 108).

[136] Michigan Comm'n Report, at 21-22 (TTABVue 91, pp. 116-17).

[137] Michigan Comm'n Report, at 6 (TTABVue 91, p. 101).

[138] Statement to the [Miami] University Senate, Dr. Britton Harwood 1993 Minutes from University Senate April 5, 1993, Petitioners' Notice of Reliance Ex. 87 (TTABVue 95, p. 19). These minutes were made admissible in the *Harjo* proceeding in view of both parties not objecting to the other parties' documents submitted under notice of reliance. They have been stipulated into this record and there is no objection based on authentication or foundation and any hearsay objection is waived (respondent objects to the relevancy of these minutes for other reasons that do not impair the statement regarding how many tribes are members of NCAI in 1993). In addition, an article from the newspaper *The Voice* (April 27, 1993) titled "Harwood Addresses U. Senate on 'Redskin' Issue" includes the statement "The National Congress of American Indians, representing approximately 150 tribal governments, calls it a racial slur." Petitioners' Notice of Reliance Ex. 88 (TTABVue 95, p. 29).

This number is further corroborated a June 3, 1991 letter from Dale Pullen, publisher of The U.S. Congress Handbook to Charlie Drayton, the Vice President of Communications for the Washington Redskins, submitted by respondent to show Native American support of the team.[139] In his letter, Mr. Pullen wrote the following:

> The National American Indian Council, representing 70 per cent of the American Indian population, would like 400 U.S. CONGRESS HANDBOOKS for their D.C. meeting beginning June 7.
>
> Ms. Lee Ann Tallbear, Executive Director, for the NAIC, called to see how she might get books . . . .
>
> Ms. Tallbear said that her group represents about 1.2 million American Indians who do not live on reservations. The National Congress of American Indians represent [sic] Indians living on reservations (the remaining 30 percent).

In 1995, there were approximately 500 recognized tribes in the United States; 150 would have been about one third in 1993.[140] Ms. Chase also testified that there were between 100 – 400 members at the time the resolution was taken.[141]

We further note that in addition to NCAI, the American Indian Movement (AIM) was represented at the 1972 meeting. AIM was founded in 1968 as stated in the following letter from Clyde H. Bellecourt, National Director of the AIM and

---

[139] Chase Dep. pp. 104-105 (TTABVue 98, pp. 110-11), Respondent's Notice of Reliance Ex. 29.1 (TTABVue 142, p. 43) (shown as the Deloria Exhibit 35 also presented as exhibit 41 in the Chase deposition).

[140] 1995 Federal Register, Respondent's Notice of Reliance Ex. 64 (TTABVue 151, pp. 57-63).

[141] Chase Dep. p. 54 (TTABVue 98, p. 60). It is interesting to note that the 1992 WTOP survey shows 28 percent of tribal leaders (again approximately 30 percent) found the name offensive and wanted it changed. John Kent Cooke Dep., Ex. 6 (TTABVue 149, pp. 43-68; TTABVue 156, pp. 11-38).

William A. Means, President of International Indian Treaty Council, to Jack Kent

Cooke[142] dated December 20, 1991:

> The American Indian movement (AIM) is the foremost advocacy organization representing and defending the spiritual, cultural, political and treaty rights of the Indigenous (Indian) peoples in all of North, Central and South America. … The American Indian Movement, which was reborn here in Minneapolis, Minnesota in 1968 … The efforts by Indian people to cleanse organized sports, both within major league baseball, the national football league and hockey, as well high school and university athletic programs has been ongoing for years. … We have received hundreds of calls and letters both national and international in support of our efforts to change these demeaning names (i.e. Washington Redskins) … by sports teams and athletic programs.[143]

<u>Letters of Protest</u>

Petitioners submitted 19 letters from individuals identifying themselves or family members as Native Americans from across the United States representing a geographic cross section (South Dakota, Virginia, Florida, Nebraska, Iowa, Idaho, Minnesota, Georgia, Illinois),[144] letters from three Native American organizations,[145] one letter from the Otoe-Missouria Tribe,[146] in which they

---

[142] Jack Kent Cooke was respondent's former "chairman of the Board, . . . president and a director." John Kent Cooke Dep. 15:16-21, Mar. 26, 1996 (TTABVue 65, p. 86).

[143] Letter from Clyde H. Bellecourt, Nat'l Dir., Am. Indian Movement, and William A. Means, President, Int'l Indian Treaty Council, to Jack Kent Cooke (Dec. 20, 1991), Petitioners' Notice of Reliance, Ex. 5 (TTABVue 63, pp. 172-76).

[144] Petitioners' Notice of Reliance Ex. 5 (TTABVue 63, pp. 84-177; 67 pp. 14, 65, 86-87, 93, 130); petitioners' Notice of Reliance Ex. 2 (TTABVue 77, p. 6).

[145] Letter from Clyde H. Bellecourt, Nat'l Dir., Am. Indian Movement, and William A. Means, President, Int'l Indian Treaty Council, to Jack Kent Cooke (Dec. 20, 1991), Petitioners' Notice of Reliance, Ex. 5 (TTABVue 63, pp. 172-76); Letter from Loren Stiffarm, President, Nat'l Indian Educ. Ass'n, to Manuel Lujan, Dept. of Interior (Mar. 16, 1992), Petitioners' Notice of Reliance, Ex. 5 (TTABVue 67, pp. 37-38); Letter from Sharon Metz, Dir., H.O.N.O.R. to Jack Kent Cooke (Oct. 1992), Petitioners' Notice of Reliance, Ex. 5 (TTABVue 67, pp. 68, 136).

protested the use of the term "Redskins" by respondent.[147]  A representative sample

of excerpts from individual letters is set forth below:

> Since you continue not to believe that the term "Redskins" is not [sic]
> offensive to anyone, let me make this clear:  The name "Redskins" is
> very offensive to me and shows little human interest or taste.  I am a
> Comanche Indian from Oklahoma. Indians are having enough trouble
> trying to erase misconceptions about themselves without having to be
> hit in the face with it every day in the form of a football team or
> baseball team.  If you think you are preserving our culture or your
> history, then may I suggest a change?  To live up to your name, your
> team would field only two men to the opponents eleven.  Your player's
> wives would be required to face the men of the opposing team.  After
> having lost every game in good faith, you would be required to remain
> in RFK stadium's end zone for the rest of your life living off what the
> other teams had left you. (Which wouldn't be much.)  Since you would
> probably find this as distasteful as 300,000 Indians do, I would suggest
> a change in name.  In sticking to your ethnic theme, I would suggest
> the Washington Niggers as a start.  … This would start a fantastic
> trend in the league.  We would soon be blessed with the San Fransisco
> [sic] Chinks, New York Jews, Dallas Wetbacks, Houston Greasers, and
> the Green Bay Crackers.  Great, huh?  Mr. Williams, these would be
> very offensive to many people, just as Redskins is offensive to myself
> and others.  You can take a stand that would show you and the team
> as true believers in civil rights, or you can continue to carry a name
> that keeps alive a threatening stereotype to Indian people.  People, Mr.
> Williams.  We don't want the Redskins![148]

> … I, along with many other Native Americans, have tried over many
> years to reduce the level of opprobrium and prejudice surrounding

---

[146] Letter from Otoe-Missouria Tribe to Jack Kent Cooke (Oct. 8, 1993), Petitioners' Notice of Reliance, Ex. 5 (TTABVue 67, p. 150).  According to the Census Bureau, there were a total of 1,762 Otoe-Missourias in the United States in 1990.  Census Bureau, U.S. Dep't of Commerce, Pub. No. 1900 CP-3-7, 1990 Census of Population Characteristics of Am. Indians by Tribe & Language tbl. 1 (1994).

[147] Respondent's objections to these letters as irrelevant because there is no evidence that the authors are Native Americans or represent any Native American tribe or organization are overruled.  The writers self-identified as Native Americans and respondent waived the hearsay objection.  Moreover respondent relies on the same type of evidence for the truth of the matter asserted, see *infra.*

[148] Letter from Billy Kevin Gover to Edward Bennett Williams (July 18, 1972), Petitioners' Notice of Reliance Ex. 32 (TTABVue 77, p. 6).

American attitutes [sic] toward Native peoples.  I urge that you consider an immediate change of name for your team and that your new name reflect in no way unfavorably on any of our national or ethnic groups.[149]

… I must say that I am appalled at your [Jack Kent Cooke] callous attitude and comments concerning this issue.  As a Native American I can assure you that I find the term "Redskin" offensive and derogatory.  I don't mind telling you that I find the name of your team totally objectionable. … I feel you've gotten off lightly with the concerns for this issue because the Indian population is not as large or vocal as the other minorities of this country.  Because we are not highly visible that does not mean you can count us out of the human race.  We deserve the right to be treated with equal respect and consideration that is entitled to any race. … Would you be offended if someone called you or a family member a derogatory racial nickname?  Some of these nicknames are: honkie, wop, kraut, chink, potato head and nigger.  When a Native American is referred to as a "redskin" then you are in essence calling them a name that is just as bad as those above.  Would you be offended by any of these names?  If so, then please reconsider your position.  You people in Washington take so much care not to offend the minorities [in] your city.  I don't understand why this same care and consideration isn't extended to other races in this country.[150]

I object to the use of "redskins" for a football team.[151]

I am an Oglala Sioux Indian living here on the Pine Ridge Indian Reservation in South Dakota.  I am writing this letter concerning a matter that I feel is very important I believe that the name "Redskins," is very demeaning to my Indian people. … Thank you for your kind attention to the matter.[152]

… As a member of the Oneida tribe of Indians of Wisconsin, I find the team name [Redskins] very offensive and more of an ethnic slur which

[149] Letter from Joan W. Drake to Jack Kent Cooke (January 21, 1988), Petitioners' Notice of Reliance Ex. 5 (TTABVue 63, p. 86).

[150] Letter from Roxanna Pucher to Jack Kent Cooke (February 22, 1988), Petitioners' Notice of Reliance Ex. 5 (TTABVue 63, pp. 108-109).

[151] Letter from Norma Lussier to Jack Kent Cooke (member of the Red Lake Band of Chippewa Indians) (March 18, 1988), Petitioners' Notice of Reliance Ex. 5 (TTABVue 63, p. 127).

[152] Letter from Adora Martin (May 2, 1988) to Jack Kent Cooke, Petitioners' Notice of Reliance Ex. 5 (TTABVue 63, 134).

should have never been placed with the proud symbol of the team. ... I am a big fan of the team and it's collection of extraordinary talent, however, I remain adamantly opposed to the organization [sic] keeping the current team name.[153]

The Washington Redskins must go! No, not the team, but the name, which is totally demeaning of Native Americans and reinforces a negative stereotype that is unjust and unwarranted. The term "redskins" is out of a period when there was a bounty on the heads of Indians and they were scalped. Eighty cents for a man's skin, 60 cents for a woman's skin and 20 cents for a child's skin. It is a period in our history that every American should be ashamed of and the continued use of such a derogatory and offensive term is an abomination. Ben Nighthorse Campbell, the only Native American in the U.S. Senate, says that "the name Redskins carries the same negative connotation as some terms that blacks and whites find offensive. The word brings to mind a negative image of uncivilized persons and has no positive meaning." Therefore, Mr. Cooke, despite your insistence to the contrary, there is no <u>pride</u> or honor associated with the name. The controversy is something that will not go away, will not disappear until the term "redskin" is banished from our vocabulary. ... ps. Being of direct Native American descent, I find the name especially offensive.[154]

All but one of the letters were written at the end or just after the relevant time period, but do evidence the opinion of individual Native Americans across the United States, providing further corroboration that the viewpoint in the NCAI resolution represents a cross-section of Native Americans. We have not considered the at least 150 letters from individuals <u>other</u> than Native Americans protesting the use of the name Redskins.[155] Inasmuch as our determination of the issue of disparagement concerns the views of Native Americans, the 150 letters from non-Native Americans have limited probative value. While they may serve to indicate a

---

[153] Letter from Jeffrey Valentino to Jack Kent Cooke (September 14, 1992), Petitioners' Notice of Reliance Ex. 5 (TTABVue 67, p. 65).

[154] Letter from Kimberly Whitehead to Jack Kent Cooke (October 8, 1993), Petitioners' Notice of Reliance Ex. 5 (TTABVue 67, p. 130).

[155] *See* App. A (detailed listing of submissions by petitioners' notice of reliance).

broader consensus regarding the word, which may add to the weight of the evidence, we do not find it necessary to rely on this evidence.

<p align="center">Respondent's Evidence of Support for the Name</p>

On January 16, 1992, the chief of the Modoc Tribe of Oklahoma sent the Washington Redskins a copy of the Inter-Tribal Council (comprising the Miami, Ottawa, Modoc, Peoria and Seneca-Cayuga Tribes of Oklahoma) "Resolution Supporting Use of Team Name 'Redskins' by the Professional Football Team in Washington, D.C.," approving the name "as a positive image depicting Native American culture and heritage."[156]

In October 1991, the chairman of the Tulalip Tribes of Washington, Stanley G. Jones Sr., sent a letter to Senator John McCain, then-Vice Chairman of the Select Committee on Indian Affairs, stating that "[m]any of us are proud that sport teams use us and our symbols to represent them. . . . We are not offended by the Washington football team being called the Redskins."[157]

The "Tribal Leader of the Soboba Band of Indians located in San Jacinto, California," Robert J. Salgado, sent a letter to Jack Kent Cooke, in January 1992, stating that he had "been impressed [by] the manner in which the Washington

---

[156] Resolution of Inter-Tribal Council, Inc. (1992), Respondent's Notice of Reliance, Ex. 27 (TTABVue 142, pp. 28-29), Respondent's Notice of Reliance, Ex. 28.2 (TTABVue 142, pp. 32-33 (duplicate). *See also* letter from Floyd E. Leonard, Chief of the Miami Tribe of Oklahoma, to C. A. Buser (June 21, 1991) (explaining that the Miami Tribe voted to support and acknowledge its pride in the use of the name "Redskins" by Miami University in Oxford, Ohio), Respondent's Notice of Reliance, Exhibit 28.7 (TTABVue 142, pp. 39-40).

[157] Letter from Stan Jones Sr., Chairman, the Tulalip Tribes, to Sen. John McCain (Oct. 30, 1991), Respondent's Notice of Reliance, Ex. 28.1 (TTABVue 142, pp. 30-31). *See* letter from Stanley G. Jones Sr., Chairman, the Tulalip Tribes, to Redskin Support Comm. (Aug. 31, 1992) (expressing no objection by the Tulalip Tribe to the use of the "Redskins" name), Respondent's Notice of Reliance, Ex. 28.6 (TTABVue 142, p. 38).

Redskins have portrayed the American Indian," and further stating his support for the team.[158]

The chief of the Choctaw Nation of Oklahoma, Hollis E. Roberts, sent a letter to the Washington Redskins Communications Department in January 1992, which covered the history of the Choctaws and connected that history with the use of American Indian names and images by sports teams.[159] Chief Roberts stated:

> Sports teams traditionally adopt a namesake and image which they perceive as noble and powerful. The Washington Redskins is a team . . . that Indian people can be proud to be identified with.[160]

The chief concluded by expressing his support "of the Washington football team, the 'Redskins.'"[161]

The Principal Chief of the Seminole Nation of Oklahoma, Jerry G. Haney, sent a letter to Jack Kent Cooke in January 1992, expressing that the use of the "Redskins" name by the Washington football team is a source of pride.[162]

The Vice President of the Pima-Maricopa Indian Community of Salt River in Scottsdale, Arizona, Merna L. Lewis, sent a letter to Ms. Jo Walter regarding the

---

[158] Letter from Robert J. Salgado, Chairman, Soboba Band of Mission Indians, to Jack Kent Cooke (Jan. 17, 1992), Respondent's Notice of Reliance, Ex. 28.3 (TTABVue 142, p. 34).

[159] Letter from Hollis E. Roberts, Chief, Choctaw Nation of Okla., to Charlie Dayton, V.P., Wash. Redskins Communications Dep't (Jan. 23, 1992), Respondent's Notice of Reliance, Ex. 28.4 (TTABVue 142, pp. 35-36).

[160] *Id.* (TTABVue 142, p. 36).

[161] *Id.*

[162] Letter from Jerry G. Haney, Principal Chief, Seminole Nation of Okla., to Jack Kent Cooke (Jan. 23, 1992), Respondent's Notice of Reliance, Ex. 28.5 (TTABVue 142, p. 37).

use of the name "Naperville Redskins" by a high school in Illinois.[163]  Ms. Lewis wrote that her Native American community did not object to the Naperville school using the name "Redskins" so long as it was used with honor and respect.

The principal chief of the Eastern Band of Cherokee Indians in North Carolina, Jonathan L. Taylor, also sent a letter to Ms. Jo Walter in July 1992, regarding the use of the name "Naperville Redskins."[164]  Chief Taylor wrote that the use of the name "Redskins" by the school was a "great honor for all Native Americans."[165]

A 1992 newspaper article reported that the Mattaponi tribe did not object to the use of the name "Redskins" by the Washington football team.  The tribal chief of the Mattaponi of King William County, Virginia, Webster "Little Eagle" Custalow, is quoted as saying that his tribe did not "disapprove of that name at all.  The only thing I've asked them to do is to wear the helmets proudly.  There's an Indian head dress on the helmet and I asked them to keep that helmet high and not rub it in the dirt."[166]

The record also includes evidence regarding Native Americans using the word "redskins" in connection with their own sports teams:

---

[163] Merna L. Lewis, V.P., Pima-Maricopa Indian Community (Ariz.), to Jo Walter (July 14, 1992), Respondent's Notice of Reliance, Ex. 28.8 (TTABVue 142, p. 41).

[164] Jonathan L. Taylor, Principal Chief, Eastern Band of Cherokee Indians, to Jo Walter (July 16, 1992), Respondent's Notice of Reliance, Ex. 28. 9 (TTABVue 142, p. 42).

[165] *Id.*

[166] Associated Press, "NAACP Objects to 'Redskins'; Chief Doesn't," *N. Va. Daily*, Aug. 5, 1992, Petitioners' Notice of Reliance, Ex. 19 (TTABVue 48, p. 59).

A sign at a Navajo Indian Reservation school: Red Mesa High School Home of the Redskins, with the photograph taken in 1989 and sent by Robert D. Kahn to Jack Kent Cooke on November 4, 1991;[167]

A sports article in the April 30, 2010 issue of the Seminole Tribune (Fla.), referencing the "Lady Redskins" as one of the teams involved in a tribal basketball tournament.[168]

Respondent also points out that its seventeenth draft pick in 1956 was Eagle Day, who was part of the Cherokee tribe.[169] Day began his career with the Washington Redskins in 1959, as reported in this *Washington Daily News* article:

**Redskins Sign Indian**

The Washington Redskins will have a real Indian on their reservation next summer. He's Eagle Day, former Mississippi University star who played two seasons in Canada after being drafted by Washington in 1956.

Day, who's part Indian, agreed to terms in a telephone conversation yesterday with Redskin head coach Mike Nixon.

"I told him he'd be given every chance to beat out Eddie Le Baron and Ralph Guglielmi," Nixon said. "But if he doesn't make the grade at quarterback, I believe he'll make a fine defensive back."

Day, 26, was the Redskins' No. 17 draft pick in 1956 b: chose to play for Calgary.

When he arrived at training camp in July 1959, the *Washington Daily News* reported that "Eagle Day is an Indian who has always wanted to be a Redskin,"

---

[167] Letter from Robert D. Kahn to Jack Kent Cooke (Nov. 4, 1991), Respondent's Notice of Reliance, Ex. 33 (TTABVue 143, pp. 6-8).

[168] Marcus Anthony Briggs-Cloud Dep. 67:20-68:14, 72:14-73:18, June 23, 2011 (TTABVue 121, pp. 73-74, 78-79); Briggs-Cloud Dep. Ex. 3 (Chris C. Jenkins, "Son, Daughter Celebrated in Memorial Tourneys," *Seminole Tribune (Fla.)*, Apr. 30, 2010, at 1C) (TTABVue 121, p. 24). We note this article is not from nor does it reference the relevant period.

[169] "Redskins Sign Indian," *Washington Daily News*, Mar. 10, 1959, at 37, Respondent's Ex. 31.1 (TTABVue 143, p. 4).

quoting Day as saying "I'm finally getting a chance to do what I wanted in the first place—play for the Redskins."[170]

Based on our review of the record within the confines of this narrow case and taking into consideration the stipulations that all evidence deemed admissible in *Harjo* is of record and all hearsay objections are waived to allow consideration of documents for the truth of the matter asserted,[171] we find the following facts in the two categories.

**FINDINGS OF FACT**

General Analysis of the Word[172]

1.  The word REDSKIN on its face is and always has been a racial designation.[173]

2.  The word REDSKINS is a plural of the word REDSKIN.[174]

3.  The word REDSKIN on its face refers to the real or imagined skin color of Native Americans.[175]

---

[170] Tom Yorke, "An Indian Joins the Redskins," *Washington Daily News*, July 27, 1959, Respondent's Ex. 31.2 (TTABVue 143, p. 5).

[171] Despite the waiver of hearsay objections, we only rely on the content of these documents to corroborate testimony and NCAI Resolution 93-11, and when various documents point to the same result to establish sufficient indicia of reliability. *West Florida Seafood, Inc. v. Jet Restaurants*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994).

[172] Although titled "General Analysis" this category includes evidence and findings of fact based on Native American viewpoints, i.e., the viewpoint of paramount concern under the applicable analysis.

[173] This is not in dispute and is evident from the answer to the first part of the test, i.e., that REDSKINS retains the meaning Native American. However, it is also amply supported by the multitude of dictionary definitions in the record, including those set forth in the majority opinion. *See also* Barnhart Rept. p. 1 (TTABVue 129, p. 5).

[174] This has been conceded and established by the record as part of the first prong of the test.

[175] Barnhart Dep. p. 70-71 (TTABVue 159, p. 74); Barnhart Rept. (TTABVue 162, p. 21); Nunberg Dep. Ex. 14 (TTABVue 83, p. 118) *Webster's New Twentieth Century Dictionary of*

4. Racial slurs often refer to real or imagined physical differences.[176]

5. Dictionary usage labels signal that a word is not part of standard vocabulary.[177]

6. Before 1966 no dictionary in this record included a usage label for the term REDSKIN.[178]

7. Beginning in 1966 and continuing to 1990, usage labels in dictionaries indicating the term REDSKIN to be offensive, disparaging, contemptuous or not preferred, first appear and then grow in number.[179]

---

*the English Language Unabridged* (2d ed. 1977) "so called from the reddish or coppery color of the skin." This is not in dispute. Resp. Br. pp. 38-40.

[176] Allen, Irving Lewis, *Unkind Words: Ethnic Labeling from Redskin to WASP* (Bergin & Garvey 1990) p. 18 ("Nearly half of all interracial slurs ...refer to real or imagined physical differences. ... Most references to physical differences are to skin color, which affirms what we have always known about the significance of color in human relations. Asian groups were called yellow this and that and Native Americans were called redskins, red men, and red devils.") petitioners' notice of reliance Ex. 57 (TTABVue 87, p. 20). See also Allen, Irving Lewis, *The Language of Ethnic Conflict Social Organization and Lexical Culture* (Columbia University Press 1983) p. 51 (Redskin listed as a disparaging slur for Native Americans), petitioner's notice of reliance Ex. 1 (TTABVue 63, p. 41). In a deposition submitted by respondent, Richard Leslie Vaughn, director of communications for the Washington football team, presents an example that reference to skin color is disparaging. "Q. What is it about the word 'darkie' that causes you to believe that it refers to African-Americans? A. The color of their skin. Q. Do you consider the word 'darkie' derogatory? A. Yes. Q. Do you consider it disparaging? Yes." Vaughn Dep. pp. 148-149 (TTABVue 158, pp. 151-152).

[177] Barnhart Rept. (TTABVue 162, p. 25). This is not in dispute.

[178] Barnhart Rept. (TTABVue 162, p. 21).

[179] Barnhart Rept. (TTABVue 162, p. 21). Regarding respondent's attempt to weaken the usage labels by pointing to the qualifier "often," as in "often offensive" indicating that it allows for contexts in which it would not be offensive, the usage labels for HEBE, KIKE GOOK, CHINK and NIGGER are all qualified by "usually," yet it would be hard to imagine anyone feeling emboldened to adopt as a team name any one of these words based on the qualifier "usually." *Merriam-Webster's Collegiate Dictionary* (10th ed. 1998). The Board may take judicial notice of dictionary definitions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006). *See also* Nunberg Dep. p. 343-344 (TTABVue 81 pp. 236-237) "As for the 'often' that is sometimes added as a hedge and is even added to words whose status has disparaging epithets is beyond a question like 'nigger.' That's usually used merely to make

8. From 1983 on, *all* dictionary entries in the Barnhart report include a usage label indicating the term is offensive, disparaging, contemptuous or not preferred.[180]

9. The National Congress of American Indians (NCAI) was founded in 1944.[181]

10. The record shows that NCAI began advocating against use of respondent's name REDSKINS, in the 1960's.[182]

11. The advocacy organization American Indian Movement (AIM) was founded in 1968 and its effort to rid sports teams of Indian names, including respondent's name REDSKINS, has been ongoing for decades.[183]

---

an exception of the ironic uses of the word often by members of the group to whom it's applied."

[180] Barnhart Rept. (TTABVue 162, p. 26). Apart from respondent's expert report, respondent points to a 1987 entry from the *Oxford English Dictionary* that does not have a usage label. However, the 1980 *Oxford American Dictionary* entry of record contains the usage label "contemptuous" and is obviously more probative on this point inasmuch as we are concerned about the meaning of language in the United States – not the English speaking world at large. (TTABVue 86, p. 76). Moreover, by 1989 even the *Oxford English Dictionary* added the usage label "not the preferred term." (TTABVue 63, pp. 55-57).

[181] Chase Dep. p. 34 (TTABVue 98, p. 40).

[182] *Lakota Times* (September 16, 1992) ("The National Congress of American Indians has been battling against the racist use of Indians as mascots for decades. The battle has been uphill all the way because mainstream America does not see the term [Redskins] as offensive – because they are not American Indians. … Mr. Deloria who directed NCAI in the 1960's and spoke out on the mascot issue then ... The grounds for cancellation of the federal registration include: The term 'Redskin' … is ... disparaging.") TTABVue 71, p. 89. *See also NCAI Sentinel* "NCAI Wages War on Indian Image" (Winter-Spring 1969) (campaign to combat negative images and references to Native Americans). TTABVue 48, pp. 80-82. *See also* letter from William B. Welles and Charles B. Kusen to Mr. Pete Rozelle (April 25, 1972) (commenting on "movement to change the familiar titles of many teams in the sports world," including the "Redskins") (TTABVue 77, p. 20).

[183] Letter from Clyde H. Bellecourt, National Director of AIM and William A. Means President of International Indian Treaty Council to Jack Kent Cooke (December 20, 1992) (TTABVue 63, p. 172). *See also The Evening Star* (Washington D.C. Wednesday January 19, 1972) "the New American Indian Movement is considering a suit against the Washington Redskins ... [a]s for the Washington Redskins, the movement suggests that 'insult is added to injury' when the Redskins are sometimes referred to as 'the Skins.'") TTABVue 77, p. 14; *Star Tribune* (November 1, 1991) ("The American Indian Movement

12. Usage labels sometimes result from pressure groups trying to influence the lexicographer.[184]

---

and others have for decades urged professional teams to drop Indian names … . Indian activist Russell Means even sued the Cleveland Indians in 1972.") (TTABVue 71, p. 21, 33-35).

[184] Butters Report p. 5, (TTABVue 129, p. 41; 165 p. 8) ("Usage labels are subject to sociopolitical pressure. … [W]hat constitutes a significant-enough semantic change to warrant the revision of a dictionary entry is often a judgment call, one which is furthermore highly subject to overt and covert sociopolitical pressures, especially where possible changes in connotation and usage are concerned. … 'Quite simply, it is a concerted attempt by various pressure groups to force dictionary editors to … abandon the traditions of setting down the language as it is actually used, however, disagreeable, regrettable, or uncongenial the use.'") p. 5-6, quoting Landau, Sydney, *Dictionaries The Art and Craft of Lexicography* (1984)). Barnhart Dep. p. 22 ("But some people that are in lexicography have been known to be less stalwart and have caved in to suggestions from non-editorial sources."). (TTABVue 159, p. 25), *see also* Barnhart Dep. pp. 80-82 (TTABVue 159, pp. 82-83) and Barnhart 1997 Dep. pp. 200-201; 210-211 (TTABVue 161, pp. 20; 23). *See also* Nunberg Dep. pp. 331-339 (TTABVue 81, pp. 224-232).

Thus, as the referenced minority asserts itself through pressure groups, the general population "abandon[s] the traditions of setting down the language" as it uses the word. This is amply demonstrated by the record where the use of REDSKIN or REDSKINS is rampantly used in literature, newspapers and movies by the mainstream prior to the 1960's to refer to Native Americans, and severely drops off, except as to the football team, after the 1960's. Nunberg Rept. (TTABVue 108, p. 107), (TTABVue 83, p. 85). *See also* Butters Dep. Exh. 10 "How to Hate Thy Neighbor A Guide to Racist Maledicta Maledicta II" p. 169 (TTABVue 171, p. 18) ("Redskin Any Native American, after the red warpaint they traditionally wore when attacking white settlers. Formerly insulting, now seldom used except in connection with the Washington Redskins football team.") Mr. Barnhart's search of newspapers and other publications from 1969-1996 revealed only 2 percent of the uses of redskin were references to Native Americans. Barnhart Rept. (TTABVue 129, pp. 7, 17). As noted by Mr. Barnhart "In recent years the *sensitivities* of *these* people [Native Americans] have caused some speakers of English to adjust their usage of some of these terms accordingly." (emphasis added) Barnhart Rept. (TTABVue 129, p. 15). He also acknowledges the trend in usage labels from "1965 to the present (1992)." "It is clear that in the last 18 years the opinions of the editors of dictionaries concerning the current usage of redskin is not uniformly agreed upon. For the first time since 1872 (when dictionaries began entering the term redskin), editors have begun to report some change in its use." *Id.* Barnhart concludes the term redskin "is acceptable in both formal and informal speech or writing of educated people" yet his own research demonstrates that it is not so used, at least in written form from 1969-1996.

Looking at Mr. Barnhart's research in combination with Nunberg's research, Mr. Barnhart's unequivocal conclusion is in conflict with the underlying data. Similarly, Dr. Butter's unequivocal conclusion that the term redskin is a "minor variant" for American Indian is contradicted by his acknowledgement of dictionaries labeling it as offensive

13. From the mid-1960's to 1996, the word 'redskin(s)' has dropped out of written and most spoken language as a reference to Native Americans.[185]

14. From at least the mid-1960's to 1996, the words 'Native American,' 'Indian,' and 'American Indian' are used in spoken and written language to refer to Native Americans.[186]

15. The usage labels appear and the use of the word redskin(s) disappears because it is increasingly recognized that the term is offensive and disparaging during the relevant time period as Native Americans raise awareness about the offensive nature of the term redskin(s).

<u>Native American Objection to Use of the Word Redskins for Football Teams</u>

16. Since 1994, Jo Ann Chase has been the Executive Director of the NCAI.[187]

17. The membership of the NCAI consists of Native American tribes and individuals.[188]

---

during the relevant time period. Butters Dep. (TTABVue 163, pp. 10, 20); Butters Rept. (TTABVue 129, p. 51). Because the conclusions of Mr. Barnhart and Dr. Butters are in direct conflict with the usage labels and the disappearance of the term from American English, since the 1960's, the time period with which we are concerned, we give their ultimate conclusions little weight.

[185] This is not in dispute see *Pro-Football*, 68 USPQ2d at 1234. Nunberg 2/18/97 Dep. (TTABVue 81, pp. 200-201); Barnhart Dep. (TTABVue 159, p. 72). The trial record includes evidence on this point up until 1996; the *Harjo* trial period ended on June 3, 1997. *Pro-Football, Inc. v. Harjo,* 45 USPQ2d 1789 (TTAB 1998). Respondent points to Mr. Butter's statement that the appearance of the term "redskins" in connection with its team in newspaper sport pages indicates that "they" (presumably the editors) find no pejorative connotations what[so]ever to the word." Pet'rs' Br. p. 28 *quoting* Butters Rebuttal Report (TTABVue 151). However, the fact that people other than the referenced group continue to use the term in one last context is not compelling evidence that the referenced group does not find it to be disparaging.

[186] Id.

[187] Chase Dep. p. 4 (TTABVue 98, p. 10).

18.  Member tribes, through resolution, designate a delegate for the purpose of representing them in NCAI and voting on NCAI resolutions. [189]

19.  The Executive Council of NCAI consists of the official representative delegates of the member tribes of the organization.[190]

20.  The Executive Council is the decision-making entity for the organization. [191]

21.  The member tribes vote on resolutions by voice vote which are usually unanimous.[192]

22.  The quorum for the Executive Council is one third of the member tribes of the organization.[193]

23.  The delegates attending the Executive Council vote on behalf of the tribes. [194]

24.  Resolutions are read out before the membership prior to the vote. [195]

25.  Resolutions are the policy of the NCAI.[196]

26.  In 1996, 206 tribes were NCAI members.[197]

27.  Approximately 150 tribes were members in 1993.[198]

---

[188] NCAI By-Laws (TTABVue 83, p. 42). *See also* Chase Dep. p. 28, Ex. 108 (TTABVue 98, p. 34).

[189] Chase Dep. p. 30.

[190] Chase Dep. p. 30.

[191] Chase Dep. p. 30.

[192] Chase Dep. p. 42.

[193] Chase Dep. p. 43, 44; By-Laws.

[194] Chase Dep. p. 55.

[195] Chase Dep. p. 62.

[196] Chase Dep. p. 47.

[197] Chase Dep. p. 54.

28. On January 18-19, 1993 NCAI passed resolution 93-11 which reads in pertinent part:

> NCAI is the oldest and largest intertribal organization nationwide representative of and advocate for national, regional, and local tribal concerns; …
>
> [T]he term REDSKINS is not and has never been one of honor or respect, but instead, it has always been and continues to be a pejorative, derogatory, denigrating, offensive, scandalous, contemptuous, disreputable, disparaging and racist designation for Native American's [sic] and
>
> [T]he use of the registered service marks identified in Exhibit B to this resolution by the Washington Redskins football organization, has always been and continues to be offensive, disparaging, scandalous, and damaging to Native Americans.[199]

---

[198] "The National Congress of American Indians, representing approximately 150 tribal governments, calls it a racial slur." Statement to the [Miami] University Senate, Dr. Britton Harwood 1993 Minutes from University Senate April 5, 1993, (TTABVue 95, p. 19). *See also The Voice* (April 27, 1993) "Harwood Addresses U. Senate on 'Redskin' Issue" ("The National Congress of American Indians, representing approximately 150 tribal governments, calls it a racial slur.") (TTABVue 95, p. 29); letter from Dale Pullen to Charlie Drayton wherein it is stated that NCAI represented 30 percent of the Native Americans in 1992. (TTABVue 98, at 111, TTABVue 142, p. 43) (shown as the Deloria Exhibit 35 also presented as exhibit 41 in the Chase deposition). In 1995, there were approximately 500 recognized tribes in the United States; 150 would have been about one third in 1993. 1995 Federal Register, respondent's Notice of Reliance (TTABVue 151, pp. 57-63). Ms. Chase also testified that there were between 100 – 400 members at the time the resolution was taken. Chase Dep. p. 54. *See also* 1992 WTOP telephone survey of tribal leaders submitted by respondent, shows approximately 30 percent of tribal leaders found the name offensive and wanted it changed. John Kent Cooke Dep., Ex. 6 (TTABVue 149, pp. 43-68; TTABVue 156, pp. 11-38).

By contrast, the 1992 letters from "tribal leaders" submitted by respondent are purportedly from 6 tribes and the Inter-tribal Council resolution represents 5 tribes in Oklahoma. In addition, the letter from Mr. Roberts explicitly only references his personal belief and not the tribe's collective opinion. (TTABVue 142, p. 36) ("If I were opposed to the football team name… The Washington Redskins is a team I admire … Thank you for this opportunity to express my views…").

[199] National Congress of American Indians Est. 1944 Resolution No. Ex DC-93-11, (TTABVue 63, p. 71).

29. This resolution represents the view of the member tribes that the word REDSKINS has always been disparaging as used for the name of a football team, this includes 1967-1990.[200]

30. The president of NCAI is elected by the membership.[201]

31. In 1972 the president of NCAI, as a representative of NCAI, met with Edward Bennett Williams (then owner of the team) requesting that the team cease use of the name REDSKINS because it is disparaging.[202]

---

[200] At oral hearing, in arguing that petitioners have not satisfied their burden by a preponderance of the evidence, respondent's counsel noted the absence of resolutions from 1967 to 1990. Obviously, contemporaneous resolutions, from NCAI or other organizations or tribal bodies, would be significant evidence; however, given the evidence of record that corroborates that the views of past perception expressed in 1993 were also held in 1967, 1972, 1974, 1978 and 1990, we find the evidence of record to be sufficient.

[201] NCAI By-laws (TTABVue 83, p. 43).

[202] Gross Dep. pp. 19-20 (TTABVue 79, pp. 181-182). Letter from Edward Bennett Williams to Commissioner Rozelle (March 30, 1972) ("I met with a delegation of American Indian leaders. … Among those who met with me yesterday were … Leon F. Cook, President, National Congress of American Indians.") (TTABVue 105, p. 81); Gross Dep. pp. 19-20 (TTABVue 79, pp. 181-182). *See also Washington Daily News* (Thursday March 30, 1972) (From an article discussing the meeting with Edward Bennett Williams the following excerpt "After Petite's fist shaking speech, Williams closed this first meeting with the American Indians who claim his team nickname, 'Redskins' is a racial slur. The eleven Indian *representatives* included ... Leon Cook, president of the National Congress of American Indians which claims a membership of *300,000*; Dennis J. Banks, national chairman of the American Indian Movement." (emphasis added) (TTABVue 48, p. 33); *The Washington Post* (Thursday March 30, 1972) ("A DELEGATION OF 11 people *representing* a variety of Indian organizations ... Among the group ... requesting that 'the derogatory racial epithet 'Redskins" be banished from the Washington sports scene were ...Leon Cook, president of the National Congress of American Indians which claims a membership of 350,000 Indians, according to the protesting group's informal leader, Harold Gross, an attorney for another Indian organization.") (emphasis added) (TTABVue 48, pp. 85-86). Harold Gross testified that he worked for NCAI in 1969 and would have first-hand knowledge as to the membership in that time period. Gross Dep. p. 37 (TTABVue 79, p. 199).

32. In 1972, the president of NCAI, along with others, requested that "the derogatory racial epithet "Redskins" be withdrawn as a team nickname… ."[203]

33. In 1972, NCAI represented approximately 300,000 Native Americans out of approximately 792,730.[204]

34. NCAI has been in existence since 1944 and between 1972 and 1993, a span of twenty years, the record shows that NCAI has represented approximately one third of Native Americans. It is reasonable to infer that NCAI represented approximately one third of Native Americans merely five years earlier in 1967.

35. NCAI objected to respondent's use of the word REDSKINS in the late 1960's.[205]

36. NCAI objected to respondent's use of the word REDSKINS in 1972.[206]

37. NCAI objected to respondent's use of the word REDSKINS in 1988.[207]

38. NCAI objected to respondent's use of the word REDSKINS in 1992.[208]

---

[203] "Recommendations to the Washington, D.C. Professional Football Team" (TTABVue 77, p. 9). Some of the others included Ron Aquilar, President of the Washington Chapter National Indian Youth Council. Mr. Aquilar, in his capacity as President of the Washington Chapter National Indian Youth Council sent a letter to the "Washington Redskin Football Team" objecting to the team name REDSKINS. ("I don't see why it is so hard for people to understand why the word 'Redskin' is a racial slur, therefore degrading. This fact is established by the everyday racism towards my people ... Regardless of whether the word insults ten of us or ten thousand of us that is not the point.") (TTABVue 77, p. 17).

[204] *Washington Daily News*, supra, *The Washington Post*, supra; Gross Dep., supra. *See also* letter from Billy Kevin Gover, a "Comanche Indian from Oklahoma," dated July 18, 1972, also indicating 300,000 Native Americans object to the name REDSKINS. (TTABVue 77, p. 6). "Historical Census Statistics on Population Totals by Race," supra.

[205] *Lakota Times* (TTABVue 71, p. 89). *See also NCAI Sentinel* (1969) (TTABVue 48, pp. 80-82).

[206] Gross Dep. pp. 19-20 (TTABVue 79, pp. 181-182).

[207] Michigan Civil Rights Commission Report (October 1988) ("The National Congress of American Indians, the oldest and largest national Indian group in the U.S. also supports this organization's [Fan's Against Indian Racism] efforts to have the Washington team's name changed.") (TTABVue 91, p. 101).

39. NCAI objected to respondent's use of the word REDSKINS in 1993.

## CONCLUSIONS

As noted above, as was found in the *Harjo* case, both by the Board and the District Court, and conceded by respondent, "the meaning of the matter in question," retains the core meaning Native American when used as the name of respondent's sports team. More specifically, the term "redskin(s)" as used by respondent in its registered marks when used in connection with professional football retains the "likely meaning" Native Americans. Much of respondent's evidence is directed to the first part of the test. Respondent's argument regarding "secondary meaning" in the sense that it has "a secondary or alternate meaning" denoting a football team, is not persuasive in that the "secondary meaning" has not stripped the word "redskins" of its "ethnic" meaning.[209] *See Squaw Valley*, at 1282 (emphasis added) (Squaw Valley ski resort meaning of squaw is "likely meaning" "*rather than* the meaning of Native American woman or wife").[210]

We turn then to the second question, "was the meaning one that may have disparaged" a substantial composite, which need not be a majority, of Native Americans, at the times of the registrations. The crux of this case is whether or not this record supports petitioners' contention that the answer to that question is yes.

[208] *Lakota Times* (March 4, 1992) ("D.C. council to consider 'Redskins' protest") (TTABVue 71, p. 71); *Lakota Times* (September 16, 1992) ("Action taken to chop 'Redskins' trademark") (TTABVue 71, p. 89); *The Circle* (October 1992) ("National Coalition Challenges Federal Trademark Registrations").

[209] Pet'rs' Br. p. 26 n. 94.

[210] We further note that there was no evidence of use of Native American indicia in connection with the term "squaw" when used with ski-related goods. *Squaw Valley*, 80 USPQ2d at 1279.

Respondent contends that it does not and characterizes the record as, at most, showing a handful of individuals (the *Harjo* petitioners, the current petitioners, the letter writers, a few individuals from various organizations) who have their own individual opinion. Such a characterization, however, ignores, and is contradicted by the substantial evidence of record.

NCAI Resolution 93-11 represents the views of a substantial composite of Native Americans. NCAI consists of member tribes from across the United States and they voice their collective opinion through the Executive Council by resolutions. A resolution from the oldest Native American organization composed of tribes from across the United States and structured in a manner to represent the collective opinion of its membership through resolutions is strong evidence of the views of Native Americans.[211] The NCAI members throughout the relevant time period represent approximately 30 percent of Native Americans.[212]

---

[211] This type of evidence is particularly useful here where the claim pertains to the views of a group rather than just an individual opinion.

The dissent points to Native American use of Indian imagery for sports teams. However, the evidence of various instances where predominantly Native American schools or groups have adopted other designs and/or words referencing Native Americans and/or Native American culture in connection with the schools or sports teams, has no relevance to the use of the word "Redskins." *E.g.*, Haskell Indian Nations University displaying an Indian head logo. The title of the newspaper article relied on by the dissent, in fact, supports the majority position: "'Chop' is spreading, but Indians Disagree on What is Offensive Most Decry 'Redskins' Nickname." *Star Tribune* (Minn.), Nov. 1, 1991, at 2B, petitioners' Notice of Reliance Ex. 20 (TTABVue 71, pp. 21, 33-35). In any event, the fact that differences of opinion exist within the group does not obviate a claim of disparagement. *Heeb*, 89 USPQ2d at 1077 ("Although some in the community may not find it disparaging, as noted above, the evidence shows that there is a substantial component of those in the named group who do.").

[212] As discussed *supra*, the record clearly points to specific numbers throughout the time period. Therefore, the dissent's statement at being "astound[ed] that the petitioners did not submit any evidence regarding the Native American population during the relevant time

The statement about Native Americans' *past* views of the word REDSKINS in the 1993 resolution is corroborated by the meeting held with the former owner Edward Bennett Williams in 1972. At the meeting, the president of NCAI at the time, Mr. Leon Cook, represented that Native Americans find the term REDSKINS to be a racial slur. Respondent characterizes Mr. Cook's views as solely his own and opines that he merely represented himself at this meeting. The president of NCAI is elected by the membership to represent them. It is unreasonable and illogical to characterize the views regarding something of importance to the members of an organization as only belonging to that individual president where he is attending in his capacity as the president of that organization. It is equally unreasonable and illogical to reduce Mr. Cook's representative capacity in such a manner. His attendance at this meeting was, not surprisingly, referenced as *representing* an Indian organization, both by the press and by Mr. Williams himself.[213]

The trend in dictionary usage labels also corroborates the time frame of objections from Native Americans starting in the late sixties and continuing

---

frame" and characterization of the evidence as "a house of cards," is simply incorrect. Moreover, taking judicial notice of the U.S. Census population statistics did not require any "gyrations." As noted earlier, while more evidence would provide more support, the existing record shows, by a preponderance of the evidence, that a substantial composite of the referenced group found the term disparaging during the relevant time period when used in connection with respondent's services and respondent has not rebutted that showing by providing a handful of examples of some members of the referenced group holding a different opinion. *Heeb*, 89 USPQ2d at 1070. *See also West Fla. Seafood, Inc. v. Jet Restaurants*, 31 USPQ2d at 1663 (Board should look at evidence as a whole to recognize "clear interrelationships existing between the several pieces of evidence submitted.")

[213] Mr. Williams appropriately refers to them as "a delegation of American Indian leaders…." Letter from Edward Bennett Williams to Commissioner Pete Rozelle (March 30, 1972), (TTABVue 105, p. 81). *See also Washington Post* (March 30, 1972) (TTABVue 48, pp. 85-86).

through the nineties as lexicographers begin and finally uniformly label the term as "offensive" or "disparaging."[214] The recognition that this racial designation based on skin color is disparaging to Native Americans is also demonstrated by the near complete drop-off in usage of "redskins" as a reference to Native Americans beginning in the 1960's.

The record establishes that, *at a minimum*, approximately thirty percent of Native Americans found the term REDSKINS used in connection with respondent's services to be disparaging at all times including 1967, 1972, 1974, 1978 and 1990. Section 2(a) prohibits registration of matter that disparages a substantial composite, which need not be a majority, of the referenced group. Thirty percent is without doubt a substantial composite. To determine otherwise means it is acceptable to subject to disparagement 1 out of every 3 individuals, or as in this case approximately 626,095 out of 1,878,285 in 1990.[215] There is nothing in the Trademark Act, which expressly prohibits registration of disparaging terms, or in

---

[214] See *Chicago Tribune* (May 21, 1992) ("In pros or preps, 'Redskins' a slur" … "And let there be no doubt that 'redskin' is a vile word. Contemporary dictionaries acknowledge it as a disparaging and offensive slang term") (TTABVue 71, p. 82).

[215] "Historical Census Statistics on Population Totals by Race," supra. In this regard we note that, in commenting on the results of the WTOP survey where 28 percent of tribal leaders voiced objection to the word REDSKINS for the name of a football team, Mr. Vaughn, as an employee of respondent, voiced the opinion that it was a "favorative [sic] response to the name 'the Redskins' being used by the Washington football team among citizens of this area and also among Native Americans." Vaughn Dep. p. 70 (TTABVue 158, p. 73). This indicates an acceptance by respondent of the possibility of disparaging approximately one third of Native Americans. Respondent's argument, contrary to established precedent, that a substantial composite should be a majority of the referenced group reflects this attitude, i.e., that it is acceptable to disparage up to forty-nine percent of Native Americans. Resp. Br. p. 21. This is clearly in direct contradiction to the legal test enunciated by our primary reviewing court and as set forth in our pretrial order.

its legislative history, to permit that level of disparagement of a group and, therefore, we find this showing of thirty percent to be more than substantial.

Respondent has introduced evidence that some in the Native American community do not find the term "Redskin" disparaging when it is used in connection with professional football. While this may reveal differing opinions within the community, it does not negate the opinions of those who find it disparaging. The ultimate decision is based on whether the evidence shows that a substantial composite of the Native American population found the term "Redskins" to be disparaging when the respective registrations issued. *Heeb Media LLC,* 89 USPQ2d at 1077. Therefore, once a substantial composite has been found, the mere existence of differing opinions cannot change the conclusion.

In view of the above, petitioners have shown by a preponderance of the evidence that a substantial composite of Native Americans found the term REDSKINS to be disparaging in connection with respondent's services during the relevant time frame of 1967-1990. Accordingly, the six registrations must be cancelled as required under Sections 2(a) and 14(3) of the Trademark Act. [216]

---

[216] The District Court also expressed concern that the Board was silent as to "whether it paid cautious heed to the admonition that in proceedings where a party has waited longer to bring a cancellation petition, that party has a very serious burden of making its case, even though the standard of proof is not technically different and remains 'a preponderance of the evidence.'" *Pro-Football, Inc. v. Harjo*, 68 USPQ2d at 1246. As stated in *Rockwood Chocolate Co., Inc. v. Hoffman Candy Co.*, 152 USPQ at 601, the Board exercises due caution in making a determination to cancel a registration, in particular, registrations that have existed for decades. We note, however, that although the first attempt to cancel the registrations did not occur until 1992, the out of court challenge to use of the marks in the six registrations, based on this record, has been ongoing for *several decades*. Respondent was not blindsided by either *Harjo* or this proceeding, but merely faces the inevitable use by petitioners of a predictable legal option, employed after requests and protests did not result in discontinuation of the use and registration of the term REDSKINS.

**LACHES DEFENSE**

In *Harjo v. Pro Football, Inc.,* 30 USPQ2d 1828, the Board held that respondent's laches defense was not applicable because there was a public policy interest at stake rather than just the petitioners' personal interest.

> [T]here exists a broader interest – an interest beyond the personal interest being asserted by the present petitioners – in preventing a party from receiving the benefits of registration where a trial might show that respondent's marks hold a substantial segment of society up to public ridicule, [and] we will not deny petitioner the right to attempt to make their case by allowing respondent's equitable defenses [laches].

*Id.* at 1831.

On appeal, however, the U.S. District Court for the District of Columbia reversed the Board and held that the Trademark Act does not unequivocally bar respondent's laches defense and permitted respondent to assert laches as an affirmative defense. *Pro-Football, Inc. v. Harjo*, 57 USPQ2d at 1145, *aff'd*, 75 USPQ2d at 1527. Nevertheless, the District Court noted that the applicability of laches "is dependent upon the equities of the factual scenarios within which it is raised." 57 USPQ2d at 1145. In the order issued in this case on May 31, 2011, the Board stated that "[b]ecause … this cancellation proceeding is essentially a relitigation of what transpired in the *Harjo* case before the Board, we will follow the precedent of the D.C. Circuit Court of Appeals in *Pro-Football, Inc. v. Harjo*, 75 USPQ2d at 1527 in allowing the defense of laches in this case … and to the extent

that petitioners maintain that laches does not provide a defense to a disparagement claim, this issue is preserved for appeal."[217]

The America Invents Act, enacted in September 2011, changed the venue for appeals to District Court from USPTO *inter partes* proceedings to the U.S. District Court for the Eastern District of Virginia from the U.S. District Court of the District of Columbia. *See* Pub. L. No. 112-29 § 9(a), 125 Stat. 284 (2011) (to be codified at 15 U.S.C. § 1071(b)(4)). Accordingly, subsequent judicial review of this dispute, if any, will occur either in the U.S. District Court for the Eastern District of Virginia in the Fourth Circuit or in the Court of Appeals for the Federal Circuit, but not in the D.C. Circuit. In view thereof, petitioners filed a motion to reconsider the legal standard for laches in light of the America Invents Act.[218]

Although the Board earlier ordered that "any motion or brief including a re-argument of a previously decided issue in this proceeding will be deemed to be a nonconforming brief and will be given no consideration,"[219] and specified that the decision in the May 31, 2011 Order regarding laches was a final decision on the applicability of the defense, we find that the passage of the America Invents Act sufficiently changes the circumstances in this case so as to justify revisiting the issue.

We hold that laches does not apply to a disparagement claim where the disparagement pertains to a group of which the individual plaintiff or plaintiffs

---

[217] Board's May 31, 2011 Order, p. 12 n.6 (TTABVue 40) (internal quotations omitted).

[218] TTABVue 178.

[219] May 5, 2011 Order, p. 4 (TTABVue 39).

simply comprise one or more members. First, laches is an equitable defense. *A.C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 22 USPQ2d 1321, 1328 (Fed. Cir. 1992) (en banc). It is difficult to justify a balancing of equities where a registrant's financial interest is weighed against human dignity. To apply laches to this type of claim contemplates the retention on the register of a mark determined by the Board to be a racial slur, in blatant violation of the Trademark Act's prohibition against registration of such matter, merely because an individual plaintiff "unreasonably delayed" in filing a petition to cancel. For example, if Reg. No. 217,067, renewed in 1946 for twenty years, i.e., until 1966, for the mark NIGGER BABY BRAND for oranges and grapefruit were still active, individual members of the group referenced by such matter would be barred from seeking cancellation if they "unreasonably delayed" in seeking such relief.[220] We add that the decision of the Court of Appeals for the District of Columbia Circuit, even though it countenanced application of laches in the *Harjo* decision, actually provides support for not applying the doctrine in cases such as this. If plaintiffs are created every day as individual members of the referenced group mature to age 18, the laches defense will never yield the registrant of a racial slur the repose it seeks.[221]

Second, courts and the Board have routinely held that where there is a broader public policy concern at issue, the equitable defense of laches does not apply. *See Ultra-White Co. v. Johnson Chem. Indus., Inc.,* 465 F.2d 891, 175 USPQ

---

[220] TTABVue 61, p. 38.

[221] As succinctly expressed in Ms. Whitehead's 1993 letter, this is an issue that "will not go away." Petitioners' Notice of Reliance Ex 5 (TTABVue 67, p. 130).

166, 167 (CCPA 1972) (public interest in preventing likelihood of confusion prevails over a laches defense); *Linville v. Rivard*, 41 USPQ2d 1731, 1733 n. 5 (TTAB 1997), *aff'd on other grounds,* 133 F.3d 1446, 45 USPQ 1374 (Fed. Cir. 1998) (laches is unavailable against abandonment); *Bausch & Lomb, Inc. v. Leupold & Stevens Inc.*, 1 USPQ2d 1497, 1499 (TTAB 1986) (laches is not available against a claim of descriptiveness or fraud); *Int'l Assn. of Fire Chiefs, Inc. v. H. Marvin Ginn Corp.*, 225 USPQ 940, 947 (TTAB 1985), *rev'd on other grounds*, 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986) (laches is not available where the petition to cancel is based on genericness of the registered matter because it would frustrate Section 14(c) of the Trademark Act that a registered mark may be cancelled at any time on the ground that it is generic); *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 146 USPQ 313, 316 (TTAB 1965), *aff'd,* 377 F.2d 1001, 153 USPQ 749 (CCPA 1967) ("laches is not available to a defendant in a proceeding wherein, as here, the adverse party is claiming in essence that the mark in question inherently cannot function as a trademark" because "it is within the public interest to have registrations which are void ab initio stricken from the register and this interest or concern cannot be waived by the inaction of a single person or concern, no matter how long the delay persists."); *Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories, Inc.*, 5 USPQ2d 1067, 1069 (TTAB 1987) (laches does not apply against a claim that respondent does not control the use of a certification mark because of the public interest in making sure that certification marks are properly controlled); *compare Bridgestone/Firestone Research Inc. v. Auto. Club,* 245 F.3d 1359, 58 USPQ2d 1460,

1463-64 (Fed. Cir. 2001) (laches may be an affirmative defense against a Section 2(a) false suggestion of a connection claim because it is designed to protect a single person or institution from exploitation of their persona, not to protect the public or a broader group).

In this case, it cannot be disputed that there exists a broader public interest than that of the individual petitioners in preventing respondent from receiving the benefits of registration because respondent's marks may have disparaged a substantial composite of Native Americans at the time. The fact that this claim falls within the category of claims that pertain to a broader public interest is made clear by the elements of the claim that plaintiffs must prove, i.e., that a substantial composite of the referenced group find the term to be disparaging. Thus, there is an overriding public interest in removing from the register marks that are disparaging to a segment of the population beyond the individual petitioners.

While the Fourth Circuit has not addressed whether laches applies to a claim that a term disparages a substantial composite of an ethnic or cultural group, the decisions of the Fourth Circuit prohibiting laches when confusion is inevitable suggest that the Fourth Circuit would prohibit the affirmative defense of laches in this case. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 38 USPQ2d 1449, 1453 (4th Cir. 1996) ("in consideration of the public interest, estoppel by laches may not be invoked to deny injunctive relief if it is apparent that the infringing use is likely to cause confusion."). In *Sara Lee,* the Fourth Circuit reversed the lower District Court because "the court did not consider the public interest in avoiding

77

confusion." *Id.*; *see Lyons P'ship L.P. v. Morris Costumes Inc.*, 243 F.3d 789, 58 USPQ2d 1102, 1108 (4th Cir. 2001); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 47 USPQ2d 1465, 1469 (4th Cir. 1998) ("strong proof of likelihood of confusion—indeed, actual confusion—trumps the defenses of laches and acquiescence.").

However, if it was held in any appeal from this decision that the doctrine were to apply, to prevail on its laches defense, respondent must prove that there was undue or unreasonable delay by each of the petitioners in filing the petition for cancellation, and prejudice to respondent resulting from the delay. *Bridgestone/Firestone v. Auto. Club*, 58 USPQ2d at 1462; *see also A.C. Aukerman Co.*, 22 USPQ2d at 1328) (there are two elements to laches: (i) unreasonable and inexcusable delay and (ii) prejudice or injury to the defendant). The application of laches depends on a balancing of the length of the delay and the seriousness of the prejudice with a focus on the reasonableness of the delay. *Id.* at 1329.

On this record, we find that respondent has *not* shown (1) that any one of the plaintiffs has unreasonably delayed in bringing the petition to cancel, in view of the pending *Harjo* litigation because the pendency of that case in court excused inaction; (2) that the 11 and 15 month delays by plaintiffs Tsotigh and Pappan were inexcusable or unreasonable; or (3) that is has been prejudiced, i.e., that there has been economic prejudice due to the delay.

Amanda Blackhorse turned 18 on February 20, 2000.[222] Phillip Martin Gover turned 18 on October 1, 2000.[223] Courtney Tsotigh turned 18 on August 22, 2005.[224] Marcus Briggs-Cloud turned 18 on December 31, 2001.[225] Jillian Pappan turned 18 on May 9, 2005.[226] The pending *Harjo* litigation provided excusable delay at least until June 2008, i.e., for the entire period that case was pending, until the District Court issued its final opinion on the issue of laches as to one plaintiff.[227] In 2005, the D.C. Circuit retained jurisdiction over the case, including the pending appeal of the decision on the disparagement claim, and remanded the case to the District Court to apply the defense of laches, incorporating the age of majority requirement, to one plaintiff. *Pro-Football Inc. v. Harjo*, 415 F.3d 44, 75 USPQ2d 1525, 1529 (D.C. Cir. 2005); *Pro-Football Inc. v. Harjo*, 567 F. Supp. 2d 46, 87 USPQ2d 1891, 1893 (D.D.C. 2008). However, the appeal of the disparagement claim was never addressed by the D.C. Circuit apparently because it was "overshadowed by the defense of laches." *Pro-Football v. Harjo*, 565 F.3d 880, 90 USPQ2d 1593, 1594 (D.C. Cir. 2009). After the District Court found laches applied to the remaining plaintiff, that decision was appealed and the D.C. Circuit narrowed its decision to only that issue.

---

[222] Blackhorse Dep. 7:16-18 (TTABVue 122, p. 15).

[223] Gover Dep. 11:10-12 (TTABVue 120, p. 17).

[224] Tsotigh Dep. 23:2-18 (TTABVue 115, p. 29).

[225] Briggs-Cloud Dep. 41:5-6 (TTABVue 110, p. 47).

[226] Pappan Dep., p. 80:20-22 (TTABVue 112, p. 84).

[227] As discussed *supra*, the District Court had earlier found laches as to all the *Harjo* plaintiffs, but the D.C. Circuit remanded for further consideration as to one plaintiff.

Notwithstanding the pending *Harjo* litigation, Pappan and Tsotigh were young adults and were entitled to assess the situation and determine whether it was in their best interest to file the petition for cancellation and then act in accordance with that assessment. Respondent has shown nothing more than a minimal delay in seeking cancellation. In this regard, respondent has not cited, nor have we found, any cases supporting such a minimal delay as being sufficient to support laches. *See Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 223 USPQ 202, 207 (7th Cir. 1984) ("We note that two years has rarely, if ever, been held to be a delay of sufficient length to establish laches.").

As of 1999, when the Board issued its decision in *Harjo* to cancel the registrations, the status of those registrations was in question up until, at least, the District Court's decision on remand in 2008. Throughout this time, as the record demonstrates, respondent continued to invest and build its brand. Respondent's evidence of purported economic prejudice covers the alleged delay period 2000-2006/7 which is concurrent with the pending *Harjo* litigation. Thus, it is impossible to distinguish the possible monetary or investment loss that might have accompanied ultimately losing the *Harjo* case from losses that might be incurred as a result of ultimately losing the subsequent *Blackhorse* case filed during the pendency of the *Harjo* litigation. Clearly respondent was not deterred by *Harjo* from investing in its brand, and an adverse decision in the present litigation would not have prevented respondent's loss of monetary investments had the current plaintiffs brought their suit earlier, inasmuch as it still would, of necessity, have

80

been after *Harjo* began in order for them to reach the age of majority. While specific evidence of reliance is not required to show prejudice, there must be some nexus between a delay in filing the suit and the expenditures. *A.C. Aukerman Co. v. R. L. Chaides Construction Co.*, 22 USPQ2d at 1329. There is nothing in the record to indicate that respondent's business decisions regarding investment in its brand and marks has been influenced in any way by the pendency of this cancellation proceeding.

In view of the above, respondent's invocation of the laches defense fails.

**Decision:** The petition for cancellation is granted.

Bergsman, Administrative Trademark Judge, dissenting:

I respectfully dissent from the majority's decision to grant the petition on the claim of disparagement because the dictionary evidence relied upon by the majority is inconclusive and there is no reliable evidence to corroborate the membership of National Council of American Indians.

To be clear, this case is *not* about the controversy, currently playing out in the media, over whether the term "redskins," as the name of Washington's professional football team, *is* disparaging to Native Americans *today*. The provisions of the statute under which the Board must decide this case – §§ 2(a) and 14(3) of the Trademark Act, 15 U.S.C. §§ 1052(a) and 1064(3) – require us to answer a much narrower, legal question: whether the evidence made of record in this case establishes that the term "redskins" *was* disparaging to a substantial composite of

Native Americans *at the time each of the challenged registrations issued.*[228]  *See generally Consorzio del Proscuitto di Parma v. Parma Sausage Prods., Inc.*, 23 USPQ2d 1894, 1898-99 (TTAB 1992) (discussing the language of Lanham Act § 14(3) and explaining that the "registration was obtained" language Congress used to specify when a registration for a mark may be cancelled under the enumerated statutory provisions, such as § 2(a), "shows an intent that only if it should not have issued in the first place should a registration more than five years old be cancelled").

The new petitioners here have filed a petition to cancel the same registrations on one of the same grounds asserted in the *Harjo* cancellation proceeding originally filed with the Board.  Not only is this claim the same as one in the *Harjo* cancellation proceeding, but the evidence relating to whether the term "redskins" was disparaging to Native Americans during the relevant time period predominantly is the same as well.  As noted by the majority, in this case the new petitioners re-submitted most of the same evidence that the *Harjo* petitioners submitted—evidence which the district court previously ruled was insufficient to support an order to cancel the challenged registrations as disparaging.  The evidence from *Harjo* was augmented by depositions of the individual petitioners

---

[228] Nor is this case about whether respondent may continue to use the term "redskins" as the name of a professional football team.  As observed by the majority, our jurisdiction is limited to deciding only whether the marks that are the subject of this proceeding may continue to be registered.  We have no authority to compel parties to cease use of marks.

here, each of whom testified that they found the term "redskins" in the challenged marks offensive.[229]

Thus, beyond the statutory constraint that the Board can decide only whether the marks can remain registered, the Board's decision also is constrained by the evidence placed before it. The new petitioners in this proceeding made the decision to simply re-use the trial record from the previous *Harjo* litigation, without substantial augmentation. The D.C. Circuit Court of Appeals did not overturn the district court's ruling in *Harjo II* that the evidence introduced at the Board in the *Harjo* cancellation proceeding was insufficient to support the Board's decision in that case. Nor has the passage of time aided what could be described as a stale record. The consequence of petitioners' decision to rely on the same evidence previously found insufficient to support cancellation without substantial augmentation is that the evidence before the Board in this case remains insufficient as well.

By this dissent, I am not suggesting that the term "redskins" was *not* disparaging in 1967, 1974, 1978, and 1990 (the registration dates at issue). Rather, my conclusion is that the evidence petitioners put forth fails to show that it was.

### THE RECORD

The evidence submitted by petitioners can most charitably be characterized as a database dump. Despite the fact that the Board conducted a case management conference and issued an order "to clarify the applicable law prior to trial to allow

---

[229] The petitioners did not resubmit the depositions of the *Harjo* petitioners in this case.

the parties to focus their testimony and evidence on facts relevant to the legal issues,"[230] petitioners submitted the entire *Harjo* file and even lodged objections to the evidence that they submitted. There was no order or structure to petitioners' evidence that told a compelling story or presented a coherent case. One need look no further than gyrations the majority employed to establish the membership of the National Council of American Indians. It is astounding that the petitioners did not submit any evidence regarding the Native American population during the relevant time frame, nor did they introduce any evidence or argument as to what comprises a substantial composite of that population thereby leaving it to the majority to make petitioners' case have some semblance of meaning.

## DISPARAGEMENT CLAIM

### Expert Reports

As noted above, Dr. Geoffrey Nunberg, Dr. Ronald Butters, and David K. Barnhart were qualified as expert witnesses in linguistics, none of whom specifically researched the Native American viewpoint of the word "redskin(s)" in connection with football-related services during any time period.[231] Despite the fact that the issue before us is how Native Americans perceive the term "Redskins," we are presented with the expert testimony of three non-Native American men opining on how other presumptively non-Native American men and women (*i.e.,* the editorial staff of dictionary publishers) perceive the term "Redskins."

---

[230] May 31, 2011 order summarizing pretrial conference (TTABVue 40). Petitioners also resubmitted the Ross Survey which the Board and the district court both held had little, if any, probative value.

[231] *See supra* note 49.

The majority notes that when Mr. Barnhart was asked whether the term "darky" is derogatory, he said that "[d]epending on the context, yes."[232]  Likewise, we must determine how Native Americans perceive the term "Redskins" when used in connection with the name of a football team.  In this regard, the record includes evidence, albeit one example after the relevant time period, regarding Native Americans using the term "Redskins" to identify the name of their sports teams.  The record includes the following material:

a.    A sign at a Navajo Indian Reservation school:  Red Mesa High School Home of the Redskins, with the photograph taken in 1989 and sent by Robert D. Kahn to Jack Kent Cooke on November 4, 1991;[233] and

b.    A sports article in the April 30, 2010 issue of the *Seminole Tribune* (Fla.), referencing the "Lady Redskins" as one of the teams involved in a tribal basketball tournament.[234]  To the extent that post-1990 evidence has any relevance, it shows Native Americans using the term "Redskins" in a prideful way to identify their teams.[235]

We can imply from the use of "Redskins" by Native Americans in connection with the name of sports teams that the context in which "Redskins" is used changes

---

[232] Barnhart Dep., pp. 71-72 (TTABVue 159, pp. 74-75).

[233] Letter from Robert D. Kahn to Jack Kent Cooke (Nov. 4, 1991), Respondent's Notice of Reliance, Ex. 33 (TTABVue 143, pp. 6-8).

[234] Marcus Anthony Briggs-Cloud Dep. 67:20-68:14, 72:14-73:18, June 23, 2011 (TTABVue 121, pp. 73-74, 78-79); Briggs-Cloud Dep. Ex. 3 (Chris C. Jenkins, *Son, Daughter Celebrated in Memorial Tourneys*, SEMINOLE TRIBUNE (FLA.), Apr. 30, 2010, at 1C) (TTABVue 121, p. 24).

[235] As noted above, this evidence was introduced into the record by petitioners because they believed it was relevant.

the perception of the term. Thus, for example, when a dictionary usage label says "often offensive," the usage label would not encompass use of the term "Redskins" in connection with a team name because that would not be offensive to Native Americans who identify their teams with the name "Redskins." *See* the discussion about dictionary usage labels *infra.*

Petitioners also introduced testimony and evidence regarding Native Americans using other references to Native Americans and Native American imagery in connection with sports teams. This testimony and evidence introduced into this record by petitioners is relevant to show that the commercial impression or perception of a term or image changes in connection with its use. For example, the record includes the following:

a. A sign at a Navaho Indian Reservation school: Round Rock Public School Fighting Braves with an Indian logo, with comments on the back of the photograph indicating that the image was captured on June 10, 1994;[236]

b. A sign at a Navajo Indian Reservation school: Tuba City High Warriors with an Indian head logo, with comments on the back of the photograph indicating that the image was captured on June 10, 1994;[237]

c. An article in the November 1, 1991 issue of the Star Tribune[238] reported the following:

---

[236] Respondent's Notice of Reliance, Ex. 37 (TTABVue 143, pp. 15-16).

[237] Respondent's Notice of Reliance, Ex. 38 (TTABVue 143, pp. 17-18).

[238] Pat Doyle, *'Chop' is Spreading, but Indians Disagree on What is Offensive Most Decry 'Redskins' Nickname*, STAR TRIBUNE (Minn.), Nov. 1, 1991, at 2B, Petitioners' Notice of Reliance, Ex. 20 (TTABVue 71, pp. 21, 33-35).

> [A]ttempts by the Department of Education to order all schools to discard Indian nicknames failed because leading tribal officials objected. They said schools with large Indian enrollments often took pride in the names. The tribal leaders cited Mahnomen High School, where the enrollment is 39 percent Indian. It's located within White Earth reservation boundaries. Mahnomen's nickname is Indians;

d. The website of the Omaha Nation public school system[239] displaying the legend "Home of the Chiefs & Lady Chiefs," featuring teepees and an Indian head logo, and providing issues of its online publication, Chief Times;[240]

e. A webpage from the Haskell Indian Nations University displaying an Indian head logo;[241]

f. Various Native American images are shown as logos for Flandreau Indian School, a Bureau of Indian Affairs boarding school located in Flandreau, South Dakota.[242]

---

[239] The Omaha are a Native American tribe and the Omaha Nation public schools are located in Macy, Nebraska. Briggs-Cloud Dep. 174:6-18 (TTABVue 120, p. 180); Gover Dep. Ex. 18 (*Welcome to the Home of the Chiefs & Lady Chiefs*, Omaha Nation Public Sch. website) (printed June 10, 2011) (TTABVue 118, pp. 49-51).

[240] Gover Dep. Ex. 19 (*Chief Times, vol. 1, issue 17*, Omaha Nation Public Sch. website) (printed June 10, 2011) (TTABVue 118, pp. 52-55). Petitioner Phillip Gover testified that he was not aware of the school or the school's team name. Gover Dep. 173:4-173:17 (TTABVue 120, pp. 178-79).

[241] Blackhorse Dep. Ex. 2 (*Haskell Logos*, Haskell Indian Nations Univ. website) (printed June 19, 2011) (TTABVue 123, p. 29); Blackhorse Dep. 39:22-40:8, June 22, 2011 (TTABVue 122, pp. 47-48). Haskell Indian Nations University is located in Lawrence, Kansas. Blackhorse Dep. 26:12-13 (TTABVue 122, p. 34).

[242] Pappan Dep. 16:8-16, 36:13-14, 73:19-76:6, Aug. 11, 2011 (TTABVue 112, pp. 20, 40, 77-80), Pappan Dep. Exhibits 4-6 (TTABVue 113, pp. 27-29). A Bureau of Indian Affairs school "means 100 percent Native Americans attend this school." Pappan Dep. 46:15-18.



The Flandreau Indian School's nickname is the "Indians" and, as shown by the image above, the school has an Indian head logo.[243] The Flandreau Indian School's girls' basketball team is nicknamed the "Lady Indians" and another team in its league is nicknamed the "Mighty Braves;"[244] and

g.      The Sherman Indian High School, a Bureau of Indian Affairs school located in Riverside, California,[245] has an Indian head logo, shown by the image below:[246]



The school's nickname is the "Braves."[247]

---

[243] Pappan Dep. 60:20-25 (TTABVue 112, p. 64); Pappan Dep. Exhibits 4-6 (TTABVue 113, pp. 27-29).

[244] Pappan Dep. 76:15-21 (TTABVue 112, p. 80).

[245] Pappan Dep. 37:2-10, 46:13-18 (TTABVue 112, pp. 41, 50).

[246] Pappan Dep. Ex. 2 (TTABVue 113, p. 25).

[247] Pappan Dep. 43:24-44:13, 54:24-57:24 (TTABVue 112, pp. 47-48, 58-61).

Petitioner Jillian Pappan, a Native American of the Omaha Tribe of Macy, Nebraska,[248] provided the following testimony regarding the use of Native American imagery in connection with sports teams:

> The Sherman Indian School logo is an attempt by a Native American school to show their pride, to show their honor, and I say 'attempt' because there are people that will misuse it.
>
> <center>*     *     *</center>
>
> The Sherman Indian School, I understand that they want to preserve heritage and preserve culture and it's a good idea but at the end of the day that's not the way to do it.[249]

The record does not show any evidence or testimony of any actual effort, past or present, at any of the named Native American schools to have the Indian namesakes or imagery changed as school nicknames and logos. Based on this record, there is a difference between what petitioners' linguistic expert concludes regarding the meaning of the term "Redskins" and the empirical evidence regarding how Native Americans use that term in connection with name of sports teams.

<center>Dictionary Usage Labels for "Redskins" Entries</center>

Keeping in mind that Registration No. 0836122 for the mark THE REDSKINS (stylized), shown below, issued September 26, 1967,

<center>*The Redskins*</center>

---

[248] Pappan Dep. Ex. 1: Resp. to Respondent's First Set of Interrogs., No. 3, at 6 (TTABVue 113, p. 9).

[249] Pappan Dep. 59:24-60:4, 60:11-15 (TTABVue 112, pp. 63-64).

Registration No. 0978824 for the mark WASHINGTON REDSKINS, in typed drawing form, issued February 12, 1974, Registration No. 0986668 for the mark WASHINGTON REDSKINS and design, shown below, issued June 18, 1974,



Registration No. 0987127 for the mark THE REDSKINS and design, shown below, issued June 25, 1974, and



Registration No. 1085092 for the mark REDSKINS, in typed drawing form, issued February 7, 1978, let us examine the survey of dictionary usage labels.

The majority references the dictionary research conducted by Mr. Barnhart. He found no restrictive usage labels for the term "redskin" in any dictionaries prior to 1965. Beginning in 1966 Mr. Barnhart's dictionary entries start to include usage labels indicating the term is offensive. *See Random House Unabridged* (1st ed. 1966). However, the record includes a copy of the 1967 *Random House Unabridged Dictionary*. There is no copy of the 1966 edition. Thus, at the time Registration No. 0836122 registered, there was purportedly only one dictionary with a usage label

that stated the term "Redskin" is "often offensive," meaning that it is not always offensive and leaving open the possibility that "Redskins" is not considered offensive when used in connection with the name of a football team.

According to Mr. Barnhart's survey, between 1966 and 1979, only one additional dictionary published a negative usage label regarding the term "Redskin"; that is, the *Thorndike-Barnhart Intermediate Dictionary* (1974), noting that "the word *redskin* is often considered offensive."[250] Thus, at the time Registration Nos. 0978824, 0986668, 0986668, and 1085092 registered, there were two dictionaries with usage labels stating that the term "Redskin" is "often offensive," again meaning that it is not always offensive and leaving open the possibility that "Redskins" is not considered offensive when used in connection with the name of a football team.

Based on the above-noted evidence, the majority found that there is a "clear trend beginning in 1966 to label this term as offensive." However, at the relevant times (1967, 1974 and 1978), that "clear trend" comprised only two dictionaries. Two does not make a trend. In fact the next dictionary to set forth a negative usage label was the 1980 *Oxford American Dictionary,*[251] six years after the 1974 *Thorndike-Barnhart Intermediate Dictionary*. The evidence does not support the

---

[250] Barnhart Expert Report (June 8, 1996), Barnhart Ex. 3 (TTABVue 162, pp. 26-27). Mr. Barnhart was an associate editor of the Thorndike-Barnhart school dictionaries (1966-1980) and the general editor of THE BARNHART DICTIONARY OF NEW ENGLISH SINCE 1963 (1973), THE SECOND BARNHART DICTIONARY OF NEW ENGLISH (1980), and THE THIRD BARNHART DICTIONARY OF NEW ENGLISH (1990). *Id.* (TTABVue 162, p. 14). He is the son of Clarence Barnhart, a noted American lexicographer. Barnhart Dep. 23:14-16 (TTABVue 159, p. 26).

[251] *Id.*

majority's finding of fact No. 7 that "[b]eginning in 1966 and continuing to 1990, usage labels in dictionaries indicating the term REDSKINS to be offensive, disparaging, contemptuous or not preferred appear and grow in number," as applied to Registration Nos. 0836122, 0978824, 0986668, 0986668, and 1085092.[252] The dictionary evidence is not sufficiently probative to justify cancelling respondent's registrations when, as noted by the majority, any cancellation of a registration should be granted only with "due caution" and "after a most careful study of all the facts." *Rockwood Chocolate Co., Inc. v. Hoffman Candy Co.,* 152 USPQ at 601.

<u>Use of the term Redskins in Various Media</u>

The majority references Dr. Nunberg's survey of electronic databases from major newspapers and magazines published between approximately 1975 through 1989 to glean information about the use of the word "redskins" in the context of Native Americans." Because Dr. Nunberg's survey begins in 1975, the conclusions he draws are not relevant to Registration No. 0836122 registered in 1967 and Registration Nos. 0978824, 0986668, and 0986668 registered in 1974.

Mr. Barnhart conducted a similar search using a Nexis electronic database group file featuring major newspapers, magazines and journals published between 1969 and 1996.[253] He found that the term "redskin" or "redskins" appeared at least

---

[252] The majority's finding of fact No. 15 regarding dictionary usage labels is not relevant to 0836122 because that registration issued before the usage labels came into use.

[253] Barnhart Expert Report pp. 3, 18 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 20, 35).

once in 143,920 articles.[254]   Similar to Dr. Nunberg's initial search results, Mr. Barnhart reported that the results of his "redskin" database search were "overwhelming to be in the context of sports," with less than two percent of the results referring to Native Americans.[255]   Mr. Barnhart would not draw any inferences about the infrequency in which the term "redskin" or "redskins" was used to refer to Native Americans.  He testified that it was not what he was asked to do and it would be a significantly greater project to determine whether there is any significance to the lack of occurrences.[256]   Nevertheless, he did conclude that since the term REDSKIN appeared in 143,920 articles, it "is acceptable in both formal and informal speech or writing of educated people"[257] at least as it applies to sports teams.

In view of the foregoing, the majority's conclusion that the "near complete drop-off in usage of 'redskins' as a reference to Native Americans beginning in the 1960's" is somehow probative that the term is disparaging is not supported by the record.

NCAI Resolution

The majority finds that the resolution passed by the National Congress of American Indians ("NCAI") in 1993 is "clearly probative of the view of Native

---

[254] Barnhart Dep. 64:13 (TTABVue 159, p. 67); Barnhart Expert Report pp. 3, 12 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 162, pp. 20, 29).

[255] Barnhart Expert Report p. 12 (unnumbered), Barnhart Dep. Ex. 3 (TTABVue 161, p. 29); *see* Barnhart Dep. 69:5-8 (TTABVue 159, p. 72).

[256] Barnhart Dep. 67:15-70:6 (TTABVue 159, pp. 70-73).

[257] Barnhart Expert Report (TTABVue 162, p. 31).

Americans held at the relevant time period because the NCAI "represented approximately thirty percent of Native Americans" and the resolution set forth "the past and ongoing viewpoint of the Native Americans it represents." Despite the assertions in the resolution that the organization represents "the American Indian and Alaska Tribal governments and people gathered in Crystal City, Virginia, of the Washington D.C. area, for the 1993 Executive Council Meeting"[258] of the organization, there is no reliable evidence supporting the number of Native Americans or tribes that attended the meeting or that were members of the organization during the relevant time frame between 1967 and 1990.

The majority relies on the deposition testimony of JoAnn Chase who became the Executive Director of the NCAI on April 1, 1994 and provided testimony about the resolution. JoAnn Chase testified that she "was not in attendance at this meeting" when the resolution was passed, that she did not know if any minutes of the meeting were taken, that she could not locate any record of the minutes or any indicator of whether a quorum was present for the voting of this resolution, that she had no record of the people in attendance at the meeting, and that she did "not know what the membership of the organization was at that time."[259] Ms. Chase also testified that she had no record of the number of tribes who had delegates to the organization in 1967, 1974, 1985, or 1990, no record of any similar resolutions concerning the use of the name "Washington Redskins" by the organization between 1967 and 1992, and had no letters or correspondence concerning the use of the word

[258] NCAI Resolution (TTABVue 63, p. 71).

[259] Chase Dep. 51:21-52:11, 53:7-17, 54:3-4 (TTABVue 98, pp. 57-60).

"redskins" or "Washington Redskins" with respect to the football team between 1967 and 1992.[260]

Nevertheless, based on the following testimony, the majority found that "there were between 100 – 400 members at the time the resolution was taken":

> I do not know what the membership of the organization was at that time. I can tell you currently, if, for example, our membership is 206 tribes, it would be one-third. At that time the membership would have been 100 tribes. It could have been 400 tribes. I don't know.[261]

The majority also relies on the deposition of Harold Gross, the Director of Indian Legal Information Development Services, a legislative oversight program. The relevance of the Gross deposition testimony is that Mr. Gross testified that Leon Cook, President of the NCAI, participated in a 1972 meeting with Edward Bennett Williams, the President and part-owner of the Washington Redskins football team, to protest the Redskins name. Petitioners did not depose Mr. Cook and have him testify regarding the membership of the NCAI in 1972. Rather, the majority relies on an article published in the *Washington Daily News* on March 30, 1972 discussing that meeting which reported that the NCAI "claims a membership of 300,000."[262] The article provides no source as to 300,000 membership figure. The author of the article did not state that Leon Cook said that the NCAI had 300,000 members.

---

[260] *Id.* 83:20-22, 84:1-85:1 (TTABVue 98, pp. 89-91).

[261] *Id.* 54:3-8 (TTABVue 98, p. 60).

[262] Petitioners' Notice of Reliance Ex. 18 (TTABVue 48, p. 33).

The majority references an article published in *The Washington Post* on March 30, 1972 discussing that meeting reported that the NCAI claims a membership of 350,000 "according to the protesting group's informal leader, Harold Gross, an attorney for another Indian organization."[263]  According to the majority, "Harold Gross testified that he worked for the NCAI in 1969 and would have first-hand knowledge as to the membership in that time period."  In fact, Mr. Gross testified that he was staff counsel for a year.[264]  But he was not employed by the NCAI in 1972, the year that the meeting took place, and the article does not provide any information to conclude that Mr. Gross had accurate knowledge about the membership of the NCAI in 1972.

The majority references the participation of Dennis Banks, District Representative of the American Indian Movement, at the 1972 meeting.  There is no testimony or evidence verifying the size or membership of that organization during the relevant time period.

The majority references the Michigan Civil Rights Commission Report on the Use of Nicknames, Logos and Mascots Depicting Native American People in Michigan Education Institutions (October 1998) which stated that the NCAI is "the oldest and largest national Indian group in the U.S."  This statement is probative that the Michigan Civil Rights Commission believes that the NCAI is the biggest Native American Group.  However, there is no evidence, let alone reliable evidence, as to the basis of that belief on the part of the Michigan Civil Rights Commission.

---

[263]  Petitioners' Notice of Reliance Ex. 18 (TTABVue 48, pp. 85-86) (emphasis added).

[264] Gross Dep., p. 37 (TTABVue 79, p. 199).

In footnote 137, the majority references a statement by Dr. Britton Harwood set forth in the minutes of the Miami University Senate that "[t]he National Congress of American Indians, representing approximately 150 tribal governments, calls it [redskin] a racial slur." The problem with Dr. Harwood's statement is that (i) the minutes do not identify Dr. Harwood, (ii) the minutes do not identify how Dr. Harwood is knowledgeable about the membership of the NCAI, and (iii) the minutes do not identify the source that Dr. Harwood used to quantify the membership of the NCAI. The minutes are probative of Dr. Harwood's belief as to the membership of the NCAI, made in support of a resolution urging Miami University to change its' team names.

In footnote 140, the majority references a 1992 survey by WTOP, a Washington, D.C. radio station, showing 28% of Native American tribal leaders found the name Redskins offensive corroborates the fact that a substantial composite of Native Americans perceive the term "Redskin" to be disparaging.[265] The purpose of the survey was to see how tribal leaders and listeners felt about WTOP not using the name Washington Redskins to refer to the football team. There are numerous problems with this survey for purposes of this proceeding. First, the survey took place in 1992, after the relevant time period about an act that took place after the relevant time period. Second, the "tribal leaders" were asked a leading question: "Do you think the name of the football team, The Washington Redskins, is offensive?" The survey respondents were only given the option to

---

[265] John Kent Cooke Dep., Ex. 6 (TTABVue 149, pp. 43-68; TTABVue 156, pp. 11-38).

answer "yes" or "no." They were not given the option of "do not know" or "no opinion." There was no probe question as a follow-up to the answer to determine why a respondent gave a particular answer. Finally, it is not clear that the universe of "tribal leaders" was correct. Petitioners did not provide any information regarding how the survey company identified tribal leaders or verified that the respondent was, in fact, a tribal leader. Furthermore, there was no verification to determine whether the interviews actually took place.

Finally, the majority relies on a June 3, 1991 letter from Dale Pullen, publisher of The U.S. Congress Handbook to Charlie Drayton, the Vice President of Communications for the Washington Redskins.[266] In his letter, Mr. Pullen wrote the following:

> The National American Indian Council, representing 70 per cent of the American Indian population, would like 400 U.S. CONGRESS HANDBOOKS for their D.C. meeting beginning June 7.
>
> Ms. Lee Ann Tallbear, Executive Director, for the NAIC, called to see how she might get books . . . .
>
> Ms. Tallbear said that her group represents about 1.2 million American Indians who do not live on reservations. The National Congress of American Indians represent [sic] Indians living on reservations (the remaining 30 percent).

This is the most persuasive evidence that supports the majority's contention. Nevertheless, the letter is double hearsay (i.e., hearsay within hearsay). While the hearsay objection has been waived, it does not remove the problem with this type of

---

[266] Chase Dep. pp. 104-105 (TTABVue 98, pp. 110-111), Respondent's Notice of Reliance Ex. 29.1 (TTABVue 142, p. 43) (shown as the Deloria Exhibit 35 also presented as exhibit 41 in the Chase deposition).

evidence (*i.e.,* someone said to someone that the NCAI represents "the remaining 30 percent").

The evidence supporting the majority's finding of fact No. 27 that "[a]pproximately 150 tribes were members [of the NCAI] in 1993" and its conclusion that "[t]he NCAI members throughout the time period represent approximately 30 percent of Native Americans" is a house of cards that collapses upon examination.

In view of the above, "after a careful study of all the facts" and "due caution," I find that petitioners failed to show by a preponderance of the evidence that a substantial composite of Native Americans found the term REDSKINS to be disparaging in connection with respondent's services during the relevant time frame of 1967-1990. Accordingly, the six registrations should not be cancelled under Sections 2(a) and 14(3) of the Trademark Act.

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits |||| 
| BOOKS, ESSAYS, GUIDES, SCHOLARLY PAPERS & JOURNAL ARTICLES |||| 
| 1 | Book excerpt | George E. Shankle, American Nicknames: Their Origin & Significance 373 (2d ed. 1955); As Nunberg Dep. Ex. 40 (part) | 62, pp. 164-65; (dup) 86, pp. 55-56 |
| 1 & 67 | Book excerpt, book (complete) | Irving Lewis Allen, Language of Ethnic Conflict, Social Organization & Lexical Culture 50-51 (1983); As Nunberg Dep. 40 (part) [title page only] | 63, pp. 40-41; (complete) 90, pp. 72-110; 86, p. 98 |
| 20 | Article in journal | *NCAI Wages War on Indian Image*, NCAI Sentinel, Winter-Spring 1969, at 5-7. | 48, pp. 80-82 |
| 37 | Article in monographic series | Rayna Green, *The Indian in Popular American Culture*, in Handbook of N. Am. Indians IV (not on copy) 587-606 (1988) | 77, pp. 65-84 |
| 38 | Article in literary magazine | Richard Hill, *Savage Splendor: Sex, Lies and Stereotypes*, Turtle Quarterly 14-23 (undated) | 77, pp. 86-95 |
| 39 | Essay | Michael Dorris, *Why I'm not Thankful for Thanksgiving*, [in another publication] 19-22 (1978) (not on copy) | 77, pp. 97-100 |
| 40 | Essay | Mary Gloyne Byler, *Taking Another Look*, [in another publication] 83-89 (undated) | 77, pp. 102-08 |
| 41 | Book excerpt | Frederick Whittaker, Hunters and Redskins (1909) | 77, pp. 110-22 |
| 42 | Book excerpt | Ernest A. Dench, Making the Movies v, 92-95 (1915) | 78, pp. 5-8 |
| 48 | Book excerpt | Morris A. Bealle, The Redskins 1937-1958, at 6-7, 10-11, 20-21, 34-35, 52-53, 80-81, 90-91, 96-97, 104-05, 118-23, 154-55, 158-63, 194-95, 198-99, 226-27 (1959) | 78, pp. 36-56 |
| 49 | Book excerpt | Henry E. Fritz, The Movement for Indian Assimilation, 1860-1890, at 176-77 (1963) | 78, pp. 58-60 |
| 51 & 77 | Article in journal | Hedy Hartman, *A Brief Review of the Native American in American Cinema*, 9 Indian Historian 27-29 (1976) | 78, pp. 62-64; (dup entry) 91, pp. 140-42 |
| 52 | Article in journal | Wolfgang Mieder, *Proverbs in Nazi Germany: The Promulgation of Anti-Semitism and Stereotypes Through Folklore*, J. of Am. Folklore, 1982 | 78, pp. 66-81 |
| 53 | Article in journal | Alden T. Vaughan, *From White Man to Redskin: Changing Anglo-American Perceptions of the American Indian*, 87 Am. Hist. Rev. 917-53 (1982) | 89, pp. 5-41 |
| 54 | Book excerpt | Robert Pack, Edward Bennett Williams for the Defense 14-15, 74-77, 80-83, 90-103 (1983) | 89, pp. 43-56 |
| 55 & 77 | Article in book | Haig A. Bosmajian, *Defining the "American Indian": A Case Study in the Language of Suppression*, in Exploring Language 291-99 (3d ed. 1983) | 89, pp. 58-62; (dup entry) 91, pp. 149-53 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 56 | Article in journal | Robert H. Keller Jr., *Hostile Language: Bias in Historical Writing About American Indian Resistance*, in J. of Am. Culture 9-23 (Winter 1986) | 89, pp. 64-79 |
| 57 | Book | Irving Lewis Allen, Unkind Words: Ethnic Labeling from Redskin to WASP (1990) | 87, pp. 6-80 |
| 58 | Unpublished manuscript | Cornel D. Pewewardy, Native American Mascots and Imagery:  The Struggle of Unlearning 'Indian' Stereotypes  (Oct. 26-30, 1991) | 87, pp. 82-95 |
| 60 | Article in journal | Charles L. Cutler, *"I Have Spoken": Indianisms in Current English*, English Language Notes, Mar. 1992, at 70-80 | 87, pp. 103-08 |
| 61 | Article in literary magazine | Robin Powell, *Recycling the Redskin*, Turtle Quarterly, Winter 1993, at 8-11 | 87, pp. 110-13 |
| 62 | Article in journal | Wolfgang Mieder, *"The Only Good Indian is a Dead Indian" History and Meaning of a Proverbial Stereotype*, J. of Am. Folklore, Winter 1993, at 38-60 | 90, pp. 5-28 |
| 63 | Article in journal | Robert Jensen, *Banning "Redskins" From the Sports Page: The Ethics and Politics of Native American Nicknames*, J. of Mass Media Ethics, 1994, at 16-25 | 90, pp. 30-34 |
| 64 | Unpublished manuscript | John M. Coward, What "Indians" Mean in the Media: Race, Language, and the Population Imagination (Aug. 1995) | 90, pp. 36-64 |
| 65 | Book (complete) | Raymond William Stedman, Shadows of the Indian (1982) (on file with TTAB) | 90, p. 66 |
| 66 | Book (complete) | John E. O'Connor, The Hollywood Indian: Stereotypes of Native Americans in Films (1980) (on file with TTAB) | 90, pp. 68-70 |
| 70 | Teacher's Guide | John M. Coward, Teacher's Guide to the Media & the Am. Indian, undated | 91, pp. 9-40 |
| 74 | Article in book | Robert B. Moore & Arlene Hirschfelder, *Feathers, Tomahawks & Tipis*, *in* Understanding "Indian" Stereotypes (1977) | 91, pp. 77-85 |
| 112 | Thesis | Arlene B. Hirschfelder, Univ. of Chi., The Treatment of American Indians in Selected American History Textbooks for Secondary Schools, Aug. 1971 As Hirschfelder Dep. Ex. 7 | 95, pp. 76-176; (dup) 107, pp. 5-108 |
| 113 | Book | Frederick E. Hoxie, A Final Promise: The Campaign to Assimilate the Indians, 1880-1920 (1984) (on file with TTAB) | 95, pp. 178-80 |
| 114 | Book | Frederick E. Hoxie, Parading Through History: The Making of the Crow Nation in America 1805-1935 (1995) (on file with TTAB) | 95, p. 182 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 125 | Play in book | James L. McCloskey, Across the Continent; Or, Scenes from New York Life and the Pacific Railroad 64-114 (1963) | 64, pp. 5-32 |
| 126 | Movie review in journal | *"Flap" is Flop*, 4 Indian Historian [unknown] (Spring 1971) | 64, p. 34 |
| 127 | Article in journal (partial) | *Stanford Removes Indian Symbol*, 5 Indian Historian 21 (1972) | 64, p. 38 |
| 129 | Article in journal | Jeannette Henry, *Our Inaccurate Textbooks*, 1 Indian Historian 21-24 (1967) | 64, pp. 46-50 |
| 130 | Essay in book | Jay J. Coakley, *Team Logos and Mascots: When are They Racist?*, Sport in Society, Issues & Controversies (4th ed. 1990) | 64, pp. 52-55 |
| 170 | Book excerpt | NR 6: [author unknown] The Iron Redskin 19, 21, 111, 203 (1994) (not on copy) | 83, pp. 5-9 |
| 170 | Guide excerpt | NR 6: Jerry Hatfield, Illustrated Indian Motorcycle Buyer's Guide: All the Iron Redskins from 1901, at 145-46 (1989) (not on copy) | 83, pp. 10-13 |
| N/A | Article in catalog | Hirschfelder Dep. Ex. 4: Arlene Hirschfelder, Headdresses, Drums, and Bows and Arrows: Indian Imagery in Children's Toys | 106, pp. 22-30 |
| N/A | Article in journal | Hirschfelder Dep. Ex. 5: Arlene Hirschfelder, *Unlearning Indian Stereotypes*, 12 HALCYON, at 49-61 (1990) | 106, pp. 32-38 |
| N/A | Book excerpt | Hirschfelder Dep. Ex. 6: Arlene Hirschfelder, Am. Indian Stereotypes in the World of Children: A Reader & Bibliography 46-79 (1982) | 106, pp. 40-57 |
| N/A | Textbook excerpt | Ross Dep. Ex. 157: Donald S. Tull & Del I. Hawkins, Marketing Research: Measurement & Method 183-85 (6th ed. 1993) | 92, pp. 179-83 |
| N/A | Book excerpt | Ross Dep. Ex. 158: Jacob Jacoby, *Survey & Field Experimental Evidence*, *in* Saul M. Kassin & Lawrence S. Wrightsman, Psychology of Evidence & Trial Procedure 182-85 (1985) | 92, pp. 184-87 |
| N/A | Book excerpt | Ross Dep. Ex. 163: William G. Zikmund, Exploring Marketing Research 143-44 (1994) | 93, pp. 43-46 |
| N/A | Book excerpt | Ross Dep. Ex. 164: Naresh K. Malhotra, Marketing Research: An Applied Orientation 177-78 (1993) | 93, pp. 47-50 |
| N/A | Article | Ross Dep. Ex. 166: Jacob Jacoby, Experimental Designs in Deceptive Advertising & Claim Substantiation Research, *presented at* Council of Better Business Bureaus, NAD Workshop III, at 119-31 (Apr. 29-30, 1991) | 93, pp. 84-97 |
| **BROADCAST TRANSCRIPTS** | | | |
| 72 | Broadcast transcript | *60 Minutes* (CBS News television broadcast Mar. 4, 1973) | 91, pp. 54-71 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
| BUSINESS COMMUNICATIONS BETWEEN RESPONDENT & THIRD-PARTIES AND INTERNAL COMMUNICATIONS (UNLESS UNDER OTHER HEADING) | | | |
| 25 | Business facsimile | John Kent Cooke Jr., Dir. of Promotions, to Craig Kapp, McCann-Erickson USA, Sept. 13, 1993, regarding ad campaign; As Cooke Dep. Ex. 7 | 50, p. 21; (dup) 65, p. 147 |
| N/A | Business letter | Cooke Dep. Ex. 2: John Kent Cooke, Redskins, to Susan T. Fletcher, Phila. Eagles, Sept. 22, 1983 | 65, p. 139 |
| N/A | Internal memo | Cooke Dep. Ex. 3: Paul E. Denfeld, to John Kent Cooke, Subject: Chief Z, May 19, 1987 | 65, p. 141 |
| N/A | Business letter | Cooke Dep. Ex. 4: John Kent Cooke, Redskins, to Nate Pope, NPC & Associates, Aug. 10, 1987 | 65, p. 143 |
| N/A | Business letter | Cooke Dep. Ex. 5: John Kent Cooke, Redskins, to Ercle F. Herbert Jr., Herbert & Herbert Inc., Dec. 18, 1987 | 65, p. 145 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): Jack Kent Cooke to Robert H. Paschall, May 3, 1988 | 88, p. 56 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): Jack Kent Cooke to Sylvia L. Cash, May 3, 1988 | 88, p. 59 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): John Kent Cooke to Wilcomb E. Washburn, May 3, 1988 | 88, p. 60 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): Charlie Dayton, Commc'n Dir., Wash. Redskins, to R. C. Ahtone, June 15, 1988 | 88, p. 64 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): John Kent Cooke to Wilcomb E. Washburn, Jan. 9, 1992 | 88, p. 119 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): John Kent Cooke to Robert Salgado, Soboba Band of Mission Indians, Mar. 5, 1992 | 88, p. 158 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): John Kent Cooke to Joseph F. K. Mayhew, Mar. 26, 1992 | 92, p. 20 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): John Kent Cooke to Wilcomb E. Washburn, Apr. 21, 1992 | 92, p. 32 |
| N/A | Response to support letter | Nunberg Dep. Ex. 41 (part): Jack Kent Cooke to M. Henson, Aug. 3, 1992 | 92, p. 71 |
| N/A | Response to support letter | Cooke Dep. Ex. 26: Jack Kent Cooke, Redskins, to James Kevin Campbell, Sept. 2, 1993, with James Kevin Campbell to Jack Kent Cooke, Aug. 20, 1993; As Nunberg Dep. Ex. 41 (part) | 66, pp. 52-53; (dup) 92, p. 75 |
| N/A | Internal memo | Nunberg Dep. Ex. 41 (part): Charlie Dayton to Jack Kent Cooke, re: Nat'l Rainbow Coalition campaign letters received, Oct. 13, 1993, with protest letters attached | 92, pp. 77-144 |
| BUSINESS LETTERS BETWEEN RESPONDENT & PUBLISHER | | | |
| 10 | Business letter | Prof'l Football Publications Ass'n to John Kent Cooke, May 23, 1993, regarding advertising space | 68, p. 15 |
| 10 | Business letter | Redskin Review to Redskin Park, May 2, 1994, requesting player photos | 68, p. 16 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| 10 | Business letter | Redskin Review to Redskin Park, May 2, 1994, requesting player autograph | 68, p. 17 |
| 10 | Business letter | Redskin Review to Redskin Park, Aug. 9, 1994, requesting issuance of game credentials | 68, p. 18 |
| 10 | Business letter | Redskin Review to Redskin Park, Aug. 23, 1994, requesting issuance of game credentials | 68, p. 20 |
| 10 | Business letter | Redskin Review to Redskin Park, Aug. 23, 1994, requesting player autographs | 68, p. 21 |
| 10 | Business letter | Redskin Review to Redskin Park, Aug. 30, 1994, requesting issuance of game credentials | 68, p. 22 |
| 10 | Business letter | Redskin Review to Redskin Park, Sept. 13, 1994, requesting issuance of game credentials | 68, p. 23 |
| 10 | Business letter | Redskin Review to Redskin Park, Sept. 20, 1994, requesting press and photo passes | 68, p. 24 |
| 10 | Business letter | Redskin Review to Redskin Park, Sept. 27, 1994, requesting press and photo passes | 68, p. 25 |
| 10 | Business letter | Redskin Review to Redskin Park, Sept. 28, 1994, requesting player autographs | 68, p. 26 |
| 10 | Business letter | Redskin Review to Redskin Park, Oct. 11, 1994, requesting press and photo passes | 68, p. 27 |
| 10 | Business letter | Redskin Review to Redskin Park, Oct. 18, 1994, requesting issuance of game credentials | 68, p. 28 |
| 10 | Business letter | Redskin Review to Redskin Park, Nov. 1, 1994, requesting issuance of game credentials | 68, p. 29 |
| 10 | Business letter | Redskin Review to Redskin Park, Nov. 15, 1994, requesting issuance of game credentials | 68, p. 30 |
| 10 | Business letter | Redskin Review to Redskin Park, Nov. 22, 1994, requesting issuance of game credentials | 68, p. 31 |
| 10 | Business letter | Redskin Review to Redskin Park, Nov. 29, 1994, requesting issuance of game credentials | 68, p. 32 |
| 10 | Business letter | Redskin Review to Washington Redskins, Nov. 30, 1995, regarding 1995 press passes | 68, pp. 33-34 |
| 10 | Business letter | Redskin Review to Redskin Park, Dec. 13, 1994, requesting press and photo passes | 68, p. 35 |
| 10 | Business letter | Progressive Publ'g Grp. to Washington Redskins, July 17, 1995, regarding ownership change of Redskin Review | 68, pp. 36-37 |
| 10 | Business letter | Redskin Review to Redskin Park, Aug. 29, 1995, requesting issuance of game credentials | 68, p. 38 |
| 10 | Business letter | Redskin Review to Redskin Park, Oct. 26, 1995, requesting issuance of game credentials | 68, p. 39 |
| 10 | Business letter | Redskin Review to Redskin Park, Nov. 14, 1995, requesting issuance of game credentials | 68, p. 40 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 10 | Business letter | Redskin Park to Redskin Review, Dec. 1, 1995, regarding game-by-game credentials requests | 68, p. 41 |
| **BUSINESS RECORDS (RESPONDENT'S)** | | | |
| 25 | Board minutes | Redacted minutes of Mar. 27, 1972 meeting of respondent's regular meeting of directors | 50, pp. 16-18 |
| **BUSINESS RECORDS (THIRD-PARTY)** | | | |
| N/A | Incorporating documents | Chase Dep. Ex. 108: Nat'l Congress of Am. Indians Const. & By-Laws, Nov. 14, 1944, as further amended | 83, pp. 41-46 |
| N/A | Board minutes | Kahn Dep. Ex. 2: Am. Jewish Comm. Bd. of Dirs. Minutes, Sept. 2, 1992 | 108, pp. 18-19 |
| N/A | Incorporating documents | Stevens Dep. Ex. 1: Cent. Conf. Of Am. Rabbis Const. & By-Laws, June 1953, as further amended | 94, pp. 89-94 |
| **CORRESPONDENCE BY PETITIONERS' COUNSEL** | | | |
| N/A | Business letter | Nunberg Dep. Ex. 4: Stephen R. Baird to Geoffrey Nunberg, Dec. 7, 1995, regarding consultation as expert | 83, pp. 90-91 |
| N/A | Business letter | Nunberg Dep. Ex. 5: Stephen R. Baird to Geoffrey Nunberg, Feb. 21, 1996, regarding film list | 83, p. 93 |
| N/A | Business letter | Nunberg Dep. Ex. 6: Stephen R. Baird to Cy Gomberg, Jan. 26, 1993, regarding film list | 83, pp. 95-96 |
| N/A | Business letter | Nunberg Dep. Ex. 7: Stephen R. Baird to Geoffrey Nunberg, Jan. 30, 1996, regarding materials | 83, p. 98 |
| N/A | Business letter | Ross Dep. Ex. 7: Michael A. Lindsay to Ivan Ross, Dec. 7, 1995, regarding *Harjo* cancellation petition, answer & MSJ, with attachments | 84, pp. 112-55 |
| N/A | Business letter | Ross Dep. Ex. 8: Stephen R. Baird to Ivan Ross, Dec. 7, 1995, regarding materials | 102, pp. 7-127; 85-127; 103, pp. 4-62 |
| N/A | Business letter | LaFromboise Dep. Ex. 4: Laurie Scalon to Teresa D. LaFromboise, Dec. 5, 1996, regarding prepared expert report | 108, pp. 64-74 |
| N/A | Business letter | LaFromboise Dep. Ex. 6: Michael Drysdale to Teresa D. LaFromboise, May 8, 1996, regarding expert testimony draft | 108, pp. 76-84 |
| N/A | Business letter | Stevens Dep. Ex. 4: Gerald H. Sullivan to Elliot Stevens, Jan. 28, 1997, regarding deposition | 94, p. 101 |
| N/A | Fax cover | Stevens Dep. Ex. 5: Gerald H. Sullivan to Elliot Stevens, Jan. 28, 1997, cover page | 94, p. 103 |
| N/A | Fax note | Stevens Dep. Ex. 6: Gerald H. Sullivan to Elliot Stevens, Jan. 28, 1997, regarding resolution | 94, p. 105 |
| **CORRESPONDENCE BETWEEN THIRD PARTIES** | | | |
| 26 | Business letter | Dave Moore, Am. Indian Bible College, to Paul Tagliabue, NFL, Feb. 19, 1991 | 50, pp. 23-24 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** |||
| 32 | Business letter | William B. Welles & Charles B. Krusen to Pete Rozelle, Apr. 25, 1972 | 77, pp. 20-21 |
| 75 | Business letter | Donald T. Carlson, Univ. Relations Dir., Stanford Univ., to Kris Boucher, Dir. of Athletics, Wayland Acad., Dec. 5, 1985, with Stanford U. press release (Dec. 6, 1979), & Tony Kahn, Editorial: *'Indian' Mascot Belittled Native Americans*, Stanford Daily (handwritten), Nov. 1, 1985 (handwritten) | 91, pp. 87-89 |
| 76 | Business letter | Michael A. Bailey to Paul O. Sand, Reg'l Dir., Nat'l Conference of Christians & Jews, Feb. 17, 1988 | 91, p. 91 |
| 79 | Business letter | Terry Shepard, Univ. of Ill., to Gary Smith, Dir., Marching Illini, Feb. 5, 1990, with attachments | 91, pp. 197-201 |
| 81 | Business letter | Robert Eaglestaff, Principal, Am. Indian Heritage Sch. & Program, to Kris Deweese, Jan. 21, 1992 | 95, p. 5 |
| 84 | Business letter | John Mundahl, Minn. Pub. Sch., to Dorsey & Whitney Law Firm, Sept. 11, 1992 | 95, p. 11 |
| 85 | Business letter | U.S. Sen. Daniel K. Inouye, Select Comm. on Indian Affairs, to Tom Griffith, Nov. 6, 1992 | 95, p. 13 |
| 89 | Memo | Bill Jarboe, Comm. Chair, to Beverly Jasmin, I.H.S. Bldg. Coordinator, Native Am. Mascot Associated with Iroquis H. S., Aug. 13, 1993 | 95, pp. 32-33 |
| 92 | E-mail | Adolph L. Soens to manley@ksgrsch.harvard.edu, Oct. 5, 1994 | 95, p. 48 |
| N/A | Business letter | Cooke Dep. Ex. 1: Susan T. Fletcher, Phila. Eagles, to Marilyn Z. Kutler, Municipal Services Bldg., re: Parking Lot Incident During Wash. Redskins Game at Veterans Stadium Sept. 11, 1983, Sept. 16, 1983 | 65, pp. 136-37 |
|  | **CORRESPONDENCE RELATING TO MAR. 1972 MEETING—FROM WILLIAMS & CONNELLY LAW FIRM** |||
| 32 | Note | La Donna [Harris] (Native American) to Ed[ward] Bennett Williams, undated | 77, p. 7 |
| 32 | Notes | Recommendations to the Washington D.C. Prof'l Football Team, from seven Native American meeting participants; As Gross Dep. Ex. 32.005 | 77, pp. 9-10; (dup) 105, pp. 67 |
| 32 | Protest letter | Harold M. Gross, Dir., Indian Legal Info. Dev. Servs. (Native American legislative oversight group) to Edward Bennett Williams , Jan. 18, 1972; As Gross Dep. Ex. 32.007 | 77, pp. 11-13; (dup) 105, pp. 71-73 |
| 32 | Unsigned business letter | Edward Bennett Williams to Harold M. Gross, Jan. 31, 1972; As Gross Dep. Ex. 32.009 | 77, p. 15; (dup) 105, p. 75 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** |||

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| 32 | Business letter | Harold M. Gross to Edward Bennett Williams , Feb. 16, 1972; As Gross Dep. Ex. 32.010 | 77, p. 16; (dup) 105, p. 77 |
| 32 | Protest letter | Ron Aguilar, President, Nat'l Indian Youth Council, to Wash. Redskins Football Team, Mar. 29, 1972; As Gross Dep. Ex. 32.011 | 77, p. 17; (dup) 105, p. 79 |
| 32 | Unsigned business letter | Edward Bennett Williams to Pete Rozelle, NFL, Mar. 30, 1972; As Gross Dep. Ex. 32.012 | 77, p. 18; (dup) 105, p. 81 |
| 32 | Unsigned business letter | Edward Bennett Williams to Harold M. Gross, Mar. 30, 1972; As Gross Dep. Ex. 32.013 | 77, p. 19; (dup) 105, p. 83 |
| 32 | Note | Edward Bennett Williams to La Donna Harris, June 7, 1972 | 77, p 22 |
|  | **CURRICULA VITAE** |||
| N/A | CV | Nunberg Dep. Ex. 2 (end): Geoffrey D. Nunberg, Apr. 1996; As Nunberg Dep. Ex. 32 | 83, pp. 76-80; (dup) 108, pp. 95-99 |
| N/A | CV | Ross Dep. Ex. 3 (part): Ivan Ross, May 1996 | 97, pp. 15-29 |
| N/A | CV | Hirschfelder Dep. Ex. 1: Arlene Hirschfelder | 106, pp. 8-10 |
| N/A | CV | Hoxie Dep. Ex. 1: Frederick E. Hoxie | 107, pp. 117-21 |
| N/A | CV | LaFromboise Dep. Ex. 2: Teresa D. LaFromboise, April 1996 | 108, pp. 39-63 |
|  | **DEPOSITIONS & SUBPOENAS TO GIVE TESTIMONY/PRODUCE EVIDENCE** |||
| N/A | Deposition | John Kent Cooke Dep., Mar. 26, 1996 | 65, pp. 85-107 |
| N/A | Deposition | John Kent Cooke Dep., Mar. 27, 1996 | 65, pp. 108-34 |
| N/A | Deposition | JoAnn Chase Dep., Apr. 26, 1996 | 98, pp. 6-124 |
| N/A | Subpoena | Chase Dep. Ex. 107: Subpoena Ad Testificandum & Duces Tecum on the Nat'l Congress of Am. Indians' custodian of records, Mar. 15, 1996 | 83, pp. 20-40 |
| N/A | Deposition | Ivan Ross Dep., Dec. 12, 1996 | 96, pp. 5-253 |
| N/A | Subpoena | Ross Dep. Ex. 1: Subpoena Ad Testificandum & Duces Tecum on Ivan Ross, Dec. 12, 1996 As Ross Dep. Ex. 4 | 83, pp. 169-76; 84, pp. 61-71 |
| N/A | Deposition | Geoffrey D. Nunberg Dep., Dec. 17, 1996 | 98, pp. 128-76, 99, pp. 2-177 |
| N/A | Subpoena | Nunberg Dep. Ex. 1: Subpoena for Foreign Deposition served on Geoffrey Nunberg, Dec. 5, 1996 | 83, pp. 52-58 |
| N/A | Deposition | Elliot L. Stevens Dep., Jan. 30, 1997 | 101, pp. 8-71 |
| N/A | Deposition | Walterene Swanston Dep., Jan. 31, 1997 | 101, pp. 73-143 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| N/A | Deposition | Judith Kahn Dep., Jan. 31, 1997 | 80, pp. 217-56 |
| N/A | Deposition | Frederick E. Hoxie Dep., Feb. 12, 1997 | 80, pp. 127-215 |
| N/A | Deposition | Teresa D. LaFromboise Dep., Feb. 17, 1997 | 81, pp. 5-115 |
| N/A | Subpoena | LaFromboise Dep. Ex. 1: Subpoena for Foreign Deposition served on Teresa D. LaFromboise, Dec. 5, 1996 | 108, pp. 21-28 |
| N/A | Deposition | Susan Courtney Dep., Feb. 18, 1997 | 79, pp. 6-161 |
| N/A | Deposition | Geoffrey D. Nunberg Dep., Feb. 18, 1997 | 81, pp. 119-271 |
| N/A | Deposition | Geoffrey D. Nunberg Dep., Feb. 19, 1997 | 82, pp. 5-125 |
| N/A | Deposition | Ivan Ross Dep., Feb. 20, 1997 | 82, pp. 127-267 |
| N/A | Deposition | Arlene B. Hirschfelder Dep., Apr. 10, 1997 | 80, pp. 6-125 |
| N/A | Deposition | Harold M. Gross Dep., June 11, 1997 | 79, pp. 163-235 |
| N/A | Deposition | Ivan Ross Dep., June 11, 1997 | 100, pp. 5-150; 101, pp. 2-6 |
| N/A | Deposition | Geoffrey D. Nunberg Dep., June 17, 1997 | 109, pp. 6-159 |
|  | **DICTIONARIES** | | |
| 1 | Definition | Am. Heritage Dictionary of the English Language 1514 (3d ed. 1992); As Nunberg Dep. Ex. 40 (part) | 63, pp. 61-63; (dup) 88, pp. 20-22 |
| 1 | Definition | Am. Heritage Dictionary of the English Language 1514 (3d ed., 1996); As Nunberg Dep. Ex. 40 (part) | 63, pp. 67-69; (dup) 88, pp. 26-28 |
| 1 | Definition | Chambers English Dictionary [illegible page number] (7th ed. 1988); As Nunberg Dep. Ex. 40 (part) | 63, pp. 52-54; (dup) 88, pp. 14-16 |
| 1 | Definition | Merriam Webster's Collegiate Dictionary 980 (10th ed. 1995); As Nunberg Dep. Ex. 40 (part) | 63, pp. 64-66; (dup) 88, pp. 23-25 |
| 1 | Definition | Oxford Am. Dictionary 564 (1980); As Nunberg Dep. Ex. 40 (part) | 63, pp. 16-18; (dup) 86, pp. 74-76 |
| 1 | Definition | Oxford English Dictionary 429 (2d ed. 1989); As Nunberg Dep. Ex. 35 | 63, pp. 55-57; 108, pp. 108-10 |
| 1 | Definition | Random House Dictionary of the English Language 1204 (1966); As Nunberg Dep. Ex. 40 (part) | 62, pp. 166-68; (dup) 86, pp. 60-62 |
| 1 | Definition | Random House Dictionary of the English Language 1204 (1967); As Nunberg Dep. Ex. 40 (part) | 62, pp. 169-71; (dup) 86, pp. 63-64 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 1 | Definition | Random House Dictionary of the English Language 1107 (College Edition) (1968); As Nunberg Dep. Ex. 40 (part) | 63, pp. 4-6; (dup) 86, pp. 57-59 |
| 1 | Definition | Random House Dictionary of the English Language 642 (School Edition) (1970); As Nunberg Dep. Ex. 40 (part) | 63, pp. 7-8; (dup) 86, pp. 65-66 |
| 1 | Definition | Random House Dictionary of the English Language 1204 (1973); As Nunberg Dep. Ex. 40 (part) | 63, pp. 9-11; (dup) 86, pp. 67-69 |
| 1 | Definition | Random House College Dictionary 1107 (rev. ed., 1975); As Nunberg Dep. Ex. 40 (part) | 63, pp. 12-13; (dup) 86, pp. 70-71 |
| 1 | Definition | Random House Dictionary of the English Language [no page provided] (1979); As Nunberg Dep. Ex. 40 (part) | 63, pp. 14-15; (dup) 86, pp. 72-73 |
| 1 | Definition | Random House Dictionary of the English Language 1618 (2d ed. 1987); As Nunberg Dep. Ex. 40 (part) | 63, pp. 46-48; (dup) 88, pp. 8-10 |
| 1 | Definition | Richard A. Spears, Slang & Euphemism: A Dictionary of Oaths, Curses Insults, Sexual Slang & Metaphor, Racial Slurs, Drug Talk, Homosexual Ling, & Related Matters vii-xxiv, 327 (1981); As Nunberg Dep. Ex. 40 (part) | 63, pp. 19-39; (dup) 86, pp. 77-97 |
| 1 | Definition | Webster's Ninth New Collegiate Dictionary 987 (1986); As Nunberg Dep. Ex. 40 (part) | 63, pp. 42-45; (dup) 88, pp. 4-7 |
| 1 | Definition | Webster's Ninth New Collegiate Dictionary 987 (1988); As Nunberg Dep. Ex. 40 (part) | 63, pp. 49-51; (dup) 88, pp. 11-13 |
| 1 | Definition | Webster's Ninth New Collegiate Dictionary 987 (1990); As Nunberg Dep. Ex. 40 (part) | 63, pp. 58-60; (dup) 88, pp. 17-19 |
| N/A | Definition | As Nunberg Dep. Ex. 8: Thorndike/Barnhart Doubleday Advanced Dictionary 855 (1979) | 83, pp. 100-01 |
| N/A | Definition | As Nunberg Dep. Ex. 9: HBJ School Dictionary (1977) | 83, pp. 103-04 |
| N/A | Definition | As Nunberg Dep. Ex. 10: Webster's New American Dictionary 823 (1965); As Hoxie Dep. Ex. 4; As Nunberg Dep. Ex. 46: | 83, pp. 106-07; (dup) 107, pp. 139-40; 92, pp. 170-71 |
| N/A | Definition | As Nunberg Dep. Ex. 11: Int'l Webster New Encyclopedic Dictionary 803 (1970); As Hoxie Dep. Ex. 6; As LaFromboise Dep. Ex. 9 | 83, pp. 109-10; (dup) 108, pp. 5-6; 108, pp. 88-89 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| N/A | Definition | As Nunberg Dep. Ex. 12:  World Book Dictionary, Vol. 2, 1633 (1967) | 83, pp. 112-13 |
| N/A | Definition | As Nunberg Dep. Ex. 13:  World Book Dictionary, Vol. 2, 1752 (1979) | 83, pp. 115-16 |
| N/A | Definition | As Nunberg Dep. Ex. 14:  Webster's New Twentieth Century Dictionary of the English Language Unabridged 1513 (2d ed. 1977); As Hoxie Dep. Ex. 5; As LaFromboise Dep. Ex. 10 ; As Nunberg Dep. Ex. 45 | 83, pp. 118-19; (dup) 107, pp. 142-43; 108 pp. 90-91 ; 92, pp. 168-69 |
| N/A | Definition | As Nunberg Dep. Ex. 15:  Webster's New Collegiate Dictionary 961 (1980); As Hoxie Dep. Ex. 8 | 83, pp. 121-22; (dup) 108, pp. 11-12 |
| N/A | Definition | As Nunberg Dep. Ex. 18:  Am. Heritage Dictionary of the English Language 1514 (1st ed. 1976) | 83, pp. 129-30 |
| N/A | Definition | As Nunberg Dep. Ex. 19:  Am. Heritage School Dictionary (1977); As Hoxie Dep. Ex. 3; As LaFromboise Dep. Ex. 8 | 83, pp. 132-33; (dup) 107, pp. 136-37; 108, pp. 86-87 |
| N/A | Definition | As Hoxie Dep. Ex. 7:  Am. Heritage Dictionary of the English Language 1082 (1981); As Nunberg Dep. Ex. 44 | 108, pp. 8-9; (dup) 92, pp. 166-67 |
|  | **ENCYCLOPEDIAS** | | |
| 1 | Encyclopedia entry | Indians, North American, Encyclopædia Britannica 454-82 (11th ed. 1910); As Nunberg Dep. Ex. 36 | 62, pp. 131-63; (dup) 86, pp. 4-36 |
|  | **FILM FOOTAGE (DVD OF VHS-FORMATTED MATERIAL)** | | |
| 93 | NFL Films | Lombardi (DVD not included with submissions) | 95, p. 50 |
| 94 | NFL Films | Warpath: The Washington Redskins' Road to Super Bowl XXII (1988) (on file with TTAB) | 95, p. 52 |
| 95 | NFL Films | Hail to the Redskins 1937-1988 (1988) (on file with TTAB) | 95, p. 54 |
| 96 | NFL Films | Washington Redskins (1961) (DVD not included with submissions) | 95, p. 56 |
| 97 | NFL Films | Time After Time: The 1967 Washington Redskins in Action (1968) (on file with TTAB) | 95, p. 58 |
| 98 | NFL Films | Three Cheers for the Redskins (1971) (on file with TTAB) | 95, p. 60 |
| 99 | NFL Films | The AFC and NFC Championships (1973) (mislabeled; on file with TTAB) | 95, p. 62 |
| 100 | NFL Films | The World Championship of Professional Football [Super Bowl VII] (1973) (on file with TTAB) | 95, p. 64 |
| 101 | NFL Films | Promises to Keep: The Washington Redskins Season of '74 (1974) (on file with TTAB) | 95, p. 66 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
| 102 | NFL Films | Return Engagement (1979) (mislabeled; incomplete; without opening credits; no sound; on file with TTAB) | 95; p. 68 |
| 103 | NFL Films | Super Bowl XVII: Hog Day Afternoon (1983) (on file with TTAB) | 95, p. 70 |
| 104 | NFL Films | Ambush at Super Bowl XXII (NFL Films 1988) (on file with TTAB) | 95, p. 72 |
| 105 | NFL Films | Super Bowl XXVI—Washington 37, Buffalo 24 (1992) (DVD not included with submissions) | 95, p. 74 |
| N/A | Footage excerpts | NR 5: Excerpts from video previously submitted as Exhibits 93 through 105 (on file with TTAB) | 101, p. 147 |
| N/A | Footage excerpts | Courtney Dep. Ex. 3: Footage from major motion picture productions using the term "redskin" | 105, p. 36 |
| **GAME PROGRAM PAGES (PITTSBURGH STEELERS)** | | | |
| 15 | Program front page | Sept. 29, 1957 (from Pittsburgh Steelers Football Club); As Cooke Dep. Ex. 12 (part) | 70, pp. 49, (dup) 68; 66, p. 47 |
| **GAME PROGRAMS, PRESS GUIDES & FACT BOOKS, OFFICIAL MAGAZINES, YEARBOOKS & ANNIVERSARY ISSUES (WASHINGTON REDSKINS)** | | | |
| 14 | Program front covers | Opening Day 1954 – Redskins v. NY Giants 12/11/60 (non-consecutive) | 69, pp. 66-72 70, pp. 4-26 |
| 15 | Program front covers | Undated As Cooke Dep. Ex. 12 (part) | 70, pp. 29-42, 44, 46-47; (dup) 66, pp. 30-46 |
| 15 | Program front covers | Opening Day 1938, Opening Day 1950 | 70, pp. 43, 45 |
| 15 | Program front cover | Sept. 21, 1958 (includes cartoon reprinted from Evening Star (Wash.), Dec. 17, 1936); As Cooke Dep. Ex. 12 (part) | 70, p. 48; (dup) 66, p. 49 |
| 29 | Press guide (partial) | *Redskin Movie, in* 1948 Washington Redskins press guide, p. 26 | 50, p. 42 |
| 29 | Fact book (partial) | 1949 Redskins, front cover, marching band photo, pp. 40-41 | 50, pp. 43-45 |
| 29 | Fact book front cover | 1950 Redskins, front cover | 50, p. 46 |
| 29 | Fact book front cover | 1951 Redskins, front cover | 50, p. 47 |
| 29 | Fact book (partial) | 1952 Redskins, front cover, marching band, at 13 | 50, pp. 48-49 |
| 29 | Fact book (partial) | 1953 Redskins front cover, marching band, at 12-13 | 50, pp. 50-52 |
| 29 | Fact book (partial) | 1954 Wash. Redskins, front cover, marching band, at 14 | 50, pp. 53-54 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 29 | Fact book (partial) | 1955 Wash. Redskins, front cover, marching band, at 12 | 50, pp. 55-56 |
| 29 | Fact book (partial) | 1956 Prof'l Football, front cover, Redskins club directory, *Do You Remember? 1937*, photos (illegible), and article on half-time show | 50, pp. 57-61 |
| 29 | Program (partial) | S.F. 49ers v. Wash. Redskins, Aug. 26, 1956 front cover, team photo with autographs and Indian caricature | 50, pp. 62-63 |
| 29 | Fact book (partial) | 1957 Wash. Redskins, front cover, and marching band photo, at 16 | 51, pp. 4-5 |
| 29 | Program (partial) | S.F. 49ers v. Wash. Redskins, Aug. 25, 1957 front cover, team photo with autographs and Indian caricature | 51, pp. 6-7 |
| 29 | Fact book (partial) | 1958 Wash. Redskins, front cover, entertainment program article, two band photos, fight song lyrics | 51, pp. 8-11 |
| 29 | Program | Redskins v. Bears, Sept. 21, 1958 front cover | 51, p. 12 |
| 29 | Fact book (partial) | 1959 Wash. Redskins, various photos of marching band, players, and Redskin board members, fight song lyrics | 51, pp. 13-16 |
| 29 | Fact book (partial) | 1960 Wash, Redskins, front cover, fight song lyrics, marching band photos, history page, club directory | 51, pp. 17-23 |
| 29 | Program (partial) | Redskins v. N.Y. Giants, Oct. 1, 1961 front cover, Ourisman Chevrolet ad, WTOP Radio game coverage listing, VW ad | 51, pp. 24-27 |
| 29 | Magazine cover | Redskins v. Colts, Nov. 26, 1961 front cover | 51, p. 28 |
| 29 | Magazine cover | Merry Christmas 1961, front cover | 51, p. 29 |
| 29 | Magazine cover | Redskins v. Steelers, Dec. 10, 1961 front cover | 51, p. 30 |
| 29 | Program (partial) | 1962 Wash. Redskins, front cover, inside article on mid-field matinees (marching band) | 51, pp. 31-34 |
| 29 | Program (partial) | Silver Anniversary Redskins, front cover, marching band photo | 51, pp. 35-36 |
| 29 | Magazine (partial) | Redskins v. Cardinals, Sept. 30, 1962, front cover, *Conducts the Band, Who's Ahead? The Offense and Defense are in Hot Pursuit, Girls! Girls! Girls! Aren't They Something', Long Time No See, Signals On!,* & *Teepee Talk*, REDSKINS (Magazine), Sept. 30, 1962, at 1, 3, 5, 9, 16, 49 | 52, pp. 4-14 (dup pages) |
| 29 | Magazine (partial) | Redskins v. Rams, Oct. 7, 1962, front cover, *Snead to Mitchell Redskins Passing Combo Dazzles Fans and Foes, Dancing Indians*, North Carolina Day announcement, REDSKINS (Magazine), Oct. 7, 1962, at 1, 15, 26 | 52, pp. 15-20 (dup pages) |
| 29 | Magazine cover | Redskins v. Cowboys, Nov. 4, 1962 front cover | 52, p. 21 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 29 | Magazine cover | Redskins v. Browns, Nov. 11, 1962 front cover | 52, p. 22 |
| 29 | Magazine (partial) | Redskins v. Giants, Nov. 25, 1962, front cover, & Midfield Matinee featuring marching band and Redskinettes, at 21 | 52, pp. 23-24 |
| 29 | Magazine cover | Redskins v. Eagles, Dec. 2, 1962 front cover | 52, p. 25 |
| 29 | Magazine cover | Merry Christmas 1962, front cover | 52, p. 26 |
| 29 | Fact book (partial) | 1963 Wash. Redskins front cover, photo entitled *Ambush*, at 15 | 52, pp. 27-28 |
| 29 | Magazine (partial) | Redskins v. Cowboys, Sept. 29, 1963, front cover, *The Experts are Looking for Help Eastern Title Race is a Fans Delight*, & Matinee at Midfield featuring marching band and Redskinettes, at 1, 11 | 52, pp. 29-31 |
| 29 | Magazine (partial) | Redskins v. Giants, Oct. 6, 1963, front cover, *Time for a Change There's no Whammy Like a Giant Whammy*, photos entitled *Midfield Ball* & *Hail to the Redskin*, at 1, 50, 60 | 52, pp. 32-35 |
| 29 | Magazine cover | Redskins v. Eagles, Oct. 13, 1963, front cover | 52, p. 36 |
| 29 | Magazine (partial) | Redskins v. Cardinals, Oct. 27, 1963, front cover, WWDC advertisement, at 6 | 52, pp. 37-38 |
| 29 | Magazine (partial) | Redskins v. Steelers, Nov. 17, 1963, front cover, *Kilroy Reports: These Players are All-Americans*, Matinee at Midfield featuring marching band and Redskinettes, & photo entitled *Finders Keepers*, at 1, 11, 52 | 53, pp. 4-7 |
| 29 | Magazine (partial) | Redskins v. Colts, Dec. 1, 1963, front cover, *Redskins Can Determine the Eastern Conference*, Matinee at Midfield featuring marching band, & photo entitled *Chief Big Music Man*, at 1, 11, 43 | 53, pp. 8-11 |
| 29 | Fact book (partial) | 1964 Redskins front cover, WWDC advertisement, *Signals On!*, Bears Series History, at 10, 16, 59 | 53, pp. 12-16 (dup pages) |
| 29 | Magazine (partial) | Redskins v. Browns, Sept. 13, 1964, front cover, *It's Time for Our Foes to Show Their Colors*, *On the Warpath*, & Matinee at Midfield featuring Redskinettes, at 1, 5, 11 | 53, pp. 17-22 (dup pages) |
| 29 | Magazine cover | Redskins v. Cardinals, Oct. 4, 1964, front cover | 53, p. 23 |
| 29 | Magazine cover | Redskins v. Eagles, Oct. 11, 1964, front cover | 53, p. 24 |
| 29 | Magazine (partial) | Redskins v. Bear, Oct. 25, 1964, front cover, *On the Warpath*, at 5 | 53, pp. 25-26 |
| 29 | Magazine cover | Redskins v. Cowboys, Nov. 22, 1964, front cover | 53, p. 27 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| 29 | Magazine (partial) | Redskins v. Giants, Nov. 29, 1964, front cover, *Today's Draft is All Work and No Play*, & *On the Warpath*, at 1, 5 | 53, pp. 28-30 |
| 29 | Magazine (partial) | Redskins v. Steelers, date illegible, front cover, *On the Warpath*, at 5 | 53, pp. 31-32 |
| 29 | Press guide front cover | 1965 Redskins, front cover | 53, p. 33 |
| 29 | Magazine (partial) | Redskins v. Browns, Sept. 19, 1965, front cover, *On the Warpath*, Marriott advertisement & *Coia Wins Shrine Award*, at 5, 24, 43 | 53, pp. 34-37 (dup pages) |
| 29 | Magazine cover | Redskins v. Cardinals, Oct. 10, 1965, front cover | 54, p. 4 |
| 29 | Magazine cover | Redskins v. Colts, Oct. 17, 1965, front cover | 54, p. 5 |
| 29 | Magazine (partial) | Redskins v. Cowboys, Nov. 28, 1965, front cover, & Kann's advertisement, at 29 | 54, pp. 6-7 |
| 29 | Magazine cover | Redskins v. Giants, Dec. 12, 1965, front cover | 54, p. 8 |
| 29 | Magazine (partial) | Redskins v. Steelers, Dec. 19, 1965, front cover, *Here are the Redskins Stars of Tomorrow*, & Kann's advertisement at 3, 29 | 54, pp. 9-11 |
| 29 | Press guide front cover | 1966 Redskins, front cover | 54, p. 12 |
| 29 | Magazine (partial) | Redskins v. Browns, Sept. 11, 1966, front cover, National Bohemian Beer, Herson's, Walton & Hoke Commercial Art, & Hot Shoppes advertisements, at 13, 53, 78, 81 | 54, pp. 13-17 |
| 29 | Magazine cover | Redskins v. Steelers, Oct. 2, 1966, front cover | 54, p. 18 |
| 29 | Magazine cover | Redskins v. Falcons, Oct. 9, 1966, front cover | 54, p. 19 |
| 29 | Magazine (partial) | Redskins v. Cardinals, Oct. 23, 1966, front cover, Redskinettes photo, at 32 | 54, pp. 20-21 |
| 29 | Magazine cover | Redskins v. Cowboys, Nov. 13, 1966, front cover | 54, p. 22 |
| 29 | Magazine cover | Redskins v. Giants, Nov. 27, 1966, front cover | 54, p. 23 |
| 29 | Magazine cover | Redskins v. Eagles, Dec. 18, 1966, front cover | 54, p. 24 |
| 29 | Magazine cover | 1967 Redskins Football Magazine, front cover | 54, p. 25 |
| 29 | Press guide (partial) | 1967 Redskins, front cover, listed game schedule, fight song lyrics, history by key dates, at 1, 3, 7 | 54, pp. 26-30 (dup pages) |
| 29 | Program (partial) | Redskins v. N.Y. Giants, Oct. 1, 1967 front cover, *Tepee Pow-Wow*, at 78-79 | 55, pp. 4-6 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 29 | Magazine (partial) | Redskins v. Colts, Oct. 29, 1967, front cover, photo of marching band, & Nat'l Bohemian Beer advertisement | 55, pp. 7-10 (dup pages) |
| 29 | Magazine cover | 1968 Redskins Football Magazine, front cover | 55, p. 11 |
| 29 | Press guide front cover | 1968 Redskins, front cover | 55, p. 12 |
| 29 | Magazine (partial) | Redskins v. Steelers, Oct. 13, 1968, front cover, photo entitled *Here comes No. 9* (also shows marching band), at 75 | 55, pp. 13-14 |
| 29 | Magazine photo | Redskins v. Steelers, Nov. 17, 1968 (not on copy), *Cowboys and Redskins are the Best Western Ever* (partial), at 5 | 55, p. 15 |
| 29 | Magazine photo | Photo entitled *Let It Snow; Let It Snow*, at 5; photos of Redskinettes, at 81, undated | 55, pp. 16-17 |
| 29 | Press guide front cover | 1969 Redskins, front cover | 55, p. 18 |
| 29 | Magazine (partial) | Redskins v. Brown, Sept. 6, 1969, front cover, Nat'l Bohemian Beer & Am. Sec. & Trust Co. advertisements | 55, pp. 19-21 |
| 29 | Magazine cover | Redskins v. Giants, Oct. 19, 1969 (not on copy), front cover | 55, p. 22 |
| 29 | Press guide (partial) | 1970 Redskins, front cover, & game schedule listing, at 1 | 55, pp. 23-24 |
| 29 | Magazine advertisement | Am. Sec. & Trust Co. advertisement, Pro! Magazine, Oct. 11, 1970 (not on copy), at 7 | 55, p. 25 |
| 29 | Magazine cover | Redskins v. Cardinals, Dec. 20, 1970, front cover, Pro! Magazine | 55, p. 26 |
| 29 | Press guide (partial) | 1971 Redskins, front cover, & 1970 final league standings | 55, pp. 27-28 |
| 29 | Magazine cover | 1971 Redskins Football Magazine, front cover, Redskins Magazine table of contents, undated, at 3 | 55, pp. 29-30 |
| 29 | Magazine (partial) | 1972 Redskins, front cover, table of contents, Sept. 24, 1972, at 3 | 73, pp. 4-5 |
| 29 | Magazine (partial) | Table of contents, & *What's in a Nickname*, Pro! Magazine, Nov. 20, 1972, at 3, 3A-5A | 73, pp. 6-9 |
| 29 | Magazine (partial) | Division Playoff: Redskins vs. Green Bay Packers, front cover, table of contents, photo entitled *Game XIV— Buffalo Bills vs. The Redskins*, Pro! Magazine, Dec. 24, 1972, at 3, 26-27 | 73, pp. 10-14 (dup page) |
| 29 | Magazine (partial) | Redskins vs. Cardinals, Pro! Magazine, Oct. 21, 1973 (not on copy), front cover, & photo entitled *Game 4—Cowboys and Indians*, at 83, photo entitled *Game 4—Cowboys Scalped*, at 85, photo entitled *Game 4—The Promised Land*, at 86 | 73, pp. 15-18 (dup page) |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 29 | Magazine article | Redskins vs. Giants, front cover, Morris Siegel, *George Preston Marshall: Master Showman, Mastermind*, Pro! Magazine, Dec. 2, 1973, at 3C-5C, 7C | 73, pp. 19-24 |
| 29 | Magazine (partial) | Redskins vs. Eagles, front cover, table of contents, at 3, & photo under heading *Game 15—Disaster in Dallas*, at 39-41, Pro! Magazine, Dec. 16, 1973 | 73, pp. 25-31 (dup page) |
| 29 | Magazine (partial) | 1974 Redskins, front cover, Redskins vs. Cardinals, front cover, table of contents, *News & Notes from Around the NFL*, Pro! Magazine, Sept. 22, 1974, at 5, 16-17 | 74, pp. 4-8 |
| 29 | Magazine (partial) | Redskins vs. Giants, front cover, *News & Notes*, Pro! Magazine, Sept. 28, 1975, at 6 | 74, pp. 9-10 |
| 29 | Magazine (partial) | Table of contents, partial article with caricature, Pro! Magazine, Nov. 23, 1975, at 7, 11 | 74, pp. 11-12 |
| 29 | Yearbook (partial) | Redskins '76 Yearbook, front cover, table of contents, photo of marching band, *It's Halftime* (photo illegible), at 85 | 74, pp. 13-16 |
| 29 | Yearbook (partial) | Redskins '77, front cover, photo showing team helmets, advertisements | 74, pp. 17-19 |
| 29 | Press guide (page) | 1970s team & coaching achievements, at 94 | 74, p. 20 |
| 29 | Press guide (partial) | 1979 Redskins, front cover, & Jefferson Hotel advertisement | 74, pp. 21-22 |
| 29 | Magazine (partial) | Redskins Edition, Dallas v. Washington, front cover, & Greenhouse Lowes L'Enfant Plaza Hotel advertisement, Pro! Magazine, Sept. 8, 1980 | 74, pp. 23-24 |
| 29 | Magazine (partial) | Redskins Edition, New Orleans v. Washington, front cover, & Greenhouse Lowes L'Enfant Plaza Hotel advertisement, Pro! Magazine, Oct. 26, 1980 | 74, pp. 25-26 |
| 29 | Magazine (partial) | Redskins Edition, St. Louis v. Washington, front cover, & photos, Pro! Magazine, Nov. 1, 1981 | 74, pp. 27-29 (dup page) |
| 29 | Yearbook (partial) | 1982 NFL Champion Redskins , The Season of Respect, front cover, Leonard Shapiro, *At RFK, the Crowds were Pleasers All Season*, undated | 74, pp. 30-31 |
| 29 | Yearbook (partial) | Hail to the Redskins, Official 1983 Team Yearbook, front cover, photos and one article | 56, pp. 4-9 |
| 29 | Program (partial) | Gameday, front cover, Ronn Levine, *Redskins Band . . . NFL's First and Still the Best*, at L41, Evans advertisement featuring Redskins' merchandise, Aug. 12, 1983 | 56, pp. 10-13 (dup page) |
| 29 | Program photo | Photo entitled *Three Cheers for the Redskinettes*, Gameday (not on copy), Sept. 18, 1983 (not on copy) | 56, p. 14 |
| 29 | Program photos & cartoon | Photos under title *The Fan-atacism for the Redskins*, & cartoon, Gameday (not on copy), Nov. 27, 1983 (not on copy), at L-16, L-39 | 56, pp. 15-16 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of _Harjo_ Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 29 | Yearbook (partial) | Hail to the Redskins, Official 1984 Team Yearbook, front cover, table of contents, fight song, photos of Redskinettes, singers, and marching band | 56, pp. 17-23 (dup pages) |
| 29 | Yearbook (partial) | Washington Redskins, Official 1985 Team Yearbook, front cover, & photo of marching band, at 6 | 56, pp. 24-25 |
| 29 | Program (partial) | Gaithersburg (Md.) Redskins Fever, front cover, & marching band members, at 11, Aug. 20, 1985 | 75, pp. 4-5 |
| 29 | Program (partial) | Gameday, front cover, Steve Guback, _When It Came to Fightin' Cowboys, No Redskin Flung Arrows Mightier than Talbert_, & photos of stadium and marching band, Oct. 19, 1986, at L19, L25, L55 | 75, pp. 6-13 (dup pages) |
| 29 | Yearbook (partial) | Washington Redskins, Official 1987 Team Yearbook, front cover, & photos of Redskinettes & pageantry | 75, pp. 14-17 |
| 29 | Yearbook (partial) | 1937-1986 Washington Redskins, Official 50th [1987] Anniversary Team Yearbook, front cover, reproduction of historic cartoon, photo, & 1947 game advertisement for Redskins vs. Giants at the Polo Grounds | 75, pp. 18-20 |
| 29 | Program (partial) | Gameday, front cover, table of contents, & reproduction of 1958 program cover, Nov. 15, 1987, at 3, 19 | 75, pp. 21-23 |
| 29 | Yearbook (partial) | Official Yearbook of the 1988 World Champion Washington Redskins, front cover, & photos of marching band | 75, pp. 24-25; 57, pp. 4-5 (dup pages) |
| 29 | Press guide (partial) | 1988 Washington Redskins, front cover, history by key dates, at 222 | 57, pp. 6-7 |
| 29 | Program advertisement | The 12th Man advertisement for Redskin souvenirs in Aug. 15, 1988 issue of Gameday (not on copy) | 57, p. 8 |
| 29 | Yearbook (partial) | Official 1989 Yearbook of the Washington Redskins, front cover, Paul Denfeld, _Hail to the Band_, & photos of marching band, at 92-95 | 57, pp. 9-13 |
| 29 | Press guide (partial) | 1989 Washington Redskins, front cover, history by key dates, at 239-40 | 57, pp. 14-16 |
| 29 | Program (partial) | Photos under title _From Cheering to Charity . . ._ , Gameday (not on copy), Aug . 25, 1989 (not on copy), at 13 | 57, p. 17 |
| 29 | Program (partial) | Gameday, front cover, Paul Denfeld, _Hail to the Band_, & photos of marching band, Sept. 11, 1989, at 13, 15, 17 | 57, pp. 18-21 |
| 29 | Yearbook cover | Washington Redskins Official 1990 Yearbook, front cover | 57, p. 22 |
| 30 | Yearbook (complete) | 1937-1986 Washington Redskins, Official 50th [1986] Anniversary Team Yearbook | 58, pp. 5-27, 59, pp. 4-32, 76, pp. 4-27, 60, pp. 4-26, 61, pp. 4-18 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| N/A | Yearbooks (partial) | Cooke Dep. Ex. 9: Washington Redskins, Official 1987 Team Yearbook, Limited Edition, front cover, & & photos of players in uniform, marching band, Redskinettes & pageantry, & 1937-1986 Washington Redskins, Official 50th [1987] Anniversary Team Yearbook, images of 6 helmets bearing various logos, reproduction of historic cartoon, articles, 1947 game advertisement for Redskins vs. Giants at the Polo Grounds, fight song lyrics, & photos of players in uniform, marching band, Redskinettes & pageantry | 66, pp. 4-17 |
| **LEGISLATIVE MATERIALS** | | | |
| 90 | Hearing summary & statements | Comm. on Natural Res., Subcomm. on Nat'l Parks, Forests & Public Lands, to authorize the construction, maintenance, and operation of a new stadium in the District of Columbia, and for other purpose, Nov. 5, 1993 | 95, pp. 35-43, 45-46 |
| **LYRICS, MUSIC FOLIOS & SHEET MUSIC** | | | |
| 27 | Music folio | Al Stillman & Al Jacobs, *Rosie the Redskin*, 1938 | 50, pp. 26-31 |
| 28 | Lyrics (partial) | *Hail to the Redskins!* lyrics, *in* Washington Redskins' 50th Anniversary Yearbook | 50, p. 33 |
| 28 | Sheet music | Corinne Griffith (Marshall) & Barnee Breeskin, *Hail to the Redskins* | 50, p. 36 |
| 28 | Lyrics | *Hail to the Redskins!* Lyrics, *in* 1962 Washington Redskins game program | 50, pp. 37-38 |
| 28 | Lyrics | *Hail to the Redskins!* Lyrics, *in* Pro!, Nov. 21, 1971, at 3 | 50, p. 39 |
| **MARKETING MATERIALS** | | | |
| 6 | Marketing materials | Images of Redskins merchandise (with other NFL team merchandise) | 67, pp. 165-82 |
| **MISCELLANEOUS** | | | |
| 22 | Misc. | Peter Tamony Collection, clippings, undated & typed definitions, unsourced, from W. Hist. Manuscript Collection, Univ. of Mo. | 72, p. 33 |
| 22 | Misc. | *Red Indians* entry from Brewer's Dictionary of Phrase & Fable, undated, pp. 757-59, from W. Hist. Manuscript Collection, Univ. of Mo. | 72, p. 34-35 |
| 25 | NFL Films transcript (partial) | Pages 1 and 9 of narration tracked on HAIL TO THE REDSKINS 1937-1988 (NFL Films), at 0:33-3:25, 18:37-21:42, the DVD of which was also submitted as Petitioners' Notice of Reliance, Ex. 95 | 50, pp. 19-20 |
| 32 | File folder label (print) | Pro-Football, Inc. Re: Indian Complaints (re: use of name "Redskins"), William & Connelly (law firm) | 77, p. 5 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** |||
| 173 | Internet homepage | Copy Editor Home Page, https://www.copyeditor.com (accessed Sept. 2, 1997) | 109, p. 173 |
| N/A | Note | Gross Dep. Ex. 32.006: Mar. 1972 meeting attendance list | 105, p. 69 |
| N/A | Coin | LaFromboise Dep. Ex. 7: Indian head nickel (1937); As Stevens Dep. Ex. 7 | 108, p. 85; (dup) 94, p. 107 |
| N/A | Court document | Ross Dep. Ex. 165: Prefiled Direct Testimony of Dr. Jacob Jacoby, Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., CA No. 88-2854 (S.D.N.Y.) | 93, pp. 51-83 |
| N/A | Court document | Ross Dep. Ex. 167: Initial Decision, FTC v. Kraft (Apr. 3, 1989) (partial) & related material | 93, pp. 98-103 |
| N/A | Brochure | Stevens Dep. Ex. 11: Bureau of Indian Affairs, U.S. Dep't of the Interior, You Asked About . . . Indian Ancestry, with BIA Area Office Listing | 94, pp. 115-16 |
| N/A | Packaging | Stevens Dep. Ex. 13: Image of Argo-brand corn starch box | 94, p. 121 |
| N/A | Packaging | Stevens Dep. Ex. 14: Image of Land O'Lakes-brand carton | 94, p. 123 |
|  | **PERIODICAL MATERIALS—ADVERTISING/MARKETING BY THIRD PARTIES, INCLUDING ITEMS IN THIRD-PARTY PUBLICATIONS** |||
| 11 | Newspaper advertisement | Hecht's Dep't Store advertisement, undated and unidentified publication | 68, p. 43 |
| 11 | Newspaper advertisement | Woodward & Lothrop advertisement, WASH. POST, date illegible | 69, pp. 7-8 |
| 16 | Newspaper advertisement | *Janie* advertisement (Broadway show), N.Y. TIMES, Oct. 29, 1942 (handwritten) | 70, p. 62 |
| 16 | Navy Bureau of Personnel brochure | Discount tickets sponsored by Navy for Redskins v. Browns at Griffith Stadium, Nov. 17, 1957 | 70, p. 66 |
| 16 | Newspaper announcement | Charlotte News, *The Redskins are Coming!*, Event announcement for Aug. 29, 1959 | 70, p. 69 |
| 20 | Poster | Concerned Am. Indian Parents, *How Would You Like It?* (shows pennants with racial slurs & Cleveland Indians with Chief Wahoo) | 48, p. 89 |
| 80 | Brochure | HONOR, Inc., *"What is the Point to all of this Protesting? . . ." A Primer*, 1992 | 91, pp. 203-06 |
| N/A | Brochure | Hirschfelder Dep. Ex. 2: Brochure of consultation services in Native Am. Studies | 106, pp. 13-16 |
|  | **PERIODICAL MATERIALS—CARTOONS** |||
| 15 | Cartoon | Jim Berryman, *Wonder How We'll Get Along*, reprinted from Wash. Star, 1937, undated and unidentified source (on Redskins move to DC from Boston); As Cooke Dep. Ex. 12 (part) | 70, p. 28; (dup) 66, p. 48 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 16 | Cartoon | Jim Berryman, *Hey! Are These Two Gonna Start Given' Me Trouble?*, undated and unidentified publication (circa 1940s) (on popularity of Georgetown/GW football versus Redskins) | 70, p. 51 |
| 16 | Cartoon | Jim Berryman, *C'mon Out and Play Chief!*, undated and unidentified publication (circa 1940s) (on injuries and trade rumors regarding Redskins) | 70, pp. 52, (dup) 55 |
| 16 | Cartoon | Reinert cartoon, *Rams to Fight Bring Cleveland its Second Pro Football Title*, undated and unidentified publication (circa 1947) (on path to title) | 70, p. 53 |
| 16 | Cartoon | Cartoon, undated and unidentified publication (point of cartoon is unknown) | 70, p. 54 |
| 16 | Cartoon | Jim Berryman, *Red, White—And Blue!*, undated and unidentified publication (circa 1940s) (Redskins gloom over loss of Eastern title game) | 70, p. 56 |
| 16 | Cartoon | Jim Berryman, *A Bold Challenge—With Reservations!*, undated and unidentified publication (circa 1940s) (team limitations) | 70, p. 57 |
| 16 | Cartoon | Crockett, *The Vanishing American*, EVENING STAR (Wash.), Dec. 9, 1940 (Redskins lose 73-0) | 70, pp. 58-59 |
| 16 | Cartoon | Jim Berryman, *Still Sitting—But Not Pretty!*, EVENING STAR (Wash.), Nov. 17, 1941 (handwritten) (Bears challenging Redskins); As Cooke Dep. Ex. 12 (part) | 70, p. 60 (dup) 66, p. 27 |
| 16 | Cartoon | Jim Berryman, *Hang On Boy, He Might Stumble*, WASH. POST, Nov. 17, 1941 (handwritten) (Redskins unafraid of Giants); As Cooke Dep. Ex. 12 (part) | 70, p. 61; (dup) 66, p. 28 |
| 16 | Cartoon | Jim Berryman (caption cut-off), EVENING STAR (Wash.), Oct. 19, 1943 (handwritten) (point of cartoon is unknown); As Cooke Dep. Ex. 12 (part) | 70, p. 64; (dup) 66, p. 24 |
| 16 | Cartoon | Jim Berryman, *No Time For Shadow Boxing*, EVENING STAR (Wash.), Nov. 14, 1943 (handwritten) (Redskins v. Lions); As Cooke Dep. Ex. 12 (part) | 70, p. 65; (dup) 66, p. 23 |
| 16 | Cartoon | Jim Berryman, *Full of Food—And Fight!*, unidentified publication, Nov. 24, 1950 (handwritten) (Bears winning history); As Cooke Dep. Ex. 12 (part) | 70, p. 67; (dup) 66, p. 29 |
| 16 | Cartoon | *Redskins 1960*, undated and unidentified publication (team wins); As Cooke Dep. Ex. 12 (part) | 70, p. 70; (dup) 66, p. 25 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 16 | Cartoon | F. Becerra, *The Medicine Man*, Yonkers Herald Statesman, Feb. 7, 1969 (Lombardi brings bottled GB medicine to DC) | 70, p. 73 |
| 16 | Cartoon | Viewpoints, FORT WORTH STAR TELEGRAM (Tex.), Nov. 21, 1979, at 14A (Indian runs away with the turkey as prize); As Cooke Dep. Ex. 12 (part) | 70, p. 74; (dup) 66, p. 26 |
| 16 | Cartoon | Garner, Editorial, WASH. TIMES, 1988 (scalped man saying "I got tickets to the playoff!") | 70, p. 75 |
| 16 | Cartoon | Anne Arundel Viewpoints, BALT. SUN, Dec. 18. 1994, at B4 (Cooke on a rocking horse wishing for Laurel stadium) | 70, p. 76 |
| 22 | Cartoon | *The Indian Messiah [in Four Acts]*, ROCKY MTN. NEWS, Nov. 19, 1890 | 49, pp. 34-35 |
| 22 | Cartoon | *High Lights of History: Colorado's Indian Policy—1864*, ROCKY MTN. NEWS, undated (Governor's proclamation to friendly Indians to gather at Indian Agencies and keep away from hostile Indians) | 72, p. 31 |
| 22 | Cartoon | *Social Life in the Occident: A Western House-Warming*, PUCK, undated (images suggestive of violence and alcoholism) | 72, p. 32 |
| **PERIODICAL MATERIALS —SOURCED & DATED** | | | |
| 11 | Newspaper photo & headline | *Redskins' Offensive Line Ready to Hit Warpath in Old D.C. Today*, TIMES-HERALD, Oct. 12, 1952 | 68, p. 73 |
| 11 | Newspaper article (partial) | Dave Slattery, *Tribe Quarterbacks Go Back to School*, WASH. DAILY NEWS, Aug. 8, 1952, first part of article only | 68, p. 75 |
| 11 | Newspaper article | Dave Slattery, *The Redskins Resembled Cigar Store Indians*, WASH. DAILY NEWS, Oct. 6, 1958; As Nunberg Dep. Ex. 43 (part) | 68, p. 83; (dup) 92, p. 157 |
| 11 | Newspaper article | N. P. Clark, *Speedy Steeds Outrun, Outgun Injuns*, BALT. NEWS-POST, Oct. 27, 1958 | 68, pp. 84-85 |
| 11 | Newspaper article | Tom Yorke, *Redskins First in Trail-Blazing*, WASH. DAILY NEWS, Apr. 14, 1959 | 68, p. 86 |
| 11 | Newspaper article | Max Muhleman, *Beware, Colts! Redskins in Ambush*, CHARLOTTE (N.C.) NEWS, Nov. 7, 1959 | 68, p. 87 |
| 11 | Newspaper article | Tom Yorke, *Brass Seeks Answers*, WASH. DAILY NEWS, Nov. 10, 1960 | 68, p. 92 |
| 11 | Newspaper article | Tom Yorke, *Colts Are Scalping Redskins at the Gate*, WASH. DAILY NEWS, May 23, 1961; As Nunberg Dep. Ex. 43 (part) | 68, p. 93; (dup) 92, p. 160 |
| 11 | Newspaper photo & ledger | *The New Indian Rope Trick*, WASH. DAILY NEWS, July 31, 1961 | 68, p. 94 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 11 | Newspaper article | Tom Yorke, *Our Injuns Get Tuneup; Sonny the Spark Plug*, WASH. DAILY NEWS, Oct. 25, 1965 | 68, p. 100 |
| 11 | Newspaper headline & photo | *Skins Scalp Giants, 23-7*, DAILY NEWS (N.Y.), Nov. 8, 1965; As Nunberg Dep. Ex. 43 (part) | 68, p. 101; 92, p. 161 |
| 11 | Newspaper article | Tom Yorke, *Directors Meet Next Week; McPeak is Facing the Tomahawk*, WASH. DAILY NEWS, Dec. 16, 1965, at E-1, E-4; As Nunberg Dep. Ex. 43 (part) | 68, p. 102; (dup) 92, p. 165 |
| 11 | Newspaper article | Tom Yorke, *Did Tribe Panic on Paluck Deal?*, WASH. DAILY NEWS, Aug. 18, 1966, at 36 | 68, p. 103 |
| 11 | Newspaper article | Dave Brady, *Redskins Scalp 49ers, Plan Cowboy Ambush*, PRO FOOTBALL WEEKLY, Nov. 13, 1967, at 5, copy illegible | 68, p. 104 |
| 11 | Newspaper article | Bob Levey, *A Redskin 'Salesman' Gets Scalped*, WASH. POST, Oct. 21, 1985 (handwritten) | 69, p. 9 |
| 11 | Newspaper article | Martie Zad, *Redskins Back on the Warpath*, WASH. POST, Aug. 5, 1990 (handwritten); As Nunberg Dep. Ex. 43 (part) | 69, p. 11; (dup) 92, p. 164 |
| 12 | Newspaper article | *ACC Won't Puff on GP's Peace Pipe*, WASH. DAILY NEWS, Dec. 3, 1949, at 19 | 69, p. 31 |
| 12 | Newspaper photo | EVENING STAR (Wash.), Sept. 22, 1959, at A-17 | 69, p. 39 |
| 12 | Newspaper article | Tom Seppy, *Skins' Pow, Wow Fading?*, DALLAS MORNING (handwritten), Nov. 21, 1978 (handwritten) | 69, p. 43 |
| 13 | Newspaper photo, article (partial) | Blain Harden, *500,000 Frenzied Fans Revel in the Rain for Redskins*, WASH. POST, at A1 | 69, p. 48 |
| 13 | Newspaper article, photos | Patricia E. Bauer & John Mintz, *Unbelievers in an Alien Land*, WASH. POST, Jan. 11, 1981, at A8 | 69, pp. 49-50 |
| 13 | Newspaper article, photo | June Cook, *The Chief of Victory*, GREAT TIMES, Aug. 25, 1983, at 7 | 69, p. 51 |
| 13 | Newspaper article, photo | Martin Kimel, *The Lullaby of Washington*, WASH. POST, Jan. 31, 1991 (handwritten) | 69, p. 57 |
| 13 | Newspaper article (partial) | Valerie Lynn Dorsey, *Indian Mascots Stir Sensitivity Debate*, USA TODAY, Oct. 23, 1991 (handwritten) | 69, p. 58 |
| 13 | Newspaper article, photo | Kara Swisher, *Undefeated 'Skins Fans on the Store Path*, WASH. POST, Oct. 26, 1991 (handwritten) | 69, p. 59 |
| 13 | Newspaper article, photo | Bob Molinaro, *Redskins Leave No Doubts*, Virginian-Pilot (Va.-N.C.), Jan. 27, 1992 | 69, pp. 61-62 |
| 13 | Newspaper article, photos | Lorraine Woellert, *Movable Feats: Redskins Fans Bring Party to Parking Lots at RFK*, Sept. 5, 1994, at C4 | 69, p. 64 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 16 | Newspaper article & cartoon | Tom Yorke, *Jurgensen to be Out Two to Three Weeks*, WASH. DAILY NEWS, Aug. 5, 1964, at 39 (cartoon shows caricature of QB with arm around Indian caricature) | 70, p. 71 |
| 16 | Newspaper article | Tom Yorke, *Redskins Don't Figure to be as Nervous Without Pervis*, WASH. DAILY NEWS, Oct. 14, 1965 (handwritten) | 70, p. 72 |
| 17 | Newspaper article | *Redskins' Marshall Under Fire Again*, WASH. DAILY NEWS (handwritten), Jan. 18, 1957 (handwritten) | 48, p. 5 |
| 17 | Newspaper articles | Jack Eisin, *Marshall Warned on Color Bar*, & Dave Brady, *Marshall Willing to Debate with President on Negro Players*, WASH. POST, Mar. 25, 1961 | 48, p. 8 |
| 17 | Newspaper article | *New Look for the Redskins*, AUGUSTA CHRONICLE (Ga.) (handwritten), Mar. 29, 1961 (handwritten) | 48, p. 11 |
| 17 | Newspaper article | *This Morning . . . with Shirley Povich*, WASH. DAILY NEWS, Apr. 27, 1961 (handwritten) | 48, p. 12 |
| 17 | Newspaper article | Dave Brady, *Administration Chided Over 'Skins*, WASH POST, May 5, 1961 (handwritten) | 48, p. 13 |
| 17 | Newspaper article | Gene Markham, *Skins' Owner Knows About 'African Problem'*, TIMES-HERALD (Newport News, Va.), May 12, 1961, at 2 | 48, p. 14 |
| 17 | Newspaper article | *Udall Standing Pat on Integration of Redskins this Fall*, & Tom Yorke, *Grid Game on TV Here*, WASH. DAILY NEWS, June 27, 1961 | 48, p. 15 |
| 17 | Newspaper article | Lewis F. Atchison, *Marshall Loses High First with Udall on Racial Issue: NFL Head gets Redskin Pledge to use Negros*, EVENING STAR (Wash.), Aug. 15, 1961 | 48, pp. 16-17 |
| 17 | Newspaper article | UPI, *George Marshall, Redskin Chief, Dies*, PITTSBURGH PRESS (Pa.), Aug. 10, 1969 | 48, p. 18 |
| 17 | Newspaper article | Dave Brady, *Mitchell Broke Color Line and Records for Redskins*, JERSEY JOURNAL (NJ), Sept. 9, 1969 | 48, p. 19 |
| 18 | Newspaper article | Tom Quinn, *Redskins, Rednecks*, WASH. DAILY NEWS, Nov. 5, 1971 | 48, p. 24 |
| 18 | Newspaper article | Tom Quinn, *Indians are Starting to Fight Back*, WASH. DAILY NEWS, Jan. 28, 1972, at 72 | 48, p. 27 |
| 18 | Newspaper article | Morris Siegel, *Siegel at Large*, WASH. STAR, Jan. 26, 1972 (handwritten), at A-1, A-3 | 48, p. 28 |
| 18 | Newspaper article | Russ White, *No Reservations, Williams' Answer: What's In A Name?*, EVENING STAR (Wash.), Jan. 27, 1972 | 48, p. 29 |
| 18 | Newspaper article | Tom Quinn, *Redskins Face Suit*, & Tom Quinn, *The Quest for Dignity*, WASH. NEWS (handwritten), Feb. 18, 1972 (handwritten), at 107 | 48, p. 30 |
| 18 | Newspaper article | Tom Quinn, *What's in a nickname? In Washington, plenty of trouble, possibilities*, WASH. DAILY NEWS (handwritten), Feb. 29, 1972 (handwritten) | 48, p. 31 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 18 | Newspaper article | Tom Quinn, *More on the Redskins*, WASH. DAILY NEWS, Mar. 22, 1972 | 48, p. 32 |
| 18 | Newspaper article | Tom Quinn, *Williams, Indians in Showdown*, WASH. DAILY NEWS, Mar. 30, 1972, at 53 | 48, p. 33 |
| 18 | Newspaper article | Steve Guback, *Indians Take On Williams*, WASH. STAR (handwritten), Mar. 30, 1972 (handwritten) | 48, p. 34 |
| 18 | Newspaper article | Shelby Coffey III, *Indians Open War on Redskins*, WASH. POST, Mar. 30, 1972, at F1 | 48, pp. 35, (dup) 85 |
| 18 | Newspaper article | George Solomon, *Redskins Keep Names, Will Change Lyrics*, WASH. POST , July 18, 1972 (handwritten) | 48, p. 36 |
| 18 | Newspaper article | Steve Guback, *Time Will Tell- Allen on Redskins: "Could be the Best,"* EVENING STAR (Wash.), Nov. 14, 1972 | 48, p. 37 |
| 18 | Newspaper article | Steve Guback, *Dallas Favored by 6- Allen: No Letup Rest of the Way* EVENING STAR (Wash.), Dec. 5, 1972 | 48, p. 38 |
| 19 | Letter to the editor | Emily Thurocey, *Change the Name*, WASH. POST (typed), Aug. 12, 1987 (typed) | 48, p. 40 |
| 19 | Letters to the editor | *The Redskins' Name (Cont'd.)*, Christopher Burke, Arthur Stambler, WASH. POST, Aug. 28, 1987 (handwritten) | 48, p. 41 |
| 19 | Newspaper editorial | Tim Giago, *If the Name Redskins Doesn't Bother Team Owner, How About Blackskins?*, SIOUX FALLS ARGUS LEADER (handwritten), Feb. 21, 1988 (handwritten) | 48, p. 42 |
| 19 & 23 | Newspaper article | Leonard Shapiro, *Offensive Penalty is Called on 'Redskins' - Native Americans Protest the Name*, WASH. POST, Nov. 3, 1991, at D1, D9 | (reprinted) 48, pp. 47-48; 72, pp. 52-53 |
| 19 | Newspaper article | Benjamin Alexander Jr., *Why This Football Lover Passed up the Super Bowl*, WASH. POST, Feb. 23, 1992 [not on copy] | 48, p. 49 |
| 19 | Newspaper article | Les Suzukamo, *Indians Plan Super Protest of Redskins' Name*, ST. PAUL PIONEER PRESS, Jan. 22, 1992 | 48, p. 50 |
| 19 | Newspaper commentary | K. R. Clark, *What's In a Name? A Redskin by . . .* , PENTAGRAM, Feb. 6, 1992, at 10 | 48, p. 51 |
| 19 | Newspaper article | Claude Lewis, *The Name 'Redskins' is a Loser*, PHIL. INQUIRER, Mar. 2, 1992 | 48, p. 52 |
| 19 | Newspaper article | Vincent McCraw, *Indians, Friends Huddle up on Effort to Spike Redskins' Name*, WASH. TIMES, Mar. 4, 1992 (handwritten), at B1, B6 | 48, pp. 53-54 |
| 19 | Newspaper commentary | Dick Heller & Tom Knott, *Should the Redskins Change Their Name*, WASH. TIMES, Mar. 4, 1992 [not on copy], at D1, D6 | 48, pp. 55-56 |
| 19 | Newspaper article | Leonard Shapiro, *WTOP Won't Say 'Redskins'*, WASH. POST, Mar. 15, 1992 (handwritten), at D1, D13 | 48, pp. 57-58 |
| 19 | Newspaper article | Associated Press, *NAACP Objects to 'Redskins'; Chief Doesn't*, N. VA. DAILY (typed), Aug. 5, 1992 (typed) | 48, p. 59 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 19 | Newspaper article | *Mayor favors renaming Redskins*, WASH. TIMES, Aug. 24, 1993 | 48, p. 64 |
| 19 | Newspaper article | Suzanne Fields, *Gridiron Tepee of Sensitivity*, WASH. TIMES, Aug. 30, 1993, at E1, E4 | 48, p. 65 |
| 19 | Newspaper article | Ruben Castaneda, *Protesters Condemn Redskins Name*, WASH. POST, Sept. 7, 1993 (handwritten) | 48, p. 66 |
| 19 | Newspaper article | Serge F. Kovaleski, *Delays Push Back Stadium's Chances for 1995 Opening*, WASH. POST, Oct. 28, 1993 (handwritten), at C1-C2 | 48, pp. 67-68 |
| 19 | Newspaper article | Mark Fitzgerald, *Drop Indian Sports Terms, Minorities Say*, EDITOR & PUBLISHER, Aug. 13, 1994 | 48, p. 69 |
| 19 | Newspaper article | Richard Leiby, *Bury My Heart at RFK – How the Redskins Got Their Name and Why Just Maybe it Should be Changed*, WASH. POST, Nov. 6, 1994, at F1, F4-F5 | 48, pp. 70-74 |
| 20 | Newspaper article | *Dartmouth Loses Its Indian Mascot*, N.Y. TIMES, Oct. 12, 1969 | 48, pp. 83-84 |
| 20 | Newspaper article | Shelby Coffey III, *Indians Open War on Redskins*, WASH. POST, Mar. 30, 1972, at F1 | 48, pp. 85-87 |
| 20 | Magazine article | Reprint of Calvin Trillin, *U.S. Journal: Hanover, N.H., The Symbol is a Symbol*, NEW YORKER, May 7, 1979 | 48, p. 88 |
| 20 | Newspaper article | Ron Martz, *Stereotypes of Indians Ingrained in America*, ATL. J-CONST., Dec. 7, 1986 (handwritten), at 1A, 16A. | 48, pp. 90-91 |
| 20 | Newspaper article | Don Boxmeye, *Humboldt Urged to Leave Indians in Peace*, ST. PAUL PIONEER PRESS DISPATCH, Nov. 29, 1987 | 48, p. 92 |
| 20 | Newspaper article | Elmer M. Savilla, *Sticks and Stones & Names All Hurt*, LAKOTA TIMES, 1988 | 48, p. 96 |
| 20 | Publication article | Associated Press, *Group Calls Indian Name Racist*, WATERTOWN PUBLIC OP. (handwritten), Jan. 1988 | 48, p. 97 |
| 20 | Publication article | Associated Press, *Indian Group Fights 'Racist' Team Names*, ST. CLOUD DAILY TIMES (handwritten), Jan. 1988 [not on copy] | 48, p. 98 |
| 20 | Newspaper article | Mark Grossman, *'Redskins' Irks Indians; Protest Planned*, FAIRFAX J. (Va,), Jan. 21, 1988 (handwritten), A1, A6 | 48, pp. 99-100 |
| 20 | Newspaper editorial | Clarence Page, *It'll Be the Broncos vs. a Racial Slur*, CHICAGO TRIBUNE, Jan. 24, 1988, at C3 | 48, p. 101 |
| 20 | Newspaper editorial | Paul O. Sand, *Do Not Continue to Smear American Indians in Team Names*, ST. PAUL PIONEER PRESS DISPATCH, Jan. 28, 1988, at 17A | 71, p. 4 |
| 20 | Newspaper commentary | Pat Helmberger, *Consider Religious Significance*, PIONEER (Bemidji, Minn. (handwritten)), Feb. 5, 1988 (handwritten) | 71, p. 6 |
| 20 | Newspaper article | Amy Brooks Baker, *Redskins Won? Not if This Group has Anything to Say About it!*, CHRISTIAN SCIENCE MONITOR, Feb. 5, 1988 | 71, p. 7 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 20 | Newspaper editorial | Bob Bernotas, *Sports Corner*, and *D.C. Group Tackles the Redskins*, BALT. JEWISH TIMES, Feb. 12, 1988, at 64-65 | 71, pp. 8-9 |
| 20 | Publication column | Don Coldsmith, *Horsin' Around: Racism Topic of Athletic Concern*, GRASS & GRAIN (Kan.), Mar. 8, 1988 | 71, p. 10 |
| 20 | Newspaper editorial | Richard Cohen, *Critic at Large: Redskin Reservations*, WASH. POST, Apr. 17, 1988 | 71, p. 11 |
| 20 | Newspaper editorial | Tim Thornton, *No Humor Found in Ignorance*, WINCHESTER STAR (Va.) (handwritten), June 2, 1988 (handwritten) | 71, pp. 12-13 |
| 20 | Magazine editorial | Rick Telander, *This Was a Magic Year*, SPORTS ILLUSTRATED, Dec. 26, 1988 (handwritten), at 168 | 71, p. 14 |
| 20 | Student newspaper editorial | Sam Thorp, *Mascot Could be Part of Bigger Problem*, THE PENN, Dec. 8, 1989, at 7 | 71, p. 15 |
| 20 | Newspaper editorial | Colman McCarthy, *Now It's Time for the Braves to Chop that Offensive Name*, WASH. POST, Nov. 2, 1991, at A23 | 71, p. 18 |
| 20 | Newspaper editorial | Nancy Butterfield (Chippewa Indian), *Indians Still a Long Way From Racial Equality*, SEATTLE TIMES, Jan. 21, 1991 (handwritten), at A13 | 71, p. 22 |
| 20 | Newspaper commentary | Sen. Paul Simon, *Plight of Native Americans Needs New Understanding*, CHAMPAIGN-URBANA NEWS-GAZETTE (Ill.), Mar. 24, 1991 | 71, p. 23 |
| 20 | Newspaper commentary | Steve Christllaw, Native Americans Sensitive to Slurs, SEATTLE TIMES, Oct. 21, 1991, at D1, D6 | 71, p. 27 |
| 20 | Newspaper article | Richard Keil, *Redskins Next Target of Indians*, RAPID CITY J. (S.D.), Oct. 23, 1991 | 71, p. 28 |
| 20 | Newspaper article | Associated Press, *'Chop' Splits Braves Fans*, RAPID CITY J. (S.D.), Oct. 23, 1991 | 71, p. 28 |
| 20 | Newspaper article | Valerie Lynn Dorsey, *Native Americans Say Teams Turn People Into Mascots*, USA TODAY, Oct. 23, 1991 | 71, pp. 29-31 |
| 20 | Magazine editorial | Rick Reilly, *Let's Bust Those Chops: Native Americans Have Every Reason to Object to the Way They're Caricatured by Teams*, SPORTS ILLUSTRATED (handwritten), Oct. 28, 1991 (handwritten), at 110 | 71, p. 32 |
| 20 | Newspaper article | Pat Doyle, *'Chop' is Spreading, but Indians Disagree on What is Offensive Most Decry 'Redskins' Nickname*, STAR TRIBUNE (Minn.), Nov. 1, 1991, at 2B | 71, p. 21<br>71, pp. 33-35 |
| 20 | Newspaper article | Elmer Savilla, *'Redskins' Should Go Says Virginia Governor*, LAKOTA TIMES (not shown on copy), Nov. 6, 1991 | 71, p. 36 |
| 20 | Newspaper article | Associated Press, *Journalist Unprepared for Reservation Visit*, FORUM (Fargo, N.D.), Nov. 20, 1991, at A5 | 71, p. 37 |
| 20 | Newspaper editorial | *Redskins, Braves: Listen to Those You've Offended*, USA TODAY, Nov. 25, 1991 | 71, p. 38 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 20 | Magazine editorial | Norris Hite Jr., *Understanding and Respect*, NSBE, Jan. 1992, p. 12 | 71, p. 43 |
| 20 | Newspaper editorial | Edward Lazarus, *Redskins: What's in the Name*, WASH. POST, Jan. 14, 1992 (handwritten) | 71, p. 45 |
| 20 | Newspaper column | Nick Coleman, *Indian Nicknames Spark Column War*, ST. PAUL PIONEER PRESS (Minn), Jan. 16, 1992 | 71, p. 46 |
| 20 | Newspaper article | Bunty Anquoe, *'Redskins' New Site on Interior Land*, LAKOTA TIMES, Jan. 21, 1992, at A1-A2 | 71, pp. 47-48 |
| 20 | Newspaper opinion | Elmer Savilla, Real Indians Need to Tackle Mascot Issue," Lakota Times, Jan. 21, 1992, at A5 | 71, p. 49 |
| 20 | Newspaper article | Randy Furst, *Wellstone Urges End to Washington 'Redskins'*, STAR TRIBUNE (Minn.), Jan. 23, 1992 | 71, p. 50 |
| 20 | Newspaper article | Margaret Cohen, *Indian Mascot Protest Starts*, RAPID CITY J. (S.D.), Jan. 24, 1992 | 71, pp. 51-52 |
| 20 | Newspaper article | Peter Lewis, *Indian Principal No Redskin Fan*, SEATTLE TIMES, Jan. 26, 1992, at B1, B4 | 71, pp. 53-54 |
| 20 | Newspaper article | Leonard Inskip, *Redskins: Good Team, Bad Name*, STAR TRIBUNE (Minn.), Jan. 26, 1992 | 71, p. 55 |
| 20 | Newspaper article & photo | Eric Haase, 3,000 Protest at Super Bowl (photo) & *3,000 Rally Against Racist Mascots*, LAKOTA TIMES, Jan. 28, 1992, at B1-B2 | 71, pp. 57-64 |
| 20 | Newspaper editorial | *Tradition Shouldn't Obscure Racism Against Indians*, SEATTLE TIMES, Feb. 8, 1992 (handwritten), at A15 | 71, p. 65 |
| 20 | Newspaper editorial letters | Kent Winters-Hazelton, Blake Lewis & Kathryn Tobias, *A New Name for the Redskins,* WASH. POST, Feb. 8, 1992 (handwritten) | 71, p. 66 |
| 20 | Newspaper editorial letters | Robert C. Hunter, *Continue to Educate the Ignorant*, John Pohlmann, *We Can Communicate*, Erik Bailey, *Sometimes Even Minorities Miss the Point*, Miriam Helphill, *Public Education Exposes False Traditions*, Sen. Paul Simon, *Article 'Excellent'*, Ken Mitchell, *Are There Non-Racist Mascot Choices*, Carter Nash, *Reader Says to 'Lighten Up!"*, Helen Allen, *Keep Being Vocal*, & Peter Pohl, *Their Turn,* WASH. POST, Feb. 8, 1992 (handwritten) | 71, pp. 67-68 |
| 20 | Newspaper article | *No More Braves or Redskins*, SEATTLE TIMES, Feb. 15, 1992 | 71, p. 69 |
| 20 | Newspaper note | *To Our Readers*, OREGONIAN (Portland), Feb. 16, 1992 | 71, p. 70 |
| 20 | Newspaper article | Bunty Anquoe, *D.C. Council to Consider 'Redskins' Protest*, LAKOTA TIMES, Mar. 4, 1992 | 71, p. 71 |
| 20 | Newspaper editorial | Tony Kornheiser, *By Any Other Name*, WASH. POST, Mar. 5, 1992 (not shown on copy) | 71, p. 72 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 20 | Publication article | Tim Sandler, *Unsportsmanlike Conduct*, In These Times, Mar. 11-17, 1992 | 71, pp. 73-74 |
| 20 | Newspaper commentary | Andy Rooney, *Redskins Blame Whites Too Much*, DAILY RECORD (N.J.) (handwritten), Mar. 11, 1992 (handwritten) | 71, p. 75 |
| 20 | Publication article | Tim Sandler, *Chop, Chop Native Americans Fight Back Against Racial Stereotyping*, Boston Phoenix, Mar. 13, 1992 | 71, pp. 76, 79-80 |
| 20 | Newspaper article | Bunty Anquoe, *D.C. Radio Station Won't Say 'Redskins'*, , LAKOTA TIMES (handwritten), Mar. 18, 1992 (handwritten) | 71, p. 77 |
| 20 | Newspaper commentary | Andy Rooney, *A (Sort of) Apology to Indians*, DAILY RECORD (N.J.) (handwritten), Apr. 19, 1992 (handwritten) | 71, p. 78 |
| 20 | Newspaper commentary | Nick Coleman, *Didja Even Notice How Some People Never Learn*, DAILY RECORD (N.J.), Apr. 20, 1992 (handwritten) | 71, p. 81 |
| 20 | Newspaper editorial | Eric Zorn, *In Pros or Preps, 'Redskins' a Slur*, CHI. TRIB., May 21, 1992 | 71, p. 82 |
| 20 | Newspaper articles | Avis Little Eagle, *Protesters Meet Kansas 'Chiefs' at Training Camp, Mascots: A History of Cultural Insensitivity*, & *A Chronology of the Mascot Controversy*, LAKOTA TIMES (handwritten), July 29, 1992 (handwritten), at B1-B2 | 71, pp. 83-84 |
| 20 | Newspaper editorial | *A Slur Is a Slur*, ALBUQUERQUE J. (N.M.),Sept. 12, 1992 | 71, p. 87 |
| 20 | Newspaper article | Avis Little Eagle, *Action Taken to Chop 'Redskins' Trademark*, LAKOTA TIMES, Sept. 16, 1992 (handwritten) | 71, pp. 88-89 |
| 20 | Publication article | *National Coalition Challenges Federal Trademark Registrations*, THE CIRCLE, Oct. 1992 | 71, p. 90 |
| 20 | Newspaper editorial | Jonathan Rand, *It's Time to Dump the Chop*, Kansas City Star, Nov. 13, 1992 | 71, pp. 91-92 |
| 20 | Newspaper editorial letter | John Killen, *The Story of the Oregonian Decision*, INDIAN COUNTRY TODAY (handwritten), Nov. 19, 1992 (handwritten), at A4 | 71, pp. 93-94 |
| 20 | Newspaper editorial | Barbara Reynolds, *History Demands End to 'Redskins'*," USA TODAY (handwritten), Feb. 5, 1993 (handwritten) | 49, p. 4 |
| 20 | Newspaper article | Jennifer Marklewicz, *'Redskins' Banned by University Senate*, MIAMI STUDENT, Apr. 13, 1993 | 49,  p. 5 |
| 20 | Newspaper article | Avis Little Eagle, *Sen. Nighthorse Stalks Redskins*, INDIAN COUNTRY TODAY, July 8, 1993, at A1-A2 | 49,  p. 6 |
| 20 | Newspaper article | Buntie Anquoe, *'Redskins' on the Run. Bill Seeking Name Change*, INDIAN COUNTRY TODAY, Aug. 1, 1993, at A1-A2 | 49,  pp. 7-8 |
| 20 | Newspaper article | Terry Johnson, *Minneapolis Star Tribune Specifies Mascot Policy*, INDIAN COUNTRY TODAY, Feb. 10, 1994, at A3 | 49, p. 9 |

| | | | |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 20 | Newspaper article | Terry Johnson, *Minneapolis Star Tribune Discontinues Mascot Use*, INDIAN COUNTRY TODAY (handwritten), Feb. 2, 1994 (handwritten) | 49, p. 9 |
| 20 | Newspaper letter to the editor | Shawn Bluejacket, *How About a Team Named the Missoula Rednecks*, INDIAN COUNTRY TODAY, Jan. 26, 1995 | 49, p. 10 |
| 21 | Newspaper editorial | Tim Giago, *Using Sham Rituals to Boost Sports Teams Belittles Native Americans' Culture*, ST. PAUL PIONEER PRESS, Oct. 22, 1991 | 49, p. 13 |
| 21 | Newspaper editorial | Tim Giago, *Ignorance Adds Insult to Injury*, LAKOTA TIMES, Oct. 30, 1991 | 49, p. 14 |
| 21 | Newspaper editorial | Tim Giago, *I Hope the Redskins Lose*, NEWSWEEK, Jan. 27, 1992, at 8 | 49, p. 15 |
| 21 | Newspaper editorial | Tim Giago, *Brave Redskins? Gee, Mr. Cooke, Very Bigot of You*, LAKOTA TIMES, Feb. 4, 1992 | 49, p. 16 |
| 21 | Newspaper editorial | Tim Giago, *Mascot Issue Won't Go Away and Neither Will Indian People*, LAKOTA TIMES, Apr. 1, 1992 | 49, p. 17 |
| 22 | Newspaper article | *Merritt Meets the Enemy*, DAILY NEWS (Denv.) (handwritten), Oct. 8, 1879 (handwritten) | 49, pp. 19-21 |
| 22 | Newspaper article | *Indian Massacre*, ROCKY MTN. NEWS (handwritten), Jan. 1, 1882 (handwritten) | 49, pp. 22-23 |
| 22 | Newspaper article | *The Sand Creek Battle*, CHICAGO TRIBUNE (handwritten), Aug. 8, 1887 (handwritten) | 49, pp. 24-25 |
| 22 | Newspaper article | *Indians Ready to Fight*, N.Y. TIMES (handwritten), Nov. 22, 1890 (handwritten) | 49, pp. 26-27 |
| 22 | Newspaper article | *Ready for Battle: the Rebellious Redskins*, ASPEN DAILY TIMES, Nov. 29, 1890 | 49, p. 28 |
| 22 | Newspaper article | *A Bad Ute's Skull*, ROCKY MTN. NEWS, Nov. 16, 1890 | 49, pp. 29-31 |
| 22 | Newspaper article | *A Sioux Outbreak*, ROCKY MTN. NEWS, Nov. 18, 1890 | 49, pp. 32-33 |
| 22 | Newspaper article | *Troops Moving Forward*, N.Y. TIMES (handwritten), Nov. 20, 1890 (handwritten) | 49, pp. 36-37 |
| 22 | Newspaper article | *The Ghost Dance*, N.Y. TIMES (handwritten), Nov. 22, 1890 (handwritten) | 49, p. 38 |
| 22 | Newspaper article | *The Latest Indian News*, DAILY NEWS (Denv.) (handwritten), Nov. 23, 1890 (handwritten) | 49, pp. 40-41 |
| 22 | Newspaper article | *Dancers Threaten to Shoot*, N.Y. TIMES (handwritten), Nov. 23, 1890 (handwritten) | 49, p. 42 |
| 22 | Newspaper article | *To Ambush the Soldiers*, N.Y. TIMES (handwritten), Nov. 24, 1890 (handwritten) | 49, pp. 43-46 |
| 22 | Newspaper article | *Abandoning the Craze*, ROCKY MTN. NEWS (handwritten), Nov. 26, 1890 (handwritten);<br>As Nunberg Dep. Ex. 24 | 49, pp. 47, (dup) 48;<br>83, p. 147-48 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 22 | Newspaper article | *Cowed by the Soldiers*, N.Y. TIMES (handwritten), Nov. 26, 1890 (handwritten);<br>As Nunberg Dep. Ex. 23 | 49, pp. 49-52, (dup) 53-55; 83, pp. 143-45 |
| 22 | Newspaper article | *Montana Redskins*, ROCKY MTN. NEWS (handwritten), Nov. 28, 1890 (handwritten) | 49, p. 56 |
| 22 | Newspaper article | *To Disarm the Hostiles: Cavalry Under Orders for a Night March*, N.Y. TIMES, Nov. 29, 1890 | 49, pp. 57-59 |
| 22 | Newspaper article | *The Messiah Craze*, ROCKY MTN. NEWS, Dec. 1, 1890 (handwritten) | 49, p. 62 |
| 22 | Newspaper article | *Prowling Redskins*, ROCKY MTN. NEWS, Dec. 11, 1890 (handwritten) | 49, p. 63 |
| 22 | Newspaper article | *Apache Excitement. The Redskins in New Mexico Hold a Ghost Dance*, ROCKY MTN. NEWS, Dec. 12, 1890 (handwritten) | 49, p. 64 |
| 22 | Newspaper article | *Ute Uprising*, ROCKY MTN. NEWS, Dec. 16, 1890 (handwritten) | 49, p. 65 |
| 22 | Newspaper article | *On the Warpath*, ROCKY MTN. NEWS, Dec. 18, 1890 (handwritten) | 49, pp. 66-67 |
| 22 | Newspaper article | *An Indian Battle*, ASPEN DAILY NEWS, Dec. 20, 1891 | 49, p. 68 |
| 22 | Newspaper article | *Fifty Killed: Redskins are Being Shot Down by the Soldiers as They Appear, Without Mercy*, ROCKY MTN. NEWS, Dec. 30, 1890 (handwritten) | 49, pp. 71-72 |
| 22 | Newspaper article | *Counting the Dead: The Redskins Did Not Last Long Before the Cavalry, But Attempted to Escape*, ROCKY MTN. NEWS, Dec. 31, 1890 (handwritten) | 49, p. 73 |
| 22 | Newspaper article | *Chased by Indians*, ROCKY MTN. NEWS, Jan. 6, 1891 (handwritten);<br>As Nunberg Dep. Ex. 21 | 49, pp. 74, (dup) 75; 83, p. 139 |
| 22 | Newspaper article | *Rode for Their Lives*, ROCKY MTN. NEWS (handwritten), Jan. 6, 1891 (handwritten) | 49, p. 76 |
| 22 | Newspaper article | *The Redskin Trouble*, ASPEN DAILY NEWS (handwritten), Jan. 7, 1891 (handwritten) | 49, p. 78 |
| 22 | Newspaper article (partial) | *Looting Homes*, ROCKY MTN. NEWS , Jan. 8, 1891 | 49, p. 79 |
| 22 | Newspaper article | *Awaiting a Chance*, ROCKY MTN. NEWS, Jan. 10, 1891 (handwritten) | 49, p. 81 |
| 22 | Newspaper article | *Calling for Arms*, ROCKY MTN. NEWS, Jan. 11, 1891 (handwritten) | 49, pp. 82-84, (dup front page) 85 |
| 22 | Newspaper article | *Ready for Trouble*, ROCKY MTN. NEWS, Jan. 12, 1891 (handwritten) | 49, p. 86 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | |
| 22 | Newspaper article | *Bull's Plot*, ROCKY MTN. NEWS, Jan. 12, 1891 (handwritten) | 49, p. 87 |
| 22 | Newspaper article | *The Redskins Are Slowly Moving Toward Pine Ridge*, ROCKY MTN. NEWS (handwritten), Jan. 12, 1891 (handwritten) | 49, p. 88 |
| 22 | Newspaper article | *Into the Bad Lands*, ROCKY MTN. NEWS, Jan. 14, 1891 | 49, p. 89 |
| 22 | Newspaper article | *The Redskins Have Great Faith in Their Bullet-Proof Red Flannel Shirts*, ROCKY MTN. NEWS, Jan. 15, 1891 (handwritten) | 72, p. 4 |
| 22 | Newspaper article | *To Fight the Redskins*, ROCKY MTN. NEWS (handwritten), Jan. 15, 1891 | 72, pp. 5-6 |
| 22 | Newspaper article | *The American Indian Difficulty*, LONDON TIMES (handwritten), Jan. 15, 1891 (handwritten) | 72, p. 7 |
| 22 | Magazine article | *The Sioux Rebellion*, HARPER'S WEEKLY, Feb. 7, 1891 (handwritten), at 106 | 72, p. 8 |
| 22 | Newspaper article | *The American Indian Difficulty*, LONDON TIMES (handwritten), Jan. 3, 1891 (handwritten); As Nunberg Dep. Ex. 22 | 72, pp. 18, (dup) 19; 83, p. 141 |
| 22 | Newspaper article | *Redskin Chieftains Welcome Buffalo Bill and Retell Stirring Tales*, DENVER POST (handwritten), Oct. 15, 1913 (handwritten) | 72, p. 36 |
| 22 | Newspaper article | *Indians Destroy Road Signs to Check Flood of Tourists*, DENVER POST (handwritten), Feb. 5, 1922 (handwritten) | 72, p. 37 |
| 22 | Newspaper article | *Custer's Men Lured into Trap By Wily Redskins*, DENVER POST (handwritten), June 19, 1932 (handwritten) | 72, p. 38 |
| 22 | Newspaper article | *'Fort Wicked' Too Tough for Redskins: Pleasant-Faced Rancher and Garrison of Three Men, Four Women, Beat Off Savages*, ROCKY MTN. NEWS, Oct. 21, 1932 | 72, pp. 39-40, (dup) 41 |
| 22 | Newspaper article | *Story of Battle on Lightning Creek in 1903; Indians Lost Battle with Cowbys; Eagle Feather's Skull Found and Now Preserved*, LUSK HERALD, May 28, 1936, at 3, 6 | 72, pp. 42-43 |
| 22 | Newspaper article | Roger Williams, *Stanford Alumni Clamor for Tradition: The Return of the Indian*, S.F. Examiner, Nov. 12, 1974 | 72, p. 48 |
| 22 | Newspaper article | Marge Banks, *Indians Here on Warpath Against Tribe*, Cleveland Press, Mar. 17, 1970 | 72, p. 51 |
| 23 | Newspaper article | Avis Little Eagle, *Protestors Challenge Racist Mascot Names*, INDIAN COUNTRY TODAY (not on copy), Nov. 19, 1992 (not on copy), at A1, A7 | 72, pp. 54-56 |
| 32 | Newspaper article | *'Redskins' Target of Movement*, EVENING STAR, Jan. 19, 1972 | 77, p. 14 |
| 43 | Magazine article | Robert Gessner, *Vengeance on the Redskin! How the White Man Massacres the Indian*, Outlook & Independent, Mar. 11, 1931, at 367-69, 382, | 78, pp. 10-14 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 45 | Magazine article | *Redskin Revival*, NEWSWEEK, Feb. 20, 1939, at 14-15 | 78, pp. 16-18 |
| 46 | Magazine article | J. H. Peck, *How I Put Down the Redskins*, SAT. EVENING POST, Oct. 23, 1943, at 25, 126, 128 | 78, pp. 20-23 |
| 47 | Magazine article | Don Eddy, *Whooping it up with the Redskins*, AM. MAG., Nov. 1953, at 38-41, 93-97 | 78, pp. 25-34 |
| 59 | Magazine article | Richard MacPhie, *We Are Not Extras: A Native American Perspective on the Morality of Indian Mascots*, Colors, Jan.–Feb. 1992, at 12-15 | 87, pp. 97-101 |
| 73 | Newsletter | Dartmouth College Alumni Newsletter, Apr. 27, 1973 | 91, pp. 73-75 |
| 88 | Univ. magazine article | Michael Cabonargi, *Miami University and the "Redskin" – an Analysis*, & Brett Harwood, *Harwood Addresses U. Senate on "Redskin" Issue*, Voice, Apr. 27, 1993 | 95, pp. 22-30 |
| 128 | Newspaper article | Paul Shomin, *Scalping Demonstration Outrage*, Wassaja, Oct. 1975 | 64, pp. 40-44 |
| N/A | Newspaper article | Cooke Dep. Ex. 11: Leonard Shapiro, *Indian Group to Stage Protest Sunday at RFK*, Wash. Post, Oct. 31, 1991, at B3 | 66, p. 21 |
| N/A | Newspaper article | Nunberg Dep. Ex. 20: *Fighting Indians*, ROCKY MTN. NEWS (handwritten), June 11, 1891 (handwritten) | 83, pp. 135-37 |
| 173 | Newsletter | Copy Editor, June/July 1997 | 109, pp. 164-71 |
| 173 | Letter to editor | Mary Beth Protomastro, *Redskin Sacked*, Copy Editor, Aug./Sept. 1997, at 7 | 109, pp. 175-76 |
| **PERIODICAL MATERIALS—UNDATED AND/OR UNIDENTIFIED PUBLICATION** | | | |
| 11 | Newspaper article | *All Chiefs, No Indians*, undated and unidentified publication | 68, p. 44 |
| 11 | Newspaper article | Jack Seli, *Washington Team's Powerful Attack Routs Local Team*, undated and unidentified publication | 68, p. 45 |
| 11 | Newspaper article | *Heap Big Injuns*, undated and unidentified publication | 68, p. 46 |
| 11 | Newspaper article (partial) | *Redskins Scalp Army Gridders*, undated and unidentified publication, continued part of article only | 68, p. 47 |
| 11 | Newspaper article | *Redskins, Scalped by* [rest of title cut-off], undated and unidentified publication | 68, p. 48 |
| 11 | Newspaper photo & ledger | *'Skins Scalp Yanks, 17 to 14*, undated and unidentified publication | 68, p. 49 |
| 11 | Newspaper article | Hugo Autz, *College Stars Give Redskins Scalping, 27-7*, undated and unidentified publication | 68, p. 50 |
| 11 | Newspaper article | John E. McNab, *'Skins After Dummy's Scalp in Next Season*, undated and unidentified publication | 68, p. 51 |
| 11 | Newspaper article | *Tribe Figured Best in East With Foe Tops in West*, undated and unidentified publication | 68, p. 52 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 11 | Newspaper article | Dave Slattery, *GP's Set to Scalp*, undated and unidentified publication | 68, p. 53 |
| 11 | Newspaper article | Charles Chamberlain, *Tribe is Inspired by Memory of 73-0 Defeat*, undated and unidentified publication | 68, p. 54 |
| 11 | News photo & ledger | *Hail to the Redskins*, undated and unidentified publication | 68, p. 55 |
| 11 | Newspaper photo | WASH. POST, Sept. day/year & copy illegible | 68, p. 56 |
| 11 | Newspaper article (partial) | *36,006 See Redskins Topple Bears for Title*, undated and unidentified publication, continued part of article only | 68, pp. 57-58 |
| 11 | Newspaper article | Edward Prell, *Redskin Chief Wants Showdown on Future*, undated and unidentified publication | 68, pp. 59-60 |
| 11 | Newspaper article | Joe King, *Skin'd Even Scalp Bears in the Kickoff Were Today*, undated and unidentified publication | 68, p. 61 |
| 11 | Newspaper headlines | Various headlines, undated and unidentified publications (one headline includes handwritten "Pittsburgh Press 6/21/43) | 68, p. 62 |
| 11 | Newspaper article | Dave Slattery, *59 in Boston, Too? It's the Yanks Again but Turk Fears Overconfidence—What's he Want, 100?*, undated and unidentified publication, copy illegible | 68, p. 63 |
| 11 | Newspaper article | Ev Gardner, *Navy Should Quite Baltimore for Griff's 'Watchable' Park*, News, undated, article not about the Washington Redskins | 68, p. 64 |
| 11 | Newspaper Advertisement | WMAL-TV, *The Redskins Show*, 9:30 P.M. Tonight, undated and unidentified publication | 68, p. 65 |
| 11 | Newspaper article | Dave Slattery, *Gen. Custer Avenged*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 68, p. 66; (dup) 92, p. 153 |
| 11 | Newspaper article | Al Costello, *Redskins Hit Warpath to Coast Camp Today*, undated and unidentified publication | 68, p. 67 |
| 11 | News photo & ledger | *Redskin Chiefs Pow-Wow*, undated and unidentified publication | 68, p. 68 |
| 11 | Newspaper article | Dave Slattery, *Redskins to the Left, Right and Rear, Wigwam Chit-Chat*, undated and unidentified publication, copy illegible | 68, p. 69 |
| 11 | Newspaper article | Various articles, Dave Slattery, *Redskins on the Warpath*, WASH. DAILY NEWS, Oct. day/year & copy illegible, Dick O'Brien, *Sports Slants*, undated and unidentified publication, copy illegible | 68, p. 70 |
| 11 | Newspaper article | *'Skins Scalp Steelers, 22-7 for 3rd Win*, undated and unidentified publication, copy illegible | 68, p. 71 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 11 | Newspaper photo & headline | *Big Chief Welcomes Todd Back to Redskin Tepee*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 68, p. 72; (dup) 92, p. 154 |
| 11 | Newspaper article | Ev Gardner, *Optimism in the Tepee*, undated and unidentified publication | 68, p. 74 |
| 11 | Newspaper article | Dave Slattery, *Tribe Thins a Heap of its Old Braves*, undated and unidentified publication | 68, p. 76 |
| 11 | Newspaper article | Dave Slattery, *Redskins Brewing Special Kickapoo Juice for Browns*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 68, p. 77; (dup) 92, p. 155 |
| 11 | Newspaper article | Dave Slattery, *Wigwam Wigwags*, WASH. DAILY NEWS, Oct. 22, 1953, & Ev Gardner, *Feuding Fans Would Help the Redskins*, WASH. DAILY NEWS, Oct. 22, 1953 | 68, p. 78 |
| 11 | Newspaper headline | Dave Slattery, *Scalped Redskins Scratched They're Out of the Title Race*, undated and unidentified publication | 68, p. 79 |
| 11 | Newspaper article | Dave Slattery, *Redskins Ambushed*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 68, p. 80; (dup) 92, p. 156 |
| 11 | Newspaper article | Wayne Thompson, *Papoose Platoon Set for Rough NFL Wars*, undated and unidentified publication | 68, p. 81 |
| 11 | Newspaper article | Dave Slattery, *Tribe's Sloppy Play Makes Curly Erupt*, undated and unidentified publication | 68, p. 82 |
| 11 | Newspaper article | *Nixon's on the Redskin Warpath*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 68, p. 88; (dup) 92, p. 159 |
| 11 | Newspaper article (partial) | *Redskins Start Bloodletting Today*, undated and unidentified publication, continued part of article only, part of copy illegible; As Nunberg Dep. Ex. 43 (part) | 68, p. 89; (dup) 92, p. 158 |
| 11 | Newspaper headline, photo & article | *Darkness Descends on Redskins Ruins, 34-0*, undated and unidentified publication, copy illegible | 68, p. 90 |
| 11 | Newspaper article | Jack Walsh, *Redskins Conduct Full Scale Workout on Regular Day Off*, undated and unidentified publication | 68, p. 91 |
| 11 | Newspaper article | Dave Brady, *Redskins Will be Good Warriors if Huff Gets Linebacking Help*, undated and unidentified publication | 68, p. 95 |
| 11 | Newspaper article | Dave Brady, *Hostility of Redskins Intrigues Patient Fans*, undated and unidentified publication, and partially illegible copy | 68, p. 96 |
| 11 | Newspaper article | Joe Tomlinson, *Tom-Toms*, undated and unidentified publication | 68, p. 97 |
| 11 | Newspaper article | Lewis F. Atchison, *Redskins and Coaches Stunned by Debacle*, undated and unidentified publication | 68, pp. 98-99 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 11 | Newspaper photo & ledger | *Redskins on Warpath*, undated and unidentified publication, photo illegible | 68, p. 105 |
| 11 | Newspaper article | Dave Brady, *Lombardi's Messages Come Through Loud and Clear*, WASH. POST, July 11, 1969, and copy illegible | 68, p. 106 |
| 11 | Newspaper article | Lewis F. Atchison, *More Cuts Likely to Follow Full-Scale Redskin Warfare*, WASH. STAR, undated publication; As Nunberg Dep. Ex. 43 (part) | 68, p.107 (dup) 69, p. 4; 92, p. 162 |
| 11 | Newspaper article | Steve Hershey, *Redskins' Pass Rush Now Formidable*, undated and unidentified publication; As Nunberg Dep. Ex. 43 (part) | 69, p. 5; (dup) 92, p. 163 |
| 11 | Newspaper article | William [illegible], *Skin Fans Scalped by Ticket Owners*, WASH. POST, Dec. 10, 1971, copy illegible | 69, p. 6 |
| 11 | Newspaper article | *Sweet Revenge*, unidentified publication, Nov. 25, 1986 (handwritten) | 69, p. 10 |
| 12 | Newspaper article | *Santa Claus Misses Wigwam Goal*, WASH. TIMES-HERALD, undated and copy partially illegible | 69, p. 13 |
| 12 | Newspaper photo | *So You Won't Talk, Eh?*, undated and unidentified publication, copy illegible | 69, p. 14 |
| 12 | Newspaper photo | *Cigar Store Indian Part of Marshall's Ballyhoo*, Milwaukee J., undated | 69, p. 15 |
| 12 | Newspaper photos | Undated and unidentified publications, photo and copy illegible | 69, p. 16 |
| 12 | Newspaper photo | *Feathers are Only Decorative but Players Bear DC Football Hope*, undated and unidentified publication | 69, p. 17 |
| 12 | Newspaper photo | *Heap, Heap Hooray! For Redskins*, undated and unidentified publication | 69, p. 18 |
| 12 | Newspaper photos | *Bring on Those Bears*, undated and unidentified publication | 69, p. 19 |
| 12 | Newspaper photo | *In This Caw-Nuh!*, undated and unidentified publication | 69, p. 20 |
| 12 | Newspaper photos | *Redskins' Hopes*, undated and unidentified publication | 69, p. 21 |
| 12 | Newspaper photo | *Hip-Hip, Redskins . . . ,* undated and unidentified publication | 69, p. 22 |
| 12 | Newspaper photo | *Alexandrians in 'Skins Band,* undated and unidentified publication | 69, p. 23 |
| 12 | Newspaper photos | Undated and unidentified publications, photo and copy illegible | 69, p. 24 |
| 12 | Newspaper article | Ev Gardner, *How George Preston Marshall Boosted Racing*, WASH. STAR, undated | 69, p. 25 |
| 12 | Newspaper photo | *Champion Drum Major Scores Hit with Band*, undated and unidentified publication (states below photo: Redskins band roster 1941 season) | 69, p. 26 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| — **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 12 | Newspaper photo | *Layden Sits In on Annual Banquet of Redskin Band,* HERALD (hand-written), date-stamped May 5, 1941 | 69, p. 27 |
| 12 | Newspaper photo | *As One Indian to Another, Says Redskin Rookie,* unidentified publication, June 23, 1942 | 69, p. 28 |
| 12 | Newspaper photo | *Tomahawk Trade-in Value is One Football*, undated and unidentified publication , photo of Jack Jacobs (Muscogee Indian who played for Redskins), WASH. POST, undated | 69, p. 29 |
| 12 | Newspaper photo | *The Admiral Gets His Orders*, undated and unidentified publication | 69, p. 30 |
| 12 | Newspaper photo | *George Marshall of Redskins Smokes Pipe of Peace*, undated and unidentified publication | 69, p. 32 |
| 12 | Newspaper photo | *Big Chief Choo-Choo He Ponders*, undated and unidentified publication | 69, p. 33 |
| 12 | Newspaper photo | *Tenth in Row*, undated and unidentified publication (on exclusive rights of radio company to broadcast Redskins' games) | 69, p. 34 |
| 12 | Newspaper article | Dave Slattery, *Three Redskins Due for Ax*, WASH. DAILY NEWS, Oct. [illegible] | 69, p. 35 |
| 12 | Newspaper photo | *Redskins Clip Eagles, 27-21, as Baugh Ends Career*, undated and unidentified publication | 69, pp. 36-37 |
| 12 | Newspaper photo | *Pair of Winners for Redskins*, undated and unidentified publication (on Miss Redskins of 1954 winners) | 69, p. 38 |
| 12 | Newspaper photo | *Four Fumbles Take the Cheer Out of Washington's Redskinettes*, undated and unidentified publication | 69, p. 40 |
| 12 | Newspaper article | *Globe Helps Washington Redskins*, unidentified publication, Aug. 1964 | 69, p. 41 |
| 12 | Newspaper article | Morris Siegel, *Redskins' Band to Drop Dixie*, WASH. STAR, undated and unidentified publication | 69, p. 42 |
| 13 | Newspaper photos | That Super Season!, Wash. Times, undated, at front page, 72 | 69, pp. 45-46 |
| 13 | Newspaper photos | *Rally 'Round the 'Skins*, undated and unidentified publication, at 69 | 69, p. 47 |
| 13 | Newspaper photo, ledger | *A Fan's First Impression*, undated and unidentified publication | 69, p. 52 |
| 13 | Newspaper article | Christine Williams, *A City's Soul on a Roll*, WASH. POST, undated, at D1 | 69, p. 53 |
| 13 | Newspaper photos | Undated and unidentified publication | 69, p. 54 |
| 13 | Newspaper photos | *Shame on You, Redskins*, undated and unidentified publication, photos legible | 69, p. 55 |
| 13 | Newspaper photo, article (partial) | Dave Kindred, . . . *Washington Reacts Quizzically*, WASH. POST, undated | 69, p. 56 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 13 | Newspaper photo | Undated and unidentified publication | 69, p. 60 |
| 13 | Newspaper photo | Undated and unidentified publication | 69, p. 63 |
| 16 | Newspaper article, cartoon | Arch Ward, *In the Wake of the News*, unidentified publication, Aug. 19, 1943 (handwritten) (cartoon: *The Injuns Are Coming!*) | 70, p. 63 |
| 17 | Newspaper article | *Pickets Charge Marshall with Race Bias*, Pittsburgh Times Herald, Feb. 1, 1957 (handwritten), copy illegible | 48, p. 6 |
| 17 | Newspaper article | *Pickets Protest Redskin Failure to Hire Negros*, Wash. Star, Oct. 14, 1957 (handwritten), copy illegible | 48, p. 7 |
| 17 | Newspaper article | Tom Yorke, *GPM Faces Frontier*, unidentified publication, Mar. 25, 1961 (handwritten) | 48, pp. 9-10 |
| 17 | Newspaper article (partial) | Washington D.C. continued, undated and unidentified publication | 48, pp. 20-21 |
| 17 | Publication article | *The Redskins' 50th*, unidentified publication, Sept. 8, 1986 (handwritten) | 48, p. 22 |
| 18 | Newspaper article, cartoon | Paul Kaplan, *Do We Defame Native Americans?*, & Mike Roberts, *Team Nicknames Linked to Myths*, Bill Garner cartoon, *'Call me a redskin. I like it'*, WASH. STAR (circa 1972) | 48, pp. 25-26 |
| 19 | Publication article | *Political Correctness Comes to the Playing Field*, undated and unidentified publication | 48, p. 43 |
| 19 | Newspaper article | Rose Gutfeld, *A Native American Group Lobbies NFL's Redskins to Change Name*, WALL ST. J., undated | 48, p. 44 |
| 19 | Newspaper article | Vito Stellino, *What's in Name? Redskins Find Out From Indians*, unidentified publication, Dec. 28, 1990 | 48, p. 45 |
| 19 | Newspaper article | Associated Press, *NFL is Urged to Forbid Use of 'Redskins'*, unidentified publication, Dec. 28, 1990 (handwritten) | 48, p. 46 |
| 19 | Newspaper editorial | Bob Molinaro, *Please, Stop Calling Them 'Redskins'*, unidentified publication, Oct. 4, 1992 (handwritten) | 48, pp. 60-61 |
| 19 | Newspaper article | *Change Nickname, Redskins Told*, unidentified publication, July 3, 1993 | 48, p. 62 |
| 19 | Newspaper article | AP Denver, *Senate Bill Could Force Redskins Name Change*, unidentified publication, July 3, 1993 | 48, p. 63 |
| 20 | Newspaper article | Reprint of Ron Martz, *Indian Stereotypes Ingrained in U.S.*, ATL. J.-CONST., undated and unidentified publication, at 133-34 (sourced & dated article provided also) | 48, pp. 77-78 |
| 20 | Newspaper editorial | *'Redskins' is Racist*, STANFORD DAILY (Univ.), undated | 48, p. 79 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 20 | Newspaper article | John Slupski, *Native Americans get Unsportsmanlike Rep*, undated and unidentified publication | 48, pp. 93-94 |
| 20 | Newspaper article | Gary Fallesen, *'Racist' Name Taints Game With Stupidity*, DEMOCRAT & CHRON., undated | 48, p. 95 |
| 20 | Newspaper column | *A Sign of Change*, undated and unidentified publication | 71, p. 5 |
| 20 | Newspaper article | Chuck Robertson, *Wee Hours*, undated and unidentified publication | 71, p. 16 |
| 20 | Newspaper article | Mary Jane Smetanka, *Indian Logos, Mascots Still Must Go*, undated and unidentified publication | 71, p. 17 |
| 20 | Newspaper article | Wiley A Hall III, *Only a Rude Nation Could Ignore Team Insults to Indians*, BALT. EVENING SUN, undated | 71, p. 19 |
| 20 | Publication letters to the editor | Sharon White, et al., *Mascots Affect/Reflect Social Attitudes*, & Cornell D. Cooper, *Mascot Racist Mockery Must Stop Soon*, undated and unidentified publication | 71, p. 20 |
| 20 | Newspaper column | Jonathan Yardley, *Get with the Program Jane Fonda!*, Wash. Post, undated | 71, p. 24 |
| 20 | Newspaper article (partial) | *"Mascots" Issue Sparks National Debate*, end of article, undated and unidentified publication | 71, p. 25 |
| 20 | Newspaper article (partial) | Larry Lipman, *Are Tomahawks, War Chant Racist?*, unidentified publication, Oct. 9, 1991, at C2 | 71, p. 26 |
| 20 | Publication article | Tim Sandler, *Indian Symbols in Sports Promote Bias Against Native Americans*, undated and unidentified publication | 71, pp. 39-40 |
| 20 | Newspaper commentary | Nat'l Indian Youth Council, *Commentary: Cultural Ignorance Abounds*, Americans Before Columbus, undated | 71, p. 41 |
| 20 | Newspaper article | Clarence Page, *Party Pooper? Redskins (and Indians) Should Think Up New Names*, PLAIN DEALER, undated | 71, p. 42 |
| 20 | Newspaper article | Jay Calvin Weaver and Monika Bauerlein, *Skin Deep*, unidentified publication, Jan. 1992 | 71, p. 44 |
| 20 | Newspaper article | *2,000 Demonstrate Against Indian Nicknames*, unidentified publication, Jan. 27, 1992, at B7 | 71, p. 56 |
| 20 | Newspaper article | Avis Little Eagle, *Mass Protest Planned for 'Redskins' Game*, LAKOTA TIMES, July 29, 1992 (handwritten), at A1, A3, undated | 71, pp. 85-86 |
| 20 | Newspaper editorial | Jim Caple, *There's No Defense for Using 'Redskins'*, unidentified publication, Oct. 22, 1995 | 49, p. 11 |
| 22 | Newspaper article (partial) | Byline: Cheyenne, Wyo., Nov. 30, N.Y. TIMES, undated (handwritten) | 49, p. 60 |

| | | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 22 | Newspaper article (partial) | [No title shown], N.Y. TIMES, Dec. 2, 1890 (handwritten) | 49, p. 61 |
| 22 | Newspaper accountings | Byline: Camp Near Battle Creek, Dakota, Dec. 26, LONDON TIMES(handwritten), Dec. 27, 1890 (not shown on copy) | 49, pp. 69-70 |
| 22 | Newspaper accountings | Byline: Pine Ridge, Jan. 6, LONDON TIMES (handwritten), Jan. 7, 1891 (not shown on copy) | 49, p. 77 |
| 22 | Newspaper accountings | Byline: Long Pine, Jan. 7, LONDON TIMES (handwritten), Jan. 8, 1891 (not shown on copy) | 49, p. 80 |
| 22 | Publication story | Colo. Hist. Soc'y Archives, *Tales of the Old West: Scraps of History*, undated and unidentified publication | 72, p. 9 |
| 22 | Publication story | *Quanah, Chief of Redskins Sets White Trap*, undated and unidentified publication | 72, p. 10 |
| 22 | Newspaper article | *The American Indian Difficulty*, LONDON TIMES (handwritten), undated | 72, p. 11 |
| 22 | Newspaper material | LONDON TIMES, undated and no identifiable and legible article | 72, pp. 12-15 |
| 22 | Newspaper article | Byline: Pine Ridge, Jan. 2, LONDON TIMES (handwritten), undated | 72, pp. 16-17 |
| 22 | Newspaper article | *The American Indian Difficulty*, LONDON TIMES (handwritten), undated | 72, pp. 20-21 |
| 22 | Newspaper article | undated and unidentified publication | 72, p. 22 |
| 22 | Publication story | *Thursday is 70th Anniversary of Sand Creek Indian Massacre: Men, Women and Children of Redskin Tribe Slaughtered Near Colorado Springs*, undated and unidentified publication (from Univ. of Colo. archives) | 72, p. 23 |
| 22 | Magazine articles | Arthur Chapman, *The Indian Fighters of the Arickaree*, & Henry Smith Williams, *Immigration & Democracy* (beginning of article), HARPER'S WEEKLY, undated, at 9-10, 25-26 | 72, pp. 24-27 |
| 22 | Newspaper article | *Major's Men Were Lured Into Ambush by Fleeing Redskins*, DENVER POST, undated (from Univ. of Colo. archives) | 72, pp. 28-30 |
| 22 | Publication article | Guy Murchie Jr., *Sandy Forsyth's Thrilling Frontier Fight*, unidentified publication, Apr. 25, 1937 | 72, pp. 44-47 |
| 22 | Newspaper photo | Ledger: Zema (Chief Zee) Williams appeals to the heavens in an empty RFK Stadium, WASH. POST, undated | 72, p. 50 |
| 23 | Newspaper article (partial) | Dave Matheny, *The Year of a Super Bowl, a Final 4 and a 'Hugedale'*, STAR TRIBUNE (Minn.) (not shown on copy), Dec. 31, 1992 (not shown on copy) | 72, p. 57 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 28 N/A | Publication article | Morris Siegel*, Washington's Unifying Force*, undated and unidentified publication; As Cooke Dep. Ex. 8 | 50, pp. 34-35; 65, pp. 149-50 |
| **PHOTOS (INDEPENDENTLY SUBMITTED)** | | | |
| 24 | Photos | Copies of photographs of varying legibility demonstrating Washington Redskins imagery and logos, including general memorabilia, cigar store Indian statue, commemorative posters of past seasons, teams and general history, exterior façade of building, members of marching band and Redskinettes members wearing headdress | 72, pp. 59-80 50, pp. 4-14 |
| N/A | Photos | Nunberg Dep. Ex. 16: Photos of Red Mesa school entrance and welcome signs displaying "Home of the Redskins" | 83, p. 124; (dup) 92, p. 31 |
| N/A | Photo | Nunberg Dep. Ex. 17: Photo of roadside billboard displaying "Round Rock Public School Fighting Braves" and back of photo describing location as Round Rock on Navajo Indian Reservation in northeast Ariz, taken June 10, 1994; As Stevens Dep. Ex. 12 | 83, pp. 126-27; (dup) 94, pp. 118-19 |
| **PRESS RELEASES & POSITION STATEMENTS** | | | |
| 68 | Press release | UCLA Am. Indian Student Ass'n, Native American Legal Action Seeks Abandonment of Washington Redskins Name, Sept. 10, 1992 | 91, p. 5 |
| 69 | Public statement | Statement of David P. Bradley in Support of Native American Action Against "Redskins," undated | 91, p. 7 |
| 82 | Press release | U.S. Sen. Daniel K. Inouye, *Inouye Comments on Native American Legal Action*, Sept. 9, 1992 | 95, p. 7 |
| 83 | Press statement | Thom White Wolf Fassett, Gen. Sec'y, United Methodist Gen. Bd. of Church & Soc'y on Racist Images in the Sports Indus., Sept. 10, 1992 | 95, p. 9 |
| 87 | Statement to the University | Dr. Britton Harwood, Statement to the [Miami] Univ. Senate, 5 April 1993 | 95, pp. 18-20 |
| N/A | Press release | Cooke Dep. Ex. 10: Wash. Redskins undated statement that its name "was never intended to offend anyone" and that "the name has reflected positive attributes of the American Indian." | 66, p. 19 |
| **PROCLAMATIONS** | | | |
| 36 | Proclamation | Proclamation of King George II, 40 pounds issued to subjects "[f]or every scalp of a male Indian brought in as evidence of their being killed," June 10, 1756 | 77, p. 63 |
| **PROTEST LETTERS INDICATING INDIVIDUAL AUTHORS ARE NATIVE AMERICANS** | | | |
| 5 | Protest letter | Philip St. John (Native American) to Jack Kent Cooke, Jan. 6, 1988 | 63, p. 84 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 5 | Protest letter | Joan W. Drake (Native American) to Jack Kent Cooke, Jan. 21, 1988 | 63, p. 86 |
| 5 | Protest letter | Hubert Roy (Native American) to Jack Kent Cooke, Feb. 19, 1988 | 63, p. 90 |
| 5 | Protest letter | Roxanna Puchner (Native American) to Jack Kent Cooke, dated Feb. 22, 1988, with Tim Giago, *A Clever Nickname Cannot Disguise a Racial Slur*, editorial excerpt (Lakota Times, 1988) | 63, pp. 108-10 |
| 5 | Protest letter | A. Beston (Native American) to Jack Kent Cooke, Feb. 23, 1988 | 63, p. 112 |
| 5 | Protest letter | James & Lenora Bezpaletz (non-Native Americans & adoptive parents of Native Americans) to Jack Kent Cooke, Feb. 21, 1988 | 63, pp. 94-95 |
| 5 | Protest letter | Ronald C. Brownotter (Native American) to Jack Kent Cooke, Feb. 29, 1988 | 63, pp. 121-22 |
| 5 | Protest letter | Melissa D. McRae (Native American) to Jack Kent Cooke, Feb. 29, 1988 | 63, p. 123 |
| 5 | Protest letter | Lavon Schmidt (Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 1, 1988") | 63, p. 125 |
| 5 | Protest letter | Norma Lussier (Native American) to Jack Kent Cooke, Mar. 18, 1988 | 63, pp. 127-28 |
| 5 | Protest letter | BoBo Shangreaux (Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 22, 1988") | 63, p. 129 |
| 5 | Protest letter | Adora Martin (Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. May 2, 1988") | 63, pp. 132-34 |
| 5 | Protest letter | Donna Jumping Eagle (Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. May 2, 1988") | 63, pp. 135-37 |
| 5 | Protest letter | Paula Sheridan (Native American) to Jack Kent Cooke, Feb. 11, 1992 | 67, p. 14 |
| 5 | Protest letter | Jeffrey Valentino (Native American) to Jack Kent Cooke, Sept. 14, 1992 | 67, p. 65 |
| 5 | Protest letter | Teresa Mitchell (Native American) to Jack Kent Cooke, Apr. 19, 1993 | 67, pp. 86-87 |
| 5 | Protest letter | Kasey Abbott (Native American) to Jack Kent Cooke, Aug. 30, 1993 | 67, p. 93 |
| 5 | Protest letter | Nat'l Rainbow Coalition, Inc. Native American supporter Kimberly Whitehead (form letter campaign) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 130; (dup) 92, p. 112 |
| 32 | Protest letter | Billy Kevin Gover (Native American) to Edward Bennett Williams, July 18, 1972 | 77, p. 6 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| — **Appendix A – Petitioners' Submissions of _Harjo_ Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **PROTEST LETTERS INDICATING NATIVE AMERICAN ADVOCACY GROUP** | | | |
| 5 | Protest letter | Clyde H. Bellecourt, National Director, American Indian Movement, William A. Means, President, International Indian Treaty Council (Native American advocacy organization) to Jack Kent Cooke, Dec. 20, 1991 | 63, pp. 172-75 |
| 5 | Protest letter | Loren Stiffarm, President, Nat'l Indian Educ. Ass'n (Native American advocacy organization) to Manuel Lujan, Dept. of Interior, Mar. 16, 1992 | 67, pp. 37-38 |
| 5 | Protest letter | Sharon Metz, H.O.N.O.R. (Native American advocacy organization) to Jack Kent Cooke, Oct. 1992 | 67, p. 68 |
| 5 | Protest letter | Nat'l Rainbow Coalition, Inc. & Native American supporters (form letter campaign) to Jack Kent Cooke, Oct. 8, 1993, submitted by Otoe-Missouria Tribe of Indians | 67, p. 150; (dup) 92, p. 132 |
| **PROTEST LETTERS NOT INDICATING AUTHORS ARE NATIVE AMERICANS** | | | |
| 5 | Protest letter | Trudy Cooney (non-Native American) to Jack Kent Cooke, Aug. 16, 1986 | 63, p. 83 (dup) 62, p. 140 |
| 5 | Protest letter | Christopher Burke (non-Native American) to Jack Kent Cooke, Jan. 15, 1988 | 63, p. 85 |
| 5 | Protest letter | Gerrard W. Rudmin (non-Native American) to Jack Kent Cooke, Feb. 19, 1988 | 63, p. 91 |
| 5 | Protest letter | Shirley McKinsey (non-Native American) to Jack Kent Cooke, Feb. 19, 1988 | 63, p. 92 |
| 5 | Protest letter | David J. Eastman (non-Native American) to Jack Kent Cooke, Feb. 21, 1988 | 63, p. 93 |
| 5 | Protest letter | Ottinger, et al. (non-Native Americans), to Jack Kent Cooke, Feb. 21, 1988 | 63, p. 96 |
| 5 | Protest letter | Jay Davis (non-Native American) to Jack Kent Cooke, Feb. 21, 1988, with Tim Giago , _If the Name Redskins Doesn't Bother Team Owner, How About Blackskins?_, editorial excerpt (Sioux Falls Argus Leader, Feb. 21, 1988) | 63, pp. 97-98 |
| 5 | Protest letter | Timothy E. Hamel (non-Native American) to Jack Kent Cooke, Feb. 22, 1988 | 63, pp. 100-01 |
| 5 | Protest letter | Larry D. Jones (non-Native American) to Jack Kent Cooke, Feb. 22, 1988 | 63, pp. 102-03 |
| 5 | Protest letter | J. Bruce Blake (non-Native American) to Jack Kent Cooke, Feb. 22, 1988, with Tim Giago, _If the Name Redskins Doesn't Bother Team Owner, How About Blackskins?_, editorial excerpt (Sioux Falls Argus Leader, Feb. 21, 1988) | 63, pp. 104-05 |
| 5 | Protest letter | Lee Axdahl (non-Native American) to Jack Kent Cooke, Feb. 22, 1988 | 63, p. 106 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| 5 | Protest letter | Kathleen H. Williams (non-Native American) to Jack Kent Cooke, Feb. 22, 1988 | 63, p. 107 |
| 5 | Protest letter | Charles Woodard (non-Native American) to Jack Kent Cooke, Feb. 22, 1988 | 63, p. 111 |
| 5 | Protest letter | Evelyn & E.A. Griesse (non-Native Americans) to Jack Kent Cooke, Feb. 23, 1988 | 63, p. 99 |
| 5 | Protest letter | Eleanor Rickard (non-Native American) to Jack Kent Cooke, Feb. 23, 1988 | 63, p. 113 |
| 5 | Protest letter | M. Marin (non-Native American) to Jack Kent Cooke, Feb. 23, 1988 | 63, p. 114 |
| 5 | Protest letter | John Margolis (non-Native American) to Jack Kent Cooke, Feb. 24, 1988 | 63, p. 115 |
| 5 | Protest letter | Bob Folk (non-Native American) to Jack Kent Cooke, Feb. 25, 1988 | 63, p. 116 |
| 5 | Protest letter | Janice Munn Johnson (non-Native American) to Jack Kent Cooke, Feb. 25, 1988 | 63, pp. 117-18 |
| 5 | Protest letter | Verna K. Severson (non-Native American) to Jack Kent Cooke, Feb. 28, 1988 | 63, p. 119 |
| 5 | Protest letter | Lynn Rudmin Chong (non-Native American) to Jack Kent Cooke, Feb. 29, 1988 | 63, p. 120 |
| 5 | Protest letter | Ruth Alexander (non-Native American) to Jack Kent Cooke, Mar. 3, 1988 | 63, p. 126 |
| 5 | Protest letter | Rudy Boschwitz (non-Native American) to Jack Kent Cooke, Mar. 22, 1988 | 63, p. 130 |
| 5 | Protest letter | Diane P. (non-Native American) to Jack Kent Cooke, Apr. 5, 1988 | 63, p. 131 |
| 5 | Protest letter | Ronald B. Duber (non-Native American) to Jack Kent Cooke, June 6, 1988 | 63, p. 139 |
| 5 | Protest letter | David A. Clarke, DC Council, to Jack Kent Cooke, forwarding letter from Robert Coronado (non-Native American) to Clarke, Feb. 9, 1989 | 63, pp. 141-43 |
| 5 | Protest letter | Lou Schoen, Minn. Council of Churches (non-Native American) to Jack Kent Cooke, Jan. 3, 1991 | 63, p. 146 |
| 5 | Protest letter | Steve Macuk (non-Native American) to Jack Kent Cooke, Jan. 15, 1991 | 63, p. 147 |
| 5 | Protest letter | Michael Corbett (non-Native American) to Director of Communications, NFL, Jan. 25, 1991 | 63, p. 148 |
| 5 | Protest letter | Kristy Blain (non-Native American) to Director of Communications, NFL, Jan. 29, 1991 | 63, p. 149 |
| 5 | Protest letter | U.S. Sen. Dennis DeConcini (ethnicity unstated) to NFL Commissioner Paul Tagliabue, Mar. 13, 1991 | 63, pp. 150-51 |
| 5 | Protest letter | R. Scott Klappenbach (non-Native American) to Jack Kent Cooke, Oct. 19, 1991 | 63, pp. 152-53 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 5 | Protest letter | Diana L. Wilcox (non-Native American) to Jack Kent Cooke, Oct. 23, 1991 | 63, p. 154 |
| 5 | Protest letter | Louis H. Kalikour (non-Native American) to Jack Kent Cooke, Oct. 25, 1991 | 63, pp. 155-56 |
| 5 | Protest letter | Mitch Engel (non-Native American) to Jack Kent Cooke, Nov. 1, 1991 | 63, pp. 158-59 |
| 5 | Protest letter | Dan Lieberman (non-Native American) to Jack Kent Cooke, Nov. 14, 1991 | 63, p. 163 |
| 5 | Protest letter | Paul Kuenning (non-Native American) to Jack Kent Cooke, Nov. 17, 1991 | 63, p. 164 |
| 5 | Protest letter | Frederick A. Wilson (non-Native American) to Maureen Bunyan, CBS News, Nov. 20, 1991, with letter from same to Scott Simon, NPR to Clarke, Jan. 18, 1988 | 63, pp. 165-67 |
| 5 | Protest letter | Elizabeth Hudman (non-Native American) to Jack Kent Cooke, Nov. 22, 1991 | 63, p. 168 |
| 5 | Protest letter | John Lynch (non-Native American) to Jack Kent Cooke, Nov. 23, 1991 | 63, p. 169 |
| 5 | Protest letter | Lewis Straughn Nippard (non-Native American) to Jack Kent Cooke, Dec. 4, 1991 | 63, pp. 170-71 |
| 5 | Protest letter | Cynthia Mazur, First Congregational United Church of Christ (non-Native American) to Jack Kent Cooke, Jan. 17, 1992 | 63, p. 177 |
| 5 | Protest letter | U.S. Sen. Paul D. Wellstone (ethnicity unstated) to NFL Commissioner Paul Tagliabue, Jan. 21, 1992 | 63, p. 178 |
| 5 | Protest letter | Brian Myers (non-Native American) to Nick Coleman, St. Paul Pioneer Press, Jan. 24, 1992, on his column | 63, p. 179 |
| 5 | Protest letter | T. Paul Imse, Jr. (non-Native American) to Jack Kent Cooke, Jan. 27, 1992 | 63, pp. 180-84 |
| 5 | Protest letter | T. Paul Imse, Jr. (non-Native American) to Jack Kent Cooke, Feb. 6, 1992, responding to response of previous letter | 67, p. 13 |
| 5 | Protest letter | T. Paul Imse, Jr. (non-Native American) to George Solomon, Washington Post Sports Editor, Feb. 6, 1992, referencing previous letters as attached | 67, p. 12 |
| 5 | Protest letter | G. Allen (non-Native American) to Jack Kent Cooke, Jan. 27, 1992 | 63, pp. 185-86 |
| 5 | Protest letter | Marietta L. Sandberg (non-Native American) to Jack Kent Cooke, Jan. 28, 1992 | 67, p. 4 |
| 5 | Protest letter | John Brawthen (non-Native American) to Jack Kent Cooke, Jan. 28, 1992 | 63, pp. 5-6 |
| 5 | Protest letter | Lona Stewart (non-Native American) to Jack Kent Cooke, Jan. 29, 1992 | 67, p. 7 |
| 5 | Protest letter | Constance M. Skousen, Missoula Women for Peace (non-Native American) to Jack Kent Cooke, Jan. 31, 1992 | 67, p. 8 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 5 | Protest letter | Elmer Kuball (non-Native American) to Jack Kent Cooke, Feb. 2, 1992 | 67, p. 9 |
| 5 | Protest letter | Larry Shapiro (non-Native American) to Jack Kent Cooke, Feb. 5, 1992 | 67, p. 10 |
| 5 | Protest letter | Toni Zima (non-Native American) to Jack Kent Cooke, Feb. 1, 1992 | 67, p. 11 |
| 5 | Protest letter | Dirk A. Griffin (non-Native American) to Jack Kent Cooke, Feb. 12, 1992 | 67, pp. 15-16 |
| 5 | Protest letter | Michael Scicutella (non-Native American) to Jack Kent Cooke, Feb. 13, 1992 | 67, p. 17 |
| 5 | Protest letter | Dennis P. Dalton (non-Native American) to Jack Kent Cooke, Jan. 21, 1992 | 67, pp. 18-20 |
| 5 | Protest letter | Donald D. Kummings (non-Native American) to Jack Kent Cooke, Feb. 24, 1992, with publication excerpts | 67, pp. 21-23 |
| 5 | Protest letter | Benjamin Alexander (non-Native American) to Washington Redskins, Feb. 25, 1992, with Open Letter to Washington Redskins Fans | 67, pp. 24-27 |
| 5 | Protest letter | William P. Lightfoot, DC Council (ethnicity unstated) to Jack Kent Cooke, Feb. 25, 1992 | 67, p. 28 |
| 5 | Protest letter | Alison J. Gegenhuber (non-Native American) to Jack Kent Cooke, Feb. 26, 1992, with Bud Geracie, *Time for Redskins to Change Their Name*, editorial excerpt (San Jose Mercury News, Jan. 28, 1992) | 67, p. 29 |
| 5 | Protest letter | Douglas & Charlotte Graham (non-Native Americans) to Jack Kent Cooke, Jan. 27, 1992, with cartoon (St. Petersburg Times, Jan. 26, 1992) | 67, pp. 30-31 |
| 5 | Protest letter | Stanley Carpenter (non-Native American) to Washington Post Letter to the Editor, Mar. 5, 1992 | 67, p. 32 |
| 5 | Protest letter | George W. Howe (non-Native American) to Jack Kent Cooke, Mar. 13, 1992 | 67, p. 34 |
| 5 | Protest letter | Dave Wachter (non-Native American) to Jack Kent Cooke, Mar. 17, 1992 | 67, p. 39 |
| 5 | Protest letter | Thomas Watkins (non-Native American) to Jack Kent Cooke, Mar. 23, 1992, with letter from same to Washington Post, Mar. 23, 1992 | 67, pp. 41-42 |
| 5 | Protest letter | Elliot L. Stevens, Cent. Conference of Am. Rabbis (non-Native American) to Jack Kent Cooke, April 1992, with "Racism" Resolution Adopted by the 103rd Annual Convention of sender (Apr. 1992); As Stevens Dep. Ex. 3 | 67, pp. 48-49; (dup) 99, p. 99 |
| 5 | Protest letter | Clare Nichols (non-Native American) to Jack Kent Cooke, Apr. 18, 1992 | 67, p. 51 |
| 5 | Protest letter | Deanna L. Shimko-Herman (non-Native American) to Jack Kent Cooke, Apr. 21, 1992 | 67, p. 52 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| 5 | Protest letter | Dan Mackie (non-Native American) to Jack Kent Cooke, Apr. 29, 1992 | 67, p. 53 |
| 5 | Protest letter | K. Schowalter (non-Native American) to Jack Kent Cooke, May 4, 1992 | 67, p. 54 |
| 5 | Protest letter | Joseph P. Morra (non-Native American) to Jack Kent Cooke, May 11, 1992 | 67, pp. 55-56 |
| 5 | Protest letter | Bud White (non-Native American) to Jack Kent Cooke, June 11, 1992 | 67, p. 57 |
| 5 | Protest letter | Kenneth R. Fredgren (non-Native American) to Jack Kent Cooke, June 19, 1992, with Maurice Patton, *Ill. School Does 'Right Thing,' Drops Redskins Nickname* (USA Today, June 18, 1992) | 67, pp. 58-59 |
| 5 | Protest letter | Chas. T. Hayes (non-Native American) to Jack Kent Cooke, July 9, 1992 | 67, pp. 60-61 |
| 5 | Protest letter | Stephen T. Wicke (non-Native American) to Jack Kent Cooke, Aug. 21, 1992 | 67, pp. 62-63 |
| 5 | Protest letter | William & Kathy Miller (non-Native Americans) to Jack Kent Cooke, Sept. 1992 | 67, p. 64 |
| 5 | Protest letter | Mitch Engel (non-Native American) to Jack Kent Cooke, Sept. 23, 1992 | 63, p. 66 |
| 5 | Protest letter | Brian George (non-Native American) to Jack Kent Cooke, Sept. 25, 1992 | 67, p. 67 |
| 5 | Protest letter | Jackee Allen (non-Native American) to Jack Kent Cooke, Oct. 3, 1992, forwarding her editorial *Football Teams Shouldn't Have Racist Names* (Daily Record (Morris County, NJ), Sept. 25, 1992) | 67, pp. 69-72 |
| 5 | Protest letter | Bob Carter (non-Native American) to Jack Kent Cooke, Nov. 10, 1992 | 67, p. 75 |
| 5 | Protest letter | Members of First Congregational Church (non-Native Americans) to Jack Kent Cooke, Nov. 24, 1992 | 67, p. 76 |
| 5 | Protest letter | Dan Lee (non-Native American) to Jack Kent Cooke, Dec. 7, 1992 | 67, p. 77 |
| 5 | Protest letter | John Hallenbeck (non-Native American) to Wash. Redskins, Dec. 30, 1992, forwarding his editorial *How 'bout Redskins?* (Times Union (Albany, NY), Dec. 25, 1992) | 67, pp. 78-79 |
| 5 | Protest letter | Allan & Eric Coles (non-Native Americans) to Jack Kent Cooke, Mar. 8, 1993 | 67, p. 82 |
| 5 | Protest letter | Debara Gertenberg (non-Native American) to Jack Kent Cooke, Mar. 8, 1993 | 67, p. 83 |
| 5 | Protest letter | Kathleen E. Quasey (non-Native American) to Jack Kent Cooke, Mar. 29, 1993 | 67, pp. 84-85 |
| 5 | Protest letter | Kathy Crawford (non-Native American) to Jack Kent Cooke, May 11, 1993 | 67, p. 88 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 5 | Protest letter | J. Tyler (non-Native American) to Jack Kent Cooke, July 13, 1993 | 67, pp. 89-90 |
| 5 | Protest letter | Jon Cohen (non-Native American) to Jack Kent Cooke, Aug. 3, 1993 | 67, p. 91 |
| 5 | Protest letter | Joe R. Talaugon, Comm. for Betterment of Santa Maria Valley (non-Native American) to Jack Kent Cooke, Aug. 24, 1993 | 67, p. 92 |
| 5 | Protest letter | Nat'l Rainbow Coalition, Inc. & non-Native American supporters (form letter campaign) to Jack Kent Cooke, all dated Oct. 8, submitted by Jesse L. Jackson, Ronald Blackburn, Lee Rory Hogan, Ernest Haywood, Ralph Johnson, Cindi Robinson, Toni Tyler, Calvin Owens, Betty Anne Summings, Michael More, Calvin Drum, Lawrence Jones, Cheryl Hansen, Charles B. Watkins, Bart Smith, Nancy Simmons, Paul Jobe, Mariam Buhari, Jean Claude Sarr, Ousame Br, Sophia Ine, Martin Dubois, Amadon Diallo, Serache Claire, Maurice Dupardieuz, Tom Rollings, M.T., Charles Farrell, Greg Halloway, Hilary N., Jo Ann C., Anthony Bell-Zuccarelli, Jane Kay, Kyra Japan, F. E. Woodson, Rebecca Murphy, Owanah Anderson, Sharon Metz, Norma Barquet, Richard Allen, Brenda P. Simmons, Thomas Barnes, Daisy Wood, Jean Gore, Aida Bound, Patricia Marshall, Monique Hitch, L. Neels, Janeen Cornish, Christine Jansen, Janice Netherland, Melissa Burkhart, Joe Gaskins, Shan Goshorn, Mannie Jackson | 67, pp. 95-129, 131-32, 135-36, 140, 142-47, 149, 153-62; (dup) 92, pp. 78-111, 113-14, 117-18, 122, 124-29, 131, 135-44 |
| 5 | Protest letter | Nat'l Coalition on Racism in Sports & the Media (non-Native American) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 133; (dup) 92, p. 115 |
| 5 | Protest letter | Killian Jordan (non-Native American) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 134; (dup) 92, p. 116 |
| 5 | Protest letter | Eve Roberts (non-Native American) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 139; (dup) 92, p. 121 |
| 5 | Protest letter | Pat Moon (non-Native American) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 141; (dup) 92, p. 123 |
| 5 | Protest letter | Andrea Utrie (non-Native American) to Jack Kent Cooke, Oct. 8, 1993 | 67, p. 148; (dup) 92, p. 130 |
| 5 | Protest letter | Mario Obledo (non-Native American) to Jack Kent Cooke, Oct. 5, 1993 | 67, p. 151; (dup) 92, p. 133 |
| 5 | Protest letter | Andrea Newman & Benjamin Wegner (non-Native Americans) to Jack Kent Cooke, Mar. 8, 1993 | 67, p. 152; (dup) 92, p. 134 |
| **PROTEST LETTERS WITH NO SOURCE OR NO DATE** | | | |
| 5 | Protest letter | R. Schmidt (non-Native American) to J. Cooke, undated, with attached Tim Giago *What's in a Name?Racism* editorial excerpt (Grand Forks Herald, Feb. 13, 1988) | 63, p. 88-90 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 5 | Protest letter | Donald Tobbin (non-Native American) to Jack Kent Cooke, undated, with Tim Giago *We are Human Beings, not Mascots* editorial excerpt (Grand Falls Tribune, Feb. 16, 1988) | 63, p. 87 |
| 5 | Protest letter | Jean Baker (non-Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 1, 1988") | 63, p. 124 |
| 5 | Protest letter | Douglas G. Yeager (non-Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. June 1, 1988") | 63, p. 138 |
| 5 | Protest letter | Susan L. Peters (non-Native American) to Jack Kent Cooke, undated | 63, p. 145 |
| 5 | Protest letter | George C. Dyers (non-Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Oct. 30, 1991") | 63, p. 157 |
| 5 | Protest letter | Jesse Seitel (a minor and non-Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Dec. 26, 1991") | 63, p. 176 |
| 5 | Protest letter | Unnamed author to Jack Kent Cooke, Mar. 12, 1992 | 67, pp. 35-36 |
| 5 | Protest letter | Unsigned letter to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 13, 1992") | 67, pp. 35-36 |
| 5 | Protest letter | Rochelle Weisser (non-Native American) to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 18, 1992") | 67, p. 40 |
| 5 | Protest letter | Friends of Washington to unspecified, undated (date stamped "JKC Inc. Apr. 16, 1992") | 67, p. 50 |
| 5 | Protest letter | Dargie Anderson (a minor and non-Native American) to Jack Kent Cooke, undated (date stamped "Redskin Park Oct. 22, 1992") | 67, p. 73 |
| 5 | Protest letter | Robert Owens (non-Native American) to Jack Kent Cooke, undated (date stamped "Redskin Park Oct. 30, 1992") | 67, p. 74 |
| 5 | Protest letter | Unnamed author to "Sir," Jan. 15, 1993 | 67, pp. 80-81 |
| 5 | Protest letter | Jenny Sauronski (non-Native American) to John Kent Cooke, undated (date stamped "Sep. 13 Rec'd") | 67, p. 94 |
| 5 | Protest letter | Karen Muler (non-Native American) to Jack Kent Cooke, undated | 67, p. 137; (dup) 92, p. 119 |
| 5 | Protest letter | James Fite (non-Native American) to Jack Kent Cooke, undated | 67, p. 138; (dup) 92, p. 120 |
| 32 | Protest letter | Maggie Gover, to Mary Jo Manning, undated | 77, p. 8 |
| **REPORTS, INCL. EXPERT PREPARATION MATERIALS** | | | |
| 71 | Report | Report & Recommendation of the Dartmouth Alumni Counsel Indian Symbol Study Committee, June 15, 1972 | 91, pp. 42-52 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 77 & 78 | Cover memo, report, & executive summary | John Roy Castillo, Dir., Mich. Dep't of Civil Rights, to Native American Organizations, Nov. 7, 1986, & Mich. Civil Rights Comm'n Report on Use of Nicknames, Logos and Mascots Depicting Native Am. People in Mich. Educ. Institutions, Oct. 1988 | 91, pp. 93-191, 194-95 |
| 86 | Executive summary | Carol Hand, Deputy Dir., Great Lakes Inter-Tribal Council, Inc., Am. Indian Study Comm. Executive Summary of Testimony Presented Nov. 12, 1992 | 95, pp. 15-16 |
| N/A | Unpublished expert report | Nunberg Dep. Ex. 2 (first part): Expert Disclosure of Geoffrey Nunberg, June 10, 1996 | 83, pp. 60-74 |
| N/A | Cover memo & summary of findings | Nunberg Dep. Ex. 3: Quantitative data results of database search of terms, June 15, 1996 | 83, pp. 83-88 |
| N/A | Unpublished expert report | Ross Dep. Ex. 3 (part): Expert Disclosure of Ivan Ross, June 10, 1996; As Ross Dep. Ex. 5 | 97, pp. 5-14; (dup) 84, pp. 75-84 |
| N/A | Study table, cover memo, questionnaire, & study | Ross Dep. Ex. 3 (part): Questionnaire, sample report, table of results from March 2 and 6, 1996 surveys, with cover letter from Jim Robinson, Robinson & Muenster, to Ivan Ross, May 16, 1996; As Ross Dep. Ex. 9 | 97, pp. 30-202; 84, pp. 4-59; 103, pp. 63-208; 104, pp. 4-123; 105, pp. 4-26 |
| N/A | Study table | Ross Dep. Ex. 5 (part): Results Table | 84, p. 85 |
| N/A | General file materials | Ross Dep. Ex. 6: File materials not in Ross Dep. Ex. 3 | 84, pp. 87-110 |
| N/A | Unpublished expert report | Hirschfelder Dep. Ex.8: Expert Disclosure of Arlene B. Hirschfelder, June 10, 1996 | 107, pp. 110-16 |
| N/A | Unpublished expert report | Hoxie Dep. Ex. 2: Expert Disclosure of Frederick E. Hoxie, June 10, 1996 | 107, pp. 125-34 |
| N/A | List | Courtney Dep. Ex. 1: List of films for potential "Redskins" citations | 105, pp. 33-34 |
| N/A | List | Courtney Dep. Ex. 2: List of screened films | 105, p. 35 |
| NA | Footage transcription | Courtney Dep. Ex. 4: Index including transcription of footage of Courtney Dep. Ex. 3 – footage of major motion picture productions | 105, pp. 37-41 |
| N/A | Notes | Courtney Dep. Ex. 5: Working notes for "Redskins" film research | 105, pp. 42-62 |
| N/A | List | Hirschfelder Dep. Ex. 3: Listing of expert's publications | 106, pp. 18-20 |
| N/A | Unpublished expert report | LaFromboise Dep. Ex. 2: Expert Report of Theresa D. LaFromboise, June 10, 1996 | 108, pp. 29-38 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| N/A | Notes | Nunberg Dep. Ex. 33: Notes for deposition on denotation and connotation | 108, pp. 100-01 |
| N/A | Notes | Nunberg Dep. Ex. 34: Notes for deposition on distinguishing informal from connotative terms | 108, pp. 102-07 |
| N/A | Notes | Nunberg Dep. Ex. 37: Excerpts from 19th century novels | 86, p. 37 |
| N/A | List | Nunberg Dep. Ex. 38: Listing of citations from database search of "redskins" referring to Indians | 86, pp. 38-49 |
| N/A | Notes | Nunberg Dep. Ex. 39: Distinguishing informal from connotative terms | 86, pp. 50-54 |
| N/A | List | Nunberg Dep. Ex. 42: Listing of names of sports teams | 92, pp. 151-52 |
| N/A | Formula | Ross Dep. Ex. 156: Response rate formulas, detailed, and in sample reports | 92, pp. 175-78 |
| N/A | Raw data | Ross Dep. Ex. 159: Data from North American study | 92, pp. 188-90 |
| N/A | Unpublished study | Ross Dep. Ex. 160: Jacob Jacoby, Study of Consumer Association & Confusion Regarding Retractable Tape Measures (1988) | 93, pp. 4-25 |
| N/A | Sample questionnaire | Ross Dep. Ex. 161: In-Store Study Main Questionnaire (1991) | 93, pp. 26-34 |
| N/A | Sample questionnaire | Ross Dep. Ex. 162: In-Store Study Main Questionnaire (Feb. 1987) | 93, pp. 35-42 |
| N/A | List | Ross Dep. Ex. 201: Cover memo & ranking of Native Am. populations by U.S. counties, Mar. 11, 1996 | 93, pp. 104-07 |
| N/A | List | Ross Dep. Ex. 202: Estimates of population by U.S. counties by race and Hispanic origin (July 1, 1994) | 94, pp. 4-81 |
| N/A | List | Ross Dep. Ex. 203: Listing of top 50 U.S. counties with highest numbers of Native Americans, based on 1994 census | 94, pp. 82-83 |
| N/A | List | Ross Dep. Ex. 204: Listing of petitioners' top 50 U.S. counties of Native American population, based on 1994 census | 94, pp. 84-85 |
| | **RESOLUTIONS (THIRD-PARTY) OPPOSING USE OF "REDSKINS"** | | |
| 3 | Resolution | Nat'l Congress of Am. Indians, Resolution No. EX DC-93-11, Resolution in Support of the Petition for Cancellation of the Registered Services Marks of the Washington Redskins AKA Pro-Football Inc. (Jan. 18-19, 1993); As Chase Dep. Ex. 108 | 63, pp. 71-77; (dup) 83, pp. 47-48 |
| 4 | Resolution | Cent. Conference of Am. Rabbis, "Racism" Resolution Adopted by the 103rd Annual Convention, calling upon the Atlanta Braves and Washington Redskins to combat racial stereotyping (Apr. 1992); As Stevens Dep. Ex. 2 | 63, p. 79, (dup) 67, p. 49; 94, pp. 96-97 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** ||||

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| 4 | Resolution | Am. Jewish Comm., Portland, Or., Resolution opposing, *inter alia*, use of racial or ethnic stereotypes in the names or titles of sport entities when the affected group has not chosen the name itself (passed Sept. 2, 1992), Oct. 21, 1992<br>As Kahn Dep. Ex. 1 | 63, p. 80;<br><br>(dup)<br>108, p. 16 |
| 4 | Resolution | Unity '94, "Mascot Resolution" to discontinue use, *inter alia*, of Native American nicknames, logos and mascots (July 27, 1994);<br>As Swanston Dep. Ex. 1 | 63, p. 81<br><br>94, p. 127 |
| **RESOLUTIONS (THIRD-PARTY) SUPPORTING USE OF "REDSKINS"** ||||
| N/A | Resolution | Nunberg Dep. Ex. 41 (part): Inter-Tribal Council, Inc. Resolution (1992), with cover letter from Modoc Tribe of Okla., Jan. 16, 1992 | 88, pp. 124-27 |
| **SOLICITATION LETTERS** ||||
| 5 | Solicitation Letter | Solicitation from Edward E. Williams to Jack Kent Cooke, undated and topic of letter not related to the Redskins name | 63, p. 144 |
| 5 | Solicitation Letter | Solicitation from John Martin Meeks to Redskins GM, Nov. 5, 1991 | 63, pp. 160, 162 |
| **SUPPORT LETTERS INDICATING INDIVIDUAL AUTHORS ARE NATIVE AMERICANS** ||||
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): George B. Tsoodle (Kiowa Indian) to Washington Redskins, undated [in 1988 labeled folder] | 88, p. 30 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Princess Palemoon (Cherokee/Ojibwa) to Jack Kent Cooke, Nov. 6, 1991 | 88, pp. 92-93 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): M. Henson (Blackfoot Indian) to Sen. Ben Nighthorse Campbell, July 22, 1993 | 92, p. 72 |
| **SUPPORT CORRESPONDENCE INDICATING NATIVE AMERICAN TRIBAL SUPPORT** ||||
| N/A | Support letter | Nunberg Dep. Ex. 28: Stanley G. Jones Sr., Chairman, Tulalip Tribes (Wash.), to Redskin Support Comm., Aug. 31, 1992;<br>As Nunberg Dep. Ex. 41 (part) | 83, p. 157;<br><br>(dup)<br>92, p. 62 |
| N/A | Support letter | Nunberg Dep. Ex. 29: Jerry G. Haney, Principal Chief, Seminole Nation of Okla., to Jack Kent Cooke, Wash. Redskins, Jan. 23, 1992 | 83, p. 159 |
| N/A | Support letter | Nunberg Dep. Ex. 30: Hollis E. Roberts, Chief, Choctaw Nation of Okla., to Charlie Dayton, V.P., Wash. Redskins Communications Dep't, Jan. 23, 1992;<br>Nunberg Dep. Ex. 41 (part) | 83, pp. 161-62;<br><br>(dup)<br>88, pp. 135-38 |
| N/A | Support letter | Nunberg Dep. Ex. 27: Floyd E. Leonard, Chief of the Miami Tribe of Oklahoma, to C. A. Buser, June 21, 1991;<br>As Nunberg Dep. Ex. 41 (part) | 83, pp. 154-55;<br>(dup)<br>88, pp. 76-77 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Stan Jones Sr., Chairman, Tulalip Tribes (Wash.), to Sen. John McCain, Oct. 30, 1991 | 88, pp. 86-89 |
| N/A | Support fax | Nunberg Dep. Ex. 41 (part):  J. Lisanby, Sioux Indians of Fort Totten, N.D. to Charlie Drayton, Redskins Park, Jan. 17, 1992 | 88, p. 128 |
| N/A | Support letter | Nunberg Dep. Ex. 31:  Robert J. Salgado, Chairman, Soboba Band of Mission Indians, to Jack Kent Cooke, Wash. Redskins, Jan. 17, 1992;<br>As Nunberg Dep. Ex. 41 (part) ;<br>As Stevens Dep. Ex. 10 | 83, p. 164; (dup) 88, pp. 129, 133;<br>94, p. 113 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Jerry G. Haney, Principal Chief, Seminole Nation of Okla., to Jack Kent Cooke, Jan. 23, 1992 | 88, p. 134 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Catherine Elston, PR Office, Hopi Tribe, to Jo Walter, July 16, 1992 | 92, p. 65 |
| N/A | Support letter | Nunberg Dep. Ex. 25:  Jonathan L. Taylor, Principal Chief, Eastern Band of Cherokee Indians, to Jo Walter, July 16, 1992;<br>As Nunberg Dep. Ex. 41 (part) | 83, p. 150;<br><br>(dup)<br>92, p. 66 |
| N/A | Support letter | Nunberg Dep. Ex. 26:  Merna L. Lewis, V.P., Pima-Maricopa Indian Community (Ariz.), to Jo Walter, July 14, 1992;<br>As Nunberg Dep. Ex. 41 (part) | 83, p. 152;<br><br>(dup)<br>92, p. 67 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Ronald R. Julian, Council Member, Jicarilla Apache Tribe (Dulce, N.M.) to Rick Vaughn, Wash. Redskins, Sept. 8, 1994 | 92, p. 147 |
| | **SUPPORT LETTERS NOT INDICATING AUTHORS ARE NATIVE AMERICANS** | | |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  James Patrick Thomas to Jack Kent Cooke, Feb. 13, 1988 | 88, p. 31 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Gwen Eggebraaten to Jack Kent Cooke, Feb. 23, 1988 | 88, p. 32 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  E. H. Paulsen to Jack Kent Cooke, Feb. 24, 1988 | 88, p. 33 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  W. J. Bryant to Jack Kent Cooke, undated (date stamped "JKC Inc. Feb. 29, 1988") | 88, pp. 34-36; (dup) 41-45 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Brenda Chilstrom to Jack Kent Cooke, Feb. 22, 1988 | 88, p. 37 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  George W. T. Hughes to Jack Kent Cooke, Feb. 21, 1988 | 88, pp. 38-39 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  L. M. (Pat) Egan to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 1, 1988") | 88, pp. 46-47 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Karen Goeke to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 14, 1988") | 88, p. 49 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): John B. Garrett, Jr. to Jack Kent Cooke, Mar. 10, 1988 | 88, p. 50 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert N. Huey to Jack Kent Cooke, Mar. 12, 1988 | 88, p. 51 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Jane Rush to Jack Kent Cooke, Mar. 17, 1988 | 88, p. 52 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Sylvia L. Cash to Jack Kent Cooke, Apr. 18, 1988 | 88, pp. 53-54 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert H. Paschall to Jack Kent Cooke, Apr. 21, 1988 | 88, p. 55 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Wilcomb E. Washburn to John Kent Cooke, Jr., Apr. 25, 1988, with his WASH. POST editorial, Apr. 23, 1988, at A23, attached | 88, pp. 57-58 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Evie Braman to Jack Kent Cooke, May 10, 1988 | 88, p. 61 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Lucky Tomblin to Donnie Tuck, Pub. Relations Dir., Wash. Redskins, May 23, 1988 | 88, pp. 62-63 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Art Nelson to Jack Kent Cooke, Mar. 9, 1989 | 88, pp. 66-68 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Ronald N. Paul to Jack Kent Cooke, Mar. 1989 | 88, pp. 69-71 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert N. Huey to Jack Kent Cooke, Mar. 29, 1989, with AP, *Indian Band Dislikes Nickname Campaign*, Sioux Falls Argus Leader (S.D.), Mar. 23, 1989, attached | 88, pp. 73-74 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Karen E. Elkins to Jack Diamond, MIX 107.6 (DC radio station), Oct. 23, 1991 | 88, pp. 78-79 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Rusty Briarton to Jack Kent Cooke, Oct. 23, 1991 | 88, p. 80 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Francis J. Donnelly to Jack Kent Cooke, Oct. 26, 1991 | 88, p. 81 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Harry J. Gould to President, Wash. Redskins, Oct. 28, 1991, with Norm Frauenheim, *No Reservations: Arizona's Braves Proud of Nickname*, [no shown date], at C1, C10, attached | 88, pp. 82-85 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert D. Kohn to Jack Kent Cooke, Nov. 4, 1991 | 88, p. 90 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Don Blevins to Jack Kent Cooke, Nov. 4, 1991 | 88, p. 91 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Tony Hurley to Jack Kent Cooke, Nov. 22, 1991 | 88, pp. 94-95 |

| | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Tony Gourse to Jack Kent Cooke, Nov. 25, 1991 | 88, pp. 96-97 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): David T. Read to Jack Kent Cooke, Nov. 26, 1991 | 88, pp. 98-99 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Hal W. Pattison to Joy J. Hanley, Assoc. on Am. Indian Affairs, Inc., Nov. 28, 1991 | 88, pp. 100-01 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Wm. D. Lillard to Wash. Redskins, Nov. 28, 1991 | 88, p. 102 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Mark Naeser to Jack Kent Cooke, undated (date stamped "JKC Inc. Dec. 10, 1991") | 88, p. 103 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Wilcomb E. Washburn to John Kent Cooke, Jr., Dec. 24, 1991, with his typescript of magazine article, attached | 88, pp. 104-12, 120 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Patricia Parker Levi to Charlie Dayton, Wash. Redskins, Jan. 2, 1992, with public relations campaign proposal attached | 88, pp. 114-18 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Billie J. Hipsley to Wash. Redskins, Jan. 13, 1992, with Mark Holmberg, *What's All the Fuss About 'Skins*, Richmond Times-Dispatch, [no shown date], at C5, attached | 88, pp. 121-22 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): A. Neal Kellum to Redskins Pub. Relations, Jan. 14, 1992 | 88, p. 123 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Harry M. Hittle to Jack Kent Cooke, Jan. 22, 1992 | 88, pp. 130-32 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Joe Davis to Jack Kent Cooke, Jan. 27, 1992 | 88, pp. 139-42 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Philip A. May to Wash. Redskins Dir. Pub. Relations, Jan. 27, 1992 | 88, p. 144 |
| N/A | Support letters | Nunberg Dep. Ex. 41 (part): U.S, House of Representatives, Comm. on Public Works & Transp. to Charlie Dayton, Pub. Relations, Feb. 13, 1992, with letters from schoolchildren attached | 88, pp. 145-47 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Wm. L. Wilkoff to Jack Kent Cooke, Feb. 27, 1992 | 88, p. 148 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): John Mull to Jack Kent Cooke, Feb. 27, 1992 | 88, p. 149 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Patti H. Snodgrass to Jack Kent Cooke, Feb. 29, 1992 | 88, p. 150 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Steve Lerman to Jack Kent Cooke, Mar. 4, 1992 | 88, p. 151 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): William P. Conway to Jack Kent Cooke, Mar. 4, 1992 | 88, p. 152 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Concetta C. Goetzinger to Sports Editor of the Times, Mar. 4, 1992 | 88, p. 153 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | **Appendix A – Petitioners' Submissions of _Harjo_ Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert Mirin to John Kent Cooke, Mar. 4, 1992 | 88, p. 154 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Dianna Belcher to Wash. Redskins, Mar. 5, 1992 | 88, p. 155 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Concetta C. Goetzinger to Wash. Redskins, Mar. 5, 1992 | 88, p. 156 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Gary L. Gallahan to Jack Kent Cooke, Mar. 5, 1992 | 88, p. 157 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Ned Fuller to Letter to the Editor, Wash. Post, Mar. 6, 1992 | 88, pp. 159-60 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): A. Wayne Coley to Jack Kent Cooke, Mar. 6, 1992 | 88, p. 161 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): M. E. Murphy to Jack Kent Cooke, Mar. 6, 1992 | 88, p. 162 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Don Craig to Jack Kent Cooke, Mar. 10, 1992 | 88, p. 163 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): R. E. Kidwell to Jack Kent Cooke, Mar. 13, 1992 | 88, p. 164 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Arthur P. McDermott to Jack Kent Cooke, Mar. 14, 1992 | 88, p. 165 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Peter Byrum to Jack Kent Cooke, Mar. 15, 1992 | 88, p. 166 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Randy Cross to Jack Kent Cooke, undated (date stamped "JKC Inc. Mar. 20, 1992") | 88, pp. 167-68 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Concetta C. Goetzinger to Jack Kent Cooke, Mar. 15, 1992 | 88, p. 170 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Margaret Cichocki to Jack Kent Cooke, Mar. 16, 1992 | 88, p. 171 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): James A. Joyner, Jr. to Gen. Mgr., WTOP Radio, Mar. 16, 1992 | 88, pp. 172-73 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Richard O. Cunningham to WTOP Radio, Mar. 17, 1992 | 88, pp. 174-75 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): John T. & Mildred R. Sheperd to Jack Kent Cooke, Mar. 17, 1992 | 88, p. 176 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Kenneth C. Allen to Jack Kent Cooke, Mar. 17, 1992 | 88, p. 177 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Louise M. Saylor to Letter to the Editor, Wash. Post, Mar. 17, 1992 | 88, p. 179 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Bill Ramsay to Jack Kent Cooke, Mar. 18, 1992 | 88, pp. 180-81 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Nicholas T. Yaworski to Michael Douglass, GM, WTOP Radio, Mar. 18, 1992 | 92, p. 4 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): James E. Felten to Michael Douglass, WTOP Radio, Mar. 18, 1992 | 92, p. 5 |

| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Theodore W. Bremer to Jack Kent Cooke, Mar. 17, 1992 | 92, p. 6 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Helen & Edward Beaver to Jack Kent Cooke, Mar. 20, 1992 | 92, p. 7 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Alexander Polett to Jack Kent Cooke, Mar. 21, 1992 | 92, p. 8 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Ricardo J. Martinez to Jack Kent Cooke, Mar. 21, 1992 | 92, pp. 9-14 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  William F. Jr. & Velma L. Kidwell to Jack Kent Cooke, Mar. 23, 1992 | 92, p. 15 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Francis J. Donnelly to Michael Douglass, GM, WTOP Radio, Mar. 24, 1992 | 92, p. 18 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Francis J. Donnelly to Jack Kent Cooke, Mar. 25, 1992 | 92, p. 19 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Charles E. Reed to Wash. Redskins, Mar. 27, 1992, with his letter to the editor *Undeserved Names are Offensive*, Mont. Std.,  Mar. 25, 1992, at 4, attached | 92, pp. 22-23 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Arthur W. Arundel to Jack Kent Cooke, Mar. 26, 1992, Charles E. Reed to Wash. Redskins, Mar. 27, 1992, with his editorial *Keep the Name*, Fauquier Times-Democrat,  Mar. 26, 1992, attached | 92, pp. 24-25 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  John Milot to Jack Kent Cooke, Mar. 30, 1992 | 92, p. 26 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Eddie M. Bryant Sr. to Jack Kent Cooke, Mar. 31, 1992 | 92, p. 27 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Robert S. Hubbard to Jack Kent Cooke, Apr. 3, 1992 | 92, p. 28 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Paul Sheldon to Jack Kent Cooke, Apr. 9, 1992 | 92, p. 29 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  J. V. Richard Kaufman to Jack Kent Cooke, Apr. 14, 1992, with enclosed photos identified as taken at the Red Mesa High School on a Navaho reservation in northern Ariz., showing "Home of the Redskins" signs; As Stevens Dep. Ex. 9 | 92, pp. 30-31; (dup) 94, p. 111 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Michael John Nisos to Jack Kent Cooke, undated (date stamped "JKC Inc. Apr. 28, 1992"), with photo indicating it shows "Redskin" Indian-named movie theater located in Andarko, Okla. | 92, pp. 33-34 |

| | | Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Ruth Walkup to Jack Kent Cooke, Aug. 1, 1992, with enclosed photo identified as taken at the Red Mesa High school on a Navaho reservation in Tonelea, Ariz., showing "Home of the Redskins" sign | 92, pp. 35-38 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  George P. Morse to Jack Kent Cooke, Aug. 5, 1992 | 92, p. 39 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Mary Beth Hughes to Jack Kent Cooke, undated (date stamped "JKC Inc. Aug. 27, 1992") | 92, p. 40 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Priscilla J. Fritz to Letters to the Editor, Wash. Post, Sept. 2, 1992, with enclosed photo identified as being from the "Redskin Motel" on a Cherokee Indian Reservation | 92, pp. 41-42 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  James Brewster Hopewell to Jack Kent Cooke, Sept. 14, 1992 | 92, pp. 43-44 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  James R. Martin to Jack Kent Cooke, Sept. 15, 1992 | 92, pp. 45-46 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Dr. Wil Rose, CEO, Am. Indian Heritage Found. to Douglas B. Comer, USPTO Acting Comm'r, Sept. 21, 1992 | 92, pp. 47-49 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Dr. Wil Rose, CEO, Am. Indian Heritage Found. to John Cooke, Sept. 21, 1992, with letter sent to the USPTO attached | 92, pp. 50-53 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Bob Burns to Jack Kent Cooke, Oct. 1, 1992 | 92, pp. 54-55 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  C. A. Buser to Jack Kent Cooke, Oct. 5, 1992 | 92, pp. 56-57 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Charles B. Rosenak to Charles Dayton, Wash. Redskins, Oct. 8, 1992 | 92, p. 58 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Dolle Nichols & Jo Walter to Jack Kent Cooke, Nov. 16, 1992, with Stanley G. Jones Sr., Chairman, Tulalip Tribes, Aug. 31, 1992, Paul J. Biscula, Penobscot Indian Nation, Aug. 31, 1992, Coeur d'Alene Tribe of Idaho, July 20, 1992, Catherine Elston, Hopi Tribe, July 16, 1992, Jonathan L. Taylor, Principal Chief, Eastern Band of Cherokee Indians, July 16, 1992, Merna L. Lewis, V.P., Salt River Pima-Maricopa Indian Community, July 14, 1992,  Mike Mayer, July 10, 1992, attached | 92, pp. 56-68 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Cliff Rodgers to Jack Kent Cooke, July 30, 1993 | 92, p. 69 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part):  Susan Giller to Jack Kent Cooke, May 10, 1993 | 92, p. 70 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits** | | | |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Robert Camp Littleton, July 11, 1993 | 92, p. 73 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): J. E. Schumach to Jack Kent Cooke, July 11, 1993 | 92, p. 74 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): James Kevin Campbell to Jack Kent Cooke, Aug. 20, 1993 | 92, p. 76 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Jeffrey L. Rosen to Jack Kent Cooke, July 3, 1995, regarding Red Mesa High School Redskins | 92, pp. 149-50 |
| **SUPPORT LETTERS WITH NO SOURCE OR NO DATE** | | | |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Philip A. Severson to Jack Kent Cooke, undated | 88, p. 40 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Chuck to Jack Kent Cooke, Mar. 16, 1989 | 88, p. 72 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Ted Smyrna to Sir, undated | 88, p. 169 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Ann & Robert Anderson to Jack Kent Cooke, undated (date stamped illegible) | 88, p. 182 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Ronald M. Eng to Letter to Editor, Wash. Post, undated (date stamped illegible) | 88, pp. 183-84 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): [unknown author] to Michael Douglass, WTOP-AM, Mar. 23, 1992 | 92, p. 16 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): Bob Ryan to "Sir,", undated (date stamped "JKC Inc. Mar. 26, 1992") | 92, p. 17 |
| N/A | Support letter | Nunberg Dep. Ex. 41 (part): writing of letter illegible, Mar. 19, 1992 | 92, p. 21 |
| **USPTO APPLICATION SERIAL NO. 74311697** | | | |
| 33 | USPTO Office Action | Charles M. Bottorff, Trademark Attorney, USPTO, to Atlantic Publ'g Group, Section 2(a) disparagement & false association, Section 2(d), & Section 2(e)(1) refusals, including evidence, ownership inquiry and specimen requirements, issued Jan. 8, 1993 | 77, pp. 24-61 |
| **USPTO REGISTRATIONS AT ISSUE** | | | |
| 8 | Registration Certificates | Registrations (with renewals) at issue | 68, pp. 6-13 |
| N/A | Registration | Stevens Dep. Ex. 8: Certified copy of U.S. Reg. No. 986,668, issued June 18, 1974, for a term of 20 years | 94, p. 109 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| Appendix A – Petitioners' Submissions of *Harjo* Petitioners' First, Fifth, Sixth & Tenth Notices of Reliance ("NR"), Deposition Testimony & Deposition Exhibits | | | |
| USPTO REGISTRATIONS—NIGGER HEAD & RELATED MARKS | | | |
| 31 | Registration Certificates | Registrations: Reg. No. 54,864, for "NIGGER HEAD BRAND" & design, used on fruits and vegetables hermetically sealed, issued July 31, 1906; Reg. No. 57,575, for "NIGGER HEAD" & design, used on oysters and shrimp, issued Nov. 13, 1906; Reg. No. 136,444, for "NIGGER HEAD" & design, used on stove polish, issued on Nov. 2, 1920; Reg. No. 158,452, for "NIGGERHED" & design, used on electric lamp sockets, electric lamp cover sockets, and electric lamp plugs; Reg. No. 160,641, for "NIGGERHEAD COAL" in special form, used on coal, issued on Oct. 24, 1922; Reg. No. 178,611, for "NIGGER BRAND" & design, used on dates, issued Jan. 15, 1924; Reg. No. 186,950, for "NIGGER CANE IN DE PATCH" in special form, used on cane syrup for food purposes, issued July 22, 1924, with first renewal on July 22, 1944; Reg. No. 217,067, for "NIGGER BABY BRAND TURN ON THE JUICE" & design, used on fresh oranges and grapefruit, issued Aug. 24, 1926, with first renewal on Aug. 24, 1946; Reg. No. 221,097, for "NIGGER HEAD" & design, used on golfing tees, clubs and grips, issued on Nov. 23, 1926; Reg. No. 301,747, for "NIGGER HEAD PRIZE ICE CREAM" & design, used on novelty confection consisting of chocolate-covered molded ice cream, issued Mar. 14, 1933; and Reg. No. 623,209, for "NEGRO HEAD" in special form, used on canned oysters and shrimps, issued Mar. 13, 1956 | 61, pp. 21-44 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **BOOKS, ESSAYS, GUIDES, SCHOLARLY PAPERS & JOURNAL ARTICLES** | | |
| 8 | Book excerpt | James Joyce, Ulysses 324-25 (1946); [As Barnhart Dep. Ex. 6] | 129, pp. 34-36 |
| 13 | Book excerpt | Elizabeth Pickette (Chevalier), Redskin 1-7, 28-29, 34-35, 46-49, 56-57, 84-85, 90-91, 102-03, 128-29, 134-37, 158-61, 164-67, 190-91, 200-01, 224-25, 246-247, 256, 274-75 (1929); As Butters Dep. Ex. 7 (part) | 175, pp. 13-42; 167, pp. 12-41 |
| 14.1 | Essay in book | Philip Rahv, *Paleface & Redskin*, Image & Idea: Twenty Essays on Literary Themes 1-6 (1957); As Butters Dep. Ex. 9 (part) | 175, pp. 43-49; 170, pp. 4-10 |
| 14.2 | Essay in book | Philip Rahv, *Paleface & Redskin*, Essays on Literature & Politics 1932-1972, at 3-7 (1978); As Butters Dep. Ex. 9 (part): Essays on Literature & Politics 1932-1972, at v-xi, 3-7 (1978) | 175, pp. 50-59; 170, pp. 11-20 |
| 14.3 | Book excerpt | Philip Rahv, *Paleface & Redskin*, Image & Idea: Fourteen Essays on Literary Themes, tbl of contents (1949); As Butters Dep. Ex. 9 (part) | 175, pp. 60-62; 170, pp. 21-23 |
| 14.4 | Book excerpt | Sanford Pinsker, *Theoretical Palefaces/Neo-Realistic Redskins, or Why the Ghost Paleface & Redskin, in* Neo-Realism in Contemporary Am. Fiction 51-64 (1992); As Butters Dep. Ex. 9 (part) | 175, pp. 63-73; 170, pp. 24-34 |
| 15 | Commentary in journal | Vine Deloria, Jr., *Commentary: Research, Redskins, and Reality*, Am. Indian Q. 457-68 (Fall 1991) | 175, pp. 74-81 |
| 16 | Book cover | Vine Deloria, Jr., Red Earth White Lies: Native Americans and the Myth of Scientific Fact (1995) | 175, pp. 82-83 |
| 59 | Book excerpt | William G. Zikmund, Exploring Marketing Research 462-68 (4th ed. 1991); As Jacoby Dep. Ex. 5 | 153, pp. 34-41; 174, pp. 11-18 |
| 60 | Guidelines | Adver. Res. Found., Guidelines for the Public Use of Market & Opinion Research (1981); As Jacoby Dep. Ex. 7 | 153, pp. 42-56; 174, pp. 20-34 |
| 65 | Article in journal | Ward Churchill, et al., *Media Stereotyping & Native Response*, 11 Indian Historian 49, 56 (1978) | 151, pp. 64-67 |
| 69 | Book excerpt | Harry V. Sucher, The Iron Redskin (1990) | 152, pp. 9-14 |
| 70 | Book excerpt | Jerry Hatfield, Illustrated Indian Motorcycle Buyer's Guide: All the Iron Redskins from 1901, at 145-46 (1989) | 152, pp. 16-19 |
| N/A | Book excerpt | James Joyce, Ulysses 324-25 (1946) | 162, pp. 81-83 |
| N/A | Book excerpt | Butters Dep. Ex. 3: Mary Brave Bird, Ohitika Woman 6-9, 18-21, 42-43, 58-61, 119, 144-45, 158, 59, 168-69, 180-81, 192-93 (1993) | 164, pp. 23-37 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** |||
| N/A | Article in manuscript form | Butters Dep. Ex. 4: Roy C. O'Donnell, Freedom and Restrictions in Language Use (1992) | 164, pp. 38-66 |
| N/A | Article in manuscript form | Butters Dep. Ex. 5: John McCluskey, Dictionaries and Labeling of Words Offensive to Groups, with Particular Attention to the Second Edition of the OED (1990) | 164, pp. 67-75 |
| N/A | Book excerpt | Butters Dep. Ex. 7 (part): E. R. Hagemann, Fighting Rebels and Redskins: Experiences in Army Life of Colonel George B. Sanford 1861-1892, title page (1969) | 164, pp. 42-45 |
| N/A | Book excerpt | Butters Dep. Ex. 9 (part): Joan Beam & Barbara Branstad, Native American in Long Fiction: An Annotated Bibliography vii-xv, 20-21, 148-149, 186-87 (1996) | 170, pp. 35-45 |
| N/A | Book excerpt | Butters Dep. Ex. 27: Carl Waldman, Word Dance: The Language of Native American Culture vii-ix, 26-27, 94-95, 106-07, 166-67, 192-93, 202-04, 222-23 (1994) | 165, pp. 47-59 |
|  | **BUSINESS COMMUNICATIONS BETWEEN RESPONDENT & THIRD-PARTIES AND INTERNAL COMMUNICATIONS (UNLESS UNDER OTHER HEADING)** |||
| 22 | Response to support letter | John Kent Cooke to Joseph F. K. Mayhew, Mar. 26, 1992 | 142, p. 12 |
| 23 | Response to support letter | John Kent Cooke to Robert Salgado, Soboba Band of Mission Indians, Mar. 5, 1992 | 142, p. 13 |
| 25 | Business letter | John Kent Cooke, Redskins, to Susan T. Fletcher, Phila. Eagles, Sept. 22, 1983; As Cooke Dep. Ex. 2 | 142, p. 26; 156, p. 6 |
| 26 | Business letter | John Kent Cooke, Redskins, to Nate Pope, NPC & Associates, Aug. 10, 1987; As Cooke Dep. Ex. 4 | 142, p. 27; 156, p. 8 |
| 29.1 | Business letter | Dale Pullen, U.S. Congress Handbook, to Charlie Dayton, Wash. Redskins, June 3, 1991 | 142, p. 43 |
| 29.2 | Business letter | Harry J. Gould to Pres., Wash. Redskins, Oct. 28, 1991, with *No Reservations: Arizona's Braves Proud of Nickname*, Ariz. Republic, undated, at C1, C10 | 142, pp. 44-45 |
| 49 | Cover memo on WTOP survey | John Kent Cooke Sr. to Jack Kent Cooke, Aug. 24, 1993, regarding WTOP Surveys; As Cooke Dep. Ex. 6 (part) | 149, p. 43; 156, p. 10 |
| 49 | Business memo | Tom McKinley, WTOP, to Charlie Dayton, Wash. Redskins, Aug. 24, 1993, regarding survey results; As Cooke Dep. Ex. 6 (part) | 149, pp. 44-45; 156, pp. 12-13 |
| N/A | Internal memo | Cooke Dep. Ex. 3: Paul E. Denfeld, to John Kent Cooke, Subject: Chief Z, May 19, 1987 | 156, p. 7 |
| N/A | Business letter | Cooke Dep. Ex. 5: John Kent Cooke, Redskins, to Ercle F. Herbert Jr., Herbert & Herbert Inc., Dec. 18, 1987 | 156, p. 9 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** |
| N/A | Business facsimile | Cooke Dep. Ex. 7: John Kent Cooke Jr., Dir. of Promotions, to Craig Kapp, McCann-Erickson USA, Sept. 13, 1993, regarding ad campaign | 156, p. 40 |
| N/A | Internal memo | Cooke Dep. Ex. 13: John Kent Cooke to file, Nov. 22, 1991, regarding BIA meeting | 156, pp. 85-86 |
| N/A | Internal memo | Cooke Dep. Ex. 14: John Kent Cooke to Charlie Dayton, July 30, 1993, regarding contacts of supportive Indian tribal leaders | 156, pp. 90-91 |
| N/A | Internal memo | Cooke Dep. Ex. 15: John Kent Cooke to Charlie Dayton, Sept. 16, 1992, regarding blessing Redskin Park | 156, p. 92 |
| N/A | Internal memo | Cooke Dep. Ex. 16: John Kent Cooke to file, Jan. 9, 1992, regarding AIM & options | 156, p. 87 |
| N/A | Internal memo | Cooke Dep. Ex. 17: John Kent Cooke to Jack Kent Cooke, Jan. 16, 1992, regarding AIM & options | 156, pp. 88-89 |
| N/A | Response to support letter | Cooke Dep. Ex. 18: John Kent Cooke to Wilcomb E. Washburn, Jan. 9, 1992 | 156, p. 93 |
| N/A | Cease & desist letter | Cooke Dep. Ex. 22: Stuart A. Haney, Counsel, Wash. Redskins, to Benjamin D. Severson, Atl. Publ'g Grp., June 5, 1990 | 157, pp. 7-8 |
| N/A | Response to support letter | Cooke Dep. Ex. 24: John Kent Cooke to Wilcomb E. Washburn, Apr. 21, 1992 | 157, p. 11 |
| N/A | Response to support letter | Cooke Dep. Ex. 25 (part): Jack Kent Cooke to M. Henson, Aug. 3, 1992 | 157, p. 12 |
| N/A | Response to support letter | Cooke Dep. Ex. 26: Jack Kent Cooke, Redskins, to James Kevin Campbell, Sept. 2, 1993, with James Kevin Campbell to Jack Kent Cooke, Aug. 20, 1993 | 157, pp. 15-16 |
|  | **CORRESPONDENCE BETWEEN THIRD PARTIES** |
| N/A | Business letter | Cooke Dep. Ex. 1: Susan T. Fletcher, Phila. Eagles, to Marilyn Z. Kutler, Municipal Services Bldg., re: Parking Lot Incident During Wash. Redskins Game at Veterans Stadium Sept. 11, 1983, Sept. 16, 1983 | 156, pp. 4-5 |
|  | **CORRESPONDENCE BY PETITIONERS' COUNSEL** |
| 67 | Business letter | Michael Drysdale to Teresa D. LaFromboise, May 8, 1996, regarding expert testimony draft | 151, pp. 69-77 |
| 68 | Business letter | Laurie Scalon to Teresa D. LaFromboise, Dec. 5, 1996, regarding prepared expert report | 151, p. 78 |
|  | **CORRESPONDENCE WITH RESPONDENT'S *HARJO* COUNSEL** |
| N/A | Business letters & check stub | Barnhart Dep. Ex. 7: David K. Barnhart to Nadine Flynn, April 16, 1996; John Paul Reiner to David K. Barnhart, Apr. 22, 1996, with check stub indicating retainer fee payment | 162, pp. 84-86 |
| N/A | Business letter & bill | Barnhart Dep. Ex. 8: David K. Barnhart to John Reiner, June 22, 1996, with bill for expert witness services | 160, pp. 4-5 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | | |
| N/A | Business letter (partial | Barnhart Dep. Ex. 9: [sender's name not shown], White & Case, to David K. Barnhart, June 24, 1996 | 160, p. 6 |
| N/A | Business letters & bills | Butters Dep. Ex. 11: Letters between Ronald R. Butters and Nadine P. Flynn, and invoices | 172, pp. 6-19 |
| **CURRICULA VITAE** | | | |
| 7 | CV | David K. Barnhart; As Barnhart Dep. Ex. 2 | 129, pp. 31-33; 162, pp. 14-16 |
| 10 | CV | Ronald R. Butters; As Butters Dep. Ex. 1 | 129, pp. 53-61; 164, pp. 4-12 |
| 62 | CV | Jacob Jacoby, Jan. 1996; As Jacoby Dep. Ex. 1 | 151, pp. 5-48; 168, pp. 4-47 |
| **DEPOSITIONS & SUBPOENAS TO GIVE TESTIMONY/PRODUCE EVIDENCE** | | | |
| N/A | Deposition | John Kent Cooke Dep., Mar. 26, 1996 | 154, pp. 4-66 |
| N/A | Deposition | John Kent Cooke Dep., Mar. 27, 1996 | 155, pp. 4-74 |
| N/A | Deposition | Richard L. Vaughn Dep., Mar. 28, 1996 | 158, pp. 4-176 |
| N/A | Deposition | David K. Barnhart Dep., Dec. 19, 1996 | 159, pp. 4-141 |
| N/A | Deposition | David K. Barnhart Dep., Apr. 9, 1997 | 161, pp. 4-50 |
| N/A | Subpoena | Barnhart Dep. Ex. 1: Subpoena Ad Testificandum & Duces Tecum on David Barnhart & Lexik House Publishers, Dec. 13, 1996 | 162, pp. 4-13 |
| N/A | Deposition | Ronald R. Butters Dep., Dec. 20, 1996 | 163, pp. 4-66 |
| N/A | Deposition | Ronald R. Butters Dep., Apr. 10, 1997 | 163, pp. 67-106 |
| N/A | Subpoena | Butters Dep. Ex. 2: Subpoena Ad Testificandum & Duces Tecum on Ronald Butters, Dec. 13, 1996 | 164, pp. 13-22 |
| N/A | Deposition | Jacob Jacoby Dep., Apr. 8, 1997 | 166, pp. 4-114 |
| **DICTIONARIES** | | | |
| 5.1 | Definition | Webster's New American Dictionary 823 (1965) | 128, pp. 91-92 |
| 5.2 | Definition | World Book Dictionary, Vol. 2, 1633 (1967) | 128, pp. 93-94 |
| 5.3 | Definition | Int'l Webster New Encyclopedic Dictionary (1975) | 128, pp. 95-96 |
| 5.4 | Definition | Am. Heritage Dictionary of the English Language (1976) | 128, pp. 97-98 |
| 5.5 | Definition | Webster's New Twentieth Century Dictionary of the English Language Unabridged 1513 (2d ed. 1977) | 128, pp. 99-100 |
| 5.6 | Definition | HBJ School Dictionary 612 (1977) | 128, pp. 101-02 |
| 5.7 | Definition | Thorndike/Barnhart Doubleday Advanced Dictionary 855 (1979) | 128, pp. 103-04 |
| 5.8 | Definition | Webster's New Collegiate Dictionary (1980) | 128, pp. 105-06 |
| 5.9 | Definition | World Book Dictionary, Vol. 2, 1752 (1979) | 128, pp. 107-08 |
| 5.10 | Definition | Am. Heritage Dictionary of the English Language 1082 (1981) | 128, pp. 109-10 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** |||
| 19 | Definition | Am. Heritage College Dictionary 375, 400, 947 (3d ed. 1993) | 142, pp. 5-9 |
| 41 | Definition | Am. Heritage School Dictionary (1977); As Butters Dep. Ex. 26 | 143, pp. 22-23; 165, p. 46 |
| N/A | Introduction & definition | Butters Dep. Ex. 6 (part): *Explanatory notes*, *The English Language in the Dictionary*, & "redskin" definition, Merriam Webster's Collegiate Dictionary 17a-19a, 23a-30a, 980 (10th ed. 1993) | 164, pp. 76-89 |
| N/A | Introduction & definition | Butters Dep. Ex. 6 (part): *Preface to the Second Edition*, *Preface to the First Edition*, *Usage: Change and Variation*, *Labels*, "redskin" definition, Random House Dictionary of the English Language vii-x, xxi-xxiv, 1618 (2d ed. 1987) | 164, pp. 90-101 |
| N/A | Introduction & definition | Butters Dep. Ex. 20: Geoffrey Nunberg, *Usage in the American Heritage Dictionary: The Place of Criticism*, definitions of "derogatory," "disparage," "Indian," "Native American," "offensive," and "redskin," Am. Heritage College Dictionary xvi-xxi, 375, 400, 691, 908, 947, 1145 (3d ed. 1993) | 173, pp. 54-67 |

| | | | |
|---|---|---|---|
|  | **FILM FOOTAGE (DVD OF VHS-FORMATTED MATERIAL)** |||
| 52 | Footage excerpt | Scene from Courage Under Fire (1996) (on file with TTAB) | 149, p. 72 |
|  | **GAME PROGRAM PAGES (PITTSBURGH STEELERS)** |||
| N/A | Program front page | As Cooke Dep. Ex. 12 (part): Sept. 29, 1957 (from Pittsburgh Steelers Football Club) | 156, p. 82 |
|  | **GAME PROGRAMS, PRESS GUIDES & FACT BOOKS, OFFICIAL MAGAZINES, YEARBOOKS & ANNIVERSARY ISSUES (WASHINGTON REDSKINS)** |||
| 24.1 | Magazine cover | Redskins vs. Cleveland Browns, Oct. 21, 1956 front cover | 142, p. 14 |
| 24.2 | Magazine cover | Redskins vs. N.Y. Giants, Nov. 18, 1956 front cover | 142, p. 15 |
| 24.3 | Magazine cover | Redskins vs. Cleveland Browns, Nov. 17, 1957 front cover | 142, p. 16 |
| 24.4 | Magazine cover | Redskins vs. Pittsburgh Steelers, Dec. 7, 1958 front cover | 142, p. 17 |
| 24.5 | Magazine cover | Redskins vs. Pittsburgh Steelers, Oct. 18, 1959 front cover | 142, p. 18 |
| 24.6 | Magazine cover | Redskins vs. Balt. Colts, Nov. 8, 1959 front cover | 142, p. 19 |
| 24.7 | Magazine cover | Redskins vs. Phila. Eagles, Dec. 7, 1958 front cover | 142, p. 20 |
| 24.8 | Magazine cover | Redskins vs. Dall. Cowboys, Oct. 9, 1958 front cover | 142, p. 21 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | |
| 24.9 | Magazine cover | Redskins vs. Pittsburgh Steelers, Oct. 23, 1960 front cover | 142, p. 22 |
| 24.10 | Magazine cover | Redskins vs. Cleveland Browns, Oct. 30, 1960 front cover | 142, p. 23 |
| 24.11 | Magazine cover | Redskins vs. St. Louis Cardinals, Nov. 20, 1960 front cover | 142, p. 24 |
| 24.12 | Magazine cover | Redskins vs. N.Y. Giants, Dec. 11, 1960 front cover | 142, p. 25 |
| N/A | Yearbooks (partial) | Cooke Dep. Ex. 9: Washington Redskins, Official 1987 Team Yearbook, Limited Edition, front cover, & & photos of players in uniform, marching band, Redskinettes & pageantry, & 1937-1986 Washington Redskins, Official 50th [1987] Anniversary Team Yearbook, images of 6 helmets bearing various logos, reproduction of historic cartoon, articles, 1947 game advertisement for Redskins vs. Giants at the Polo Grounds, fight song lyrics, & photos of players in uniform, marching band, Redskinettes & pageantry | 156, pp. 43-55 |
| N/A | Program front covers | Cooke Dep. Ex. 12 (part): Undated | 156, pp. 65-81 |
| N/A | Fact book (partial) | Cooke Dep. Ex. 12 (part): *Do You Remember? 1937*, undated | 156, p. 83 |
| N/A | Program front cover | Cooke Dep. Ex. 12 (part): Sept. 21, 1958 (shows cartoon reprinted from Evening Star (Wash.), Dec. 17, 1936) | 156, p. 84 |
|  | **LEGISLATIVE MATERIALS** | | |
| 64 | Fed. Reg. Notice | Indian Entities Recognized & Eligible to Receive Services from the U.S. BIA, 60 Fed. Reg. 9250 (Feb. 16, 1995); | 151, pp. 57-63; |
| | | As Jacoby Dep. Ex. 4 | 174, pp. 4-10 |
|  | **MARKETING MATERIALS** | | |
| N/A | Catalog | Cooke Dep. Ex. 20: 1985 NFL Merchandise Catalog, including Redskins' merchandise | 157, pp. 4-5 |
|  | **MISCELLANEOUS** | | |
| 2 | Logo | Depiction of Washington Redskins' logo, showing the head of an Indian in profile, wearing feathers, within a circle, which has two feathers attached | 128, p. 84 |
| 3 | Logo | Depiction of football helmet bearing Washington Redskins' logo, described above | 128, p. 85 |
| 4 | Court document | Petition for Cancellation in the Harjo proceeding, with cover letter from the TTAB, mailed Oct. 5, 1992 | 128, pp. 86-90 |
| 39 | Logo | Depiction indicated as a Native American wearing feathers, developed by Onekema schools in conjunction with an American Indian group | 143, p. 19 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | |
| 40 | Brochure | Bureau of Indian Affairs, U.S. Dep't of the Interior, You Asked About . . . Indian Ancestry, with BIA Area Office Listing | 143, pp. 20-21 |
| 53 | Coin | Indian head nickel (1937) | 149, p. 73 |
| 54 | Packaging | Image of Land O'Lakes-brand butter carton | 153, p. 4 |
| 55 | Packaging | Image of Indian Head-brand yellow corn meal bag | 153, pp. 5-9 |
| 57 | Packaging | Image of Argo-brand corn starch box | 153, p. 13 |
| 66 | Drawing | Drawing of profile of Native American wearing headband and feathers | 151, p. 68 |
| N/A | Draft | Vaughn Dep. Ex. 27: Draft with handwritten notes, with fax cover sheet from Charlie Dayton to Jack Kent Cooke | 158, pp. 177-78 |
|  | **PERIODICAL MATERIALS—ADVERTISING/MARKETING BY THIRD PARTIES, INCLUDING ITEMS IN THIRD-PARTY PUBLICATIONS** | | |
| 43.18 | Newspaper advertisement | Safeway advertisement, *Meet a Redskin Football Star*, Wash. Post & Times Herald, Oct. 10, 1958, at A18 | 148, p. 27 |
| 43.26 | Newspaper advertisements | Janitor Supply Co., *Good Luck Redskins for a Clean Sweep*, & Maggie's Restaurant, *Good Luck for the Season! Welcome Redskins*, WASH. DAILY NEWS, Sept. 19, 1958, at 37 | 148, p. 36 |
|  | **PERIODICAL MATERIALS—CARTOONS** | | |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman, *No Time For Shadow Boxing*, EVENING STAR (Wash.), Nov. 14, 1943 (handwritten) (Redskins v. Lions) | 156, p. 58 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman (caption cut-off), EVENING STAR (Wash.), Oct. 19, 1943 (handwritten) (point of cartoon is unknown) | 156, p. 59 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): *Redskins 1960*, undated and unidentified publication (team wins) | 156, p. 60 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Viewpoints, FORT WORTH STAR TELEGRAM (Tex.), Nov. 21, 1979, at 14A (Indian runs away with the turkey as prize) | 156, p. 61 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman, *Still Sitting—But Not Pretty!*, EVENING STAR (Wash.), Nov. 17, 1941 (handwritten) (Bears challenging Redskins) | 156, p. 62 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman, *Hang On Boy, He Might Stumble*, WASH. POST, Nov. 17, 1941 (handwritten) (Redskins unafraid of Giants) | 156, p. 63 |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman, *Full of Food—And Fight!*, unidentified publication, Nov. 24, 1950 (handwritten) (Bears winning history) | 156, p. 64 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | |
| N/A | Cartoon | Cooke Dep. Ex. 12 (part): Jim Berryman, *Wonder How We'll Get Along*, reprinted from Wash. Star, 1937, undated and unidentified source (on Redskins move to DC from Boston) | 156, p. 59 |
|  | PERIODICAL MATERIALS —SOURCED & DATED | | |
| 12 | Book review in magazine | Joseph Leo Koerner, *Paleface and Redskin*, New Republic, Mar. 24, 1997, at 30-32, 34-38 (reviewing Aby M. Warburg, *Images from the Region of the Pueblo Indians of N. Am.*); As Butters Dep. Ex. 25 | 175, pp. 4-12; 165, pp. 37-45 |
| 17 | Newspaper article | *Cowed by the Soldiers*, N.Y. TIMES (handwritten), Nov. 26, 1890 (handwritten) | 175, pp. 84-86 |
| 18 | Newspaper article | *Abandoning the Craze*, ROCKY MTN. NEWS (handwritten), Nov. 26, 1890 (handwritten) | 142, p. 4 |
| 31.1 | Newspaper article | *Redskins Sign Indian*, WASH. DAILY NEWS, Mar. 10, 1959, at 37 | 143, p. 4 |
| 31.2 | Newspaper article | *An Indian Joins the Redskins*, WASH. DAILY NEWS, July 27, 1959 | 143, p. 5 |
| 43.7 | Newspaper photo/caption | *Little Mo and Bride*, EVENING STAR (Wash.), Jan. 25, 1954 | 148, p. 11 |
| 43.10 | Newspaper article | Lewis F. Atchison, *Biggest Crowd in 10 Years May See Redskins-Colts*, EVENING STAR (Wash.), Nov. 5, 1957, at C-1 | 148, pp. 14-15 |
| 43.16 | Newspaper letter to the editor | Dave Slattery, *Here's What's Wrong With the Redskins*, WASH. DAILY NEWS, Nov. 7, 1958, at 52 | 148, pp. 22-23 |
| 43.30 | Newspaper article | Lewis F. Atchison, *Redskins Plan to Start Olszewski in Opener*, EVENING STAR (Wash.), Sept. 27, 1958, at A-13 | 148, p. 40 |
| 43.35 | Newspaper article | Lewis F. Atchison, *Redskins Crippled But 'Up' for Rams' Battle Tonight*, EVENING STAR (Wash.), Aug. 21, 1959; Lewis F. Atchison, *Redskins' Hopes Dim for Game with Rams*, EVENING STAR (Wash.), Aug. 30, 1959 | 148, pp. 46-47 |
| 43.36 | Newspaper article | Jack Walsh, *Bears Favored by 4 ½ Points Over Redskins*, WASH. POST, Sept. 5 1959 (handwritten), at A11, A15; Lewis F. Atchison, *Day Will Start for Redskins Against Bears*, EVENING STAR (Wash.), Sept. 5, 1959 | 148, pp. 48-49 |
| 44.5 | Newspaper article | Lewis F. Atchison, *Redskins Cheered by News on Stadium*, EVENING STAR (Wash.), Mar. 6, 1961 | 150, p. 8 |
| 44.6 | Newspaper article | Tom Yorke, *Redskin Coaches Kick HBs Around*, WASH. DAILY NEWS, Oct. 26, 1961, at S7 | 150, p. 9 |
| 44.7 | Newspaper articles | Lewis F. Atchison, *Davis Drafted by Redskins;* & [no author shown], *Collins Claimed by Browns*, & *Chance for Promised Land Blown by Jittery Redskins*, EVENING STAR (Wash.), Dec. 4, 1961 (handwritten) | 150, pp. 10-11 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | |
| 44.9 | Newspaper article & commentary | Dave Brady, *Redskins Receive $250,000 for Radio-TV*; & *Bob Addie's Column . . .*, WASH. POST (handwritten), Aug. 30, 1961 (handwritten) | 150, pp. 13-16 |
| 44.11 | Newspaper article | Tom Yorke, *Redskins & 18 Face the Eagles*, WASH. DAILY NEWS, Sept. 23, 1961 | 150, pp. 18-19 |
| 44.12 | Newspaper commentary & article | Morris Siegel, *Siegel at Large, Redskins Luncheon: Who Said What*, WASH. STAR,, May 1, 1963 (handwritten) & Lewis F. Atchison, *Redskin Board Set to Change Club Control*, WASH. STAR,, May 2, 1963 (handwritten) | 150, pp. 20-21 |
| 44.14 | Newspaper article | *Five Redskins to Serve in Guard During March*, EVENING STAR (Wash.), Aug. 27, 1963 (handwritten) | 150, p. 23 |
| 44.18 | Newspaper article | Tom Yorke, *Jayne Scores for Redskins and Bears*, WASH. DAILY NEWS, June 25, 1963 | 150, p. 29 |
| 44.20 | Newspaper article | Dave Brady, *Redskins Landed Tom Urbanik with $120,000 Contract, Benefits*, WASH. POST, Feb. 25, 1965, at F1 | 150, pp. 31-32 |
| 44.21 | Newspaper article | *Redskins Add Exhibition with Eagles*, WASH. POST (handwritten), Apr. 16, 1965 (handwritten) | 150, p. 33 |
| 44.22 | Newspaper article | Dave Brady, *Huff Can Hardly Hold Delight with Redskins*, WASH. POST, July 29, 1965 | 150, pp. 34-35 |
| 44.25 | Newspaper article | Lewis F. Atchison, *Redskins Give Graham Complete Authority*, EVENING STAR (Wash.), Jan. 25, 1966, at A19 | 145, p. 9 |
| 44.26 | Newspaper articles | Lewis F. Atchison, *Redskins Take On Ex-Howard Coach*, EVENING STAR (Wash.) (handwritten), Feb. 27, 1966; Dave Brady, *White Named to Full-Time Redskin Job*, Wash. Post, Feb. 27, 1966 | 145, p. 10 |
| 44.27 | Newspaper article | Dave Brady, *Graham Won't Tolerate Any Loafing, Promises 'Some Changes' for*, WASH. POST , Mar. 23, 1966 (handwritten) | 145, pp. 11-12 |
| 44.28 | Newspaper articles | Lewis F. Atchison, *Franchise Bids Bring Out Pros*, EVENING STAR (Wash.), Mar. 19, 1966, at S8, & Dave Brady, *Marshall's Children Fail in Attempt to Remove Redskins' Conservators*, WASH. POST (handwritten), May 21, 1966 (handwritten) | 145, p. 13 |
| 44.29 | Newspaper articles | Lewis F. Atchison, *Graham Plans Snowden Test as Tight End*, EVENING STAR (Wash.), May 24, 1966 (handwritten), Tom Yorke, *Redskins Set Training Date*, WASH. DAILY NEWS, May 24, 1966 | 145, p. 14 |
| 44.30 | Newspaper articles | Bob Addle, *5 Redskin Join Fellow of Christian Athletes*, WASH. POST, Oct 22, 1966, at E5 | 145, p. 15 |
| 44.31 | Newspaper article | Tom Yorke, *Williams is 'Conspiring,' Says Jailed GPM Jr.*, WASH. DAILY NEWS, Jan. 13, 1967 | 145, p. 16 |
| 44.32 | Newspaper article | *Sailors Sign Deal With Redskins*, Wash. Post, Feb. 3, 1967 | 145, p. 17 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | |
| 44.33 | Newspaper article | Dave Brady, *Kurharich Sees Redskins up to 40% Impoved*, WASH. POST, May 18, 1967 (handwritten) | 145, p. 18 |
| 44.34 | Newspaper article | *Redskins Play Basketball Game on Friday Night*, WASH. POST (handwritten), Feb. 26, 1967 (handwritten) | 145, p. 19 |
| 44.35 | Newspaper article | Dick O'Brien, *Ex-Redskin Pounding Pins*, EVENING STAR (Wash.), Feb. 24, 1967 | 145, p. 20 |
| 44.37 | Newspaper article | Dave Brady, *Ad Fails Fan in Redskins' Ticket Quest*, WASH. POST (handwritten), Mar. 29, 1967 (handwritten) | 145, p. 22 |
| 44.38 | Newspaper photo | *Early Birds in Redskin Ticket Line*, EVENING STAR (Wash.), Apr. 29, 1967, at A-14 | 145, p. 23 |
| 44.39 | Newspaper article | *45 Redskin Rookies to Open Drills at Dickinson Tuesday*, Evening Sentinel (Carlisle, Pa.) (handwritten), July 15, 1967 (handwritten) | 145, p. 24 |
| 44.40 | Newspaper article | Dave Brady, *Jerry Allen Finds Identity, Running Room as Redskin*, WASH. POST, Aug. 24, 1967 | 145, p. 25 |
| 44.41 | Newspaper article | *Redskin Sold Out for Seven Home Football Games in 1967*, Evening Sentinel (Carlisle, Pa.) (handwritten), Aug. 29, 1967 (handwritten) | 145, p. 26 |
| 44.42 | Newspaper commentary | Tom Yorke, *Redskin Sellouts Aren't Limited to Sundays*, WASH. DAILY NEWS, Sept. 20, 1967 | 145, p. 27 |
| 44.44 | Newspaper article | Claudia Baskin, *Redskins' Wives Winning Team*, EVENING STAR (Wash.) (handwritten), Oct. 31, 1967 (handwritten) | 145, p. 29 |
| 44.45 | Newspaper article | Tom Yorke, *GPM Changed—Ditto His Team*, WASH. DAILY NEWS, Nov. 3, 1967 | 145, pp. 30-31 |
| 44.46 | Newspaper article | Tom Yorke, *For Otto . . . It's Still Diet Soda*, WASH. DAILY NEWS, Nov. 7, 1967 | 145, p. 32 |
| 44.47 | Newspaper article | Dave Brady, *Redskins' Game Now 'Off Board,'* WASH. POST, Nov. 18, 1967 (handwritten) | 145, pp. 33-34 |
| 44.48 | Newspaper article | Dave Brady, *Redskins Land McDonald,* WASH. POST, Mar. 30, 1967, at C-1 | 145, p. 35, 146, pp. 4-5 |
| 44.49 | Newspaper article | Dave Brady, *Redskins Expect Effortless '68 Sellout*, WASH. POST, Feb. 27, 1968 | 146, pp. 6-7 |
| 44.50 | Newspaper article | Tom Yorke, *Another Mr. Smith in Washington*, WASH. DAILY NEWS, May 13, 1968 | 146, p. 8 |
| 44.52 | Newspaper article | William Gildea, *Kammerer Claims 90% of Redskins Support Walkout by Players in NFL*, WASH. POST, July 13, 1968 (handwritten) | 146, pp. 10-11 |
| 44.53 | Newspaper article | William Gildea, *Harbingers of Peace in NFL Precede Today's Key Meeting*, WASH. POST, July 14, 1968 (handwritten) | 146, p. 12 |
| 44.54 | Newspaper article | *Redskins Notes*, EVENING STAR (Wash.) (handwritten), July 28, 1968 (handwritten) | 146, p. 13 |

| Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits | | | |
|---|---|---|---|
| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
| 44.55 | Newspaper article | Tom Yorke, *The Menu: Redskins Under Glass*, WASH. DAILY NEWS, Aug. 1, 1968 (handwritten) | 146, p. 14 |
| 44.57 | Newspaper article | Dave Brady, *Rock Wants to be a Redskin but 49ers Remain Adamant*, WASH. POST, Sept. 7, 1968 | 146, pp. 16-17 |
| 44.59 | Newspaper article | Tom Yorke, *Wooten Joins Redskins Amid Hairy Controversy*, WASH. DAILY NEWS, Aug. 14, 1968 | 146, pp. 19-20 |
| 44.60 | Newspaper article | Dave Brady, *Graham Names Theofiledes Quarterback Starter Friday*, WASH. POST , Aug. 15, 1968 (handwritten) | 146, pp. 21-22 |
| 44.62 | Newspaper article | Dave Brady, *Redskins Upend Bears, 38-28*, WASH. POST, Sept. 16, 1968 | 146, pp. 24-25 |
| 44.63 | Newspaper article | Lewis F. Atchison, *Redskin Personality*, EVENING STAR (Wash.), Sept. 29, 1968 (handwritten) | 146, p. 26 |
| 44.70 | Newspaper article | AP, *All-1930s Team Lists Leemans and 3 Redskins*, EVENING STAR (Wash.), Aug. 26, 1969 | 146, p. 35 |
| 44.2– 44.3 | Newspaper article | Leonard Shapiro, *Redskins Hit Bill to Bail Out Short*, Wash. Post, Mar. 30, 1971, at D1, D3 | 149, pp. 5-6 |
| 45.9 | Newspaper article | Steve Guback, *Allen Signing Means Little to Redskins*, EVENING STAR (Wash.), July 15, 1977 | 149, p. 13 |
| 46.1 | Newspaper article | Joann Stevens, *Flick Signs for Redskins, Charity*, Wash. Post, June 18, 1981, at D4 | 149, p. 15 |
| 46.2 | Newspaper article | Paul Attner, *Redskins '81: Revamped, But Still a Mystery*, Wash. Post, July 12, 1981 | 149, p. 16 |
| 46.4 | Newspaper article | *Redskins' Vets Unfazed by Draft*, Wash. Times, May 2, 1984, at 9B | 149, pp. 18-19 |
| 46.6 | Newspaper article | Bob O'Donnell, *Defense a Maneater, According to 'Jaws,'* Wash. Times, Sept. 8, 1986, at 7C | 149, p. 21 |
| 46.8 | Newspaper article | Christine Brennan, *Redskins Never Look Back, 41-14*, Wash. Post, Nov. 24, 1986 (handwritten), at D1, D7 | 149, p. 23 |
| 47.2 | Newspaper article (partial) | *Redskins Owner, District Near Deal on New Stadium* (continued from previous [not include] page), Wash. Post, June 11, 1991, at E4 | 149, p. 27 |
| 47.3 | Newspaper article | Matt Neufeld, *Questions About New Redskins Stadium Unsolved*, Wash. Times, May 11, 1993 (handwritten), at A1, A8 | 149, pp. 28-29 |
| 47.5 | Newspaper article | *A Tossup: Area Football Fans Cheer—and Boo— Proposed Move*, SUN (Balt.), Dec. 8, 1993 | 149, p. 31 |
| 47.6 | Newspaper article | Matt Neufeld, *Redskin Opens Learning Center*, Wash. Times, Dec. 15, 1993 (handwritten) | 149, p. 32 |
| 47.7 | Newspaper article | David Aldridge, *Veteran Friesz Likely to Join Redskins*, Wash. Post, Apr. 16, 1994, at G1, G7 | 149, pp. 33-34 |
| 47.8 | Newspaper article | David Elfin, *No. 2 Johnson Must Wait Until Redskins Sign Shuler*, Wash. Times, June 7, 1994 (handwritten) | 149, p. 35 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 47.10 | Newspaper article | AP, *Redskins' Stadium Plan on Fast Track*, N. Va. Daily (typed), June 29, 1995 (typed) | 149, p. 38 |
| N/A | Newspaper article | Cooke Dep. Ex. 11: Leonard Shapiro, *Indian Group to Stage Protest Sunday at RFK*, Wash. Post, Oct. 31, 1991, at B3 | 156, p. 57 |
| **PERIODICAL MATERIALS—UNDATED AND/OR UNIDENTIFIED PUBLICATION** | | | |
| 20 | Publication article | Title not shown, undated and unidentified publication | 142, p. 10 |
| 30 | Newspaper photo, ledger | *Redskins' Charley Malone Becomes Chief Flying Thunder*, undated and unidentified publication | 142, p. 60 |
| 42 | Newspaper clippings | Numerous clippings of articles, photos and cartoons, undated and from unidentified publications, some illegible, identified by Respondent as dated from 1940 to 1949, and identified as using the "Redskins" in the context of professional football | 144, pp. 4-43 |
| 43.1–43.6, 43.8–43.9, 43.10–43.16, 43.17 | Newspaper clippings | Numerous clippings of articles and photos, undated, illegible and/or from unidentified publications, identified by Respondent as dated from 1950 to 1959, and identified as using the "Redskins" in the context of professional football | 148, pp. 4-10, 12-13, 16-21, 24-26 |
| 43.19–43.25, 43.27–43.29, 43.31–43.34, 43.37–43.39 | Newspaper clippings | Numerous clippings of articles, photos and advertisements, undated, illegible and/or from unidentified publications, identified by Respondent as dated from 1950 to 1959, and identified as using the "Redskins" in the context of professional football | 148, pp. 28-35, 37-39, 41-45, 50-52 |
| 44.1 | Newspaper article | *Stereo Disc Made of Redskins March*, undated and unidentified publication | 150, p. 4 |
| 44.2 | Newspaper photo | *Vast New D.C. Stadium Begins to Take Shape*, Wash. Post, undated | 150, p. 5 |
| 44.3 | Newspaper article | Jack Walsh, *Marshall Asking that Dallas Play in Division with Redskins*, undated and unidentified publication | 150, p. 6 |
| 44.4 | Newspaper article | Tom Yorke, *Stadium to be Ready Oct. 1*, unknown publication, Mar. 6, 1961 | 150, p. 7 |
| 44.8 | Newspaper clipping | *Rookie Redskin Tackle Temporarily Paralyzed*, EVENING STAR (Wash.), undated | 150, p. 12 |
| 44.10 | Newspaper photo | *They'll See Redskins Opener*, undated and unidentified publication | 150, p. 17 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | | |
| 44.13 | Newspaper article | Dave Brady, *Kennedy Observance Set by Redskins Sunday*, undated and unidentified publication | 150, p. 22 |
| 44.15 | Newspaper article | Lewis F. Atchison, *Redskins, Eagles Denied Bid to Postpone Game*, EVENING STAR (Wash.), undated | 150, p. 24 |
| 44.16 | Newspaper article | Jack Walsh, *Redskins Humiliated by New York: Giants Steal 7 Passes, Win, 44-14*, undated and unidentified publication, at C1 | 150, pp. 25-27 |
| 44.17 | Newspaper article | Tom Yorke, *3 Bears Escaped the Redskins*, unidentified publication, Dec. 30, 1963 | 150, p. 28 |
| 44.19 | Newspaper article | Dave Brady, *Redskins Are Up 650% in New Customer Sales*, unidentified publication, Jan. 16, 1965 (handwritten) | 150, p. 30 |
| 44.23 | Newspaper article | Bus Ham, *Redskins' Star Out 2 to 4 Weeks*, Wash. Post, undated, at C1-C2 | 145, p. 4 |
| 44.24 | Newspaper clippings | Various clippings, undated and unidentified publications | 145, pp. 5-8 |
| 44.36 | Newspaper article | Dave Brady, *Redskins Play for CYO, Children's Hospital*, Wash. Post, undated | 145, p. 21 |
| 44.43 | Newspaper photos & article | Elizabeth Shelton, *Redskins' Wives Wouldn't Suit Up*, WASH. POST, undated | 145, p. 28 |
| 44.51 | Newspaper article | Lewis F. Atchison, *Redskins Trade for Beban, Sign Fischer*, EVENING STAR (Wash.), June 14, 1968, copy illegible | 146, p. 9 |
| 44.56 | Newspaper article | Dave Brady, *Redskins Count Cash, Not Blessings*, Wash. Post, undated | 146, p. 15 |
| 44.58 | Newspaper article | Dave Brady, *Redskins May Sign Wooten Today; Center of Browns' Racial Dispute*, WASH. POST, undated | 146, p. 18 |
| 44.60 | Newspaper commentary | Morris Siegel, *Redskins 'Fine' With Fellowship*, undated and unidentified publication | 146, p. 23 |
| 44.66–44.69 | Newspaper articles and clippings | Numerous clippings from articles, undated and/or from unidentified publications, identified by Respondent as dated from 1960 to 1969, and identified as using the "Redskins" in the context of professional football | 146, pp. 27-34 |
| 45.1 | Newspaper articles | Two articles, Wash. Post, undated | 149, p. 4 |
| 45.4–45.8, 45.10 | Newspaper articles | Various articles, undated and/or from unidentified publications, identified by Respondent as dated from 1970 to 1979, and identified as using the "Redskins" in the context of professional football | 149, pp. 7-12, 14 |
| 46.3 | Newspaper article | Paul Attner, *Miller Gives Redskins Glimpse of Long-Range Goals*, Wash. Post, undated | 149, p. 17 |
| 46.5 | Publication clipping | *State Police, Redskins Team Up to Fight Crime*, undated and unidentified publication | 149, p. 20 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | |
| 46.7 | Publication article | *Redskins Scouting Report*, unidentified publication, July 17, 1986 (handwritten) | 149, p. 22 |
| 46.9 | Publication article | Terrey Quindlen, *Redskins Tell Pupils to Say 'No' to Drugs*, undated and unidentified publication | 149, p. 24 |
| 46.10 | Newspaper article | *Redskin Tickets Among Auction Prizes*, Wash. Times, undated | 149, p. 25 |
| 47.1 | Newspaper article | Dave Bay, *Redskins Fade at the Finish*, Wash. Times, undated, at C1 | 149, p. 26 |
| 47.4 | Newspaper article | Richard Tapscott & Dan Beyers, *Schaefer to Fight Redskins Stadium*, Wash. Post, undated | 149, p. 30 |
| 47.9 | Newspaper article | Dan Beyers, *Redskins Play Stadium Game for Keeps*, Wash. Post, undated, at B1, B5 | 149, pp. 36-37 |
| 48.1 | Newspaper photo | *The President* [Truman] *Gets Annual Pass from Pro Footballers*, undated and unidentified publication | 149, p. 39 |
| 48.2 | Newspaper article/photo | *Sports by Ralph Cannon* [including photo of Pres. Truman and George Marshall], undated and unidentified publication | 149, p. 40 |
| 48.3 | Newspaper article | *Vice President* [Nixon] *Lauds LeBaron's Fine Play*, undated and unidentified publication | 149, p. 41 |
| 48.4 | Newspaper article | *Redskins Added to Nixon's List*, undated and unidentified publication | 149, p. 42 |
| N/A | Publication article | Cooke Dep. Ex. 8: Morris Siegel, *Washington's Unifying Force*, undated and unidentified publication | 156, pp. 41-42 |
|  | **PHOTOS (INDEPENDENTLY SUBMITTED)** | | |
| 32 | Photos | Photos of school entrance and welcome signs displaying "Home of the Redskins," identified as located on a Navaho reservation in northern Ariz. | 143, pp. 6-7 |
| 34 | Photo | Photo of crossing of "Navajo Trail" and "Redskin Blvd." Statement that roads are on Navajo Indian Reservation in northeast Ariz., taken June 10, 1994 | 143, pp. 9-10 |
| 37 | Photo | Photo of roadside billboard displaying "Round Rock Public School Fighting Braves" and back of photo describing location as Round Rock on Navajo Indian Reservation in northeast Ariz, taken June 10, 1994 | 143, pp. 15-16 |
| 38 | Photo | Photo of sigh for "Tuba City High Warriors" with design of profile of man's head with feathers, with back description indicating taken on June 10, 1994, on Navajo Indian Reservation in northeast Ariz. | 143, pp. 17-18 |
|  | **PRESS RELEASES & POSITION STATEMENTS** | | |
| N/A | Press release | Wash. Redskins undated statement that its name "was never intended to offend anyone" and that "the name has reflected positive attributes of the American Indian;" As Cooke Dep. Ex. 10 | 142, p. 11; 156, p. 56 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| | | | |

**Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits**

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| N/A | Press release | Vaughn Dep. Ex. 28: NFL Properties, Inc. press release regarding Morning Star Institute, Mar. 15, 1994 | 158, p. 179 |
| **REPORTS, INCL. EXPERT PREPARATION MATERIALS** | | | |
| 6 | Unpublished expert report | Expert Disclosure of David K. Barnhart, with cover letter, June 8, 1996; As Barnhart Dep. Ex. 3 | 129, pp. 4-30; 162, pp. 17-43 |
| 9 | Unpublished expert report | Expert Disclosure of Ronald R. Butters, June 7, 1996; As Barnhart Dep. Ex. 5; As Butters Dep. Ex. 21, with CV & handwritten notes; As Butters Dep. Ex. 23, with CV & handwritten notes | 129, pp. 37-52; 162, pp. 65-80; 173, pp. 68-92; 165, pp. 4-28 |
| 11 | Notes | Notes of Ronald R. Butters: *Redskin* data; As Butters Dep. Ex. 7 (part) | 129, pp. 62-66; 167, pp. 4-11 |
| 49 | Survey questionnaire | Veritas Research, WTOP "Washington Redskins" Name Survey form for metro area; As Cooke Dep. Ex. 6 (part) | 149, pp. 46-47; 156, pp. 14-15 |
| 49 | Table results | Table showing completed calls to tribal leaders; As Cooke Dep. Ex. 6 (part) | 149, p. 48; 156, p. 16 |
| 49 | Survey questionnaire | Veritas Research, WTOP tribal leader questionnaire script; As Cooke Dep. Ex. 6 (part) | 149, p. 49; 156, p. 17 |
| 49 | Survey results | WTOP "Redskins" Name Survey results; As Cooke Dep. Ex. 6 (part) | 149, pp. 50-68; 156, pp. 18-38 |
| 50 | Survey results | Richard Morin, *'America's Team' Has New Home: Washington*, Wash. Post, Jan. 17, 1992, featuring Wash. Post Super Bowl Poll; As Cooke Dep. Ex. 23 | 149, pp. 69-70; 157, pp. 9-10 |
| 58 | Unpublished expert report | Jacob Jacoby, rebuttal report: Evaluating the June 10, 1996 Expert Disclosure of Ivan Ross, Mar. 7, 1997; As Jacoby Dep. Ex. 3, with CV | 153, pp. 14-33; 169, pp. 4-67 |
| 61 | Notes | Notes of Jacob Jacoby regarding phone conversation with Richard Maisel on Apr. 1, 1997; As Jacoby Dep. Ex. 6 | 151, p. 4; 174, p. 19 |
| 63 | Notes | Ronald Butters, rebuttal commentary: Some Comments on Nunberg's Testimony | 151, pp. 49-56 |
| N/A | Unpublished expert report | Barnhart Dep. Ex. 4: Expert Disclosure of Geoffrey Nunberg, June 10, 1996, & CV, Apr. 1996 | 162, pp. 44-64 |
| N/A | Unpublished expert report | Barnhart Dep. Ex. 10: Expert Disclosure of Geoffrey Nunberg, June 10, 1996, CV, Apr. 1996, & fax transmittal, showing handwritten comments | 162, pp. 7-28 |
| N/A | Cover memo & summary of findings | Barnhart Dep. Ex. 11: Geoffrey Nunberg, Quantitative data results of database search of terms, June 15, 1996 | 160, pp. 29-34 |
| N/A | Search result printouts | Barnhart Dep. Ex. 12: Lexis/Nexis printout of database search results (various of 143,920 results) | 160, pp. 35-239 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
|  | **Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** |
| N/A | Cover letters & search result printouts | Barnhart Dep. Ex. 13: Brian Ellner to David K. Barnhart, May 13, 1996, & Brian L. Berlandi, Legal Asst., White & Case, May 23, 1996, both letters with Lexis/Nexis printout of database search results (various of 4,999 results from search as conducted on May 23,1996) | 160, pp. 240-451 |
| N/A | Unpublished expert report | Barnhart Dep. Ex. 14: Expert Disclosure of Ivan Ross, June 10, 1996;<br>As Jacoby Dep. Ex. 2 | 160, pp. 452-61;<br>168, pp. 48-57 |
| N/A | Online printouts | Butters Dep. Ex. 8: Online files—Redskin(s), with handwritten notes | 167, pp. 46-98 |
| N/A | Reference materials | Butters Dep. Ex. 10: Deposition Discovered Materials folder, with handwritten notes | 171, pp. 4-130 |
| N/A | Handwritten notes | Butters Dep. Ex. 12 | 172, pp. 19-22 |
| N/A | Draft | Butters Dep. Ex. 13: Draft No. 1 of Expert Disclosure of Ronald R. Butters, June 3, 1996 | 172, pp. 22-33 |
| N/A | Draft | Butters Dep. Ex. 14: Draft No. 2 of Expert Disclosure of Ronald R. Butters, June 3, 1996 | 172, pp. 34-42 |
| N/A | Notes | Butters Dep. Ex. 15 | 172, pp. 43-66 |
| N/A | Draft | Butters Dep. Ex. 16: Preliminary Draft of Expert Disclosure of Ronald R. Butters, June 6, 1996 | 172, pp. 67-96 |
| N/A | Draft | Butters Dep. Ex. 17: Preliminary Draft of Expert Disclosure of Ronald R. Butters, June 7, 1996 | 172, pp. 97-128 |
| N/A | Database results | Butters Dep. Ex. 18: Search results of books and articles found on Duke U. library Internet access | 173, pp. 4-47 |
| N/A | Listing | Butters Dep. Ex. 19: Listing of books in the Duke U. from expert's computer file | 173, pp. 48-53 |
| N/A | Unpublished expert report | Butters Dep. Ex. 22: Expert Disclosure of Geoffrey Nunberg, June 10, 1996 | 173, pp. 93-107 |
| N/A | Comments | Butters Dep. Ex. 24: Some Comments on Nunberg's Testimony | 165, pp. 29-36 |
|  | **RESOLUTIONS (THIRD-PARTY) SUPPORTING USE OF "REDSKINS"** |
| 27 | Resolution | Inter-Tribal Council, Inc. Resolution (1992), with cover letter from Modoc Tribe of Okla., Jan. 16, 1992;<br>As NR 28.2 | 142, pp. 28-29;<br>(dup)<br>142, pp. 32-33 |
|  | **SUPPORT LETTERS INDICATING INDIVIDUAL AUTHORS ARE NATIVE AMERICANS** |
| 29.11 | Support letter | George B. Tsoodle (Kiowa Indian) to Washington Redskins, undated | 142, p. 59 |
| N/A | Support letter | Cooke Dep. Ex. 25 (part): M. Henson (Blackfoot Indian) to Sen. Ben Nighthorse Campbell, July 22, 1993 | 157, p. 13 |

| NR Ex. | Entry Type | Source | TTABVue Ref. No. |
|---|---|---|---|
| **Appendix B – Respondent's Submissions of its _Harjo_ Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits** | | | |
| **SUPPORT CORRESPONDENCE INDICATING NATIVE AMERICAN TRIBAL SUPPORT** | | | |
| 28.1 | Support letter | Stan Jones Sr., Chairman, Tulalip Tribes (Wash.), to Sen. John McCain, Oct. 30, 1991 | 142, pp. 30-31 |
| 28.3 | Support letter | Robert J. Salgado, Chairman, Soboba Band of Mission Indians, to Jack Kent Cooke, Wash. Redskins, Jan. 17, 1992 | 142, p. 34 |
| 28.4 | Support letter | Hollis E. Roberts, Chief, Choctaw Nation of Okla., to Charlie Dayton, V.P., Wash. Redskins Communications Dep't, Jan. 23, 1992 | 142, pp. 35-36 |
| 28.5 | Support letter | Jerry G. Haney, Principal Chief, Seminole Nation of Okla., to Jack Kent Cooke, Wash. Redskins, Jan. 23, 1992 | 142, p. 37 |
| 28.6 | Support letter | Stanley G. Jones Sr., Chairman, Tulalip Tribes (Wash.), to Redskin Support Comm., Aug. 31, 1992 | 142, p. 38 |
| 28.7 | Support letter | Floyd E. Leonard, Chief of the Miami Tribe of Oklahoma, to C. A. Buser, June 21, 1991 | 142, pp. 39-40 |
| 28.8 | Support letter | Merna L. Lewis, V.P., Pima-Maricopa Indian Community (Ariz.), to Jo Walter, July 14, 1992 | 142, p. 41 |
| 28.9 | Support letter | Jonathan L. Taylor, Principal Chief, Eastern Band of Cherokee Indians, to Jo Walter, July 16, 1992 | 142, p. 42 |
| 29.3 | Support letter | Ronald R. Julian, Council Member, Jicarilla Apache Tribe (Dulce, N.M.) to Rick Vaughn, Wash. Redskins, Sept. 8, 1994 | 142, p. 46 |
| 29.10 | Support fax | J. Lisanby, Sioux Indians of Fort Totten, N.D. to Charlie Drayton, Redskins Park, Jan. 17, 1992 | 142, p. 58 |
| **SUPPORT LETTERS NOT INDICATING AUTHORS ARE NATIVE AMERICANS** | | | |
| 29.4 | Support letter | Philip A. May to Wash. Redskins Dir. Pub. Relations, Jan. 27, 1992 | 142, p. 47 |
| 29.5 | Support letter with article | Robert N. Huey to Jack Kent Cooke, Mar. 29, 1989, with AP, _Indian Band Dislikes Nickname Campaign_, Sioux Falls Argus Leader (S.D.), Mar. 23, 1989, attached | 142, pp. 48-49 |
| 29.6 | Support letter with article | Billie J. Hipsley to Wash. Redskins, Jan. 13, 1992, with Mark Holmberg, _What's All the Fuss About 'Skins_, Richmond Times-Dispatch, [no shown date], at C5, attached | 142, pp. 50-51 |
| 29.7 | Support letter | Louise M. Saylor to Letter to the Editor, Wash. Post, Mar. 17, 1992 | 142, p. 52 |
| 29.8 | Support letter | W. J. Bryant to Jack Kent Cooke, undated (date stamped "JKC Inc. Feb. 29, 1988") | 142, pp. 53-54 |
| 29.9 | Support letter | Ricardo J. Martinez to Jack Kent Cooke, Mar. 21, 1992 | 142, pp. 55-57 |
| 33 | Support letter | Robert D. Kahn to John Kent Cooke, Nov. 4, 1991 | 143, p. 8 |

| | Appendix B – Respondent's Submissions of its *Harjo* Notice of Reliance & Supplemental Notice of Reliance (collectively "NR"), Deposition Testimony & Deposition Exhibits | | |
|---|---|---|---|
| **NR Ex.** | **Entry Type** | **Source** | **TTABVue Ref. No.** |
| 35 | Support letter with photo | Priscilla J. Fritz to Wash. Post letters to the editor, Sept. 2, 1992, with photo "Redskin Motel" indicating taken in Aug. 1992 on Cherokee Indian Reservation attached | 143, pp. 11-12 |
| 36 | Support letter with photo | Michael John Nisos to Jack Kent Cooke, undated (date stamped "JKC Inc. Apr. 28, 1992"), with photo indicating its shows "Redskin" Indian-named movie theater located in Andarko, Okla | 92, pp. 13-14 |
| 51 | Support letter | Susan Giller to Jack Kent Cooke, May 10, 1993 | 149, p. 71 |
| N/A | Support letter | Cooke Dep. Ex. 19:  Wilcomb E. Washburn to John  Kent Cooke, Jr., Dec. 24, 1991, with his typescript of magazine article, attached | 156, pp. 94-102 |
| N/A | Support letter | Cooke Dep. Ex. 25 (part):  Robert Camp Littleton, July 11, 1993 | 157, p. 14 |
| **USPTO APPLICATION SERIAL NO. 74311697** | | | |
| N/A | Drawing page | Cooke Dep. Ex. 21: Date-stamped and assigned application for the mark "REDSKIN REIVEW" & design for use on magazines | 157, p. 6 |
| **USPTO REGISTRATIONS (LIVE & CANCELLED)** | | | |
| 1 | Registration Certificates | Six registrations (indicating renewals) at issue; U.S. Reg. No. 1,343,442 (SKINS for entertainment services in the form of professional football games and exhibitions) (cancelled under § 8) | 128, pp. 76-83 |
| **USPTO REGISTRATION—INDIAN HEAD** | | | |
| 56 | Registration Certificate | U.S. Registration 578,797 for "INDIAN HEAD" & design, used on corn meal, issued Aug. 18, 1953, 2d renewal issued Aug. 18, 1993 | 153, pp. 10-12 |